**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANDREW SWAINSON,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CITY OF PHILADELPHIA, et al.,**<br><br>**Defendants.** | : | **Civil Action**<br>**No. 22-2163** |

**CONCISE STATEMENT OF STIPULATED MATERIAL FACTS**

Defendants City of Philadelphia and Detectives James Alexander and Joseph Fischer ("Defendants") hereby serve this Concise Statement of Stipulated Material Facts pursuant to Federal Rule of Civil Procedure 56 and the Court's policies and procedures.

**A. Background**

1. Plaintiff Andrew Swainson's ("Swainson" or "Plaintiff" or "Blood") Second Amended Complaint ("SAC") stems from his 1988 arrest and 1989 conviction for the January 17, 1988 murder of victim Stanley Opher ("Opher"). (SAC at ¶¶ 4, 108, attached as Exhibit 1).

2. Sometime in 1984, Plaintiff moved from Jamaica to the United States, specifically to the Bronx, NY. (January 29, 2024, Deposition of Andrew Swainson at 41:4-11, attached as Exhibit 2). In September of 1987, Plaintiff moved from the Bronx to Philadelphia for the purpose of, among other things, selling drugs. (Ex. 2 at 64:18-23, 66:9-14).

3. Once Plaintiff arrived in Philadelphia, he met Opher, who Plaintiff stated was his "first friend" in Philadelphia. (Andrew Swainson 1/22/88 Statement at pg. 1, attached as Exhibit 3).

4. Jacqueline Morsell ("Morsell") testified that Opher sold drugs out of a house at 5413 Sansom Street ("5413 Sansom") and had been selling drugs out of that house for almost two months where she would often visit him. (Morsell 3/17/89 Trial Testimony at 87:9-18, 88:1-8, attached as Exhibit 4).

5. Morsell testified that Opher would be moved from "gate to gate" and whenever a new gate opened, they would transfer the "worker" to the new gate. (Ex. 4 at 88:7-16).

6. Morsell testified that a gate or gatehouse was another word for a drug house. (Ex. 4 at 88:15-16)

7. Plaintiff stated that "Dred" (later identified as Edrick Hume) was the second guy that was always supposed to be in 5413 Sansom. (Ex. 3 at pg. 5).

8. Morsell testified that Plaintiff's street name was "Blood", "Indian" was Clarence Threlkeld, she was "Star", and Opher was "Dove", and that they never used their real names on the street. (Ex. 4 at 90:19-25, 91:1-15, 106:10-20).

9. According to a written statement attributed by police to Morsell, Morsell had known "Dred" (Edrick Hume) for about four months and that he is crazy, mentioning that Dred told her he has killed, that he has plenty of bodies, and that "Jamaicans don't have no heart." (*See* Morsell 1/18/88 Statement at pg. 3, attached as Exhibit 5).

10. According to a written statement attributed by police to Morsell, Morsell explained that Dred would brag about raping American women when he first got to New York and that is why he is in Philadelphia now because they are looking for him in New York on Jamaica Avenue and the Brownsville projects for rape and murder. (Ex. 5 at pg. 3-4).

11. According to a written statement attributed by police to Morsell, Morsell described Blood (Plaintiff) as light skin, curly sandy brown hair with a thick full beard, wears two chip

diamonds in his left ear, wears a lot of gold all over his hands, and wears a lot of rings, one of which says Blood on it. (Ex. 5 at pg. 4-5).

12. According to a written statement attributed by police to Morsell, Morsell described Indian (Clarence Threlkeld) as Jamaican, short, with long curly hair, a mustache, and a goatee, who wears a black leather jacket with fur around the collar and black hats turned around backwards. (Ex. 5 at pg. 5).

13. According to a written statement attributed by police to Morsell, Morsell described "Uncle" as mean, and explained that the only thing he thinks about is money because he must make a certain quota each day. (Ex. 5 at pg. 4).

14. According to a written statement attributed by police to Morsell, Morsell recounted that Uncle said he has ten kids in Jamaica, and that he always wears a lot of Jewelry and "all leather clothes." (Ex. 5 at pg. 4).

15. According to a written statement attributed by police to Morsell, Morsell detailed that Uncle has drug houses that she knows of at 56th and Greenway, 5500 block of Woodland, 1701 S. 55th Street, and 49th and Spruce. (Ex. 5 at pg. 5-6).

16. According to a written statement attributed by police to Morsell, Morsell added that Uncle uses this house in Penrose to get drugs from New York, and it comes in by carrier – Winston King (aka "Bubula"), who brings it down on the Amtrack the first of every month in a big brown duffle bag and takes a cab from 30th Street Station to Penrose Park, then the drugs get tested for the quality, then they cut it, grind it, break it up, and use a machine to seal it then lock it in a closet in the living room. (Ex. 5 at pg. 7-8).

17. According to a written statement attributed by police to Morsell, Morsell recounted that she had been to the Penrose house four times and the last time was on her birthday, October 1, 1987, to see her sister Sharon Morsell. (Ex. 5 at pg. 8).

18. According to a written statement attributed by police to Morsell, Morsell stated that she has not seen her sister since December 10, 1987 and that Sharon got stabbed in a drug house in north Philadelphia by another girl and she does not know if she is alive or dead. (Ex. 5 at pg. 8).

19. According to a written statement attributed by police to Morsell, Winston King came to her house two days before Christmas asking for Sharon, and Morsell's mother told him not to come around anymore. (Ex. 5 at pg. 8).

20. According to a written statement attributed by police to Morsell, Morsell explained that Uncle also has a "live-in house" at 84th and Lindburgh, where workers who sell drugs rest up. (Ex. 5 at pg. 8).

21. According to a written statement attributed by police to Morsell, Morsell explained that Uncle has four "main guys": Blood, Indian, Don, and "Tony." (Ex. 5 at pg. 8-9).

22. Morsell testified that she was present at 5413 Sansom when people would buy drugs and explained that the procedure was that the buyers would come in the first door, and they would slide the money under the second door, and the package would be returned under the door. (Ex. 4 at 92:1-15).

23. Morsell testified that Opher was to be paid $500 per week as a worker. (Ex. 4 at 96:20-21).

24. According to the written statement attributed by police to Opher's sister, Antiona Opher, Opher was working for the Jamaicans on Sansom Street and that he had complained to her about not being paid. (Antonia Opher Statement at pg. 2, attached as Exhibit 6).

25. According to the written statement attributed by police to Antonia Opher, Stanley Opher told his sister that he did not trust the Jamaicans and he did not want them to know where she lived. (Ex. 6 at pg. 2).

26. According to a written statement attributed by police to Morsell, Morsell stated that there was an argument between Opher and Dred on January 12, 1988, at about 7:30PM while she was on the phone with Opher. (Ex. 5 at pg. 3).

27. According to a written statement attributed by police to Morsell, Morsell explained that as she was talking with Opher, Dred came into the house and Opher asked what was going on about his paycheck. (Ex. 5 at pg. 3).

28. According to a written statement attributed by police to Morsell, Morsell stated that Dred said "you don't work for me, you work for "Uncle"" and "I ain't paying you shit." (Ex. 5 at pg. 3).

29. According to a written statement attributed by police to Morsell, Morsell accounted that Opher said that he was going to quit, and Dred responded that you cannot quit until you talk to Uncle. (Ex. 5 at pg. 3).

30. According to a written statement attributed by police to Morsell, Morsell explained that's when they started arguing and Dred said "Bumba Clog, keep talking shit, and I will shoot you in your pussy" which Morsell stated means "Dred" would kill Opher. (Ex. 5 at pg. 3).

31. According to a written statement attributed by police to Morsell, Morsell added that Stanley called her the next day and said he still had not been paid. (*Id.*).

32. According to a written statement prepared by police, Edrick Hume (aka "Dred"), gave a statement to police, admitting that he sold drugs with Opher at 5413 Sansom. (Edrick Hume 1/25/88 Statement at pg. 1-2, attached as Exhibit 7).

33. According to a written statement attributed by police to Dred, Dred stated that he left the house on January 12, 1988 with his girlfriend Anne Green and stayed with his friend Kelvin who lives on 55th Street, and that was the last time he saw Opher. (Ex. 7 at pg. 1-2).

34. Morsell testified that she brought Stanley dinner on January 14, 1988, because he was not allowed to leave the house and did not have any money that he could spend. (Ex. 4 at 102:21-25, 103:1-3).

35. Morsell further testified that Stanley would not be able to leave the house until Blood or Indian "checked him" for money and drop off more drugs. (Ex. 4 at 103:6-13).

36. Morsell testified that they would come and drop off packages of cocaine every four hours and collect the money. (Ex. 4 at 104:1-7).

37. Morsell testified that she counted the money on one occasion after a period of four hours of drug sales that amounted to $17,000. (Ex. 4 at 104:12-25).

38. A handyman named Keith Chambers testified that the day before the murder, on Saturday, January 16, 1988, he was at a hardware store at 5100 Walnut Street when he ran into some guys that asked him if he does carpentry work. (Keith Chambers 3/16/89 Testimony at 168:4-8, attached as Exhibit 8, Keith Chambers Statement at pg. 1-2, attached as Exhibit 9).

39. Mr. Chambers testified that one of the males was American and the other was Jamaican referred to himself as "Mr. Wallace or something." (Ex. 8 at 168:14-23).

40. Mr. Chambers testified that was paid $500 for moving the door from 5413 Sansom Street to Ruby Street and the work of putting the door in. (Ex. 8 at 169:2-6). According to a written statement attributed by police to Mr. Chambers, he stated that Jamaican male was 6'0, 170lbs, and a black beard who drove him in a late model dark blue car. (Ex. 9 at pg. 2).

41. According to a second written statement attributed by police to Crystal Justice, she added that Opher explained to her that he stayed behind at 5413 Sansom and was supposed to move the next day, but no one told him where the new place was. (Crystal Justice 1/22/88 Statement at pg. 5, attached as Exhibit 10).

**B. The Murder**

42. On January 17, 1988, at roughly 3:40AM, Paul Presley ('Presley") testified that he arrived at the drug house at 5413 Sansom Street, where he had been once or twice in the past, to buy cocaine. (Paul Presley 3/17/89 Trial Testimony at 5:1-7, attached as Exhibit 11).

43. Presley testified that he got to the house, went up to the porch, and knocked on the door waiting for someone to answer, and immediately Opher opened the door and ran out. (Ex. M at 8:16-19; *see also* Photo of 5413 Sansom, attached as Exhibit 12).

44. Presley testified that Plaintiff came right out immediately behind Opher with a short barrel shotgun in his hand and fired the gun at Opher who was at the edge of the steps, hitting him in the back, and causing him to fall forward off the steps. (Ex. 11 at 8:24-25, 9:1-12, 12:2-8).

45. Presley testified that another armed man came out of the house with a rifle, pointed it at him, and told him to run. (Ex. 11 at 9:20-25; 10:1-3).

46. Presley testified that instead of running immediately, he hit the barrel of the gun away from him and started tussling, by grabbing him, and trying to grab the rifle away from him. (Ex. 11 at 10:7-14).

47. Presley testified that he spun around and tried to work his way towards the steps to get away, but then Plaintiff grabbed his collar and pulled him down the steps. (Ex. 11 at 10:15-23). Presley's testimony detailed that he fell down the steps to the pavement and heard the guy with the long rifle say: "I should shoot you." (Ex. 11 at 11:6-10).

48. Presley testified that they both then ran off, Plaintiff towards 54th Street, and the man with the long rifle towards 55th Street. (Ex. 11 at 11:14-21).

49. Presley testified that he got up, looked straight up into the house, did not see anyone else, then turned around and started running westbound on Sansom towards 55th Street. (Ex. 11 at 15:17-20). According to a second written statement attributed by police to Presley, he explained that his hands were stinging, and that he ran a few houses up and fell again because he was slipping on the snow in his dress shoes. (Paul Presley 2/12/88 statement pg. 3, attached as Exhibit 13).

50. Presley testified that he got about six or seven houses down the street when he observed a car parked in the middle of the block, one man was leaning into the car and the other guy was driving the car. (Ex. 11 at 17:10-13, 18-20). Presley testified that he ran up to them, asked for help, and told them that there had been a shooting right down the street. (Ex. 11 at 17:20-23).

51. Presley testified that the man outside the car took off running and the driver drove off. (Ex. 11 at 17-21-25). Presley then testified that he continued to run behind them, got to the corner of 55th Street, turned the corner, and jumped on a ledge in someone's front yard. (Ex. 11 at 18:8-14).

52. Presley testified that at that time, police were coming from both directions, and he got up and said: "officer, they're shooting down the [street]" at which time the officer told him to get on the ground and arrested him and the two men he saw by the car, Ashley Hines ("Hines") and Jeffrey Green ("Green"). (Ex. 11 at 18:14-25; *see also* Jeffrey Green and Ashley Hines Arrest Reports, attached collectively as Exhibit 14).

53. According to the written statement attributed by police to Green, who lived at 5431 Sansom Street (a few houses west of the drug house), he stated that he and Hines were on the way home from Cahoots in South Philadelphia, and he and Hines stopped at Wawa at 37th and Spruce

where Green bought a turkey hoagie, soda, and chips. (Jeffrey Green 1/25/88 Statement at pg. 1, attached as Exhibit 15).

54. According to the written statement attributed by police to Green, he explained that Hines drove him home and stopped in front of his apartment at 5431 Sansom Street, and as Green was getting out of the car, Green noticed a guy running towards him, mumbling something about a shooting (later identified as Presley). (Ex. 15 at pg. 1-2; *see generally* Ex. 13).

55. According to the written statement attributed by police to Hines, he explained that when he got to the corner of 55th and Sansom, he noticed to his left that Green and the same person from before were against a parked car with their hands on the car with officers there. (Ashley Hines Statement at pg. 3, attached as Exhibit 16).

56. Officer Kay stated that Green had a brown bag in his hand and explained that Green stated that it contained a turkey hoagie. (Officer John Kay's statement at pg. 5, attached as Exhibit 17).

57. Officer Lawrence Hawrylak, a police officer with the mobile crime detection unit, testified that he arrived at the scene at approximately 5:30 a.m. (Officer Hawrylak trial testimony at 53:19-25, 20:1-19, attached as Exhibit 18).

58. Officer Hawrylak testified that he observed a single shot, break-open, sawed-off shotgun under a Lincoln Continental parked facing west, closer to 54th Street. (Ex. 18 at 56:5-10, 57-7-10, 63-13-15; *see also* Photos of Sawed-Off Shotgun and Lincoln Continental, attached as Exhibit 19).

59. Specifically, Officer Kay stated he observed the sawed-off shotgun was found approximately 25 feet east of Opher's body, which was in front of 5411 Sansom Street. (Ex. 17 at

pg. 3-4). Officer Kay explained that the blue bag and the long rifle were located at approximately 5419 Sansom Street (Ex. 17 a pg. 4).

**C. Following the Murder**

60. On January 17, 1988, at 4:31 p.m., Stanley Opher was pronounced dead by way of a shotgun wound to the trunk. (Medical Examiner Report at pg. 1-2, attached as Exhibit 20).

61. On January 18, 1988, at approx. 6:00 a.m., the case was assigned to Detective Manuel Santiago from Homicide and Detective Michael Gross from West Detectives. (*See* Investigation Report at pg. 1, attached as Exhibit 21). Detective Santiago testified that he had been with Philadelphia Homicide for about a year and a half at that time. (3/8/89 Motion to Suppress Testimony at 43:23-25, 44:1, attached as Exhibit 22).

62. Once inside, Plaintiff explained that they took drugs (cocaine) and money they found in the house and gave it to Uncle. (Ex. 2 at 284:18-24, 285:1-3). The cocaine was in a fake soda (7-UP) can with a screw-off top, and the money was in Opher's Timberland boot. (Ex. 2 at 285:1-21).

63. On January 18, 1988, at 11:20 a.m, detectives took a statement from Morsell, who detectives reported stated that she grew up with Opher and that he was her "god-brother." (Ex. 5 at pg. 1). In her 9-page statement, Morsell detailed the Jamaican drug operation. (*See generally* Ex. 5).

64. Morsell testified at trial that there were always guns in 5413 Sansom and Plaintiff was often seen with the sawed-off shotgun and would clean it inside 5413 Sansom, identifying the shotgun found under the Lincoln Continental. (Ex. 4 at 121:1-10, 20-22, *see also* Ex. 19).

65. Morsell testified that the long gun would be kept behind the door at 5413 Sansom, identifying the rifle found embedded in the snow. (Ex. 4 at 121:11-14, *see also* Photo of Rifle, attached as Exhibit 59).

66. On January 20, 1988, detectives took a statement from Opher's brother, Manuel Opher, who detectives reported stated that Morsell told him she saw Dred wearing Opher's clothes the other day, that they were supposed to bring in three more Jamaicans to sell drugs, and that Blood and Uncle have been hiding out. (Manuel Opher Statement at pg. 3, attached as Exhibit 23).

67. On January 21, 1988, Detective Joseph Fischer was assigned to take Presley to the Philadelphia Police Identification Unit to have his injuries photographed. (November 23, 2023, Deposition of Detective Joseph Fischer at 115:15-19, attached as Exhibit 24).

68. Detective Fischer testified that to have the Identification Unit process anything, you had to give them a form of some kind. (Ex. 24 at 115:5-14). Detective Fischer filled out, in part, a form in connection with the photographing of Presley's injuries titled: "injured officer color photograph request form." (Ex. 24 at 115:20-22, *see also* Injured Officer Report, attached as Exhibit 25).

69. Detective Fischer wrote the name "Kevin Pearson" on the line of "known assailant" on this injured officer report. (*See* Ex. 25; *see also* Ex. 25 at 130:9-19).

70. On January 22, 1988, at 12:50 a.m., police arrested Clarence Threlkeld (aka "Indian") for possession with intent to deliver ("PWID") 79.4 grams of cocaine with a street value of $7,940. (*See* Threlkeld Arrest Report at pg. 6, attached as Exhibit 26). Indian gave a statement relating to the Opher homicide. (*See generally* Threlkeld Statement and Arrest photo, attached as Exhibit 27).

71. According to the written statement attributed by police to Indian, detectives told Indian that a 1978 Blue Datsun in his name was found parked across the street from 5413 Sansom, and Indian explained that this was Opher's car that he bought in his name because Opher did not have a driver's license. (Ex. 27 at pg. 2). Detective Santiago wrote that Plaintiff was Indian's "brother" and that Indian told police about not knowing people by the name of "Blood" or "Indian." (Ex. 27 at pg. 1). Indian stated that he did not know the Jamaicans that Opher was selling drugs for at 5413 Sansom. (Ex. 27 at pg. 6).

72. On January 22, 1988, police stopped Andrew Swainson who was driving with Jimmy Smith. (*See* 1/22/88 Jimmy Smith Statement at pg. 2, attached as Exhibit 28). Detective Santiago testified that officers took Plaintiff to Homicide the in handcuffs. (Ex. 22 at 25:15-21).

73. At the motion to suppress, Detective Santiago testified that when he came into contact with Plaintiff on January 22, 1988, and explained to Plaintiff that he would be questioned concerning the death of Stanley Opher and told him that there "was a possibility that he would be a suspect or could be a suspect in that shooting" and he read him his Miranda warnings, at which time, Plaintiff had no problem in making a statement. (Ex. 22 at 16:4-14).

74. Detective Santiago testified that he indicated to Plaintiff that he was still a suspect, but that they were not going to place charges on him, and they took his fingerprints and photograph before he left. (Ex. 22 at 16:23-25, 17:1-5, *see also* Swainson Bio/fingerprints/Photo, attached as Exhibit 39).

75. On January 23, 1988, an activity sheet indicates that Detective Santiago and stakeout unit arrested Allen Proctor in connection with a different homicide (body warrant #160953): the shooting death of Robert Harrison with a .380 automatic handgun at the 4500 Block of North Bouvier Street. (1.23.88 Activity Sheet, attached as Exhibit 30, *see also* Affidavit of

Probable Cause and Warrant for arrest of Proctor, attached collectively as Exhibit 31). That activity sheet is titled "H88-15" and "dec. Opher, Stanley" which indicate that this activity sheet was for the Opher homicide. (Ex. 30).

76. Detective Santiago testified that an "Activity Sheet" is merely that, that it represents the activity that he conducted that day. (November 9, 2023, Deposition of Manuel Santiago at 171:23-24, attached as Exhibit 32). Detective Santiago testified that you put entries into an activity sheet to let your bosses know what you were doing to show that you were not just sitting around and that you were doing something. (Ex. 32 at 172:9-16, 173:1-9).

77. Detective Santiago testified that it is possible that someone wanted to know his activities that day and typed that entry in to explain where Detective Santiago was at 7:00 a.m. that day. (Ex. 32 at 189:8-16, 190:5-16).

78. Detective Santiago testified that he had no information that Allen Proctor was involved in the Opher homicide. (Ex. 32 at 171:10-19).

79. Detective Santiago testified that at some point, he believed the District Attorney's Office withdrew the aggravated assault charges against Presley. (Ex. 22 at 40:2-15).

80. On February 15, 1988, Detective Santiago submitted the affidavit of probable cause for the arrest of Plaintiff, which was approved by an Assistant District Attorney and a magistrate. (Affidavit of Probable Cause Warrant of Arrest and Criminal Complaint, attached collectively as Exhibit 33; *see also* 2/15/88 Activity Sheet and Attempt to Apprehend Log, attached collectively as Exhibit 34).

81. On February 15, 1988, Detectives attempted to serve the arrest warrant of Plaintiff at one of the two places of residence Plaintiff provided to Detectives, but Plaintiff was not present. (*See* Ex. 3, *see also* Ex. 33). Detectives reported that they were advised by the Jamaican males in

the residence (Donny Ebanks and Isiaih Thomas) that Plaintiff was in Jamacia for a "holiday" and will be back soon. (Ex. 34).

82. On February 16, 1988, Police Officer Victor Gates stated that at roll call in his district, the Homicide Division was looking for a 1979 grey Audi PA License #SEW857, and at roughly 8:50 a.m., he observed this vehicle parked directly across 334 N. 53rd Street. (Police Officer Victor Gates Statement at pg. 1, attached as Exhibit 35).

83. Officer Gates stated that at 10:15 a.m. he observed this car moving on the 5200 block of Parrish Street, they stopped the car, and Jimmy Smith was driving and said the car belonged to Blood, whom he knew as "Anthony McKenzie." (Ex. 36 at pg. 1-2, and Snyder statement a pg. 1, attached as Exhibit 36).

84. On February 18, 1988, Detective Michael Cohen and his partner Detective James Alexander of the Homicide Fugitive Squad received the assignment of locating Plaintiff. (3/17/89 Trial Testimony of Detective Michael Cohen at 204:1-7, attached as Exhibit 37; *see also* November 13, 2023, Deposition of Detective James Alexander at 18:5-12, attached as Exhibit 38).

85. On February 18, 1988, Detectives received information from Plaintiff's sister Trisha that Plaintiff went to Jamaica to get married, that he left on February 11, 1988, and is supposed to return to Philadelphia the first week of March. (*See* 2/18-19/88 Attempt to Apprehend Log and Activity Sheets, attached as Exhibit 39).

86. On February 19, 1988, Detective Michael Cohen testified that he applied for an unlawful flight to avoid prosecution warrant. (Ex. 37 at 203:21-24, 205:6-13).

87. On February 20, 1988, Chief Inspector Robert A. Wolfinger sent a letter to the Philadelphia District Attorney's Office requesting that they reach out to the United States

Attorney's Office for an Unlawful Flight to Avoid Prosecution Warrant. (2/20/88 Letter, attached as Exhibit 40).

88. Detective James Alexander testified that if homicide wanted a fugitive flight warrant, they would go to squad ten of the FBI, and they would do all the paperwork required to get the fugitive flight warrant. (Ex. 38 at 115:13-20).

89. Detective Alexander testified the reason for obtaining a federal fugitive flight warrant is because the federal authorities have more resources and access to assist them in serving Plaintiff's arrest warrant. (Ex. 38 at 120:9-25, 121:1-7).

90. On February 29, 1988, Detectives reported checking with Air Jamaica and America Airlines with results that there were not passengers on February 11, 1988 with the name Andrew Swinson or Vanier Swainson. (*See* 2/29/88 attempt to apprehend log, attached as Exhibit 41).

91. On March 1, 1988, Detectives reported receiving information from Ernesteen Dennis (sister of the deceased) that she saw "Blood" at 56th and Greenway in Philadelphia "last Tuesday or Wednesday" (February 23rd or 24th) but at the time she did not know he was wanted for her brother's murder. (*See* 3/1/88 attempt to apprehend log and activity sheet, attached as Exhibit 42).

92. On March 9, 1988, at 2:30 p.m., Plaintiff was arrested by the New York Police Department inside 736 E. 223rd Street, Bronx, NY. (Warrant Activity Sheet, attached as Exhibit 43).

93. On March 17, 1988, Detectives Cohen and Alexander met with Officers Miller and Freer of the stakeout unit and picked up Plaintiff from Bronx, NY at approximately 3:00 p.m., and took him back to Philadelphia. (*See* 3/17/88 Activity Sheet, attached as Exhibit 44).

94. On March 17, 1988, at about 7:05 p.m., Plaintiff gave an eight-page statement to Detectives Alexander and Cohen. (*See generally* Swainson 3/17/88 Statement, attached as Exhibit 45).

95. When asked where he was on January 17, 1988, at 3:40AM, Plaintiff stated the following: "[a]t a Club, named L & W, on 57th Street on the next block up from Market Street. Me and my brother-in-law Clarence. My girl Tisha and Charmaine and Nini were there. Plus, my ex-girlfriend was there, but I don't remember her name, she's not really my girlfriend, I was just fooling around with her." (Ex. 45 at pg. 4).

**D. Plaintiff's Prosecution**

96. On April 14, 1988, Paul Presley testified at Mr. Swainson's preliminary hearing. (*See* generally 4/14/88 Preliminary Hearing Testimony, attached as Exhibit 46). When asked if he sees the person who shot Opher in the courtroom, Presley responded: "I see a young man that looks closely familiar to the guy who shot him, yes." (Ex. 46 at 15:16-19). Presley testified that the Plaintiff resembles the shooter very closely but had more hair and was maybe a shade darker than Plaintiff. (Ex. 46 at 68:3-17). Presley testified that it is a "very good resemblance" but in his heart he could not say it was him. (Ex. 46 at 73:7-9).

97. The Court held the charges over, determining that the Commonwealth made out a prima facie case against Plaintiff. (Ex. 46 at 85:12-25).

98. In June of 1988, Presley testified that his girlfriend told him that there was a white man with a Mercedes sitting on the porch and sat out in his car. (Ex. 11 at 28:17-25, 29:1-3).

99. As a result, Presley testified that he did not come home that night and instead came home two days later. Presley recounted that the man, Terrance Gibbs, called him and told him he

wanted to speak to him about the case and that he was investigating the case for Plaintiff's attorney. (Ex. 11 at 29:4-25, 30:1-11).

100. On June 10, 1988, at approximately 9:00 a.m., Presley testified that he met with Mr. Gibbs and drove down to Fairmount Park to the Robin Hood Dell parking lot where they spoke. (Ex. 11 at 30:17-25).

101. Presley testified that he signed the statement that he gave to Mr. Gibbs because he was trying to say what he wanted to hear, but the statement was not true. (Ex. 11 at 32:8-19).

102. Presley gave a statement to Mr. Gibbs, stating in part, that Plaintiff was not present the night of the shooting of Opher. (6/10/88 Presley Statement, attached as Exhibit 47).

103. On March 16, 1989, Morsell testified at Plaintiff's trial to her purported knowledge of Blood, Opher, 5413 Sansom, and the Jamaican drug operation. (*See generally* Ex. 4).

104. On March 17, 1989, Presley testified at Plaintiff's trial, and identified him as the individual with the short-barrel shotgun who shot and murdered Opher on January 17, 1988. (Ex. 11 at 4:10-12, 9:1-12, 17-19).

105. Presley testified that that in March of 1988, he saw Plaintiff while they were both incarcerated at Holmesburg Prison. (Ex. 11 at 20:13-21).

106. Presley testified that Plaintiff asked him about drawing a picture because Presley was an artist. Presley recounted that they got to talking about the case, and Presley told Plaintiff that he picked his picture out. (Ex. 11 at 21:6-24).

107. Presley testified that Plaintiff told Presley that: "Man I'm not the one. I'm not the one that did it." And Presley testified that he responded that: "Well, you look like him." (Ex.11 at 22:1-2).

108. Presley testified that after he spoke with Plaintiff, and two days prior to the preliminary hearing, he was assaulted by another inmate, James Brown. (Ex. 11 at 24:18-25).

109. Presley testified that he was hit in the head with a wooden bench while watching television, receiving six stitches to the top of his head and a broken cheekbone. (Ex. 11 at 25:1-4).

110. Presley testified that he was taken Giuffre Hospital, operated on, and taken back to the prison. (Ex. 11 at 25:4-6; *see also* Giuffre Medical Center Records, attached as Exhibit 48). Presley testified that he never had a problem with Mr. Brown before, and that he did not even know him. (Ex. 11 at 25:7-9).

111. Presley testified that was afraid at the preliminary hearing, that he did not know what to think, and that he was scared. (Ex. 11 at 25:18-25; 26:1-3).

112. Presley testified that as a result, he changed his statement around some, telling them that I think that was the man, but it was a man of darker complexion. (Ex. 11 at 26:22-24).

113. On March 21, 1989, Plaintiff was convicted of murder in the first degree, conspiracy, possession of an instrument of crime. (3/21/89 Jury Verdict at 9:11-25, attached as Exhibit 49).

114. On March 21, 1989, Plaintiff was sentenced to life in prison without the possibility of parole. (Ex. 49 at 20:7-13).

**E. Plaintiff's Post-Conviction History**

115. On October 13, 2008, a private detective that worked for Swainson's post-conviction attorneys took a recantation affidavit and statement from Presley. (10/13/08 Presley Affidavit and Statement, attached collectively as Exhibit 50).[1]

[1] Defendants' inclusion of Presley's October 13, 2008, affidavit and statement is not necessarily a concession to its admissibility.

116. On November 13, 2009, Paul Presley passed away. (*See* Paul Presley Obituary, attached as Exhibit 51).

117. On February 12, 2020, the DAO's Conviction Integrity Unit ("CIU") filed an "Answer" to Plaintiff's Amended Petition for Post-Conviction Relief. (*See generally* 2/12/20 Commonwealth Answer as Exhibit 52).[2]

118. On that same date, CIU filed a joint stipulation of facts with Plaintiff's Post-Conviction counsel. (*See generally* 2/12/20 Joint Stipulation of Facts, attached as Exhibit 53).[3]

119. On February 27, 2020, Jacqueline Morsell passed away. (Jaqueline D. Morsell Obituary, attached as Exhibit 54).

120. On June 12, 2020, Judge Shelley Robins New granted Plaintiff a new trial. (Short Certificate and Order at pg. 1, attached as Exhibit 55).

121. On June 12, 2020, Andrew Swainson was released from prison. (Ex. 55 at pg. 1).

122. On June 18. 2020, DAO *nolle prossed* case. (Docket Sheet at pg. 14, attached as Exhibit 56).

Respectfully submitted,

Date: June 21, 2024

*<u>/s/ Daniel Cerone</u>*
Daniel Cerone
Div. Deputy City Solicitor

---

[2] Defendants' inclusion of CIU's "Answer" of Plaintiff's Amended Petition for Post-Conviction Relief is not a concession to its admissibility or accuracy.

[3] Defendants' inclusion of CIU's joint stipulation of facts is not a concession to its admissibility or accuracy.