**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANDREW SWAINSON,** <br> **Plaintiff,** <br> **v.** <br> **CITY OF PHILADELPHIA, et al.,** <br> **Defendants.** | : | **Civil Action** <br> **No. 22-2163** |

## CONCISE STATEMENT OF ADDITIONAL FACTS

Defendants City of Philadelphia and Detectives James Alexander and Joseph Fischer ("Defendants") hereby serve this Concise Statement of Additional Facts ("SAF") pursuant to Federal Rule of Civil Procedure 56 and the Court's policies and procedures.

**A. Background**

1. Morsell explained that somebody by the name of "Uncle" was in charge of the 5413 Sansom gatehouse, that Opher was a "worker" for Uncle, and that Opher also took instructions from "Blood" (Plaintiff) and "Indian" (Clarence Threlkeld – Plaintiff's "brother"). (Ex. 4 at 88:23-25, 89:1-4, 90:19-25, *see also* Ex. 3 at p. 1).

2. Vernon Montage, Opher's friend of 10 years, stated that Opher told him that he had not been paid and that he was going to have to move out of the house. (Vernon Montague Statement at pg. 1, attached as Exhibit 57).

3. Crystal Justice, Opher's friend of 6-7 months, stated that Opher had explained he was going to get out of selling drugs. (Crystal Justice 1/19/88 Statement at pg. 2, 4, attached as Exhibit 58).

4. Morsell testified that Opher spoke with her on Saturday January 17, 1988, hours before he was killed, stating that he was upset that he told her that he had not been paid in the last three weeks. (Ex. 4 at 111:13-20, 112:6-20).

5. Crystal Justice stated that Blood told her that "Stan [Opher] is my enemy" less than two weeks before the murder. (Ex. 10 at pg. 6).

**B. The Murder**

6. Presley testified that he observed a rifle on the ground with a blue bag on the ground, looked into the bag, heard sirens, and started running. (Ex. 11 at 16:12-17; *see also* Photo of Rifle, attached as Exhibit 59).

7. Presley testified that he got about six or seven houses down the street when he observed a car parked in the middle of the block, one man was leaning into the car and the other guy was driving the car. (Ex. 11 at 17:10-13, 18-20). Presley testified that he ran up to them, asked for help, and told them that there had been a shooting right down the street. (Ex. 11 at 17:20-23).[1]

8. Jeffrey Green stated that Ashley Hines then sped off and Green started running because he was scared. (Ex. 15 at pg. 2).

9. Green explained that he ran to the northeast corner of 55th and Sansom to see if Hines parked in that area, then saw Presley with an officer with a gun on him keeping him at bay. (Ex. 15 at pg. 2).

10. Green stated that the officer motioned him to come over, at which time more police converged on the scene, frisked him, and took his turkey hoagie. Green added that they then were placed in a wagon. (Ex. 15 at pg. 2-3).

[1] Paragraph 7 is contained in the stipulated facts section and is repeated here to put in proper context paragraphs 9 through 13 below.

11. Hines stated that he was driving away, he turned right on to 55th street going north, then turned onto Chestnut street and decided to go back to see if Jeffrey Green was alright so he turned back on to Sansom Street, got out of the car, double parked, and walked up to Green's house, then a police car came behind and a woman officer told him to move so he got in and proceeded up the block. (Ex. 16 at pg. 3).

12. Hines stated that he got out of the car to see if he could help, but then officers took him down to the station and he was booked. (Ex. 16 at pg. 4).

13. Officer Elga Peay stated that Hines had a coffee cup in his hand. (*See* Officer Elga Peay 1/18/88 Statement at pg. 5, attached as Exhibit 60).

14. Detective Harmon conducted a neighborhood survey where Ms. Karen Clark of 5414A Sansom Street explained that she heard one shot, then saw two people with shotguns, then a small scuffle on the porch, then heard two more shots, then heard someone say: "lets get out of here" and detailed that they were "Jamaican sounding." (Neighborhood Survey, attached as Exhibit 61).

**C. Following the Murder**

15. Sunday morning, or the next day, Plaintiff explained that he and Indian went to 5413 Sansom and entered the back door through an alleyway. (Ex. 2 at 282:12-24, 283:1-15, 287:11-23, Ex. 3 at pg. 6).

16. Crystal Justice stated that the day after the murder, Plaintiff came over her house and told her that they probably walked Opher to the door and probably shot him when he ran out the door, saying: "they usually do stuff like that." (Ex. 10 at pg. 6).

17. Crystal Justice recounted that Plaintiff asked her what Tanya (Latonya Furman) had seen and added that: "you cannot trust a female." (Crystal Justice 2/6/88 Statement at pg. 5, attached as Exhibit 62).

18. On January 21, 1988, Detective Joseph Fischer was assigned to take Presley to the Philadelphia Police Identification Unit to have his injuries photographed. (Ex. 24 at 115:15-19).[2]

19. Detective Fischer testified that to have the Identification Unit process anything, you had to give them a form of some kind. (Ex. 24 at 115:5-14). Detective Fischer filled out, in part, a form in connection with the photographing of Presley's injuries titled: "injured officer color photograph request form." (Ex. 24 at 115:20-22, *see also* Ex. 26).

20. Detective Fischer wrote the name "Kevin Pearson" on the line of "known assailant" on this injured officer report. (*See* Ex. 25; *see also* Ex. 25 at 130:9-19).

21. As detailed on Presley's injured civilian card attached to his shirt in the photo, "K. Pearson" was the individual from the Police Photo Identification Unit that took the photo of Presley, indicated on the line next to "Photo by." (*See* Presley Injured Civilian Photos at p. 1, attached as Exhibit 63, *see also* Ex. 24 at 119:5-10).

22. Detective Fischer explained that he assumes that "K. Peason" is Kevin Pearson, the employee from the Identification Unit who took the picture and not an assailant, stating that it would have been a typo. (Ex. 24 at 128:18-24, 129:1-3, 125, 130:7-19).

23. On January 23, 1988, an activity sheet indicates that Detective Santiago and stakeout unit arrested Allen Proctor in connection with a different homicide (body warrant #160953): the shooting death of Robert Harrison with a .380 automatic handgun at the 4500 Block

[2] Paragraphs 18 through 20 are contained in the stipulated facts section and are repeated here to put in proper context paragraphs 21 and 22 below.

of North Bouvier Street. (Ex. 30, *see also* Ex. 31). That activity sheet is titled "H88-15" and "dec. Opher, Stanley" which indicate that this activity sheet was for the Opher homicide. (Ex. 30).[3]

24. Detective Santiago testified that an "Activity Sheet" is merely that, that it represents the activity that he conducted that day. (Ex. 32 at 171:23-24). Detective Santiago testified that you put entries into an activity sheet to let your bosses know what you were doing to show that you were not just sitting around and that you were doing something. (Ex. 32 at 172:9-16, 173:1-9).

25. Detective Santiago testified that the presence of Allen Proctor on this activity sheet might have been a mistake, and he does not know who typed it out, but normally the information from Allen Proctor would have been typed on an activity sheet for the Allen Proctor case. (Ex. 32 at 197:17-25, 180:15-17).

26. Detective Santiago testified that it is possible that someone wanted to know his activities that day and typed that entry in to explain where Detective Santiago was at 7:00 a.m. that day. (Ex. 32 at 189:8-16, 190:5-16).

27. Detective Santiago testified that he had no information that Allen Proctor was involved in the Opher homicide. (Ex. 32 at 171:10-19).

28. On February 12, 1988, Detective Santiago took a statement from Paul Presley where Presley identified Plaintiff out of a seven-person photo spread as the shooter stating that Plaintiff had a leather apple hat on. (Ex. 13 at pg. 4).

29. Detective Santiago showed Presley another photospread with another suspect in it, but Presley did not make the identification of the other individual with the rifle. (Ex. 22 at p. 58:2-6).

[3] Paragraphs 23, 24, 26, and 27 are contained in the stipulated facts section and are repeated here to put in proper context paragraph 25 below.

30. On March 3, 1988, an attempt to apprehend log and activity sheet both indicate that Detectives Alexander and Cohen contacted Ernestine Dennis to inform her that they would be at her residence at 6:30 p.m. to interview Morsell. The log shows that Ms. Dennis called Detective Alexander approximately thirty minutes later and informed him that she talked to Morsell's mother who stated that she would not allow her daughter to speak with police and that she would call her attorney if police came to her door. The log notes that: "[f]urther attempts will be made to talk to [Morsell] on the highway." (*See* 3/3/88 and 3/4/88 Attempt to Apprehend log and Activity Sheet, attached collectively as Exhibit 64).

31. There is no other information in the H-File that shows that detectives ever made subsequent contact with Morsell and Detective Alexander explained that if there was an interview with Morsell, there would at least be an activity sheet that reflected it. (Ex. 38 at 85:14-19).

32. On March 8, 1988, an activity sheet indicates that at approximately 12:40 a.m., Detective Santiago received a call from Plaintiff who stated that he had arrived from Jamaica and had a message to contact Homicide Division. The activity sheet indicates that Plaintiff stated that he was in New York at his parents' house. The activity sheet indicates that: "Swinson does not know he is currently wanted for murder, and the information was not given to Swinson." (*See* 3/8/88 Activity Sheet, attached as Exhibit 65).

33. In his March 17, 1988 statement, Plaintiff stated that he went by Vanier Swainson, Zico, and Blood. (Ex. 45 at pg. 3).

**D. Plaintiff's Prosecution**

34. Presley explained that he was nervous and told Mr. Gibbs that he did not think Plaintiff did the shooting but explained that he gave Mr. Gibbs the answers he wanted to hear to get out of there. (Ex. 11 at 31:5-13).

35. On February 15, 1989, Presley gave a statement to Detective Santiago at the Philadelphia District Attorney's Office ("DAO"). (*See generally* 2/15/89 Presley Statement, attached as Exhibit 66).[4] Presley explained that his statement on February 12, 1988 was the truth, that he "was sure it was [Plaintiff]" that committed the shooting, and explained that he testified the way he did at the preliminary hearing because he was paranoid after seeing Plaintiff at Holmesburg Prison and being attacked two days before the hearing. (Ex. 66 at pg. 1-4).

36. On February 17, 1989, Presley gave another statement to Detective Santiago at the DAO where Presley explained again that Plaintiff was the individual who committed the shooting. (2/17/89 Presley Statement at pg. 3, attached as Exhibit 68).[5]

37. Presley recounted that there was a tall individual in the gallery who had a brown/tan trench coat on, sitting in the front row who kept staring at him with an evil expression the entire time he was on the stand testifying. Presley explained that this male then he got up, walked out, and watched him until he went out the door. (Ex. 11 at 26:5-15).

**E. Plaintiff's Post-Conviction History**

38. On July 14, 2014, Morsell signed an affidavit recanting her trial testimony. (7/22/14 Morsell Affidavit, attached as Exhibit 70).[6]

---

[4] Defendants have a corresponding cassette tape recording that Defendants will send to the Court via flash drive marked "Ex. 67."

[5] Defendants have a corresponding cassette tape recording that Defendants will send to the Court via flash drive marked "Ex. 79."

[6] Defendants' inclusion of Morsell's July 22, 2014, affidavit is not necessarily a concession to its admissibility.

39. On December 14, 2018, Morsell signed an affidavit that she testified truthfully at Plaintiff's trial. (*See* 12/14/18 Morsell Affidavit, attached as Exhibit 71).[7]

**D. Other Related Evidence/Information**

40. During the discovery period, Defendants produced filler photos of Daniel Evans/Evans Daniels dated February 27, 1988, and February 8, 1988. (*See* Evans Photos, attached as Exhibit 72).

41. During the discovery period, Defendants produced the following Philadelphia Police Department Directives: (1) Directive 50: Investigations and Charging Procedure, (2) Directive 61: Investigation Report, (3) Directive 79: Disciplinary Procedure, (4) Directive 114: Right, Duty, and Opportunity to Present Complaints or Information, (5) Directive 127: Complaints Against Police, and (6) Directive 135: Rules of Discovery. (*See* Philadelphia Police Department Directives, attached collectively in numerical order as Exhibit 73).

42. During the discovery period, Defendants produced Police Commissioner Kevin M. Tucker's October 18, 1986, Memorandum with the subject line: notification of internal affairs division. (*See* Commissioner Tucker 1986 Memo, attached as Exhibit 74).

43. During the discovery period, Defendants produced the concise officer histories of Detective Manuel Santiago, Detective James Alexander, Detective Joseph D. Fischer, Detective Francis Miller, and Captain Arthur Durrant. (*See* Concise Officer Histories, attached collectively as Exhibit 75).

44. During the discovery period, Defendants produced Philadelphia Police Department Training History Records of Detective Manuel Santiago, Detective James Alexander, Detective

---

[7] Defendants' inclusion of Morsell's December 14, 2018, affidavit is not necessarily a concession to its admissibility.

Joseph D. Fischer, Detective Francis Miller, Detective Michael Cohen, and Captain Arthur Durrant. (*See* Philadelphia Police Department Training History Records, attached collectively as Exhibit 76).

45. During the discovery period, Defendants produced 1986-1987 Philadelphia Police Study Task Force Report. (*See* Philadelphia Police Study Task Force Report, attached as Exhibit 77).

46. During the expert discovery period, Plaintiff produced a report of purported expert Michael K. Lynch, dated May 2, 2024. (*See* Michael K. Lynch Report, attached as Exhibit 78).[8]

Respectfully submitted,

Date: June 21, 2024

/s/ Daniel Cerone
Daniel Cerone
Div. Deputy City Solicitor

[8] Defendants' inclusion of Mr. Lynch's Report in this Statement of Facts merely acknowledges production thereof, and Defendants expressly reserve their right to challenge Mr. Lynch's qualifications, methodology, and conclusions as inadmissible for failing to meet the requirements of Federal Rule of Evidence 702.