AS (CIU Physical File)000006

FILED
02/12/2020 04:51:26 PM
Post Trial Unit
By: M. DON

**DISTRICT ATTORNEY'S OFFICE**
Andrew Wellbrock
Assistant District Attorney
Three South Penn Square
Philadelphia, PA 19107
215-686-8738

---

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**CRIMINAL SECTION TRIAL DIVISION**

| | | |
|---|---|---|
| COMMONWEALTH | : | |
| | : | |
| v. | : | CP-51-CR-0431311-1988 |
| | : | |
| ANDREW SWAINSON | : | |

---

**COMMONWEALTH'S ANSWER TO**
**AMENDED PETITION FOR POST-CONVICTION RELIEF**

TO THE HONORABLE SHELLEY ROBINS NEW:

LAWRENCE S. KRASNER, District Attorney of Philadelphia County, by his representative Andrew Wellbrock, Assistant District Attorney, respectfully petitions this Honorable Court and answers that Mr. Andrew Swainson ("Swainson") is entitled to relief on certain claims enumerated in his second amendment to his third petition for post-conviction relief and joins Swainson in asking this Court to enter an order vacating his convictions and sentence, and ordering a new trial.

On February 23, 2018, attorneys with the Pennsylvania Innocence Project submitted a request for review of this case to the Philadelphia District Attorney's Office Conviction Integrity Unit ("CIU"). That request was

premised on Swainson's claim of actual innocence. Shortly after that request, the CIU began its review and investigation. A comprehensive review of both the record and applicable law combined with a thorough review of all available materials has revealed that at least two of Swainson's claims warrant relief.

More specifically, based on the pleadings, the trial and post-conviction records, and the factual record set forth in the parties' Joint Stipulations of Fact, filed on February 12, 2020, the Commonwealth concedes that Swainson is entitled to relief based on newly discovered evidence and violations of his right to due process under the Pennsylvania Constitution and the United States Constitution.

## OVERVIEW AND SHORT FACTUAL SUMMARY

### *The Crime*

1. Just before 4am on January 17, 1988, Officer John Kay was at the corner of 54th and Sansom Streets when he heard a shotgun blast and saw two men run from a house on the north side of Samson Street.

2. Officer Kay chased the two men to the next corner and ultimately arrested them.

3. The two men were Paul Presley (who was bleeding from his hand) and Jeffrey Green.

4. Meanwhile, Officer Robert Rouse and other officers arrived on scene pursuant to a radio call.

5. Officer Rouse found the victim of the shotgun blast, Stanley Opher, laying in front of 5409 Sansom Street bleeding profusely and saying only that "[t]hey shot me."

6. Sergeant James Shannon located a rifle sticking out of a snow bank along with a small blue duffle bag in front of 5419 Sansom Street.

7. Other officers located a sawed-off shotgun under a car, located just east of where Opher was found.

8. After Officer Kay had already stopped Presley and Green, Officer Elga Peay was driving down Sansom Street when she observed Ashley Hines walk down the front steps of 5413 Sansom Street, get into his car, and drive towards 55th Street.

9. Other officers flagged Hines down and when Hines stopped, he told the officers that he had just dropped Green off when an unknown man tried to enter his car.

10. Based on the observations of the officers, Hines was arrested along with Presley and Green – and all were charged with Aggravated Assault and related offenses.

*The Homicide Investigation*

11. The investigation became a homicide investigation the following day when Opher died from injuries suffered from the gunshot wound.

12. As the investigation continued, police took a statement from Jacqueline Morsell, a friend of Opher's.

13. According to Morsell's statement, a drug operation was being run out of the house located at 5413 Samson Street and an individual known as "Dred" had been making threats against Opher for his involvement in that operation.

14. The only mention of Swainson in Morsell's nine-page statement were references to the fact that Swainson worked in the drug house.

15. Within just three weeks of the crime and the arrests of Presley, Green and Hines, the Commonwealth withdrew all charges against all three men, and Presley, inexplicably, went from being a perpetrator to a star witness for the Commonwealth in the homicide case against Swainson.

16. In a statement provided to police, Presley claimed to have witnessed the shooting when he went to the aforementioned drug house to purchase narcotics after getting high all evening at a house approximately two miles away.

17. When Presley arrived at the door of the drug house, the door opened and Opher ran by him and a man he described as "this brown skin dude" came out the door with a sawed-off shotgun and fired at Opher.

18. Presley then began to struggle with a second man who came out of the house with a rifle. During the struggle, Presley fell down the stairs and then both men with guns fled in opposite directions.

19. After the shooting, Presley fled toward 55th Street, but stopped to take a look in a bag the second man had discarded with his rifle.

20. The bag contained Opher's personal items, such as prescription medication and cigarettes.

21. When Presley saw that the bag did not contain drugs, he continued to flee until encountering Hines and eventually the police.

22. When stopped by the police, Presley was bleeding from his hand and his coat was covered in his own blood.

23. Despite Presley stating that Opher had fallen off the steps after being shot and that neither gunman approached his body prior to fleeing, the

bag was stained on the bottom with type A blood – the same blood type as Opher.

24. In addition to the implausible story Presley told of how he witnessed the crime, Presley also identified Swainson as the man with the sawed-off shotgun from a "series of photos" shown to him by Detective Manuel Santiago.

25. Despite a claim that he would also be able to identify the second man, detectives never showed Presley any additional photographs.

26. Presley's statement was typed by the police and when it was provided to the Commonwealth, it was accompanied by a hand-written confidence statement signed by Presley containing statements and language a reasonable person might conclude were dictated or suggested by the police.

27. The confidence statement reflects that Presley's attorney was not present at the time the statement was given.

28. During a pretrial hearing on the defense's motion to suppress, Detective Santiago was asked how the confidence statement came about during the interview of Presley and he offered the following answer:

> Well, what happened here was that I left Mr. Presley alone in the room while I was reviewing the statement, the statement that he had just given, just going through it to see if there was something that was additional, some things that – other things that I might want to cover with him. And when I came back to the room I find that he had spent this time writing this out. He was not asked to write it out. Why he did it I'm not sure, but it is something he wanted to do. And he gave it to me and I included it as part of his statement. N.T. 3/08/89, p. 42 - 43, lines 22 – 25 & 1 – 8.

29. Detective Santiago's testimony about the circumstances surrounding this confidence statement during a pretrial hearing serves to exacerbate serious credibility concerns about Presley as well as Detective Santiago.

30. Although both guns were recovered along with other physical evidence, there is no evidence linking Swainson to the crime.

31. Meanwhile, when questioned by the police, Swainson gave two consistent exculpatory statements during the investigation. The first occurred when he voluntarily appeared in the Homicide Division pursuant to the detectives' request and the second after waiving his rights post-arrest.

32. In his statements (both of which are largely consistent), Swainson explained that he met Opher in September when he first moved to Philadelphia and lived with him for two or three weeks near 57th and Spruce Streets.

33. According to Swainson, at the time of the murder, Opher was living with "Dred" at 5413 Sansom Street and both were selling drugs out of the house.

34. On the night of the murder, Swainson and his brother went by the house to check on Opher, but neither he nor "Dred" answered the door.

35. After stopping to check in with Opher, Swainson went to a club at 57th and Market Streets.

36. The next day, Swainson and his brother assumed that the house had been busted by the police.

37. Shortly after making the above assumption, Swainson remembered having recently received a warning "to be careful" because the house was going to get robbed so he called the woman who had communicated that warning to him and she informed him that Opher had been killed.

*The Prosecution of Swainson*

38. The Commonwealth's theory at trial was that Swainson knew Opher had decided to get out of the drug operation on Sansom Street and he was so upset with Opher about that decision that he murdered Opher on the front steps of the drug house. To support that theory, the Commonwealth relied on motive testimony from Morsell and Presley's implausible account of the crime.

39. In order to bolster Presley's weak single eyewitness identification, the Commonwealth presented evidence of flight against Swainson through the testimony of Detective Michael Cohen.

40. The Commonwealth requested a jury charge on flight and then after the jury was instructed on flight, the prosecution argued flight in its closing.

41. After a three-day trial, Swainson was convicted of first-degree murder and related offenses and was sentenced to a mandatory term of life imprisonment.

*The Commonwealth's Witnesses Recant*

42. As outlined in Swainson's 2nd PCRA petition, Presley has a long history of recanting his identification of Swainson.

43. The recantations began at the preliminary hearing in this case on April 14, 1988, when Presley did not identify Swainson.

44. A few months later, on June 10, 1988, Presley gave a statement to a defense investigator stating that he incorrectly identified Swainson.

45. Then, just one month prior to trial, Presley was brought to the District Attorney's Office and was interviewed twice in one week. On

February 15, 1989, and February 17, 1989, during those interviews, Presley renounced his prior recantations.[1]

46. On March 17, 1989, during trial, Presley identified Swainson as the shooter.

47. Years later, on October 13, 2008, Presley provided defense investigators with a hand-written and tape-recorded recantation in which he stated that he was pressured to identify Swainson and was promised leniency on his open charges in exchange for testifying.[2]

48. Presley died on November 15, 2009.

49. Morsell, the Commonwealth's motive witness, also recanted her trial testimony but that recantation did not occur until many years after Swainson's trial and conviction.

50. Morsell's trial testimony differed significantly from her original statement provided to the police days after the murder.

51. In her original statement, Morsell identified an individual named "Dred" as the person who had a motive for killing Opher.

52. Her trial testimony on March 16, 1989, however, conveniently substituted Swainson in place of Dred as the person who had been threatening Opher before the murder.

53. On July 22, 2014, Morsell gave a detailed statement to Swainson's attorneys and investigator recanting her trial testimony

---

[1] Curiously, despite having tape-recorded both of those interviews, Detective Santiago denied having tape recorded the February 15, 1989 statement at trial.

[2] On July 28, 1988, Presley was charged with felony Possession with Intent to Deliver and Knowing and Intentional Possession. The case was first listed for trial on July 10, 1989 and all charges were nolle prossed.

claiming she falsely implicated Swainson due to pressure and threats from Opher's family.

54. Morsell's recantation is alleged to be newly discovered evidence in the instant PCRA pleadings currently pending before this Court.

55. On March 15, 2019, Mike Miller, an attorney for the City of Philadelphia Law Department, provided a four-sentence affidavit of Morsell to the CIU that it obtained while defending the City in a federal civil rights lawsuit regarding a separate exoneration resulting from a wrongful conviction.

56. The affidavit, signed by Morsell, is dated December 14, 2018, and reads as follows:

> I have personal knowledge of the facts recited below.
> I testified at the trial of Andrew Swainson for the murder of Stanley Opher.
> I have never been pressured or forced by anyone working for the Philadelphia Police Department to say anything false or misleading about the murder.
> I testified truthfully at the jury trial for the murder.

57. After receiving the affidavit, the CIU requested that the City of Philadelphia Law Department provide all other information it has regarding Swainson's case and his claim of actual innocence. Although some general information was provided, the City of Philadelphia Law Department provided limited information regarding Morsell and the circumstances surrounding the writing of her affidavit (none of which assists in evaluating Morsell's credibility).

58. As will be discussed supra under the sub-heading *"Morsell's Recantation is New Evidence and an Evidentiary Hearing is Warranted,"* the shear lack of detail in the affidavit combined with the lack of information regarding the circumstances surrounding the taking of that affidavit,

negates any usefulness the affidavit has in regard to assessing this witness's credibility absent testimony from Morsell and Mike Miller, the attorney for the City who apparently obtained the affidavit.

59. The City of Philadelphia also recently settled the civil lawsuit referenced in paragraph 55 for 4.15 million dollars so Morsell will not ever be called as a witness to testify in regards to the Plaintiff's *Monell* claim. See Chris Palmer, *Philly pays $4 million to settle lawsuit brought by man cleared of murder conviction in 2017*, PHILADELPHIA INQUIRER, January 2, 2020, https://www.inquirer.com/news/shaurn-thomas-wrongful-conviction-murder-lawsuit-martin-devlin-paul-worrell-20200102.html.

*The CIU Investigation*

60. After Swainson's counsel requested review of his conviction, the CIU obtained all available records relating to the case, including the District Attorney's Office files and the Philadelphia Police Department archived files. Review of those files revealed that *Brady* information was suppressed at trial and throughout these proceedings and false information was presented to the jury and was never corrected.

61. At the time of trial, the Commonwealth suppressed evidence that Presley was being prosecuted under the false name of Kareem Miller and was facing far more serious charges than the charge that was disclosed to the defense and the jury.

62. The testimony (and ensuing argument) presented at trial that Swainson fled the jurisdiction to avoid prosecution was false. Although Swainson traveled home to Jamaica and New York after the homicide, there was and is no evidence that he knew there was a warrant for his arrest and

homicide detectives knew Swainson's travel plans both before and after he traveled.

63. Homicide detectives assigned to the case were aware of at least two potential alternate suspects and pursued an investigation of an alternate theory involving at least one of those suspects. That information was suppressed at trial by the Commonwealth.[3]

## PROCEDURAL HISTORY

64. In the almost 32 years since his conviction, Swainson has zealously pursued his claim of innocence as outlined in his pleadings.

65. In Swainson's first PCRA petition in 1993, he alleged both prosecutorial misconduct and ineffective assistance of counsel. The petition was dismissed in 1997 without an evidentiary hearing.

66. In 2008, Swainson filed a second PCRA petition based on the October 12, 2008 recantation of Presley where Presley claimed that the Commonwealth promised him special favors on his open cases. The second PCRA petition was denied on May 14, 2014, again without an evidentiary hearing.

67. The instant PCRA Petition, Swainson's third, was filed on August 18, 2014 – within 60 days of receiving the information that formed the basis of the recantation affidavit from Morsell.

[3] Swainson's PCRA pleadings also identify other *Brady* information. The CIU investigation has revealed that some of the information identified was indeed suppressed by the Commonwealth at the time of trial. Rather than address each individual instance in this answer, the CIU has considered all of the suppressed information in its totality and that consideration has led to the conclusion that Swainson is entitled to relief based on material *Brady* violations.

68. On November 18, 2019, Swainson filed an Amended Petition raising claims relating to the suppressed evidence first disclosed during the CIU's investigation.[4]

## THERE ARE NO MATERIAL FACTS IN DISPUTE IN THIS CASE REGARDING *BRADY* AND *NAPUE* CLAIMS

69. As noted at the outset, the parties in this matter are in agreement that Swainson is entitled to relief. However, the Commonwealth recognizes that this agreement alone does not obligate this Court to set aside the verdict in this case. *See Commonwealth v. Brown*, 196 A.3d 130, 146 (Pa. 2018).

70. Rather, the Commonwealth's position in support of relief here is an "attempt[], through the exercise of effective advocacy, to persuade the courts to agree that error occurred as a matter of law." *Id.*; *see also id.* at 145 (noting that "the PCRA requires judicial merits review favorable to the petitioner before any relief may be granted.").

71. Put another way, the Commonwealth urges this Court to grant Swainson relief because it believes the record establishes his rights have been violated, not simply because the parties are in agreement. *Commonwealth v. Cox*, — A.3d —, No. 498 CAP, 2019 WL 1338435, at *13 (Pa. Mar. 26, 2019) ("[C]onfessions of error by the Commonwealth are not binding on a reviewing court but may be considered for their persuasive value").

---

[4] The November 18, 2019 Amendment replaces and supersedes the original Petition as well as an earlier amendment filed on July 13, 2017.

*Standard of Review*

72. In his concurrence in *Brown*, Justice Wecht outlined an appropriate framework for post-conviction courts resolving uncontested petitions:

> The PCRA court is tasked with considering the facts before it and resolving factual disputes. If there is no factual dispute because the Commonwealth and the petitioner are in agreement regarding the petitioner's entitlement to relief, then the role of the PCRA court is to resolve the legal implications of these facts.

*Brown*, 196 A.3d at 196 (Wecht, J., concurring).

73. As Justice Wecht described, there is no factual dispute here and the parties agree that Swainson's rights have been violated. But the ultimate decision whether to grant relief—*i.e.*, whether the facts and circumstances of this case amount to a constitutional violation—rests with this Court.[5]

*Stipulations of Fact*

59. In order to facilitate this Court's review (and consistent with its ethical duties), the Commonwealth has entered into and filed joint stipulations of facts with Swainson. *Commonwealth v. Mathis*, 463 A.2d 1167, 1171 (Pa. Super. Ct. 1983) (noting that "[i]t is axiomatic that parties may bind themselves by stipulations" in criminal proceedings) (quoting *Marmara v.*

---

[5] Justice Wecht also opined that PCRA courts may premise relief on "the Commonwealth's confession of error." *Brown*, 196 A.3d at 196; *see also id.* at 194 (Dougherty, J. concurring) (disagreeing with Justice Wecht and opining that "a prosecutor's confession of error is properly viewed not as dispositive, but as persuasive, often highly persuasive"). This point was not resolved by the *Brown* majority and need not be addressed here, as the parties agree that relief in this case ought to be premised on the Court's independent legal determinations.

*Rawle*, 399 A.2d 750 (Pa. Super. Ct. 1979)). The stipulations represent the relevant facts as disclosed during the CIU's review of the case and independent investigation of Swainson's claims.

60. Where parties stipulate as to particular facts, the stipulation does away with the necessity for introducing evidence of the fact stipulated. *In re Shank's Estate*, 161 A.2d 47 (Pa. 1960). This is so even if the evidence contains otherwise inadmissible hearsay statements. *Jones v. Spidle*, 286 A.2d 366 (Pa. 1971).

61. A stipulation is part of the evidentiary record and "binds the Commonwealth, and the Court[.]" *Commonwealth v. Phila. Elec. Co.*, 372 A.2d 815, 821 (Pa. 1977); *Commonwealth v. Rizzuto*, 777 A.2d 1069, 1088 (Pa. 2001) (noting that stipulations "become the law of the case") *abrogated on other grounds by Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003); *Park v. Greater Delaware Valley Savs. & Loan Ass'n*, 523 A.2d 771, 773 (Pa. Super. 1987) ("[S]tipulated facts are binding upon the court as well as the parties"); *Tyson v. Commonwealth*, 684 A.2d 246, 251 n.11 (Pa. Cmmw. Ct. 1996)).

62. This Court need not conduct an evidentiary hearing to grant relief because no material facts remain in dispute as to the claims discussed below. Pa. R. Crim. P. 907(2); *Commonwealth v. Morris*, 684 A.2d 1037, 1042 (Pa. 1996) ("when there are no disputed factual issues, an evidentiary hearing [on PCRA petition] is not required under the rules."); *see Commonwealth v. Martinez*, 147 A.3d 517, 524 (Pa. 2016) (affirming grant of relief where "[t]he trial court held a hearing" at which "[n]o evidence was offered . . . as the Commonwealth was willing to stipulate to the facts as stated in Martinez's petition.").

63. In light of the parties' stipulation, the Commonwealth submits that the record in this case establishes that Swainson is entitled to relief as discussed more fully below. *Cox*, 204 A.3d at 387.

**SWAINSON IS LEGALLY ENTITLED TO RELIEF**

64. The Commonwealth's failure to disclose the evidence discussed above violated Swainson's right to due process as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963). Likewise, the Commonwealth's reliance on and failure to correct the false testimony presented at Swainson's trial violated his rights under *Napue v. Illinois*, 360 U.S. 264 (1959).

65. The newly discovered evidence regarding Morsell's recantation also confers jurisdiction on this Court and it warrants an evidentiary hearing under 42 Pa. C.S. § 9543(a)(2)(vi) independent of the aforementioned constitutional violations.[6]

66. If this Court agrees with the Commonwealth that Swainson is entitled to relief on any one of his claims and orders that he be granted a new trial, any of his other claims will be rendered moot.[7]

67. Thus, the Commonwealth respectfully requests that this Court defer judgment (and any evidentiary hearing, should one be necessary) on

---

[6] See the parties Joint Stipulations of Fact for details regarding efforts to interview Morsell.

[7] See *Commonwealth v. Medina*, 92 A.3d 1210 (Pa. Super. 2014) in footnote 5 where the Superior Court specifically states that where the grant of relief is affirmed as to one ground, there is no need for the court to address remaining grounds. More specifically, in *Medina*, the trial court granted relief based on newly discovered evidence so the Superior Court, in affirming that decision held there was no need to address the remaining *Brady* claim.

any remaining claims not addressed and agreed to in this answer. Such deferral would be in the interest of judicial economy and justice.[8]

68. The Commonwealth further concedes that the new evidence and the suppressed evidence in this case indicates that Swainson may be innocent of the crime for which he was convicted, *i.e.*, it is "more likely than not that no reasonable juror would have found [Swainson] guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).[9] However, given

---

[8] While the merits of these potentially moot claims may not be resolved in these proceedings, their existence is not surprising as the majority of documented wrongful convictions are the result of multiple constitutional and systems-level errors. *See generally*, BRANDON L. GARRETT, CONVICTING THE INNOCENT: WHERE CRIMINAL PROSECUTIONS GO WRONG (Harvard University Press) (2012) (discussing the cases of the first 250 wrongfully convicted people exonerated by DNA testing and highlighting that such cases generally involve numerous investigatory and trial errors).

[9] Neither the Pennsylvania legislature nor the courts have adopted a standard of proof for demonstrating "actual innocence" in post-conviction proceedings. See, e.g., *In re Payne*, 129 A.3d 546, 556 (Pa. Super. Ct. 2015) (en banc) (noting that the "quantum of evidence necessary to satisfy" the actual innocence requirement of Pennsylvania's post-conviction DNA testing statute, 42 Pa.C.S. § 9543.1, "has never been defined"). The Commonwealth therefore relies upon the standard applied in federal courts "where when the claimed injustice is that constitutional error has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Under those circumstances, the standard for "actual innocence" is defined as whether it is "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006) (describing *Schlup* innocence standard); see also *Commonwealth v. Conway*, 14 A.3d 101, 109 (Pa. Super. 2011) (noting parties' agreement that the *Schlup* standard for actual innocence applied in context of proceedings under post-conviction DNA testing statute).

the Commonwealth's inability to completely assess the Morsell recantation claim, any recommendation or agreement as to Swainson's claim of innocence would be premature at this time.

*Brady v. Maryland*

69. The Commonwealth has an obligation to disclose to the defense information that is favorable to the guilt or punishment of the defendant. *Brady v. Maryland*, 373 U.S. 83 (1963).

70. This obligation requires that the Commonwealth disclose information that is exculpatory as well as impeaching. *Smith v. Cain*, 565 U.S. 73 (2012). And, this obligation extends to information possessed by law enforcement in the same jurisdiction as the prosecutors. *Kyles v. Whitely*, 514 U.S. 419, 434 (1995).

71. Evidence is material within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Cone v. Bell*, 556 U.S. 449, 470 (2009).

72. A reasonable probability does not mean the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Kyles v. Whitely*, 514 U.S. 419, 434 (1995).

73. In sum, to succeed on a *Brady* claim, the petitioner must establish:

> the evidence was favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued.

*Commonwealth v. Burke*, 781 A.2d 1136, 1141 (Pa. 2001).

74. A claim may be established regardless of the good or bad faith of the prosecutor.

*Napue v. Illinois*

75. It is well settled that the Commonwealth may not knowingly use false evidence, including false testimony, to obtain a tainted conviction. *Commonwealth v. Hallowell*, 383 A.2d 909, 911 (Pa. 1978) (citing *Napue v. Illinois*, 360 U.S. 264 (1959)).

76. A conviction obtained through the knowing use of materially false evidence/testimony may not stand. *Id.* A prosecuting attorney has an affirmative duty to correct the testimony of a witness which he knows to be false. *Id.* The prosecutor may not present testimony that it knows is false, without correcting the error as soon as it becomes known. The knowledge of one prosecutor is attributable to all the prosecutors in the same office. *Id.* at 238.

77. A strict standard of materiality is applied such that the false testimony is material—and a new trial is required—if it could in *any reasonable likelihood* have affected the judgment of the jury." *Commonwealth v. Wallace*, 455 A.2d 1187, 1190–91 (Pa. 1983) (citations and quotations omitted).

*New Evidence - § 9543(a)(2)(vi)*

78. To be eligible for relief based on newly-available evidence under § 9543(a)(2)(vi), Swainson must demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will

not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted. *Commonwealth v. Padillas*, 997 A.2d 356, 363 (Pa. Super. 2010) (citing *Commonwealth v. Pagan*, 950 A.2d 270, 292 (Pa. 2008)).

79. In *Commonwealth v. Lambert*, 884 A.2d 848, 852–53 (Pa. 2005), the Pennsylvania Supreme Court held that a PCRA court has jurisdiction under the *newly discovered evidence exception* to review a *Brady* claim so long as the facts supporting the *Brady* claim were known to the police and not known to the petitioner until the PCRA petition was filed.[10]

**THE SUPPRESSED EVIDENCE, THE FALSE EVIDENCE AND THE NEW EVIDENCE**

80. Swainson's petition alleges (and the Commonwealth concedes) that significant exculpatory and impeaching evidence in this case was withheld and that false evidence was used. If the suppressed evidence had been disclosed and the false evidence had either not been admitted or been corrected as the Pennsylvania and United States Constitutions demand, the outcome of his case would have been different.

81. Swainson is entitled to relief under 42 Pa. C.S. § 9543(a)(2)(i), as the suppression violated his right to due process under both the Pennsylvania and United States Constitutions.

---

[10] *Lambert* held that the Court's jurisdiction does not otherwise depend on the merits of a *Brady* claim; there is jurisdiction even if the withheld information is not material for *Brady* purposes. *Lambert*, 884 A.2d at 852-53. In any event, the Commonwealth concurs with Swainson that the withheld evidence was material and concedes that *Brady* was violated here.

*Presley Was Arrested Under the Alias of "Kareem Miller"*

82. At Swainson's trial, Presley testified that he had open "possession" charges without mentioning that he had been arrested for felony Possession with Intent to Deliver. He also denied being known by any aliases other than a specific few which did not expressly include Kareem Miller.

83. As alleged in Swainson's petition, at the time that Presley testified against Swainson, he was being held in local custody after being arrested under the name Kareem Miller for Possession with Intent to Deliver on July 28, 1988, in the same police district where Opher was murdered. Due to the passage of time and state retention schedules, no additional information on the Kareem Miller arrest is available from either the police department or DAO.

84. At the time of that arrest, Presley had an open fugitive case listed for status on August 8, 1988. Due to being arrested under a fictitious name, he was not brought down for the August 8th hearing and a bench warrant was issued for his failure to appear. Then for reasons unknown, the hearing was eventually rescheduled to February 15, 1989. However, February 15, 1989, was one of the days that Detective Santiago brought Presley to the District Attorney's Office to make a statement, so he did not appear in court that day either.

85. A review of the DAO file proves that, not only is Swainson's allegation correct about the link between Presley and Kareem Miller, but the Commonwealth was aware that Kareem Miller and Presley were the same person at the time of trial as evidenced by the below referenced documents located in the DAO trial file.

86. A copy of a "Bring down Order" for Presley's February 17, 1989 interview with Detective Santiago located in the DAO trial file clearly states Presley's alias was Kareem Miller.

87. A single page of handwritten notes in the DAO trial file, dated July 29, 1988, also indicates that Presley and Kareem Miller share the same prison identification number. Significantly, on that same date (July 29, 1988), Presley was arraigned on the July 28th arrest and sent to county prison showing the Commonwealth had clear knowledge of that arrest.

88. However, in the face of those facts, the Commonwealth filed a response to Swainson's PCRA pleadings on April 14, 2016, prior to the recent amendment and CIU review, disputing the link between Presley and Kareem Miller and calling the allegation that they were the same person "pure speculation."[11]

89. As stated in footnote 2, Presley's July 28, 1988 felony drug charges were nolle prossed at the first trial listing of the case on July 10, 1989. Swainson, in his most recent PCRA pleading, maintains that Presley was promised leniency in exchange for testifying.

90. While there is no specific indication in any DAO records that a promise was made, there are factors that exist that support the notion that Presley certainly hoped and expected consideration from the Commonwealth in exchange for his testimony. Those factors include the early stage at which the case was withdrawn, Presley's extensive record and the gradation of the offense.

---

[11] Given the erroneous nature of that response based on what is now known, the Commonwealth withdraws its April 14, 2016 response, as well as any other Commonwealth response filed prior to the instant filing.

*Swainson Never Fled the Jurisdiction to Avoid Prosecution*

91. At the time of trial, the Commonwealth possessed evidence that proved Swainson never fled the jurisdiction to avoid prosecution.

92. On January 22, 1988, Swainson voluntarily went to the Homicide Unit and provided Detective Santiago a witness statement regarding the pending homicide investigation – he also consented to being photographed and fingerprinted.

93. In his statement, Swainson listed two Philadelphia addresses as his residence and a place of employment in New York City. He also provided his mother's name and address in New York City.

94. Swainson was never informed by Detective Santiago or anyone else that he was a suspect in the crime during the witness interview.

95. On February 15, 1988, detectives obtained an arrest warrant for Swainson and that warrant listed both of his Philadelphia addresses.

96. Suppressed activity sheets and other police documents reflect that when police attempted to serve the arrest warrant at one of those locations the afternoon after obtaining the arrest warrant, two residents of the home told police Swainson was in Jamaica on vacation until the first week of March.

97. Then on February 19, 1988, detectives were specifically told by Swainson's sister that Swainson went to Jamaica on February 11, 1988 to get married and would be returning.

98. Without ever attempting to serve the arrest warrant on Swainson at his New York address and despite the fact that he left the country prior to any knowledge of being a suspect, police labeled Swainson a fugitive.

99. On March 8, 1988, Detective Santiago recorded on an activity sheet that Swainson called him to say he had returned from Jamaica and was at his parents' house in New York.

100. Detective Santiago specifically noted on the above-referenced activity sheet that "Swinson [sic] does not know that he his [sic] currently wanted for murder, and the information was not given to Swinson [sic]."

101. Despite having personal knowledge that Swainson did not flee the jurisdiction to avoid prosecution, Detective Santiago went on to testify during trial that after he obtained an arrest warrant for Swainson, he turned the case over to the fugitive squad explaining that "[w]hen you make attempts to locate a person and even if he is within Pennsylvania but he can't be located for whatever reason, then the Fugitive Squad would take over the assignment."

102. Immediately after Detective Santiago testified, Detective Michael Cohen testified. Detective Cohen was assigned to the Fugitive Squad of the PPD Homicide division and was assigned to Swainson's case on February 18, 1988.

103. According to Detective Cohen, on February 19, 1988 he applied for a federal warrant which he described as an "unlawful flight to avoid prosecution warrant." Then a few weeks later, Swainson was arrested on March 9, 1988 in New York.

104. At trial, the Commonwealth elicited testimony from Detective Cohen regarding Swainson's appearance when he was arrested and how at the time of his arrest, he appeared redder than how he looked in his January photograph (although this witness had no personal knowledge that Swainson had been in Jamaica, he testified that he had learned, to the best of his knowledge, that Swainson had been to Jamaica and when the

prosecutor asked the following question, "Do you know whether he had any kind of sunburn when he came back?" he replied "It could have been...).[12]

105. Finally, the prosecutor argued in her closing statement that Swainson's "leaving town" from Philadelphia to Jamaica and then New York was evidence of "consciousness of guilt."

*Alternate Suspects - The "Hold-up Attempt" and Allen Proctor &*
*The Known Assailant "Kevin Pearson"*

106. On January 21, 1988, just four days after the crime, detectives interviewed Vernon Montague, a friend of Opher's.

107. Montague's interview was documented in a homicide activity sheet that same day when a detective wrote that Montague told police that "word being passed around on the streets is that [Opher] was shot during a hold-up attempt."

108. Then on January 23, 1988, according to another homicide activity sheet related to this investigation, the assigned detectives assisted in the arrest of a man named Allen Proctor for a separate earlier homicide.

109. Despite the arrest of Proctor, neither the DAO file or the homicide file contain any other mention of Proctor and his connection to, or the possible role he played in, the murder of Opher.

110. After a CIU search for records regarding Proctor in January 2020, the Commonwealth learned that Proctor's arrest on January 23, 1988

---

[12] This evidence appears to have been elicited for the additional reason of shoring up issues relating to Presley's identification of Swainson because Presley described the shooter as having "dark skin" in his original statement and during the preliminary hearing yet during trial he described Swainson as the shooter and described Swainson as having "red skin."

was for a murder committed on September 21, 1987 at 3:45 am – under similar circumstances and in the early morning hour as Opher's murder.

111. According to the homicide file in the 1987 murder, Proctor and two other men held up the victim, a drug dealer, at gunpoint then Proctor fired a gun and killed him.

112. A few months after the preliminary hearing in that case, Proctor's bail was lowered and he was released on September 16, 1988.

113. While on bail, on December 31, 1988, Proctor along with Leonard Roberts murdered another man during an argument inside a drug house.

114. A witness in the second homicide case heard that Proctor "was sticking up the dope dealers in the neighborhood."

115. A police activity sheet in the second homicide case reflects that officers in the district described Proctor as "a holdup guy and always has a gun on his person."

116. Then on January 9, 1989, a warrant was issued for Proctor's arrest for the second homicide that occurred on December 31, 1988.

117. Before he was arrested on the second homicide, Proctor got into an altercation with a drug dealer who shot and killed him on January 10, 1989.

118. According to a witness in the Proctor homicide, Proctor was killed after robbing someone who returned fire when Proctor shot at him – and that witness specifically stated Proctor had been "robbing us from time to time for months."

119. At the time of trial, the Commonwealth possessed evidence that detectives suspected Proctor may be involved as an alternate theory of

the crime and even assisted in the arrest of Proctor in a separate murder committed in a similar manner as the Opher murder.

120. However, in Montague's written witness interview, a copy of which was disclosed to Swainson at the time of trial, Montague is only recorded as saying that there was a rumor that the drug house was being moved. None of the activity sheets referenced above were disclosed to the defense at the time of trial.

121. By suppressing both the narrative of the "hold-up attempt" and any mention of Proctor's name, Swainson was prevented from discovering any of the above and investigating Proctor as an alternate suspect.

122. Had this information been disclosed, it would have also corroborated information in both of Swainson's statements that Swainson heard the murder occurred as a result of a hold-up (interestingly, he said this in his January 22, 1988 statement the day before the assigned detectives arrested Proctor for the 1987 homicide).

123. A second possible suspect was also identified on January 21, 1988, four days after the shooting when Homicide Detective Joseph Fisher sent a request to the police photo lab to have Presley's left hand photographed as evidence of the injury he sustained during the incident.

124. On the photograph request form, under the section "Known Assailants," the name "Kevin Pearson" is hand-written in (a name that does not appear in any other police paperwork related to the case).

125. At that stage of the homicide investigation, the only people who witnessed the shooting who were interviewed by police were Presley and Hines – and the police documentation regarding those interviews does not reflect that either witness mentioned a "Kevin Pearson."

126. Although not entirely clear, it appears as if Presley may have identified Kevin Pearson as a "known assailant" because Pearson was identified on official police paperwork filled out at the time photographs of Presley's injuries were taken by police.

127. If Presley identified Pearson as a known assailant, Pearson is not simply an alternate suspect the Commonwealth failed to disclose; his identification by Presley also constitutes an undisclosed, inconsistent statement by the Commonwealth's sole eyewitness to the crime.

128. The CIU's investigation has revealed a Kevin Pearson with a Philadelphia arrest record around the same time as this incident which includes arrests for robbery and witness intimidation.

*Morsell's Recantation is New Evidence and an Evidentiary Hearing is Warranted*

129. Swainson's pleadings and Morsell's affidavit establish that Swainson did not know Morsell lied during her trial testimony as a result of third party threats and coercion. Due to the threats and coercion, Swainson also could not have discovered the new evidence with reasonable diligence prior to the 2014 interview with Swainson's defense team. Thus, Swainson has met the newly-discovered fact exception to the PCRA time-bar. See *Commonwealth v. McCracken*, 540 Pa. 541, 659 A.2d 541, 545 (1995).

130. The CIU has attempted to interview Morsell on several occasions but has been unsuccessful. Based on that fact, as well as the apparent attempt to recant the 2014 recantation, it is difficult to make a credibility determination without an evidentiary hearing.

131. In order to assess whether the information contained in the 2014 Morsell recantation "would likely result in a different verdict if a new trial were granted," the Commonwealth would like to elicit testimony from

at least two witnesses – Morsell and Mike Miller (or whoever interviewed her on behalf of the Law Department at the City of Philadelphia). See *Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167, 1181 (1999).

*Materiality and Different Outcome*

132. The Commonwealth concedes that the evidence at issue here was suppressed. That suppression continued throughout the investigation of this crime, Swainson's trial and his direct and collateral appeals.[13]

133. Evidence is material within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Cone v. Bell*, 556 U.S. 449, 470 (2009). A reasonable probability does not mean the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Kyles*, 514 U.S. 434.

134. The suppressed evidence in this case easily meets this standard. The jury would have had significant additional information by which to judge the credibility of Presley and Morsell as well as their motives to testify. Additionally, the suppressed information regarding Swainson's purported flight would have severely undermined the theory of the crime advanced by the Commonwealth.

135. The Commonwealth's suppression of Presley's alternate identity "Kareem Miller" and active criminal record at the time of trial corroborates Swainson's claim, and Presley's assertion in his 2008 affidavit,

---

[13] For example, as recently as November 2017, the Commonwealth argued that Swainson "fled to Jamaica" in order to avoid prosecution.

that he was given a benefit for his testimony that the Commonwealth hoped to hide.

136. By repeating Presley's claim that he was facing an open charge of "possession" and by concealing the true nature of Presley's open charges and functionally restricting defense counsel's ability to cross-examine, the Commonwealth violated Swainson's due process rights as delineated by *Napue* and *Davis*.

137. In the initial days after Presley was arrested and charged with Aggravated Assault, it appears he likely identified Pearson as a known assailant. Around that same time, homicide detectives were also given information regarding Proctor as a possible suspect. Since Presley had already given inconsistent testimony at the preliminary hearing, and in statements to a defense investigator, and the Commonwealth had evidence corroborating the "hold- up" alternate theory of the crime, had the jury heard any of this evidence, it would have changed the result at trial.

138. Additionally, the Commonwealth violated *Napue* again when the trial prosecutor presented evidence and argued that Swainson fled to avoid prosecution because Swainson was not aware he was a suspect, he was never told to remain in the jurisdiction, and he kept the police informed of his whereabouts when they reached out to locate him.

139. Presenting false evidence of flight and arguing it as consciousness of guilt is a clear violation of Swainson's due process rights.[14]

---

[14] It is of no moment whether the prosecutor herself was aware of this evidence, as the information was known to the police and was therefore imputed to the prosecutor. See *Commonwealth v. Wallace*, 455 A.2d 1187, 1191 (Pa. 1983) (finding *Napue* violation where State Trooper was aware of particular testimony's falsity).

140. As noted above, there is a reasonable probability of a different result—*i.e.*, it is likely the jury would have acquitted Swainson—if the suppressed evidence had been available to him at trial. *Id.*; *Brady*, 373 U.S. 83 (1963). The Commonwealth concedes that this evidence is material. *United States v. Agurs*, 427 U.S. 97, 103 (1976).

## CONCLUSION

141. After careful consideration of the individual facts of this case, the relevant law, and the role of the prosecutor as a "minister of justice," *see* Pa. R. Prof. Resp. 3.8 comment 1 (Special Responsibilities of a Prosecutor), the Commonwealth agrees that Swainson's conviction resulted from a violation of his right to due process as described by *Brady* and its progeny, *i.e.*, the suppression of evidence that would have changed the outcome of his trial, as well as the Commonwealth's reliance on false testimony in violation of *Napue.* Swainson is entitled to post-conviction relief in the form of a new trial under 42 Pa. C.S. § 9543.

THEREFORE, the Commonwealth asks this Court to vacate the sentence, and order a new trial.

Respectfully submitted,

Andrew Wellbrock
Assistant District Attorney
Conviction Integrity Unit

## VERIFICATION

The undersigned hereby verifies that the facts set forth in the foregoing motion are true and correct to the best of my knowledge, information, and belief. This verification is made subject to the penalties for unsworn falsification to authorities under 18 Pa. C.S. Section 4904.

Andrew Wellbrock
Assistant District Attorney

Date: 2/12/2020

## AFFIDAVIT OF SERVICE

I, ANDREW WELLBROCK, Assistant District Attorney, hereby certify that, on February 12, 2020, I served a true and correct copy of the within motion for the above-captioned matter to the following via hand delivery or electronic delivery:

The Honorable Shelley Robins New
Criminal Justice Center Room 1213
1301 Filbert Street
Philadelphia, PA 19107

Nathan J. Andrisani
Jacqueline C. Gorbey
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

Nilam A. Sanghvi
The Pennsylvania Innocence Project
Temple University Beasley School of Law
1515 Market St., Suite 300
Philadelphia, PA 19102

Craig Cooley
Cooley Law Office
1308 Plumdale Court
Pittsburgh, PA 15239

Andrew Wellbrock
Assistant District Attorney

Date: 2/12/2020