AS (CIU Physical File)000038

FILED
02/12/2020 04:53:53 PM
Post Trial Unit
By: M. DON

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**CRIMINAL SECTION TRIAL DIVISION**

| | | |
|---|---|---|
| COMMONWEALTH | : | |
| | : | |
| v. | : | CP-51-CR-0431311-1988 |
| | : | |
| ANDREW SWAINSON | : | |

# JOINT STIPULATIONS OF FACT OF PETITIONER ANDREW SWAINSON AND RESPONDENT COMMONWEALTH OF PENNSYLVANIA[1]

LAWRENCE S. KRASNER, the District Attorney of Philadelphia County, by his assistant, Andrew Wellbrock, and Petitioner Andrew Swainson, through his undersigned *pro bono* attorneys, move this Court to accept and adopt the following stipulations of fact[2] derived from the record and the post-conviction investigation into this matter.

---

[1] These stipulations of facts are submitted by the Commonwealth and are being filed as joint stipulations by agreement of the parties as evidenced by the signature of Swainson's counsel and counsel for the District Attorney.

[2] "A stipulation is a declaration that the fact agreed upon is proven." *Commonwealth v. Rizzuto*, 777 A.2d 1069, 1088 (Pa. 2001), *abrogated on other grounds by Commonwealth v. Freeman*, 827 A.2d 385 (2003). "Parties may by stipulation resolve questions of fact or limit the issues, and, if the stipulations do not affect the jurisdiction of the court or the due order of the business and convenience of the court they become the law

## FACTS DERIVED FROM THE INITIAL INVESTIGATION AND THE TRIAL RECORD

### *The Crime and Police Investigation*

1. At approximately 3:40 am on January 17, 1988, Stanley Opher was shot on the front porch of 5413 Sansom Street. He died the next day.

2. Paul Presley, Jeffrey Green and Ashley Hines were each arrested leaving the scene and charged in connection with the shooting.

3. Police Officer John Kay heard the gunshot from up the street and then immediately observed Presley running from the direction of 5413 Sansom Street. He also saw Green running approximately 10 feet behind Presley.

4. Officer Kay pursued the men and apprehended Presley after finding him hiding near the bushes on the lawn of a house on 55th Street near Sansom Street. Presley was bleeding from his left hand and had large amounts of blood on his coat.

5. Green was arrested nearby as well.

6. Hines was arrested after an officer observed him leaving 5413 Sansom shortly after Presley and Green were arrested.

---

of the case." *Id.* (quoting *Parsonese v. Midland National Ins. Co.*, 706 A.3d 814, 815 (Pa. 1998), *abrogated on other grounds by Sveen v. Melin*, 138 S. Ct. 1815 (2018)).

7. Within minutes of the shooting, Police Officer Robert Rouse asked Opher, who was still conscious and crying for help on the ground in front of 5413 Sansom Street, to tell him what happened. Opher replied, "they shot me in my back."

8. Later, at Misericordia Hospital, Police Officer Stephen Szymanski reported hearing Opher tell nurses that he was "shot with a shotgun." Opher never identified his assailants.

9. Philadelphia Homicide Detective Manuel Santiago was assigned to lead the investigation of Opher's murder.

10. Detective Santiago's investigation focused on individuals known to have worked in the drug house at 5413 Sansom Street, and he interviewed many of them, including Swainson.

11. On January 18, 1988, police interviewed Jacqueline Morsell, a good friend of Opher's, about Opher's murder.

12. Morsell provided a nine-page statement describing her knowledge of Opher's work in the drug operation at 5413 Sansom Street that did not implicate Swainson in the shooting or mention him other than to indicate that he worked at the drug house.

13. Morsell provided police a physical description of Swainson.

14. Morsell also provided information about three other individuals who worked in the drug operation: "Dred," "Indian," and Green.

15. According to Morsell, a week before the shooting, Opher got into an argument with "Dred" over not being paid. During the argument, "Dred" said "keep talking shit, and I will shoot you in your pussy." Morsell explained this meant that "Dred" would kill Opher.

16. When asked if she ever saw any weapons inside 5413 Sansom Street, Morsell said: "Yes. 'Dred' has shotguns, rifles, .45 automatic, an UZI as they call it and a snub nose that they call it."

17. When police showed her a 12-gauge bolt action shotgun, Morsell said that she had "seen Dred cleaning it in the living room" of the drug house. She also told police that she had "seen 'Indian' with" a sawed-off shotgun.

18. Morsell identified Green as someone that "used to sell drugs out of 5413 Sansom Street, but now he buys drugs from 5413 Sansom Street."

19. Hines was interviewed on January 21, 1988 and did not provide any relevant information to the investigation.

20. The police did not ask Hines for physical descriptions of any of the people he saw on the street the night of Opher's shooting.

21. On January 22, 1988, Swainson provided a voluntary, exculpatory statement to Detective Santiago. During this interview, Swainson allowed Detective Santiago to take a photograph of him and provided his fingerprints. Detective Santiago did not tell Swainson that he should not or could not leave Philadelphia while police were investigating the shooting.

22. On January 25, 1988, police interviewed Green who, other than identifying Presley as someone he had seen before, did not provide any relevant information.

23. The police did not ask Green for physical descriptions of any of the people he saw on the street the night of Opher's shooting.

24. On February 10, 1988, the Commonwealth withdrew all charges against Presley, Hines and Green.

25. On February 12, 1988, Detective Santiago interviewed Presley about what he saw the night of the shooting.

26. Presley gave a six-page statement in response to Detective Santiago's questions. Presley described a long night of drinking alcohol and getting high on cocaine with his girlfriend at her house at 1750 North Peach Street in the Wynnefield neighborhood of Philadelphia before leaving the house, catching a bus, and heading to 5413 Sansom Street at approximately 3:00 am to buy more drugs.

27. Presley told Detective Santiago that he was on the porch of the drug house at the time of the shooting and saw two gunmen who he had no recollection of ever seeing before that night.

28. Detective Santiago did not ask Presley for a physical description of either of the two gunmen.

29. The only physical description that Presley provided of the shooter was: "brown skin dude." Detective Santiago never asked Presley to expand on that description.

30. Presley never provided any physical description of the second gunman.

31. According to the police report of the interview, Detective Santiago asked whether Presley would be able to recognize the shooter and showed him a series of photographs from which Presley identified Swainson.

32. Presley told Detective Santiago that he believed he would also be able to recognize the second gunman, but there is no evidence or police documentation indicating that Detective Santiago ever showed Presley any photographs, including any photographs of "Dred," in an effort to identify the second gunman.

33. On February 15, 1988, Detective Santiago obtained an arrest warrant for Swainson based on Presley's photo identification. Later that day, Detective

Santiago attempted to locate and apprehend Swainson at a house in Philadelphia, but Swainson was not there.

34. On March 9, 1988, the Fugitive Squad arrested Swainson in New York.

35. On March 17, 1988, Swainson waived his Miranda rights and gave a second statement to police.

36. On April 14, 1988, at Swainson's preliminary hearing, Presley testified that Swainson was not Opher's shooter and that he could not identify Swainson as the shooter because Swainson is "red-skinned," while the shooter was "brown-skinned" and "darker complected."

37. Swainson was held for court on all charges based on the evidence of Presley's prior photo identification.

38. On June 10, 1988, Presley met with defense investigator Terrance Gibbs and executed an affidavit in which he stated that Swainson was not the shooter because the shooter was "much darker" skinned.

39. On February 15 and 17, 1989, Detective Santiago interviewed Presley at the District Attorney's Office about Presley's preliminary hearing testimony and the June 10, 1988 affidavit.

40. According to police reports of Presley's statements, Presley told Detective Santiago he refused to identify Swainson at the preliminary hearing

because he assumed that Swainson was behind an assault he had suffered in jail two days before the preliminary hearing.

41. According to the police reports of Presley's statements, Presley also said that his affidavit was false and that he signed it only because the defense investigator (Gibbs) had pressured, threatened, and bribed him.

*The Trial*

42. Swainson was tried before a jury from March 16, 1989 to March 21, 1989. Judge Albert F. Sabo presided.

43. On March 17, 1989, Presley testified for the Commonwealth at Swainson's trial.

44. Presley testified that he was "certain" Swainson was the shooter and had "no problem" picking his photograph.

45. Presley testified that his April 14, 1988 preliminary hearing testimony was false and that he did not identify Swainson because he feared for his life as the result of the attack he suffered in prison.

46. Presley said that he assumed Swainson was behind the assault inflicted by an inmate named James Brown – who broke Presley's jaw and struck him in the head with a wooden bench two days before he was scheduled to testify at Swainson's preliminary hearing.

47. During cross examination by the defense, Presley admitted that Brown had told him and prison officials that he beat Presley up because Presley had stolen his shoes. Prison officials punished both Presley and Brown for the stolen shoes and the assault.[3]

48. Regarding his June 10, 1988 affidavit, Presley testified that he only signed the affidavit due to threats and offers of bribes from defense investigator Gibbs.

49. In response to the prosecutor's question "[d]id you make any kind of a deal, any kind of arrangements, any promises made to you in exchange for your testifying in this case?," Presley unequivocally stated no.

50. The only other witness against Swainson at trial was Jacqueline Morsell.

51. Morsell testified that Swainson had a reputation for being "pistol happy," was nicknamed "Blood" because he bragged about killing people, and that she had seen him handling and cleaning the sawed-off shotgun used to kill Opher.

---

[3] In an attachment to Swainson's second PCRA petition, a letter dated October 29, 2008 from Brown further corroborates that Swainson had nothing to do with the assault.

52. Morsell also testified that Swainson and his associates were concerned that Opher planned to quit working in the drug house, and they were worried that Opher would snitch on them.

53. At trial, the Commonwealth also presented evidence of flight.

54. Detective Santiago testified that Swainson went to Jamaica and referred to him as a "fugitive" at trial.

55. Detective Santiago further testified about the process for pursuing "people that leave the Philadelphia area [to] insure their arrest" and said that he turned the assignment of arresting Swainson over to Detectives Cohen and Alexander of the Fugitive Squad.

56. Detective Cohen testified that he applied for "an unlawful flight to avoid prosecution warrant" while Swainson was in Jamaica on February 18, 1988.

57. At the Commonwealth's request, the trial judge instructed the jury that evidence of flight could be used to show consciousness of guilt.

58. The Commonwealth argued to the jury that Swainson's trip to Jamaica and return to his parents' home in New York was an attempt to avoid prosecution and was evidence of consciousness of guilt.

59. The jury deliberated over the course of two days. During those deliberations, they made requests to have Presley's testimony read to them and to see the map of the street, photos, and "the line-up shots."

60. The jury convicted Swainson of first-degree murder, criminal conspiracy, and possessing an instrument of crime on March 21, 1989.

## POST-CONVICTION LITIGATION

61. The Pennsylvania Superior Court affirmed Swainson's conviction and sentence on June 26, 1990, and the Pennsylvania Supreme Court denied his petition for allowance of appeal on February 5, 1991.

62. Swainson filed his first Post Conviction Relief Act (PCRA) petition on January 12, 1993. While that petition was pending, Swainson filed a *habeas corpus* petition in federal court on February 24, 1993. On March 18, 1993, the PCRA court dismissed Swainson's petition without prejudice in light of the pending federal petition. On July 15, 1993, the federal court dismissed the habeas petition for failure to exhaust state remedies.

63. On August 3, 1993, Swainson re-filed his PCRA petition alleging ineffective assistance of counsel. The PCRA court dismissed the petition on August 6, 1997 after an evidentiary hearing. The Superior Court affirmed the dismissal on

July 13, 1998, and the Supreme Court denied Swainson's petition for allowance of appeal on December 30, 1998.

64. On December 20, 1999, Swainson re-filed his federal *habeas corpus* petition. The petition was dismissed on February 19, 2002. Swainson did not appeal.

65. In April 2004, Swainson applied for DNA testing pursuant to 42 Pa. C.S. § 9543.1. The PCRA court denied the petition on March 14, 2006, and the Superior Court affirmed on October 23, 2007.

66. On December 11, 2008, Swainson filed his second PCRA petition based on Presley's recantation of his trial testimony. The PCRA court dismissed the petition without a hearing on May 14, 2010. The Superior Court affirmed on December 2, 2011.

67. On March 17, 2012, Swainson sought permission from the United States Court of Appeals for the Third Circuit to file a second federal *habeas corpus* petition based primarily on Presley's recantation, which was granted on April 25, 2012. The District Court denied relief on that petition on July 16, 2014, and the Third Circuit affirmed on August 13, 2015.

68. On August 18, 2014, Swainson filed his (current) third PCRA petition based on, among other things, Morsell's recantation of her trial testimony. He

amended that petition on July 13, 2017 (within 60 days of obtaining previously-suppressed evidence from the Opher homicide file) to raise *Brady* claims.

69. On July 11, 2018, Swainson again sought permission from the United States Court of Appeals for the Third Circuit to file a successive *habeas* petition, which the Third Circuit granted on October 15, 2018. Swainson's *habeas* petition was then filed in the Eastern District of Pennsylvania. Swainson amended the petition on January 24, 2020. That proceeding is currently stayed in the Eastern District of Pennsylvania.

70. On November 18, 2019, Swainson once again amended his current PCRA within one year of the Commonwealth's disclosures of previously-suppressed evidence regarding Presley and Swainson's alleged flight discussed in these stipulations.

## CIU INVESTIGATION AND DISCLOSURE OF SUPPRESSED EVIDENCE

### *The Investigation*

71. On February 23, 2018, Swainson, through his attorneys, submitted a formal request that the Conviction Integrity Unit (CIU) in the District Attorney's Office review and investigate his case and claim of innocence.

72. The CIU began its review and investigation into Mr. Swainson's case in July 2018.

73. The CIU reviewed the prosecution file and all the transcripts in the case along with a copy of the homicide file that Swainson had received in 2017 as a result of discovery provided in the Section 1983 civil rights law suit filed by Anthony Wright.[4]

74. On September 17, 2018, the CIU made a request to inspect and copy the original homicide file in the possession of the Philadelphia Police Department Homicide Unit (the "Homicide File").

75. The Homicide File was not made available to the CIU until March 2019.

76. The CIU provided a copy of the Homicide File to defense counsel on March 21, 2019.

77. Several pieces of evidence in the partial copy of the Opher homicide file obtained in 2017 and in the full Homicide File obtained in 2019 had never previously been disclosed to Swainson or his trial counsel.

---

[4] In June 2017, Swainson's counsel obtained a partial copy of the homicide file related to the investigation of Opher's murder. It was provided by the City of Philadelphia in discovery in a federal civil rights lawsuit against several detectives, including Detective Santiago (the detective assigned to investigate Opher's shooting). Wright's claim, which was settled in 2018, was that the Philadelphia Police Department had engaged in a pattern and practice of misconduct "in homicide investigations" where they used coercive interview and interrogation techniques to obtain confessions and incriminating witness statements.

78. During the course of the CIU investigation, the CIU endeavored to interview relevant witnesses – with the understanding that the two critical witnesses are Presley and Morsell.

79. Presley, however, died on November 15, 2009.

80. Morsell was contacted on December 11, 2019 and at that time, she agreed to meet and participate in an interview on December 19, 2019.

81. On December 19, 2019, at the time scheduled for the interview, Morsell did not answer her door or phone.

82. On December 26, 2019, the CIU contacted Morsell again by phone. A woman who sounded like Morsell answered the phone and then abruptly hung up after being told that the call was coming from the CIU.

83. On February 4, 2020, the CIU reached out to Morsell by mail with no response.

84. The CIU also reached out to the City Law Department in an attempt to get information regarding the facts and circumstances regarding the affidavit Morsell provided by Mike Miller in December 2018.

85. On February 12, 2020, citing work-product privilege, the Law Department declined to provide additional information.

86. On February 3, 2020, as part of the investigation, the CIU spoke with former Assistant District Attorney (ADA) Judith Rubino, the trial prosecutor, who stated that she recalled the evidence against Swainson at trial as being weak.

*Suppressed Evidence Related to Paul Presley*

87. As noted in Swainson's PCRA pleadings, during the defense's post-conviction investigation, Swainson's counsel discovered information indicating that, between the preliminary hearing and trial, Presley had been arrested and prosecuted under the fictitious name Kareem Miller under CP-51-CR-1024751-1988 for felony possession with intent to deliver (35 P.S. § 780-113(a)(30)) and misdemeanor possession of a controlled substance (35 P.S. § 780-113(a)(16)). This arrest did not appear on Presley's criminal history at trial and no records exist as to when it was merged.[5]

88. Although attempts have been made, the District Attorney's Office has been unable to locate any police paperwork or prosecution file relating to the "Kareem Miller" case.

89. As part of the investigation, the CIU reviewed the District Attorney's Office's file (the "DAO File) related to Swainson's prosecution and discovered that

[5] As discussed *infra*, this information was suppressed in the DAO File.

prosecutors had information related to Presley's July 1988 arrest under the name "Kareem Miller."

90. The DAO File contained a February 17, 1989 bring-down order used to arrange for Presley to be transported from prison to the District Attorney's Office for a meeting with Detective Santiago. The order reads: "Paul Presley AKA Kareem Miller."

91. The DAO File also contained a page of notes listing Presley and Kareem Miller with the same inmate number and also listing Kareem Miller with the date of July 29, 1988, the date that Presley was arrested, charged, and incarcerated under that name.

92. Presley was incarcerated in Philadelphia under the fictitious name Kareem Miller for seven months leading up to Swainson's trial.

93. The Commonwealth dismissed all charges against Presley in the case captioned *Commonwealth v. Kareem Miller*, CP-51-CR-1024751-1988 on July 10, 1989, which was the very first trial listing of the case and the first listing of any type after Swainson's trial.

94. The Commonwealth now concedes that Presley was the person arrested, charged, and incarcerated in Philadelphia under the fictitious name

"Kareem Miller" in the case *Commonwealth v. Kareem Miller*, CP-51-CR-1024751-1988.

95. The Commonwealth provided the Presley/Miller documents from the DAO File to Swainson's counsel on July 2, 2019.

96. Information regarding Presley's arrest in the case *Commonwealth v. Kareem Miller*, CP-51-CR-1024751-1988, was not provided to Swainson or his counsel before or during trial.

97. Former ADA Rubino said that she does not recall seeing the bring-down order or page of notes regarding Kareem Miller (aka Paul Presley).

98. However, she stated that if she had seen them, she would have provided them to the defense.

*Suppressed Evidence Related to Swainson's Alleged Flight*

99. As stated in paragraph 76 *supra*, the Commonwealth disclosed the complete Philadelphia Police Department Homicide File related to the investigation of Opher's murder to Swainson's counsel on March 21, 2019.

100. The Homicide File contained activity sheets and "attempt to apprehend logs" showing that, as of February 15, 1988, Philadelphia police were aware that Swainson had gone to Jamaica for a few weeks and would be returning

during the first week of March. Nonetheless, Philadelphia Police compiled a "fugitive package" on Swainson.

101. These activity sheets and logs also show that police knew as early as February 19, 1988 that Swainson had left for Jamaica on February 11, 1988 and was set to return to Philadelphia the first week of March 1988.On February 20, 1988, Philadelphia Police Detective Bureau Chief Inspector Robert Wolfinger wrote a letter asking Deputy District Attorney Raymond Harley to seek a federal warrant charging Swainson with unlawful flight to avoid prosecution on the charge of murder. Chief Inspector Wolfinger stated that Detective Santiago was assigned to the homicide investigation and that the investigation "revealed that Andrew Swainson informed persons close to him that, after the murder, he was going to flee to Jamaica." Given the information documented by police, it is clear that Inspector Wolfinger made this request on the basis of erroneous evidence.

102. Documents in the Homicide File also show that Swainson contacted Detective Santiago upon his return from Jamaica and told him that he was staying at his parents' house in the Bronx, New York. Detective Santiago noted that he did not inform Swainson of the warrant for his arrest.

103. This information was not disclosed to Swainson or his counsel before or during trial.

104. The trial prosecutor emphasized Swainson's alleged fugitive status to the jury during closing arguments.

105. The Commonwealth also sought and obtained a jury instruction regarding flight. The Commonwealth specifically asked Judge Sabo to charge the jury "both on flight from the scene and the evidence that he left the country," stating that "[t]here is evidence that after he is picked up by the police on January 22nd and knew that they were considering him as a suspect, he left the country. And left the jurisdiction of Philadelphia entirely. He went to New York after he came back from Jamaica, he didn't return to Philly."

106. Former ADA Rubino said that she does not recall seeing Detective Santiago's activity sheets and reports regarding Swainson's trip to Jamaica documenting the fact that before trial: [1] Santiago knew Swainson left for Jamaica before an arrest warrant was issued for him and [2] Swainson did not know he was a suspect nor did Santiago ever tell Swainson he was a suspect.

107. She stated that if she had seen the Santiago activity sheets and reports, she would have provided them to the defense.

108. In regard to the issue of flight, former ADA Rubino said that had she known the above-described information, she would not have argued flight as consciousness of guilt at trial.

*Suppressed Evidence Related to Other Suspects and Theories of the Crime*

109. Several pieces of evidence in the partial copy of the Opher homicide file obtained in 2017 by Swainson's defense counsel had never previously been disclosed to Swainson or his trial counsel, including documentation indicating that Presley had identified "Kevin Pearson" as his assailant and police activity sheets noting that a witness, Vernon Montague, corroborated Swainson's statement that he heard that the murder occurred during a hold-up attempt.

110. In one of the activity sheets turned over in that production, detectives noted that they participated in the arrest of a man named Allen Proctor the day after they spoke to Montague. There is no other mention of Proctor anywhere else in the Homicide File or in the DAO File.

111. In an effort to locate more information about Proctor, beginning in January 2020, the CIU searched archives and databases to locate the homicide for which Proctor had been arrested. In doing so, the CIU learned that there were three homicides related to Proctor.

112. Proctor's arrest on January 23, 1988 was for murder committed on September 21, 1987 at 3:45am (similar circumstances and timing as Opher's murder).

113. According to documents and information in the Philadelphia Police Department's homicide file for the September 21, 1987 murder, Proctor and two other men held the victim, a drug dealer, at gunpoint when Proctor fired the gun and killed him.

114. A few months after the preliminary hearing, Proctor's bail was lowered and he was released on September 16, 1988.

115. On December 31, 1988, Proctor and Leonard Roberts murdered a man during an argument inside of a drug house. A witness in that case had heard that Proctor "was sticking up the dope dealers in the neighborhood." In an activity sheet in that case, officers in the district described Proctor as "a holdup guy and always has a gun on his person."

116. The following day, Proctor was arrested for gun possession.

117. On January 9, 1989, a warrant was issued for Proctor's arrest for the December 31, 1988 homicide.

118. On January 10, 1989, Proctor got into an altercation with a drug dealer who shot and killed him. According to a witness, Proctor had been "robbing us from time to time for months. He robbed James outright, pulled out his gun and all." He went on to say that Proctor was killed after robbing someone who returned fire when Proctor shot at him.

119. This information regarding Proctor was not provided to Swainson before or during his trial. It was provided to current defense counsel until January 23, 2020.

**STIPULATED AND AGREED BY:**

Dated: February 12, 2020

*/s/ Nathan J. Andrisani*
Nathan J. Andrisani (PA ID No. 77205)
Jacqueline C. Gorbey
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
Facsimile: (215) 963-5001

Craig Cooley (PA ID No. 315673)
COOLEY LAW OFFICE
1308 Plumdale Court
Pittsburgh, PA 15239
Tel.: 919-228-6333
craig.m.cooley@gmail.com

Nilam A. Sanghvi (PA ID No. 209989)
THE PENNSYLVANIA INNOCENCE PROJECT
Temple University Beasley School of Law
1515 Market Street, Suite 300
Philadelphia, PA 19102
Tel.: 215-204-4255
nilam.sanghvi@temple.edu

*Counsel for Andrew Swainson*

Andrew Wellbrock
Assistant District Attorney
CONVICTION INTEGRITY UNIT
PHILADELPHIA DISTRICT ATTORNEY'S OFFICE
Three South Penn Square
Philadelphia, PA 19107-3499
Telephone: (215) 686-8000

*Counsel for the Commonwealth of Pennsylvania*

**VERIFICATION**

The undersigned hereby verifies that the facts set forth in the foregoing motion are true and correct to the best of my knowledge, information, and belief. This verification is made subject to the penalties for unsworn falsification to authorities under 18 Pa. C.S. Section 4904.

Dated: February 12, 2020

/s/ *Nathan J. Andrisani*
Nathan J. Andrisani (PA ID No. 77205)
Jacqueline C. Gorbey
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
Facsimile: (215) 963-5001

*Counsel for Andrew Swainson*

Andrew Wellbrock
Assistant District Attorney
CONVICTION INTEGRITY UNIT
PHILADELPHIA DISTRICT
ATTORNEY'S OFFICE
Three South Penn Square
Philadelphia, PA 19107-3499
Telephone: (215) 686-8000

*Counsel for the Commonwealth of Pennsylvania*