**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANDREW SWAINSON,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PHILADELPHIA, and Officers MANUEL SANTIAGO, JACK ROE, as personal representative of the ESTATE of MICHAEL COHEN, JAMES ALEXANDER, JOHN DELLA ROCCA, as personal representative of the ESTATES OF ARTHUR DURRANT and FRANCIS MILLER, JOSEPH D. FISCHER, and JOHN DOE, in their individual capacities,<br><br>Defendants. | Civil Action No. 2:22-cv-2163 (GEKP) |

**EXPERT REPORT OF MICHAEL K. LYNCH**

## I. Introduction and Qualifications

I have been retained by Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP and Kairys, Rudovsky, Messing, Feinberg & Lin LLP to review materials and render my written opinion regarding the Philadelphia Police Department's investigation into the January 17, 1988, murder of Stanley Opher and a history of misconduct within the Philadelphia Police Department before and after that investigation.

I am a 32-year career law enforcement professional with extensive experience, knowledge, and practice in law enforcement procedures including: preliminary response to violent crimes, criminal investigations, witness interviews, collection of evidence, use of force, management and supervision, standard operating procedures, accountability

auditing, training, criminal intelligence, shaping organizational culture and agency executive responsibilities.

Advancing through the ranks of a major city police department, I served as police officer, detective, sergeant, lieutenant, captain, police inspector, deputy chief of police, assistant chief of police and interim chief of police. During my law enforcement career, I have been directly responsible for developing and implementing systems of accountability and transforming institutional culture while rooting out corruption.

My experience as an investigator includes the preliminary investigation of hundreds of violent crimes, and the extensive investigation of more than fifty fatal motor vehicle crashes.

As the Commander of the Criminal Investigations Division, I directed and managed the investigation of organized crime syndicates, narcotics, homicide, sexual assault, robbery, aggravated assault, special victims, and property crimes. I have formed, planned, and led multi-agency investigative task force operations including collaborations with the FBI, DEA, ATF, US Marshals, Secret Service, federal prosecutors, state, county, and local law enforcement partners.

I have instructed, directed, and briefed investigative teams and supervisors on specific investigative tactics and strategies used to investigate, solve, and prevent violent crimes.

As a senior law enforcement leader, I managed the investigation of hundreds of police misconduct allegations, including insubordination, failure to police, demeanor complaints, rule infractions, excessive force, untruthfulness, constitutional violations, and negligent behavior.

During the past 24 years I have regularly researched and drafted policy & procedures for the Camden City Police Department and the Camden County Police Department. My work focuses on high-risk critical tasks/best practices in law enforcement, including policy issues relating to:

- Use of Force
- Criminal Investigations
- Interviews and Interrogation

- Early Warning Intervention
- Internal Affairs
- Property and Evidence
- Care, Custody and Transport of Prisoners
- Supervisory Practices
- Training
- Discrimination and Misconduct

I have collaborated with the Policing Project of NYU Law School, The Rodgers Group, Police Executive Research Forum, CNA, Fraternal Order of Police, NJ Attorney General's Office, local/county legal counsel and police officers holding various ranks and assignments.

In 2013, I led and directed the formation, standup, and mobilization of a 500+ member regional police force.

Between 2014 and 2023, I served as a law enforcement consultant in direct support of real-time police operations and criminal investigations. As a senior law enforcement policy advisor my work has shaped contemporary best practices and guided accreditation through the Commission on Accreditation for Law Enforcement Agencies (CALEA), a gold standard recognition earned by less than 4% of law enforcement agencies nationally.

I currently serve as Chief of Staff to the Camden County Police Department. As Chief of Staff, I assist the Chief of Police in exercising executive control and direction over management of accounting, budgeting, and auditing functions, human resource management, procurement of goods and services, administrative support services, and police records. I am responsible for developing and recommending solutions to problems related to both internal operations and police practices.

I am a graduate of the Northwestern University Police Staff and Command as well as the West Point Command and Leadership Program.

I have received numerous hours of training in criminal investigations, interviewing techniques, surveillance techniques, crime scenes, narcotics investigations, use of force, de-escalation, criminal intelligence, constitutional and criminal law,

professional standards, risk mitigation, policy development, patrol concepts and procedures, and crime prevention. I have trained hundreds of police officers in a wide variety of police procedures and tactics.

Through my extensive law enforcement career, I have gained familiarity with the practices of a variety of law enforcement agencies around the country, ranging from large to small, during the time period pertinent to this case.

I have extensive knowledge of procedures set forth by organizations such as the International Association of Chiefs of Police (IACP) and CALEA. I have been recognized as an expert witness in the criminal prosecution of police corruption in the United States District Court for the District of New Jersey.

My curriculum vitae is attached as *Exhibit B*.

My evaluation in this case is based on my training, experience, background and my knowledge of policies and practices of police agencies around the country as well as testimony and documents memorializing relevant police practices of the Philadelphia Police Department. I applied that knowledge and expertise to my examination of deposition testimony, trial testimony, and other materials listed in Exhibit A. I reserve the right to amend and/or supplement this report as I review additional material. In the last four years, I have provided expert deposition testimony in *Martinez et al v. City of Los Angeles et al*, 2:20-cv-10559 on April 6, 2022. I have not provided expert testimony at trial within the last four years. I have not authored any publications within the last 10 years.

Through my training, experience, and background I am familiar with minimally acceptable police practices—the investigative tasks that any competent police investigator must accomplish at each stage of a criminal investigation, including eyewitness identification procedures and interviews. Minimally acceptable police practices are not best practices, which may vary considerably over time and from department-to-department. Instead, minimally acceptable police practices have been consistent for decades, are well-known to any competent police officer working in the United States and constitute the bare minimum of required conduct that must be completed in any major criminal investigation. There are also minimally accepted police

practices when it comes to supervision, discipline, and accountability to prevent and remediate investigative misconduct and corruption, with which I am familiar and refer to in this report.

I am aware that the key events relevant to my opinions in this matter occurred between approximately 1988 and 1989, and, regarding discipline and supervision, during the decade before and decades after that time. I have taken this into account and my opinions are based upon minimally acceptable police practices in those years.

I have not made any credibility determinations. The terminology used in this report is not intended to invade the purview of the court or the final jury determination of credibility related to the facts, data and materials used in forming my opinions.

Should I be asked to review any additional documents I am prepared to render additional opinions or supplement the opinions stated within this report.

At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool, I will ensure that they are made available for review, if requested, prior to their use.

## II. Opher Murder Case Background

In the early morning hours of January 17, 1988, Stanley Opher was shot at 5413 Sansom Street, a house from which Opher sold drugs. When police arrived on the scene, Opher, who was badly wounded, reported "they shot me," but did not provide any additional information. Opher died from his injuries the next day.

Police initially arrested, and subsequently relied on, a purported eyewitness to the shooting, Paul Presley. Presley gave differing accounts to police. In essence, Presley maintained that he had approached the front door at 5413 Sansom to buy cocaine and was knocked down by two men he did not know who ran out of the house. Presley maintained that he struggled with one of the men and watched the other shoot Opher before both fled into the street. Presley also ran, bleeding from an injury to his hand with large amounts of blood on his coat and was arrested after he was found hiding in the bushes nearby.

Detective Manuel Santiago was assigned to the Opher murder case as the lead detective. Santiago was assisted in the investigation by Detectives James Alexander, Michael Cohen, and Francis Miller, and supervised by Lieutenant Arthur Durrant.

Presley was charged in connection with the shooting, along with two other men also discovered near the scene by police, Ashley Hines, and Jeffrey Green. The prosecution quickly dropped the charges against Hines and Green. There are numerous inconsistencies in the police documentation concerning Presley's account of what he saw and his movements following the shooting.

Other suspects also emerged from the police investigation at this time, including Allen Proctor, who appears to have robbed and murdered drug dealers in Philadelphia in a similar manner to Opher's murder. However, there is no record evidence suggesting these leads were ever investigated by Defendants or excluded as suspects.

Early in the investigation Jacqueline Morsell, a nineteen-year-old friend of Opher provided information about two potential suspects, "Dred" and "Indian," who had possible motives to murder Opher. Morsell named Andrew Swainson as someone who also sold drugs from 5413 Sansom but did not indicate that he was a likely suspect or had a motive to murder Opher. Other early witness interviews also identified Swainson as a friend of Opher who, like Opher, sold drugs from the house.

Santiago documented an early interview with Swainson on January 22, 1988, in which Swainson said that Opher was his first friend in Philadelphia, and admitted that, like Opher, he sold drugs from the house. Swainson provided an account for where he had been the night of the murder, and contact information for his girlfriend, who he said had been with him over the course of that evening. Swainson was fingerprinted and Santiago also took a photograph of him at that time.

On February 10, 1988, the charges against Presley for the Opher shooting were dropped. Two days later, he was interviewed by Defendant Santiago, resulting in a six-page statement written by Santiago. In this initial statement, Santiago did not ask for a physical description of either of the two gunmen Presley observed emerge from the house, but according to the statement Presley offered that the shooter was a "brown skin dude." Santiago did not ask Presley to expand on that description.

Santiago wrote that he showed Presley a photo array, and that Presley identified Swainson as the shooter. At a subsequent pretrial hearing Santiago testified that he also asked Presley if he would also be able to recognize the second gunman, to which Presley responded he would, but Santiago did not show him any further photographs. This is not documented in Santiago's police report. Further, although Santiago testified that he was obligated to and in fact did include the photographic array he purportedly showed to Presley, along with the accompanying filler information, in the homicide file in this case there is no preserved array—instead, the evidence indicates the first time Santiago produced the photographs he claims Presley identified Swainson from was just prior to the suppression hearing over a year later. And one of the photographs Santiago produced to the prosecutor at that point was apparently not taken until 15 days after Santiago claims the array was prepared.

Defendants obtained an arrest warrant for Swainson based on this purported identification on February 15, 1988. However, when Defendants went to arrest Swainson, they learned from his friends and his sister that he was out of the country, in Jamaica for a planned trip. Defendants then sought and obtained a federal fugitive warrant. Defendants represented to Assistant District Attorney Judith Rubino that Swainson had informed those close to him that after Opher's murder he would flee to Jamaica. On the basis of the detectives' representations Rubino sought a flight charge and argued at trial that Swainson had attempted to flee to Jamaica and this was evidence demonstrating Swainson's "consciousness of guilt." Rubino was never made aware that Swainson had called Detective Santiago upon his return to New York and informed Detective Santiago that he was in New York at his parents' house or was never made aware that he was a suspect in the Opher murder. At her deposition, Rubino testified if she had been aware of that information, she would not have sought a flight charge or argued flight as consciousness of guilt at trial.

Further, although I do not make credibility determinations, there is documentary evidence suggesting that misrepresentations were made to the federal authorities in the course of seeking the federal fugitive warrant; in addition, no warrant is present in the file and my understanding is that the federal authorities do not have a record of any such

warrant being issued. Rubino testified that if she learned that Detectives Santiago or Cohen had lied to her about obtaining a flight warrant, that would have had serious ramifications for her ability to prosecute this case.

Swainson returned to the United States and called Santiago to inform him that Swainson was in New York at the home of his parents. Swainson was arrested at the New York address he provided to Santiago on March 9, 1988. Swainson was interviewed by Cohen and Alexander on March 17, 1988, waived his right to remain silent, and gave an exculpatory statement consistent with his prior statement to Santiago.

Like Presley, Morsell changed her statement to police between the initial interview and Swainson's arrest. Although her initial statement provided information that appears to point to another man— "Dred," who was reported to be violent and argued with Opher, threatening to shoot him, five days earlier—a police statement prior to trial attributes those actions to Andrew Swainson instead. ADA Rubino testified that in her view Morsell had credibility problems that impacted the reliability of the information she provided, that by the time of the trial the victim's family was pressuring her, and that she, Rubino, "was not going to stake her case on Jackie Morsell." Rubino testified that she called Morsell at trial based on the detectives' attestations to Morsell's reliability. In a post-conviction interview Morsell reported that by the time of trial she had become homeless and was then living with Opher's mother, Tina Dennis, who had been convinced by police that Swainson was the perpetrator who had killed her son. According to that interview Morsell was subject to extensive abuse at the hands of Dennis, and to appease Dennis, Morsell adopted the statements attributing a motive for the murder to Swainson.

Presley's testimony concerning Swainson also changed. Following his inculpatory statements purportedly made to police in February 1988, Presley testified at Swainson's preliminary hearing on April 14, 1988. Contrary to the earlier statement, Presley testified that he had chosen a photograph that had a "resemblance" to the shooter, but that Swainson was not the shooter. Presley explained that the shooter had longer hair than Swainson, and that Swainson was "red-skinned" while the shooter was "brown-skinned" and had a darker complexion.

On May 10, 1988, Presley was arrested in Philadelphia as a fugitive from justice based on a New Jersey warrant for his arrest on attempted theft and conspiracy charges. After Presley was released on bail, he met with Swainson's investigator for an interview. During that meeting, Presley reaffirmed that he could not identify Swainson as the shooter and signed an affidavit to that effect.

On June 29, 1988, Presley was arrested under the name "Kareem Miller" and charged with felony drug possession with intent to distribute. Throughout the following year, Presley would remain in custody in Pennsylvania on the felony drug charges under the name Kareem Miller, and also remained on bench warrant status due to the outstanding New Jersey charges against him. On February 15, 1989, Santiago interviewed Presley at the District Attorney's Office. On February 17, Santiago took a statement from Presley concerning Presley's testimony at the Swainson preliminary hearing and the affidavit Presley executed during his interview with Swainson's investigator. There are two separate audio recordings generated during those interviews. Both have been analyzed and apparently include stops and starts on the tape that were not disclosed or acknowledged on the tape, which Santiago admits would be improper. Santiago admitted that several of the places were important portions of the interview and that the tape sounds like it was turned on and off but had no explanation for those sounds and denied turning the tape on and off without documenting it or feeding Presley information, which he admits would have been grossly improper. In that recorded statement Presley again changed his account and stated that the affidavit he had signed and given to Swainson's investigator was false and he only did so because he felt threatened and because he had been offered compensation to say that Swainson was not the shooter. Presley indicated on tape that despite his preliminary hearing testimony to the contrary Swainson was in fact the shooter.

The investigator who took Presley's statements, a former PPD Internal Affairs Lieutenant, who had temporarily retired and rejoined the force at the request of Philadelphia Mayor Ed Rendell in 1994, was deposed in this case and denied any of the misconduct attributed to him by Presley in the February 1989 statements.

On March 17, 1989, Presley appeared as the only identification witness in Swainson's trial. He testified that Swainson was the shooter, and that he had not received any benefits or leniency for his testimony. Presley testified that he had open misdemeanor drug charges but failed to disclose the felony drug case pending against him under the name "Kareem Miller."

The record contains no physical or forensic evidence implicating Swainson in the murder. Nevertheless, Swainson was convicted of the murder of Stanley Opher on March 21, 1989, and sentenced to life imprisonment.

On April 17, 1989, an extradition Order was signed for Presley's return to New Jersey on the theft and conspiracy charges. The Order specified that the extradition was not to be executed until the disposition of the felony drug charges previously listed as against "Kareem Miller." In the Order, the case is listed as against Presley for the first time. On July 10, 1989, all charges in the case previously styled as against Kareem Miller were *nolle prossed*.

After his conviction, the record demonstrates that Swainson maintained his innocence and challenged his conviction in state and federal proceedings.

In 2008, Presley met with an investigator and two attorneys for the Innocence Project representing Swainson. In that interview, Presley again recanted his identification of Swainson and stated that Swainson was not the shooter. Presley retracted the February 1989 statements to Santiago concerning feeling threatened and coerced to drop his identification of Swainson. He said that he knew he committed perjury at Swainson's trial, and that he had done so because he had been led to believe that if he identified Swainson as the shooter, the pending charges against him would be dropped, which they were. Presley also stated that he selected Swainson's photograph from five or six photos of the same person, Andrew Swainson. There are five single photographs of Swainson in the Homicide file in this case. Presley died on November 15, 2009.

The investigation conducted by the Philadelphia District Attorney's Office Conviction Integrity Unit (CIU) confirmed that Kareem Miller was a Presley alias and that information concerning the felony charges against Presley was not revealed to the

defense at the time of trial. Furthermore, the CIU obtained the full Opher homicide file, and its investigation uncovered activity sheets containing further exculpatory evidence that was suppressed by Defendants, including evidence concerning alternative suspects, an alternative motive, and evidence indicating that Defendants fabricated evidence, for instance, regarding whether Swainson fled to Jamaica or merely traveled there, as he had previously planned.

Based on the results of the CIU's investigation, the District Attorney's Office joined Swainson's request to vacate his conviction. In June 2020, Swainson's conviction was vacated and all charges against him were dismissed.

## III. Misconduct in the Philadelphia Police Department and the Homicide Division

The arrest, prosecution, conviction, and imprisonment of Andrew Swainson occurred in the context of a longstanding history of misconduct in the PPD in general and the PPD Homicide Division in particular. The vast impact of this history is apparent through a large number of cases that involve misconduct similar in nature and scope to the actions that caused Swainson's wrongful conviction.

### A. Historical Patterns and Practices in the PPD

Since at least the 1970s there have been credible and well-documented reports of policies, practices, and customs within the PPD that deviated from minimally accepted police practices. Many of these practices were detailed in a Pulitzer-prize series published in 1978 by the Philadelphia Inquirer. The series placed particular focus on how detectives in the PPD Homicide Division repeatedly engaged in the same types of misconduct that are alleged to have led to the improper arrest, prosecution, conviction, and imprisonment of Andrew Swainson, including fabrication of evidence, coerced statements, suppression and concealment of material evidence, and similar improper police practices. Despite notice to PPD policymakers of these practices provided by this public reporting, PPD failed to take meaningful steps to address and remedy this misconduct, and, as a result, the practices persisted for many years thereafter.

Thus, on no less than three occasions in the 1980s, federal courts intervened to enjoin PPD practices that violated the U.S. Constitution. In *Cliett v. City of Philadelphia*, No. 85-1846 (E.D. Pa.), the court entered a consent decree addressing practices used in the so-called "Operation Cold Turkey," during which 1,500 people were unlawfully subjected to search and

arrest. In *Spring Garden United Neighbors v. City of Philadelphia*, 614 F. Supp. 1350 (E.D. Pa. 1985), the court enjoined a police sweep targeting Latino men in the Spring Garden neighborhood section of the city following the shooting of a police officer. And, in *Arrington v. City of Philadelphia*, No. 88-2264 (E.D. Pa.), the court enjoined the stop and searches of young Black men during investigation of the activities of the "Center City Stalker."

In the late 1980s and early 1990s, officers operating in PPD's 39th District routinely made unlawful arrests of innocent people and initiated prosecutions against those people based on fabricated evidence, false police testimony, and concealed exculpatory evidence. As news of these practices broke in the 1990s, leading to extensive local and, eventually, national press coverage, the District Attorney's Office of Philadelphia (DAO) agreed to vacate hundreds of convictions, the City of Philadelphia agreed to pay millions of dollars to those wrongfully accused, and a number of officers were prosecuted by federal authorities and convicted.

In 1996, litigation arising out of the 39th District scandal was initiated in *NAACP et al. v. City of Philadelphia*, No. 96-6045 (E.D. Pa.). Shortly after the filing of the lawsuit, the City, acknowledging that wholesale reform of PPD was required, entered into a wide-ranging Settlement Agreement that, among other things, required PPD to implement policy and training initiatives to ensure that police officers would comply with restrictions on their investigative powers under the U.S. Constitution. As part of the settlement, the City agreed to appoint an Integrity and Accountability Officer ("IAO") to monitor compliance with the Agreement. The agreed purpose of the IAO was to assess PPD in several areas, and because the *NAACP* litigation placed significant focus on the absence of a functioning disciplinary system that allowed officers and supervisors alike to violate civilians' rights with impunity, the IAO devoted substantial resources to

evaluation of how the PPD investigated and disposed of misconduct complaints against officers.

Between 1997 and 2003, the Director of IAO, Ellen Green-Ceisler, issued three reports on PPD's disciplinary system, including evaluation of the unit charged with investigating misconduct complaints, Internal Affairs. While the final report noted some improvements in the PPD's disciplinary system, the IAO concluded that the system remained fundamentally ineffective, inadequate, and unpredictable. The IAO cited serious and continuing deficiencies in critical areas, including excessive and chronic delays in resolving disciplinary complaints; a lack of consistent, rational, and meaningful disciplinary actions; and the failure to discipline substantial numbers of officers who were found to have engaged in misconduct. Within this same time frame, the Mayor's Task Force on Police Discipline identified other issues impacting PPD's ability to discipline its officers, including an unclear and outdated disciplinary code and significant complexities surrounding the arbitration process required under the relevant collective bargaining agreement.

In addition to familiarizing myself with materials documenting this history, I have reviewed the work of nationally recognized police practices expert, Dr. R. Paul McCauley, including his January 11, 2019, report in the matter of *Shaurn Thomas v. City of Philadelphia et al.*, No. 17-4196 (E.D. Pa.). As Dr. McCauley documented in that report, over a 20-year period starting in the mid 1990s, he conducted a detailed analysis of more than 1,000 internal affairs investigations of PPD officers and data compiled by the City of Philadelphia regarding complaints against officers. Based on that extensive analysis, he found systemic deficiencies in the PPD's disciplinary system, including the following:

- The internal investigatory process was arbitrary and inconsistent;
- The imposition of discipline was incident-based, as opposed to progressive, such that repeat violators were not held accountable in a manner tied to repeated misconduct;
- The content of IAD investigations showed routine gaps, including, for example, giving the benefit of the doubt to officers as opposed to civilian complainants,

which gives rise to the conclusion that IAD investigators were not adequately trained and supervised; and

- The PPD lacked an effective early warning system to identify, track, and monitor officers with repeated misconduct who were at risk of causing harm to civilians.

As noted, Dr. McCauley's findings are based on analysis that began nearly thirty years ago. However, the systemic deficiencies he identified have persisted and remained unresolved in more recent times. In August 2013, then-PPD Commissioner Charles Ramsey asked the U.S. Department of Justice (DOJ) to investigate several areas of concern within the PPD, including the large incidence of police shootings and the effectiveness of internal disciplinary mechanisms regarding such shootings. On March 24, 2015, the DOJ issued a report that was highly critical of PPD policies and practices, finding, in particular, that PPD's system for investigating officer shootings suffered from inconsistencies in practice, unexplained delays, and inadequate interview techniques.

In summary, this history demonstrates that PPD's officers and supervisors were, for decades, permitted to engage in conduct that failed to meet minimally accepted police practices. There was either no training, supervision, or meaningful discipline, to remedy and prevent repeated instances of misconduct, or any such training, supervision and discipline was insufficient to address that misconduct. It is a basic principle of policing that a functioning disciplinary system and the absence of accountability will lead to a culture where officers were given the clear and unambiguous message that they were free to act in violation of the U.S. Constitution in their interactions with civilians and in their investigation of criminal cases.

## B. Investigative Misconduct in Homicide Cases

The systemic patterns described above are particularly evident in a large number of homicide investigations where, based on my review of court submissions, judicial opinions, news reports, and various other evidence, there is evidence that the misconduct of detectives in the PPD Homicide Division led to the unlawful arrest, prosecution, conviction, and imprisonment of innocent people. These investigations

occurred before, during, and after the investigation of the Opher murder that led to the wrongful conviction of Andrew Swainson and, the allegations therein are the same types of departure from minimally accepted police practices seen in the Swainson case, including fabrication of evidence, coercion of witnesses, and the concealment and suppression of material evidence. The breadth of the alleged misconduct, if credited, demonstrates not only the existence of the patterns described above, but also shows that PPD leadership and policymakers were aware of, and indifferent to, the unlawful conduct of PPD officers.

**1. Cases involving Defendant Manuel Santiago**

Notably, the lead detective in the Opher murder investigation that led to Swainson's wrongful conviction, Defendant Manuel Santiago, has been a central figure in multiple investigations with allegations or indicia of serious investigatory misconduct. Those cases include the following:

*Anthony Wright*: Wright was convicted of the 1991 rape and murder of an elderly woman. After spending nearly twenty-five years in prison, Wright's conviction was overturned after DNA evidence excluded him as a suspect and identified a different man as the true perpetrator. During the 1991 homicide investigation, Santiago, and another homicide detective interrogated Wright for hours while keeping him handcuffed in a small interrogation room without informing him of his *Miranda* rights and denying Wright's repeated requests for a phone call. According to Wright, despite his protestations of his innocence, Santiago and a fellow detective fabricated a written confession falsely implicating Wright in the crime. The detectives presented Wright with the nine-page handwritten statement, the content of which Wright was not allowed to read, and coerced Wright to sign it by pressing on his neck and threatening extreme violence after hours of interrogation. They also promised Wright that if he signed the papers, he could go home. His will having been overborne by these tactics, Wright signed the fabricated confession. At his 1993 criminal trial, Wright testified that the "confession" attributed to him had been coerced and fabricated by detectives, but Santiago maintained that the nine-page statement was a word for word,

contemporaneous record of Wright's interrogation. Even after DNA testing excluded Wright as the rapist and identified the true perpetrator, Santiago continued to claim that Wright freely and willingly confessed to killing and raping the victim. Based on this claim by Santiago and evidence from other detectives that Wright disputes, Wright was retried in 2016. During the retrial, Santiago again gave testimony that contradicted Wright's regarding the circumstance of the confession. He also falsely denied ever learning about the exculpatory DNA testing prior to taking the stand. The jury deliberated for less than an hour before acquitting Wright of all charges. In June 2018, the City of Philadelphia settled Wright's wrongful conviction suit against Santiago and other detectives for nearly $10 million. In 2021, Santiago was indicted for perjury for his false testimony at Wright's 2016 retrial concerning, among other things, the false confession he fabricated to falsely implicate Wright. Those perjury charges remain pending.

*Percy St. George*: In 1993, Santiago interrogated sixteen-year-old David Glenn, a teenager with no criminal history. At the time, Santiago believed that Glenn was the sole eyewitness to a murder Santiago was assigned to investigate. In fact, the actual eyewitness to the murder was a different teenager who had falsely given Glenn's name when he was interviewed by the police. Santiago documented in a written question-and-answer form that Glenn had picked Santiago's suspect, Percy St. George, out of a photo lineup without coercion or suggestion. But according to Glenn, Santiago separated Glenn from his mother, threatened to have him arrested, and coerced him into adopting a statement that had been made by a different witness as his own words. Santiago then forced Glenn to make a photo identification of Percy St. George as the perpetrator of a murder despite the fact that Glenn had not witnessed the murder in question. When Glenn was later asked why he had identified St. George as the killer when he had not even seen the crime, Glenn said, "[Santiago] told me that I could get locked up, so I was scared, because I had never been locked up before." During Mr. St. George's criminal proceedings Santiago denied using coercion or suggestion during his interview with Glenn. In a later hearing addressing allegations of misconduct by detectives involved in the investigation, Santiago declined to answer questions on the grounds that his answers might incriminate him in violation of his Fifth Amendment rights. All charges against St.

George were subsequently dismissed, with St. George having spent more than thirteen months in jail on the basis of Santiago's representations about the purported photo identification. At his deposition in this case Santiago admitted that the allegations against him in this Percy St. George case were the same as those against him in Swainson's case—that he used suggestion to get a witness who was worried about their own criminal consequences to identify his suspect from a photo array. Santiago could think of no explanation for how Glenn could have selected a photograph of Percy St. George, Santiago's suspect, unless David Glenn was unbeknownst to anyone a secret second witness to the murder, which police found no evidence of and Glenn denied.

*James Dennis*: Dennis was convicted of the 1991 murder of a teenage girl in Philadelphia. Dennis was convicted solely on the basis of eyewitness identifications. However, there is evidence that the identifications and other evidence used to support the arrest were the result of improper conduct by Santiago including the compilation of suggestive photo arrays, suppressing information about an eyewitness who reviewed photo arrays and did not identify Dennis as the perpetrator, withholding information about an informant who provided credible information about other suspects who confessed to the crime for which Dennis was charged, suppressing police reports that would have impeached the prosecution's main identification witness, and concealing information that corroborated the testimony of an alibi witness who would have established that Dennis was far from the scene of the crime when it occurred. As a result of this misconduct throughout the course of the investigation, Dennis spent more than twenty-five years on death row before his release from prison in 2017. In 2024 a civil jury found Detective Santiago and his partner liable for deliberately concealing evidence, including documents supporting Dennis's alibi, and awarded Dennis $16 million, including a $3 million award of punitive damages against Santiago.

**2. Cases preceding the Opher murder investigation**

Multiple additional cases involving other detectives in the Homicide Division show evidence of investigative misconduct in the years preceding the Opher murder investigation and the actions of the Defendant detectives to wrongfully arrest and

prosecute Andrew Swainson. These cases, which demonstrate the practices in place at the time of the Opher murder investigation and that PPD leadership was or should have been aware of those practices, include the following:

*Matthew Connor*: In 1980, Connor was convicted of the 1978 rape and murder of an 11-year-old girl whose body was found in the stairwell of an apartment building in Philadelphia. The medical examiner determined that the victim's wounds resulted from an ice pick. In 1989, while Connor was serving a life sentence, a non-profit organization persuaded the Philadelphia DAO to revisit the case. The prosecution then discovered that police failed to turn over exculpatory evidence, including a recording of a telephone call with a prosecution witness that contradicted her trial testimony, and evidence that police considered the victim's half-brother, who had a history of assaulting young girls and was observed carrying an ice pick around the apartment complex, as an alternative suspect. In February 1990, Connor was granted a new trial, and the next month the charges were dismissed.

*Gerald Howell*: In late 1982 into the early months of 1983, according to evidence put forward in post-conviction proceedings, PPD homicide detectives coerced witnesses into inculpating Howell in a murder that was committed by Kenneth Parnell. Homicide detectives told Arlene Williams, a teenager at the time, that they would arrest Parnell, the father of her child, for the murder if she did not sign a statement inculpating Howell. Homicide detectives also threatened two other teenage witnesses with arrest if they did not come to court to testify against Howell, even though the police had reason to believe that Parnell was the real shooter. Additionally, homicide detectives suppressed information given to them by the brother of the decedent that Parnell was the shooter. Years later, Parnell confessed to the murder for which Howell had been convicted. In 2022, the DAO conceded that the PPD had suppressed exculpatory evidence, and, in 2023, a federal judge granted Howell's habeas corpus petition and vacated his conviction. Howell was released in 2023 after being imprisoned for four decades.

*Bruce Murray and Gregory Holden*: In 1983, Murray and Holden were convicted of a 1980 murder due to homicide division detectives using coercion and other improper tactics to fabricate false evidence from the two actual perpetrators of the murder.

Detectives allegedly threatened one of the perpetrators with the death penalty to compel him to sign a statement implicating Murray and Holden, and then held the second perpetrator, a juvenile, for hours without access to a lawyer until he too signed a statement asserting that Murray and Holden were involved. Murray and Holden's convictions were vacated, respectively, in April 2023 and March 2024 based on the DAO's acknowledgement that numerous pieces of favorable evidence were suppressed and withheld for more than four decades.

*Ah Thank "Allen" Lee*: In September 1983, Lee was arrested in connection with the murder of a restaurant manager, Jade Wong. The murder was apparently committed by three gang members from New York City who had tried to extort Wong for money. There is evidence that PPD homicide detectives secured a conviction of Lee by fabricating an informant statement to implicate him, despite having credible information pointing to alternative suspects. Ultimately, Lee's conviction was vacated in April 2004 after Lee presented evidence that at the time of his trial, homicide detectives had failed to disclose evidence pointing to the actual perpetrators.

*Willie Stokes*: In 1984, PPD detectives arrested a man named Franklin Lee on rape and related charges. After his arrest, homicide detectives interviewed him about a 1980 murder and falsely told him that another witness had identified Willie Stokes as the person who committed that murder. Detectives insisted that Lee knew that Stokes was the murderer and that he needed to cooperate with their investigation or, otherwise they would "hang" him. Lee succumbed to the pressure and agreed to sign a false statement implicating Stokes in the murder. For years, Lee continued to have contact with the investigating detectives, who, in order to maintain control over their informant, arranged for him to have access to drugs and sexual encounters while incarcerated. Stokes remained wrongfully imprisoned for 39 years until December 2021 when a federal district court vacated his conviction based on evidence of the investigating detectives' misconduct. In 2023, the City of Philadelphia settled Stokes's civil claims that he was wrongfully convicted for $9.6 million.

*Curtis Crosland*: In 1987, PPD homicide detectives interviewed an informant with a long history of violent crimes who was seeking assistance from law enforcement to

reduce his sentence for a parole violation. The informant told officers that Curtis Crosland had at some undetermined time in 1986, confessed that he committed a 1984 robbery and murder at a neighborhood grocery store in South Philadelphia. There is evidence that investigating detectives knew that the informant's statement was false; the informant had provided inconsistent information to police, had failed a polygraph, and had told other family members that another person—that is, not Curtis Crosland—had admitted to the crime. There also is evidence that despite this knowledge, detectives persisted in bringing charges against Crosland and then suppressed all information in their possession showing the falsity of the informant's testimony. Further, evidence suggests that detectives suppressed and concealed information pointing to an alternative suspect who matched the size and description of the perpetrator given by eyewitnesses to the shooting. There also is evidence that as Crosland's 1989 trial approached, detectives pressured and coerced a vulnerable witness who suffered from mental health disorders and had attempted suicide to provide testimony asserting that Crosland had expressed fear about the fact that an award offered to the community for information about the shooting would lead to an arrest. Crosland was convicted and remained incarcerated for 34 years until an investigation by the DAO located the referenced exculpatory information in police files. In 2021, a federal district court accepted the DAO's concession that Crosland was entitled to relief and was likely innocent, and, therefore, vacated the conviction.

**3. Cases contemporaneous with, and after, the Opher murder investigation**

While the above-described misconduct in the years before Andrew Swainson's arrest and prosecution demonstrates that PPD officials failed to remedy a pattern of systemic wrongdoing in homicide investigations, an additional set of cases arising at around the same time and after Mr. Swainson's trial, appeal, and post-conviction litigation show the persistent failures of PPD leadership to investigate and remedy misconduct. Such cases include the following:

*Pedro Alicea*: In 1989, after failing for four years to resolve a 1985 double homicide of brothers Hector and Luis Camacho, evidence indicates that PPD detectives fabricated

a case against Pedro Alicea out of whole cloth. To build a false case against Alicea, detectives allegedly disregarded significant evidence demonstrating that two local drug dealers were responsible and leaned on vulnerable individuals to obtain false identifications of Alicea as the shooter. There is evidence that officers pressured Angel Fuentes, a longtime informant who had a close personal relationship with the lead detective, and who was facing significant prison time on several open charges, to endorse a fabricated statement identifying Alicea as the shooter. They then coerced Ray Velez, who had himself been implicated in the murders, to falsely identify Alicea as the shooter, by detaining him and threatening to charge him with the murders if he did not sign a statement. There is also evidence that detectives suppressed substantial exculpatory evidence, including a reliable eyewitness statement, pointing to the true perpetrators. Alicea was convicted because of the detectives' misconduct and imprisoned for more than 31 years before the exonerating evidence was discovered by the DAO, resulting in the vacatur of his conviction and release in 2020.

*Donald Ray Adams*: There is evidence that PPD Homicide Division detectives coerced a witness to implicate Adams in a 1990 murder by threatening the witness and also offering to provide her financial support for her testimony. In securing the statement, detectives ignored the fact that Adams's physical description was vastly different from the description provided by witnesses at the scene. Adams's conviction was later vacated, and he was acquitted at a retrial. His subsequent civil suit resulted in a financial settlement for $1 million.

*Troy Coulston*: In 1991, Coulston was convicted of a 1989 murder. There is evidence that PPD Homicide Division detectives knowingly presenting fabricated trial testimony, coercing false witness statements from a particularly vulnerable teenage witness, and suppressing exculpatory evidence undermining the credibility of a key witness, the actual perpetrator of the murder who had himself admitted to committing at least six murders and had falsely implicated multiple other people in those murders to avoid the death penalty. Coulston's conviction was vacated in 2021 based on the discovery of suppressed exculpatory evidence, including police documents showing that the key witness had provided detectives with inconsistent accounts of multiple murders,

including the one for which he implicated Coulston.

*Ronald Johnson*: Johnson was convicted in 1991 for a 1990 murder based solely on the testimony of two witnesses. PPD homicide division detectives took a total of nine different statements from the witnesses, with the statements evolving dramatically over time. In their first statements, both witnesses had expressly stated that they knew Johnson and he was not the perpetrator. According to Johnson, due to detectives' coercive tactics, including a joint interview in which detectives placed both witnesses in the same room in order to ensure that their stories were consistent, the witnesses eventually implicated Johnson in the murder. Johnson spent more than 34 years in prison before the DAO reviewed police files and located suppressed exculpatory information, including a set of Polaroid photos of suspects, including Johnson, and information documenting that both witnesses had viewed the photos and not identified Johnson as the perpetrator. Based on the DAO's concession that relief was warranted, Johnson's conviction was vacated, and he was released from prison in March 2024.

*Walter Ogrod:* In 1992, PPD detectives allegedly coerced and fabricated a false confession from Ogrod, a trucker with a low-average IQ, to the 1988 murder of a four-year-old girl. Ogrod had driven all night and had not been to bed in 36 hours when the lead detective interrogated him. Detectives interrogated Ogrod for hours, then, according to Ogrod, wrote out a fabricated statement they falsely claimed was a verbatim record of a voluntary statement from Ogrod, and coerced Ogrod into signing it. At his first trial, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse informant, Ogrod was convicted and sentenced to death. After the discovery of extensive withheld exculpatory information, Ogrod's conviction was vacated in 2020, and he was released from prison after spending more than 25 years on death row. The City of Philadelphia settled Ogrod's civil claims regarding detectives' misconduct for $9.1 million.

*Chester Hollman*: There is evidence that PPD detectives arrested Chester Hollman for a 1991 murder based on the fabricated and coerced statement of a witness, Deirdre Jones, who had no knowledge of the crimes. There also is evidence that detectives fabricated and coerced a statement from another witness, and concealed

evidence clearly pointing to Hollman's innocence. In 2019, Hollman was exonerated based on the DAO's discovery of extensive exculpatory evidence in police files that had not previously been disclosed, including evidence credibly pointing to an alternative perpetrator. Hollman was released after 28 years imprisonment. The City Law Department settled Hollman's civil rights claims for $9.8 million.

*Willie Veasy*: Veasy was convicted of murder based on a 1992 confession secured by PPD homicide detectives' use of physical force. The confession appears to be false in light of a fully corroborated alibi that Veasy was working in a popular and busy restaurant at the time of the murder. Veasy's conviction was vacated in 2019 upon the motion of the DAO, and his subsequent civil rights suit resulted in a multi-million-dollar settlement.

*Shaurn Thomas*: PPD homicide detectives arrested Thomas in 1993 on charges that he was involved in a 1990 murder. Thomas had a documented alibi that he was present in juvenile court at the time the murder occurred, but based on testimony from another man who was involved in the murder, Thomas was convicted. In May 2019, the DAO agreed to dismiss the charges after discovering, among other things, previously undisclosed information in police files showing that officers had questioned a suspect immediately after the murder occurred who provided police non-public facts about the murder and failed a polygraph test. Thomas's civil rights suit resulted in a settlement of more than $4 million.

*Johnny Berry*: PPD homicide detectives arrested 16-year-old Johnny Berry for a 1994 robbery murder based on the testimony of an eyewitness who was in the company of the murder victim and the testimony of an alleged accomplice, Tauheed Lloyd. At trial, the eyewitness claimed that detectives had pressured her into identifying Berry. Lloyd, however, testified consistently that he was with Berry and saw him commit the murder. Based on that testimony, Berry was convicted and sentenced to life imprisonment. Several years later, Lloyd, who had pled guilty to reduced charges and a shorter prison sentence than what he otherwise would have faced, acknowledged that he had lied about Berry. In 2019, the DAO agreed to vacate Berry's conviction, and, thereafter, Berry learned that detectives had suppressed information regarding multiple

witnesses who had heard Lloyd admit that he, not Berry, was the shooter. Berry's civil suit settled for $5.65 million.

*Terrence Lewis*: PPD detectives allegedly fabricated evidence and committed other investigative misconduct to convict Lewis of a 1996 murder he did not commit. The misconduct included coercing and fabricating witness statements and identifications and deliberately hiding key exculpatory evidence that would have demonstrated Lewis's innocence. In 2019, Lewis was exonerated after he spent 21 years wrongly imprisoned. His civil rights suit resulted in a settlement of $6.25 million.

*John Miller* In June 1997, Miller was arrested for the 1996 murder of Anthony Mullen based on a statement PPD detectives obtained from alleged witness David Williams. Williams recanted during a 1997 preliminary hearing and at trial in 1998. Investigating detectives had multiple reasons to know that Williams' original statement identifying Miller as the perpetrator was false as Williams had given detectives clearly false information on other subjects. In particular, Williams told police about another so-called witness who observed Miller commit the shooting, but, with minimal investigation, police were able to determine that this witness, if fact, did not observe the shooting because he was in prison at the time it occurred. Police failed to disclose their knowledge of this information undermining the credibility of Williams' statement implicating Miller. They continued to do so for years, even after Williams confessed that he was the person who had committed the murder. In 2019, a federal district court vacated Miller's conviction based upon its finding that investigating detectives had suppressed critical information undermining the inculpatory evidence presented at trial, and the DAO dismissed all charges. Miller's civil rights suit was settled for $4.6 million.

*Eugene Gilyard and Lance Felder*: In 1998, Gilyard and Felder were arrested and subsequently convicted of the 1995 murder of Thomas Keal. There is evidence that during a cold case investigation more than two years after the crime, PPD detectives fabricated and coerced witness identifications and statements and concealed exculpatory evidence in order to secure charges against Gilyard and Felder. After witness Keith Williams initially told detectives Felder was not a person he had seen at the time of the crime, detectives coerced Williams to identify Felder's photograph by visiting

Williams's home multiple times, cursing, and shouting at him, and pushing on his head while pointing to Felder's photo. Additionally, after witness Patrick Harris told detectives he did not recognize anyone in the photo arrays he had been shown, detectives fabricated a report stating that Harris had identified Gilyard, when he had not. The true perpetrator confessed in 2011, confirming Gilyard and Felder's innocence, and in 2013 their convictions were vacated. In 2018, Gilyard and Felder reached a settlement with the City for a total of $3 million.

*William Johnson*: In September 2005, homicide detectives arrested Johnson for the shooting of an off-duty Philadelphia police officer after he had solicited a sex worker. Detectives allegedly pressured two sex workers who had been in the area to identify Johnson and another man as the shooter. In 2023, following the DAO's production of materials proving that at least one of the witnesses had been coerced to testify against Johnson, a federal district court vacated the conviction, and Johnson was released after 18 years imprisonment.

*David Sparks*: In 2006, homicide detectives arrested 16-year-old Sparks for the shooting death of Gary Hall—a shooting about which Sparks had called 911 to seek emergency assistance for Hall. Detectives proceeded with the prosecution despite minimal and highly questionable evidence pointing to Sparks and concealed exculpatory material showing that Hall was killed by a different person, who was well known in the community as the true perpetrator. After an investigation, the DAO disclosed these and other materials to Sparks's attorneys and conceded that he was entitled to relief. Sparks was released from prison in 2023 after spending more than 16 years incarcerated.

*Recco Ford*: In 2007, detectives acting on an unsubstantiated anonymous tip detained two juvenile witnesses without their parents' knowledge and allegedly pressured them to identify 16-year-old Recco Ford as the perpetrator of a murder that occurred at a playground in southwest Philadelphia. Ford spent three years in pre-trial detention before his trial where, based on the testimony of two teenaged girls who had seen the shooting and called 911 to report it and who confirmed that Ford was not the perpetrator, he was acquitted. Ford later sued the detectives who caused his prosecution, and the City settled his lawsuit for several hundred thousand dollars.

*Steven Lazar*: Lazar was convicted of a 2007 murder as a result of PPD Homicide Division detectives, according to Lazar, fabricating witness statements and securing a false confession by subjecting Lazar to more than 30 hours of interrogation while, as detectives knew, he was undergoing severe opioid withdrawal. Lazar's conviction was vacated in March 2023 based on the discovery of suppressed evidence after he had spent approximately 16 years in prison.

**4. Failure to reinvestigate vacated homicide convictions**

If the allegations and evidence above are credited, the above cases are a representative sample of investigations involving highly improper conduct by PPD homicide detectives. The repeated court orders finding sufficient legal basis to undo convictions and the repeated acknowledgment of misconduct via multi-million-dollar settlements paid to several exonerated people would, in ordinary circumstances, call for police to conduct their own reinvestigations of these cases for multiple reasons: to identify root causes of the wrongful convictions, to develop methods to avoid future wrongful convictions, and to locate the actual perpetrators of the underlying crimes. Based on public reporting in early 2024, I understand that for the more than 40 exonerations that have occurred in Philadelphia since 2017, PPD has reopened an investigation regarding just *one* such case. I understand, further, that PPD's representatives have stated that in that case, the Walter Ogrod case, the so-called reinvestigation has only pointed to the involvement of Mr. Ogrod—the same person whom a court found was unlawfully prosecuted due to the prosecution's withholding of exculpatory evidence. This development confirms that the City has remained indifferent to the extraordinary allegations of unlawful conduct that has resulted in the wrongful imprisonment of apparently innocent men for hundreds of years collectively, and, as such, has endorsed homicide detectives' continued use of unlawful tactics.

Type text here

## IV. Findings and Opinions

Based on my review of the materials in this case, I conclude that in the time before and after the Opher murder investigation, PPD had established practices and procedures

allowing detectives, especially detectives in the Homicide Division, to violate the U.S. Constitution in its investigations. These practices and procedures set the stage for the series of serious failures and deviations from minimally acceptable police practice that occurred in the Opher investigation.

### A. PPD's Practices and Procedures

Minimally accepted police practices require managers of law enforcement departments to monitor the conduct of officers working under their supervision, to identify patterns of misconduct, and to remedy misconduct through officer accountability—that is, by the imposition of discipline, meaningful supervision, and training. The nearly 50-year history outlined above demonstrates that the PPD has failed in all of these respects.

Crediting the evidence above, since the late 1970s, PPD leadership has been on notice that its officers, especially the detectives in its Homicide Division, have routinely violated the most basic legal limitations on law enforcement officer conduct. They have engaged in the outright fabrication of evidence, the coercion of witness testimony while recklessly disregarding the falsity of such testimony, and the suppression and concealment of material evidence. They have also routinely ignored leads pointing to the true perpetrators of criminal offenses. Through repeated publicity about notorious scandals, PPD leadership have learned of this conduct and, in response, have paid lip service to the need for reform. In each instance, however, PPD leadership has failed to implement meaningful changes in practice that remedy and prevent instances of misconduct.

This is most apparent in the longstanding failures of PPD's disciplinary system. Law enforcement agencies cannot secure their employee officers' compliance with legal obligations without the promise of accountability for misconduct. Investigations that give officers the benefit of the doubt and mete out minimal, if any, discipline even in cases of gross misconduct, provide officers with the clear message that they can violate established legal and departmental rules with impunity. As such, the lack of effective

discipline fosters a culture of misconduct that leads to the routine violations of civilians' rights under the U.S. Constitution.

Further, with regard to the allegations against Detective Santiago specifically across the cases discussed above, based on the evidence indicating Santiago may have engaged in egregious and sometimes illegal activity for years while investigating the PPD's most serious cases, there should be a complete investigation into him and an audit of homicide cases that led to convictions that remain undisturbed. Such an investigation should address whether Santiago has committed perjury in other cases. Given the similarity, numerosity, and gravity of the allegations of misconduct in the homicide division during the time periods described the failure to fully investigate the similar allegations of investigative misconduct by detectives within that unit falls short of minimally accepted practices for supervision and discipline and raises serious concerns about PPD's commitment to preventing and disciplining investigative misconduct and protecting the constitutional rights of individuals.

Additionally, I have seen disturbing statements in the record from Santiago and other officers about the extent to which, if at all, officers observed and reported violations of PPD's rules by fellow officers. In my experience it is highly unusual for an officer not to observe a single violation of legal obligations and departmental rules over the course of a decades-long career. That testimony raises serious concerns about the extent to which a Code of Silence existed within the department in the time periods in question and its impact on PPD's disciplinary apparatus. In short, the evidence I have reviewed suggests a broken or absent disciplinary apparatus spanning many years that should have been detected and addressed by the Department's leadership long before the investigation that gave rise to Andrew Swainson's conviction and in the many years that followed.

The multiple wrongful convictions outlined above illustrate the clear and foreseeable results of such lack of discipline and, further, confirms the absence of effective training and supervision. In the years before the 1988 Opher murder investigation, PPD leadership had notice of multiple homicide arrests and prosecutions that were the result of improper investigative practices, yet they failed to address those

practices. The absence of action set the stage for the conduct that caused Andrew Swainson's arrest and prosecution for a crime he did not commit. The persistent failure to address misconduct that continued through the time and after the Opher murder investigation and into the 1990s and 2000s—while Swainson's appeal and post-conviction petitions were pending—and, in particular, the failure to address the misconduct of Detective Santiago, only served to ensure Swainson's prolonged period of imprisonment. This history, in its entirety, was a direct cause of Swainson's harms.

**B. Failures in the Opher Murder Investigation**

Deviations from minimally accepted police practice in the Opher murder investigation included many failures directly attributable to defendants Manuel Santiago, Michael Cohen, James Alexander, and supervisor Arthur Durrant. Further, based on my experience supervising investigations, I conclude that the deviations from police practice and other red flags would have been obvious to any minimally trained supervisor in 1988 and required intervention to protect the civil rights of Andrew Swainson, implicated in the flawed investigation. Among these deviations and red flags are the following:

- Evidence of Defendant Santiago fabricating Paul Presley's purported photo identification implicating Swainson in the murder of Stanley Opher, and, further, evidence of Defendant Santiago inducing Paul Presley to change his exculpatory testimony at Swainson's preliminary hearing and fabricating an explanation from Paul Presley for that testimony. For example, in 2008, Paul Presley recanted his identification of Mr. Swainson and explained that he was led to believe that if he testified that Swainson was the shooter, pending charges against Presley would be dropped, and he would be released from custody. This is consistent with evidence that at the time of his statements implicating Swainson in 1988 and 1989, Presley was variously facing charges for felony drug possession with intent to deliver as well as for the Opher shooting. Direct evidence of Defendant Santiago's fabrication of Presley's identification also

includes the undeclared stops and starts on the tape recording of Santiago's 1988 interview of Presley.

- Evidence of Defendants suppressing and concealing exculpatory evidence. Most notably, this includes leads and other evidence pointing to alternate suspects, an alternate motive which would not have implicated Swainson (that Opher had been murdered in a robbery attempt gone wrong), evidence undermining Paul Presley's account at trial, and evidence supporting that this was a robbery, undermining the purported motive advanced by the prosecution at trial that Opher was killed due to an internal dispute among drug sellers.
- Evidence of Defendants fabricating evidence that Swainson had fled the country as a "fugitive," and suppressing evidence to the contrary.

**1. Evidence that Defendants unlawfully fabricated and coerced Paul Presley's witness identification of Andrew Swainson**

I have seen record evidence, including the testimony of witnesses, indicating that Defendants fabricated false eyewitness testimony of Paul Presley, and then used coercive measures to ensure Presley testified in support of the working theory of their case.

As discussed above, Presley was the only eyewitness to the shooting, and was seen running from the scene and then discovered hiding nearby with a large amount of blood on him. He was arrested and charged in connection with the shooting. Those charges were dropped, but Presley was soon in police custody in Pennsylvania again, as a fugitive in connection with a New Jersey warrant. Less than two months later, Presley was arrested in Pennsylvania for a third time, this time on felony drug charges.

Presley's statements varied greatly over time and in apparent connection with the existence of criminal charges against him. According to Santiago, in Presley's first formal interview, conducted only two days after the charges against Presley concerning Opher's murder were dismissed, Presley identified Swainson from a photo array as the man who shot Opher. Approximately two months later, however, at Swainson's preliminary hearing, Presley testified that he had chosen a photo from the array which "resembled" Swainson, but that Swainson was not the shooter. Presley reiterated this version of

events to Swainson's investigator following the hearing and signed an affidavit attesting to these same facts.

However, after felony drug charges were entered against Presley, Santiago recorded an interview in which Presley again implicated Swainson and said he had signed the affidavit recanting his prior statements because Swainson and his investigator had offered Presley compensation to change his testimony, and because Presley felt threatened by Swainson and the investigator. Presley was the sole identification witness at Swainson's trial and testified, contrary to his testimony at the preliminary hearing, that Swainson shot Opher. After the trial and Swainson's conviction, all charges brought in the case against Presley as Miller were dropped.

In 2008, Presley recanted his trial testimony. He stated that he knew he was committing perjury at Swainson's trial, but he had been told that if he identified Swainson as the shooter, the pending felony drug charges against him would be dropped, which they were. He said Swainson was not the shooter, and that he had not been threatened or offered compensation to change his testimony by Swainson or Swainson's investigator. Presley explained that he had told the truth at Swainson's preliminary hearing and in the affidavit, he gave Swainson's investigator following the hearing. Presley said that when he saw Swainson at the hearing, he could not go through with the false statements he had previously been urged to give. Additionally, Presley also denied elements of record evidence compiled by Santiago, including disputing that a written record of one of Santiago's interviews with Presley was accurate.

Santiago has repeatedly stated under oath that Presley identified Swainson from a fair photo array with no suggestion and that the photographs the prosecution entered at the suppression hearing were the photographs from which Presley made his purported identification. Rubino testified that the photographs she introduced at the hearing were the photographs Santiago represented he had shown Presley in the array. And in his deposition in this case, Santiago testified that it was very important that detectives maintain in the investigative file records of any identification array shown to a witness, and that it was his practice to do so. However, there is no array preserved in the file and

one of the photographs Santiago maintains he included in the array was taken *after* Presley purportedly made the identification.

This set of photographs is not reproduced in the Opher homicide file despite Santiago's admission that at the time of the investigation, well-established minimally acceptable police standards required the meticulous documentation of all identification materials displayed to witnesses.

After questioning about these discrepancies at his deposition Santiago changed his testimony and denied that he had shown Presley either the photographs entered into evidence in 1989 or the photographs in the homicide file. However, Santiago could not offer any explanation for why, if that were true, there was no record of the actual array he maintains he showed Presley, nor how these loose photographs became part of the homicide file and the evidentiary record in the criminal proceedings against Swainson.

Finally, there is record evidence that the taped recordings Santiago made of his interviews of Presley following the initiation of felony drug charges against Presley under an alternate name, were manipulated. In the recordings, Presley affirmed the statement Santiago reported as his from February 1988, identifying Swainson as the man who shot Opher. Presley also explained that he had testified that Swainson was not the shooter during the preliminary hearing, and signed an affidavit to that effect, because he feared for his safety and was promised Swainson would compensate him for changing his testimony. However, in the first recording, made on February 15, 1989, there are eight analog stop and start events which are not identified as such on the recording itself. In the second recording, made on February 17, 1989, there are four such incidents. None of these incidents, in which the tape recorder was stopped and after an unspecified period of time restarted, are announced, or explained on the recordings.

Santiago testified at his deposition that he understood in 1989 that he could not stop the recording and engage in unrecorded conversations with Presley before then starting the recording again. Such an action calls into question the reliability and legitimacy of the recording as a witness statement, particularly since, as Santiago admitted, the recording was made so that if Presley were to change his testimony again at trial, the prosecution would be able to impeach him with a recording of his own voice.

If there are unspecified conversations which occurred during the interview, but off-record, the audio recording is, by definition, no longer an accurate record of all that transpired in the interview and opens the possibility that the witness or interviewer may have made unrecorded statements which alter the significance or meaning of the recorded statements.

Santiago denies fabricating or misrepresenting Presley's identification or statements. But if the jury credits the evidence discussed above, it may conclude that this is exactly what he did. Such actions are among the most serious misconduct a police officer can engage in in a homicide investigation and would constitute numerous egregious deviations from law and the minimally acceptable policing standards of the time.

Furthermore, if such deviations did in fact occur, it was so open and so fundamental to the investigation that I would expect a supervisor to have recognized these deviations. Record evidence establishes that other detectives and supervisors from within the homicide department participated in various pieces of the Opher investigation. Indicia of such grave misconduct in a homicide investigation should have prompted a review by supervisors up the chain of command of how the evidence in this investigation was obtained and to implement disciplinary action if warranted. And if the misconduct did occur and Santiago's supervisors were aware of it, that is an extremely serious deficiency calling into question the integrity and the basic functioning of the department's supervisory and disciplinary mechanisms.

**2. Evidence that Defendants suppressed exculpatory material**

The record demonstrates several areas where Defendants fell far short of their duty under minimally acceptable standards for policing to document and disclose all evidence uncovered during the course of the Opher homicide investigation.

As discussed in part above, witness testimony identified at least four additional potential suspects, but Defendants focused on Swainson to the exclusion of all others. I reviewed multiple "activity sheets" containing notes regarding these suspects and their possible motives for the murder, but Defendants did not document any investigation into

or interviews of those suspects, or reasons why they were not pursued. This is the case even though two men participated in the attack that led to Opher's death, and only one person was arrested and, wrongfully, charged and convicted.

Moreover, both Santiago and Judith Rubino, who prosecuted Swainson, testified that activity sheets were not provided to the prosecution in this matter, and thereby, to the defense. Santiago explained that activity sheets were "an internal police record of . . . the significant investigative steps you were taking," that he had discretion to determine what information went to Rubino, and that policy at the time was not to provide activity sheets to the DA's office. This policy—which is fully consistent with the extensive history of misconduct in PPD homicide investigations described above—contravenes minimally accepted policing standards at the time and incentivizes detectives to selectively omit information that hurts their case or is otherwise inconsistent with their theory as to who committed a homicide.

The pitfalls of failing to report such evidence are demonstrated by the record here. At trial, the prosecution argued that Opher was disgruntled at the fact that he had not been paid, and was intending to quit the drug business, but that the others in that business, including Swainson, were concerned that could leave them vulnerable to competing drug businesses. The defense countered with the theory that Opher's murder had been a drug-house robbery gone bad. Therefore, the prosecution had an obligation to turn over evidence tending to corroborate the defense's theory, and to ensure they could do this, the police had an obligation to turn all evidence over to the prosecution. Rubino testified that throughout her work on the Swainson prosecution, she never learned that the Defendants had investigated any alternative suspects with a history of drug-related robberies, but the undisclosed activity sheets show that the Defendants did, in fact, do so.

Moreover, the record demonstrates numerous other instances where Defendants failed to provide complete, relevant information to the prosecution. In one significant example, the felony drug charges brought against Presley were styled as against his alias, "Kareem Miller." The charges stayed that way until just after Presley testified at Swainson's trial and Swainson was convicted. At that point, the charges were suddenly

switched to be against Paul Presley. Despite the fact that Defendants knew of these charges, the information concerning them was not publicly available, as they were ostensibly against a different person, and Rubino never learned of it from Defendants. Naturally, Rubino therefore never informed the defense, and, at trial, Presley failed to disclose the felony drug case pending against "Kareem Miller" and asserted that he had not received any benefits or leniency for his testimony. After Swainson was convicted, the felony drug charges against Presley were dropped at what appears to have been the next court date.

Minimally sufficient policing standards seek to ensure that as a baseline, the prosecution will have the opportunity to meet its legal obligations. Here, there is record evidence that Defendants failed to properly investigate all leads, document all evidence, and that their selective documentation did not accurately reflect witness statements. It also shows that Defendants failed to transfer the information concerning what documentation they did perform to the prosecution. If credited, this evidence indicates that Defendants' conduct fell far short of the baseline.

This conduct extends to the Defendants' interactions with Jacqueline Morsell. She was interviewed by police the day after Opher's shooting. In the course of nine pages of responses, Morsell did not implicate Swainson in the murder, and only mentioned that he, like a few others, worked in the drug operation conducted at 5413 Sansom Street. Instead, Morsell identified two other men who may have had a motive to kill Opher. Despite appearing on the "activity sheets," there is no record evidence that these leads were ever investigated. As admissions in the record reflect, any reasonable police officer or detective would have sought out further information about any potential suspect and seek to interview any such suspect. Therefore, even if the attempts were ultimately unsuccessful, I would expect that the record would contain evidence of Defendants' efforts to investigate these leads. Failure to document investigative efforts or prematurely excluding potential suspects before ruling them out through the development of evidence falls well below the minimal acceptable policing standards of the time.

### 3. Evidence that Defendants fabricated Andrew Swainson's fugitive status

On February 15, 1988, Defendants obtained a warrant for Swainson's arrest for the murder of Opher. According to police documentation, that same day, Santiago, and Durrant attempted to arrest Swainson, and were told by friends at his address that he was in Jamaica "for a holiday and would be back soon." This report was separately confirmed by Swainson's sister, who told Defendants Cohen and Alexander on February 19, 1988, that Swainson had left Philadelphia for a planned trip to Jamaica and would be returning during the first week of March. Defendants therefore knew that Swainson had not been informed of his status as a suspect in the Opher murder, Swainson did not know there was a warrant for his arrest for the same, and that this was a "planned" trip and that Swainson would return soon.

Nonetheless, on February 19, 1988, Defendants Santiago, Cohen, and Alexander sought a federal fugitive warrant. The record evidence demonstrates that contrary to the information Defendants had gathered to that point, which did not suggest Swainson was a fugitive, Defendants represented in their application for the fugitive warrant that Swainson had "informed persons close to him that after the murder, he was going to flee to Jamaica." I have seen no record evidence to support this assertion. If, in fact, Defendants fabricated this statement to obtain a federal warrant for arrest or simply to create documentation falsely indicating consciousness of guilt, that would be egregious misconduct and a gross departure from minimally acceptable police practices. The same would be true of any misrepresentations to ADA Rubino about Swainson's fugitive status, including if Defendants misrepresented that they had obtained a federal fugitive warrant when they had not.

Furthermore, at trial, the prosecution relied on the warrant and Defendants' assertion that Swainson had intended to "flee to Jamaica" as evidence of Swainson's "consciousness of guilt." There is nothing to demonstrate that Defendants ever provided the prosecution with the actual evidence they had gathered, which showed the opposite. According to police documentation, the statements of Swainson's family and friends showed Swainson left town on a pre-planned trip, always intended to return, and soon did return, on the pre-planned date. Further, once he returned to the United States,

an activity sheet completed by Santiago shows that Swainson called Santiago and told Santiago he was in New York at his parents' home, the fact of which, according to Rubino, was never disclosed. The failure to document and disclose this information in a form provided to the prosecutor would constitute a major deviation from accepted police practices at the time.

Rubino testified that when she prosecuted the case against Swainson, she argued for and obtained a jury instruction regarding flight, based on the representations Defendants made to her concerning Swainson's travel. At the time of trial, Rubino had not seen the activity sheet concerning Swainson's call to Santiago once he had returned and did not know he had a pre-planned date for his return. Rubino maintained that if she had, she would have provided such exculpatory evidence to the defense and she would not have argued that Swainson's "flight" demonstrated consciousness of guilt.

The record therefore indicates that Defendants suppressed evidence that indicated a motive for Swainson's travel to Jamaica consistent with his innocence, and fabricated evidence to indicate consciousness of guilt, which would be an egregious deviation from the law and well-established minimally acceptable police practices that any reasonable investigator would have known at the time. The record further shows that Defendants fabricated evidence in applying for a federal fugitive warrant, which would make this departure from the minimally accepted standards even more egregious. Furthermore, this deviation, if it in fact occurred, is blatant enough that I would expect a supervisor to have recognized it, including because at least one supervisor, Lieutenant Durrant, was reportedly aware of this facet of the investigation and the application for a fugitive warrant. If credited, a supervisor's awareness of such a deep failure to meet the minimal requirements of the time, would require the issue be escalated along the chain of command, and addressed through an investigation and potentially disciplinary action, to preserve the functioning of the department.

And finally, if such a gross violation of the norms occurred with the full knowledge of a supervisor who took no action to correct or address it, this lack of action would demonstrate a general disregard for legal obligations and procedures that I would

not expect to see in the absence of a complete lack of meaningful supervision and discipline, given the seriousness of such a violation.

The fees for my professional services in this case consisted of a $12,000 flat fee for initial case development and preparation of the written report and additional fees at $200/hr. for revisions to the report. Additionally, I charge $2,750 per day or part thereof for all testimony, with an additional $1,000 fee if my testimony requires travel from the Voorhees, NJ area.

I declare under penalty of perjury that the foregoing is true and correct on this 2nd day of May 2024, in Voorhees, New Jersey.

______________________________

Michael K. Lynch

# EXHIBIT A

**To develop my report in this case, I was given the following materials for review:**

**Andrew Swainson Case Related Materials**

1. Terence Gibbs Deposition Transcript, August 29, 2023
2. Manuel Santiago Deposition Transcript, September 27, 2023
3. Andrew Wellbrock Deposition Transcript, October 10, 2023
4. Judith Rubino Deposition Transcript, October 27, 2023
5. Joseph Fischer Deposition Transcript, November 15, 2023
6. Manuel Santiago Day 2 Deposition Transcript, November 9, 2023
7. Manuel Santiago Day 3 Deposition Transcript, November 29, 2023
8. Stanley Opher H-File (D000001-D001343)

**Historical Pattern and Practice Materials**

1. *The Philadelphia Inquirer* "How Phila. Detectives Compel Murder 'Confessions,'" April 24, 1977
2. *Arrington v. City of Philadelphia*, Class Certification Opinion
3. *Civil Rights Litigation Clearinghouse*, Cliett v. City of Philadelphia Summary
4. *Cliett v. City of Philadelphia*, Consent Decree
5. *Spring Garden United Neighbors v. City of Philadelphia*, 614 F. Supp. 1350
6. Don Terry, "Philadelphia Shaken by Criminal Police Officers," *The New York Times*, August 28, 1995
7. Debbie Goldberg "For many in North Philadelphia, Police Corruption is No Surprise," *The Washington Post*, October 4, 1995
8. *NAACP et al. v. City of Philadelphia*, Complaint
9. *NAACP et al. v. City of Philadelphia*, Settlement and Monitoring and Stipulations of the Parties
10. IAO First Report, November 1997
11. IAO Second Report, September 1998
12. IAO Third Report, July 1999
13. IAO Disciplinary System Report, December 2003
14. IAO Disciplinary System Report, March 2001
15. IAO Enforcement of Narcotics Laws, July 2002
16. IAO Officer Involved Shootings, February 2005

17. George Fachner and Steven Carpenter, *DOJ Collaborative Reform Initiative*, Assessment of Deadly Force in the Philadelphia Police Department, March 24, 2023
18. *Mayor's Task Force on Police Discipline Report and Recommendation,* November 27, 2001
19. Philadelphia and It's Police: Toward a New Part – A Report by the Philadelphia Police Study Task Force, March 1987
20. R. Paul McCauley Report, *Shaurn Thomas v. City of Philadelphia et al.*, January 14, 2019

**Wrongful Conviction Case Materials**

Donald Ray Adams

1. *National Registry of Exonerations*, Don Ray Adams
2. Claudia Vargas, "I Was Pressured to Blame to Wrong Man," The Philadelphia Inquirer, August 19, 2015

Pedro Alicea

1. *Commonwealth of Pennsylvania v. Antonio Martinez*, Commonwealth's Answer to Petition for Post Conviction Relief
2. *Commonwealth of Pennsylvania v. Antonio Martinez,* Joint Stipulations of Facts
3. *Commonwealth of Pennsylvania v. Antonio Martinez,* Second Amended Complaint

Johnny Berry

1. *Commonwealth v. Johnny Berry*, Hearing (PCRA) Volume 1, June 24, 2019
2. *Johnny Berry v. City of Philadelphia et al.*, Second Amended Complaint
3. Edward Rocks Deposition Transcript, February 11, 2021
4. Manuel Santiago Deposition Transcript, March 4, 2021
5. Talli McFadden Interview, October 31, 1994
6. Roland James Interview, October 19, 1991
7. Leonard Jones Homicide File

Matthew Connor

1. Savoring Freedom – Ex Inmate Rejoices in His New Freedom*, The Philadelphia Inquirer*, March 3, 1990
2. *Commonwealth v. Matthew Connor*, Post-Conviction Petition

Troy Coulston

1. *Commonwealth v. Troy Coulston*, Commonwealth's Answer to Counseled Petition for Relief
2. *Commonwealth v. Troy Coulston*, Amended Complaint

Curtis Crosland

1. *Curtis Crosland v. Commonwealth of Pennsylvania*, Commonwealth's Answer to Petition for Habeas Relief
2. *Curtis Crosland v. City of Philadelphia*, Fourth Amended Complaint
3. *Curtis Crosland v. City of Philadelphia*, Explanation and Order

James Dennis

1. *James Dennis v. City of Philadelphia et al.,* Summary Judgment Opinion, October 30 2003
2. *James Dennis v. City of Philadelphia et al.,* Complaint
3. *James Dennis v. City of Philadelphia et al.,* Opinion, U.S. Court of Appeals for the Third Circuit
4. Charles Thompson Interview, dated November 8, 1991
5. Activity Sheet regarding Latonya Cason, dated January 11, 1992
6. Latonya Cason Interview, dated January 11, 1992
7. Charles Thompson Interview, dated January 24, 1996
8. Latanya Cason Affidavit, dated April 2, 1997
9. Latonya Cason Department of Public Welfare Receipt, dated October 22, 1991
10. Manuel Santiago Testimony from Motion to Dismiss Hearing, dated September 21, 1992

Recco Ford

1. *Recco Ford v. City of Philadelphia et al.*, Amended Complaint

Lance Felder and Eugene Gilyard

1. *Lance Felder and Eugene Gilyard v. Commonwealth of Pennsylvania*, Second Amended Complaint
2. *Lance Felder and Eugene Gilyard v. Commonwealth of Pennsylvania*, Second Amended Complaint Exhibit A
3. *Lance Felder and Eugene Gilyard v. Commonwealth of Pennsylvania*, Second Amended Complaint Exhibit B
4. Francis Healy Deposition Transcript, February 24, 2017

Chester Hollman

1. *The National Registry of Exonerations*, Chester Hollman III
2. *City of Philadelphia Press Release*, City and Chester Hollman Announce Settlement of Wrongful Conviction Claim
3. Chester Hollman Homicide File
4. Trial Transcript, April 26, 1993 – May 4, 1993
5. Diedre Jones Trial Testimony Transcript, April 26, 1993
6. Andre Dawkins Trial Testimony Transcript, April 28, 1993
7. Recantation of Diedre Jones, August 5, 2005
8. Diedre Jones PCRA Testimony Transcript January 12, 2012
9. Petition for Post Conviction Relief
10. Denise Combs' Alamo Rent a Car Records
11. Andre Dawkins' First Judicial District Court of Philadelphia Court Summary
12. Junko Nihei Interview, August 21, 1991
13. Deirdre Jones Interview, August 20, 1991
14. Deirdre Jones Interview, August 23, 1991
15. John Henderson Interview, August 20, 1991
16. Andre Dawkins Interview, August 20, 1991
17. Andre Dawkins Interview, September 12, 1991
18. George Coleman Interview, August 20, 1991
19. Joseph Caban Interview, August 20, 1991
20. Patricia Bowles Interview, August 20, 1991
21. Salvatore Genestra Interview, August 20, 1991
22. Photos of Denise Combs
23. Investigation Records
24. Recantation of Andre Dawkins, dated March 27, 2001
25. Report of Interview and Polygraph Examination of Deirdre Jones, dated August 17, 2006
26. Commonwealth's Answer to Counseled PCRA Petition
27. Joint Stipulation of Facts
28. Transcript of Statement of Deirdre Jones, dated August 16, 2005

Gerald Howell

1. *Gerald Howell v. Superintendent Brooks et al.,* Commonwealth Response to Petitioner's Amended Habeas Corpus Petition

Ronald Johnson

1. *Ronald Johnson v. Commonwealth of Pennsylvania*, Commonwealth's Answer to Consolidated Amended Petition for Post Conviction Relief
2. *Ronald Johnson v. Commonwealth of Pennsylvania*, Consolidated Amended Petition for Post Conviction Relief

William Johnson

1. *Commonwealth of Pennsylvania v. William Johnson*, Motion for Nolle Prosequi
2. *Commonwealth of Pennsylvania v. William Johnson*, Motion for Nolle Prosequi – Exhibit A
3. *Commonwealth of Pennsylvania v. William Johnson*, Motion for Nolle Prosequi– Exhibit B
4. *William Johnson v. City of Philadelphia*, Amended Complaint

Steven Lazar

1. *Steven Lazar v. George Little et al.*, Response to Petitioner's Amended Petition for Habeas Corpus Pursuant to 28 U.S.C.§ 2254
2. *Steven Lazar v. George Little et al.*, Response to Petitioner's Amended Petition for Habeas Corpus Pursuant to 28 U.S.C.§ 2254, Exhibit A
3. *Steven Lazar v. George Little et al.*, Response to Petitioner's Amended Petition for Habeas Corpus Pursuant to 28 U.S.C.§ 2254, Exhibit B
4. *Steven Lazar v. City of Philadelphia et al.*, Complaint

Ah Lee

1. *The National Registry of Exonerations*, Ah Lee

Terrance Lewis

1. *The National Registry of Exonerations*, Terrance Lewis
2. *Terrance Lewis v. City of Philadelphia et al.*, Complaint
3. Aaron Moselle, Gratitude mixes with regret for Philly man awarded $6M for wrongful murder conviction, *WHYY*, July 1, 2020
4. Terrence Lewis' PA Department of Corrections DC47C Report
5. Terrence Lewis' PA Department of Corrections Misconducts Report
6. PPD Complaint or Incident Report, filed by Bernard Howard, August 7, 1996
7. PPD Complaint or Incident Report, Filed by PPD, July 15, 1997
8. PPD Complaint or Incident Report, filed by Bernard Howard, August 6, 1996
9. PPD Complaint or Incident Report, Filed by PPD, January 1, 1997
10. Lena Laws PPD Biological Information Report, August 7, 1996
11. Lena Laws Interview, August 7, 1996
12. Lena Laws Interview, July 24, 1997
13. Lena Laws Interview, March 17, 1997
14. Lena Laws Interview, June 30, 1997

15. Hulon B. Howard Report of Autopsy, August 7, 1996
16. PPD Criminalistics Laboratory Report Property Receipt, September 14, 1996
17. City of Philadelphia, Office of the Medical Examiner - Hulon B. Howard Death Certificate Information, August 7, 1996
18. Denise Mary Williams Interview, April 10, 1997
19. Denise Williams Interview, July 10, 1997
20. Denise Williams Interview, July 24, 1997
21. P/O Brian Reynolds Interview, January 20, 1997
22. P/O Carlos Ruiz Interview, July 15, 1997
23. Daniel McGee Interview, January 20, 1997
24. P/O Frank Hack Interview, August 7, 1996
25. P/O Frank Sheridan Interview, August 7, 1996
26. P/O James Sloan Interview, August 7, 1996
27. P/O John Taggart Interview, August 7, 1996
28. P/O Shawn Butts Interview, August 7, 1996
29. City of Philadelphia, Office of the Medical Examiner - Hulon B. Howard Clothing Receipt, September 16, 1998
30. PPD Hulon B. Howard Clothing Property Receipt, September 16, 1998
31. PPD Property Receipt, August 6, 1996
32. PPD Property Receipt, July 15, 1997
33. PPD Property Receipt, July 15, 1997
34. Sgt. Mariano S. Madella Interview, August 7, 1996
35. City of Philadelphia, Office of the Medical Examiner - Hulon B. Howard Toxicology Report, September 4, 1996
36. Hulon B. Howard Homicide File

John Miller

1. *Commonwealth of Pennsylvania v. John Miller*, Motion for Nolle Prosequi
2. *John Miller v. District Attorney for the County of Philadelphia et al.*, Respondents' Statement of Non-Objection to the Magistrate Judge's Report and Recommendation
3. *John Miller v. District Attorney for the County of Philadelphia et al.*, Report and Recommendation
4. *John L Miller III v. City of Philadelphia et al.*, Complaint
5. Anthony Mullen Homicide File

Gregory Holden and Bruce Murray

1. *Bruce Murray v. Donald Vaughn et al.*, Respondents' Rule 60(b)(6) Response
2. *Bruce Murray v. Gina Clark et al.*, Joint Stipulations of Fact and Proposed Conclusions of Law

3. *Bruce Murray v. Gina Clark et* al., Order Granting Habeas Corpus Relief
4. *Gregory Holden v. Wynder et al.,* Joint Stipulations of Fact and Proposed Conclusions of Law
5. *Bruce Murray v. City of Philadelphia et al.,* Complaint
6. *Gregory Holden v. Kevin Ransom et al.,* Order Vacating Conviction

Walter Ogrod

1. *Commonwealth v. Walter Ogrod*, Consolidated Amended Petition for Habeas Corpus and Statutory Post- Conviction Relief and Memorandum of Law
2. *Commonwealth v. Walter Ogrod*, Joint Stipulation of Fact of Petitioner Walter Ogrod and Respondent Commonwealth of Pennsylvania
3. *Commonwealth v. Walter Ogrod*, PCRA Hearing Transcript, June 5, 2020
4. Judith Rubino Deposition Transcript, April 20, 2023

David Sparks

1. *Commonwealth of Pennsylvania v. David Sparks*, Commonwealth's Response to Counseled Petition for Post Conviction Relief
2. *Commonwealth of Pennsylvania v. David Sparks*, Second Amended Petition for Post Conviction Relief

Percy St. George

1. Marc Bookman, "Three Murders in Philadelphia," *Slate*, May 12, 2017
2. *Commonwealth v. Percy St. George*, Jeffrey M. Kolansky Letter to Chambers, Response to Defendant's Motion to Bar Retrial (Fifth Amendment Assertion), October 3, 1994
3. *Commonwealth v. Percy St. George*, Hearing on Fifth Amendment Assertion, September 22, 1994
4. *Commonwealth v. Percy St. George,* Motion to Bar Prosecution Based on Due Process, Violations, October 1993
5. Letter from Joe Labar to Ann Ponterio, undated
6. PPD Photo Arrays of Isaac Pollard, David Dickerson, Gregory Alexander, Keith Reese (and others)
7. PPD Japelle McCray Homicide Record
8. Det. Manuel Santiago's Affidavit of Probable Cause for Arrest for Percy St. George
9. PPD Photo Arrays of Percy St. George
10. Letter from Jeffery M. Kolansky to Honorable Carolyn Engel Temin

11. Motion to Bar Prosecution based on Due Process Violations with Exhibits, October Term 1993
12. Motion to Bar Prosecution based on Due Process Violations, October Term 1993
13. Preliminary Hearing Transcript, October 7, 1993
14. PPD Melvin McCray Interview, May 14, 1993
15. PPD David Glenn Interview, May 14, 1993
16. PPD Melvin McCray Interview, May 15, 1993
17. PPD David Glenn Interview, July 13, 1993
18. PPD Inmon Goggins Interview, August 25, 1994
19. PPD Elua McCray Interview, October 7, 1993
20. Motion to Bar Prosecution Based on Due Process Violations (with exhibits)

Willie Stokes

1. *Willie Stokes v. Marirosa Lamas et al.,* Amended Response to Successive Petition of Writ of Habeas Corpus
2. *Willie Stokes v. Marirosa Lamas et al., Report and Recommandation*, December 22, 2021

Shaurn Thomas

1. *Shaurn Thomas v. City of Philadelphia et al.*, Plaintiff's Counterstatement of Undisputed Fact Material
2. *Shaurn Thomas v. City of Philadelphia et al.*, Memorandum Opinion, August 23, 2019

Willie Veasy

1. *Commonwealth of Pennsylvania v. Willie Veasy*, Petition for Post Conviction Relief
2. *National Registry of Exonerations*, Willie Veasy
3. City of Philadelphia, Office of the Medical Examiner – John Lewis Post-Mortem Report, January 24, 1992
4. PPD Firearms Identification Unit Property Receipt
5. Denise Mitchell Statement, December 21, 2018
6. John Lewis Homicide File
7. PPD Telephone and Radio Transmittal Transcript, January 24, 1992
8. Cassandra Hayword Interview, January 25, 1992
9. Denise Mitchell Interview, January 25, 1992
10. John Lewis Activity Sheet, dated February 7, 1992
11. John Lewis Activity Sheet, dated February 8, 1992
12. *2 Guilty in Drug Killing* - Philadelphia Daily News Article June 12, 1990
13. Criminal Docket

14. Report of James L. Trainium, November 11, 2018
15. Denis Mitchell Interview, Undated
16. Willie Veasy Interview, Undated
17. Criminal Transcript, June 17, 1992
18. Criminal Complaint, May 5, 1992
19. Transcript of Video Recorded Interview, September 17, 2019

Anthony Wright

1. Commonwealth Exhibit List, May 26, 1993
2. Richard Carroll Closing Statement Transcript, June 7, 1993
3. ADA Richard Carroll Penalty Phase and Verdict Closing Statement Transcript, June 10, 1993
4. ADA Richard Carroll Opening Statement Transcript, May 26, 1993
5. Bernard Seigel Closing Statement, June 7, 1993
6. Bernard Seigel Penalty Phase and Verdict Closing Statement Transcript, June 10, 1993
7. Bernard Seigel Opening Statement Transcript, May 26, 1993
8. Jury Charge and Verdict Transcript, June 8, 1993
9. Jury Instructions Transcript, May 26, 1993
10. Trial Transcript, May 26, 1993 – June 8, 1993
11. Penalty Phase and Verdict Transcript, June 9, 1993 – June 10, 1993
12. Anthony Wright Testimony Transcript, June 3, 1993
13. Det. Bennie Bracey Testimony Transcript, June 1, 1993 – June 3, 1993
14. Det. Dennis Dusak Testimony Transcript, June 7, 1993
15. Det. Frank Jastrzembski Testimony Transcript, June 2, 1993
16. Det. Manuel Santiago Testimony Transcript, June 2, 1993 – June 3, 1993
17. Dr. Edward Lieberman Testimony Transcript, June 2, 1993
18. Grace Joyner Testimony Transcript, June 1, 1993
19. Gregg Alston Testimony Transcript, June 1, 1993
20. John Buddy Richardson Testimony Transcript, June 1 1993
21. John Buddy Richardson Testimony, June 1, 1993
22. Louis Brenner Transcript, June 3, 1993
23. Marilyn Martin Testimony Transcript, June 3, 1993
24. Officer Avon Wilson Testimony Transcript, May 26, 1993
25. Officer Mario Santiago Testimony Transcript, May 26, 1993
26. Officer William McDowell Testimony Transcript, May 26, 1993
27. Phyllis Ward Testimony Transcript, May 26, 1993
28. Roland St. James Testimony Transcript, June 1, 1993
29. Roland St. James Testimony Transcript, June 7, 1993
30. Sgt Thomas Burke Testimony Transcript, May 26, 1993
31. Shawn Nixon Testimony Transcript, June 2, 1993
32. William James Testimony Transcript, June 7, 1993
33. Anna Perdomo Testimony Transcript, June 9, 1993

34. Det. Walter Czaban Testimony Transcript, June 9, 19931993
35. Dr. Alan Tepper Testimony Transcript, June 9, 1993
36. James Douglas Testimony Transcript, June 9, 1993
37. Marilyn Martin Testimony Transcript, June 9, 1993
38. Mary Wright Testimony Transcript, June 8, 1993
39. Willie George Ellison Testimony Transcript, June 8, 1993
40. Trial Transcript (ALL DAYS), 1993
41. Letter from Jeffrey M. Kolansky, dated October 3, 1994
42. Commonwealth's Exhibit 1-19
43. Commonwealth's Exhibit 21-22
44. Commonwealth's Exhibit 24-53
45. Commonwealth's Exhibit 66 -99
46. Commonwealth's Exhibit 100-107
47. Commonwealth's Exhibit 111-131
48. Commonwealth's Exhibit 133-140
49. Commonwealth's Exhibit 142-159
50. Commonwealth's Exhibit 165-174
51. Trial 2 Commonwealth Exhibit List
52. Defendant's Exhibit 130
53. Defendant's Exhibit 139
54. Defendant's Exhibit 142-144
55. Defendant's Exhibit 147
56. Defendant's Exhibit 149
57. Defendant's Exhibit 158
58. Defendant's Exhibit 160
59. Defendant's Exhibit 164-165
60. Trial Transcript (ALL DAYS), 2016
61. Email from Manuel Santiago to Bridget Kirn, August 17, 2015
62. Samuel W. Silver Letter to Manuel Santiago, dated August 12, 2015
63. *Anthony Wright v. City of Philadelphia, et al*, Inspector Laurence D. Nodiff Deposition Transcript, March 1, 2018
64. *Anthony Wright v. City of Philadelphia, et al*, Anthony Tomaino Deposition Transcript, March 25, 2017
65. *Anthony Wright v. City of Philadelphia, et al*, Anthony Tomaino Deposition Exhibits 8-19
66. *Anthony Wright v. City of Philadelphia, et al,* Anthony Wright Deposition Transcript, September 6, 2018
67. *Anthony Wright v. City of Philadelphia, et al,* Anthony Wright Deposition Exhibits
68. *Anthony Wright v. City of Philadelphia, et al,* Thomas J. Augustine Deposition Transcript, August 3, 2017
69. *Anthony Wright v. City of Philadelphia, et al*, Thomas J. Augustine Plaintiff Exhibits 61-65
70. *Anthony Wright v. City of Philadelphia, et al*, David Baker Deposition Transcript, August 2, 2017

71. *Anthony Wright v. City of Philadelphia, et al*, David Baker Deposition Exhibits 56-60
72. *Anthony Wright v. City of Philadelphia, et al*, Bennie Bracey Jr. Deposition Transcript January 24, 2018
73. *Anthony Wright v. City of Philadelphia, et al*, Bridget L. Kirn Deposition Transcript, March 13, 2018
74. *Anthony Wright v. City of Philadelphia, et al*, Carlos Vega Deposition Transcript, August 24, 2017
75. *Anthony Wright v. City of Philadelphia, et al*, Carlos Vega Deposition Exhibits 1-7
76. *Anthony Wright v. City of Philadelphia, et al*, Charles Myers Deposition Transcript, July 11, 2017
77. *Anthony Wright v. City of Philadelphia, et al*, Charles Myers Deposition Exhibit 1
78. *Anthony Wright v. City of Philadelphia, et al*, Joseph Descher Deposition Transcript, December 11, 2017
79. *Anthony Wright v. City of Philadelphia, et al*, Dennis Dusak Deposition Transcript, December 12, 2017
80. *Anthony Wright v. City of Philadelphia, et al*, Frank Jastrzembski Deposition Transcript, August 15, 2017
81. *Anthony Wright v. City of Philadelphia, et al*, Frank Jastrzembski Deposition Exhibits 66-76
82. *Anthony Wright v. City of Philadelphia, et al*, Ryan Gallagher Deposition Transcript, January 23, 2018
83. *Anthony Wright v. City of Philadelphia, et al*, Jennifer Selber Deposition Transcript June 8, 2017
84. *Anthony Wright v. City of Philadelphia, et al*, Manuel Santiago Deposition Transcript, May 4, 2017

# EXHIBIT B

## CURRICULUMN VITAE

Chief Michael K. Lynch, (Ret.)

# CURRICULUMN VITAE

Chief Michael K. Lynch, Ret.

## EDUCATION

**Northwestern University School of Staff & Command**
Executive Management Studies

**West Point Command & Leadership**
Command and Leadership Studies

**Penn State University**
Risk Management and Critical Policy Development

**NJ Police Training Commission**
Basic Police Officer Academy
Corrections Academy
SLEO II Academy
Certified Police Instructor

**Fairleigh Dickinson University**
B.A. Independent Studies
Master of Administrative Science
Est. Grad 2026

## LAW ENFORCEMENT EMPLOYMENT

- Camden County Police Department (2013-Present)
- Invictus Expert Advisors (2015-Present)
- Camden City Police Department (1994-2013)
- Camden County Department of Corrections (1993-1994)
- Pennsauken Police Department (1992-1993)

## PROFESSIONAL EXPERIENCE

### Invictus Expert Advisors

Subject Matter Expert (2015 – Present)

Police subject matter expert advising a team of Assistant Attorney Generals from the Illinois Attorney General's Office, actively conducting a pattern or practice investigation of the Joliet Police Department. Expert support included reviewing officer trainings, policies, and actual day-to-day practices; examining accountability systems and data collection methods; interviewing law enforcement officers and other officials; observing officer conduct more broadly; and reviewing documentary evidence related to specific misconduct incidents.

Police practice expert for leading civil rights litigators, specifically providing expert analysis in wrongful conviction cases, including extensive documentary evidence review, police pattern or practice analysis, written expert opinion, and expert testimony.

### Camden County Police Department

Chief of Staff (2023 – Present)
Senior Policy Advisor (2015-2023)
Assistant Chief of Police (2013 – 2014)

As Chief of Staff, assist the Chief of Police in exercising executive control and direction over management of accounting, budgeting, and auditing functions, human resource management, procurement of goods and services, administrative support services, and police records. Responsible for developing and recommending solutions to problems related to both internal operations and police practices.

As senior policy advisor advised the Chief of Police on day-to-day operations and key policy initiatives including—Advancing 21st Century Policing, use of force, investigative practices, operational protocols, strategic-tactical intelligence, real-time integrated technology, and community-based performance management.

As Assistant Chief of Police, led the design, stand-up, mobilization, and fully directed the day-to-day operations and business management of the department—a 500+ employee regional police force—a national model for 21st

## AREAS OF EXPERTISE

- Arrest, Search & Seizure
- Crash Investigation
- Criminal Intelligence
- Early Intervention
- De-escalation
- Facility Security
- Incident Command
- Internal Affairs
- Investigative Practices
- Leadership
- Management & Supervision
- Police Administration
- Police Ethics
- Police Misconduct
- Police Operations
- Police Training
- Policy Development
- Problem Solving
- Real-Time Fusion Centers
- Risk Analysis
- Situational Awareness
- Strategic Planning
- Tactical Planning
- Use Of Force
- Vehicle Pursuits

Century Policing. Managed the department's successful assessment and award of National CALEA accreditation; a recognition earned by less than 4% of law enforcement agencies nationally. Met privately with the 44th President of the United States—Barack Obama recognizing the creation of a model public safety organization. Developed progressive policing methods, policies and technology systems that reduced incidents of crime to a 50-year record low, reduced citizens' fear of crime and led to the department being recognized as a national model for best practices.

### Camden City Police Department
Deputy Chief of Police (2008 – 2013)
Command Officer (2000-2008)
Sergeant (1997-2000)
Officer/Detective (1994-1997)

Fully directed the day-to-day operations and business management of the department—a 400+ employee, urban police force, serving a diverse and economically stressed community of more than 100,000 residents, a seasonal-transient population of more than two million, and a $60 million-dollar operating budget. Enhanced organizational effectiveness and agency culture; supported public safety goals; implemented continuous process improvements; liaised with labor organizations and completed all due diligence for mission readiness.

By leveraging technology, systems of accountability and transforming organizational culture; the department has earned the trust of its community and driven crime down to 50-year lows.

Directed and commanded all aspects of the department's investigation of crimes and proactive investigative operations. Investigative assets included Homicide, Violent Crime Task Force, Special Victims, General Investigations, Narcotics, and LE Partner Task Forces.

Maximized the delivery of police services and sustained the department's public safety doctrine despite decrease of sworn personnel by 47% and the demotion of management staff by 70%.

Created South Jersey's first Real-Time Crime Prevention Center: a-state-of-the-art center housing an integrated information, resource management, digital visualization, and force multiplier system for gathering, analyzing, and distributing actionable information, and managing resources in real-time. The Center includes two fully operational mobile command centers.

## PATTERN OR PRACTICE CASES

- United States of America v. Jason Stetser.
- Pattern or Practice Investigation of the Joliet Police Department, IL.
- Ruben & Maria Martinez v. City of Los Angeles, CA, et al
- Dwayne Thorpe v. City of Philadelphia, PA, et al.
- Raymond Lantane v. City of Philadelphia, PA, et al.
- Anthony DiPippo v. County of Putnum, NY, et al.
- Harlem Park Three v. City of Baltimore, MD, et al.
- Swainson v. City of Philadelphia, PA, et al.

Transformed an underperforming and corrupt law enforcement agency, policing one of America's most crime challenged cities—into an ethics-centered guardian not warrior police department and national model.

Developed and instituted a fully integrated CCTV/IP Camera "Eye-in-the Sky" program aimed at strategically force multiplying crime-specific prevention activity in the city's most challenged neighborhoods.

Managed public safety operations on the Camden waterfront-downtown district which experiences more than three million visitors each year. Key venues included Camden County's Wiggins Park, Susquehanna Bank Center (the region's largest indoor-outdoor entertainment center), Adventure Aquarium, Battleship NJ, Campbell's Field (minor league baseball stadium), Rutgers University, Rowan University, and Cooper Medical School of Rowan University, South Jersey Port Corporation, L-3 Communications, U.S. Federal Court House, Delaware River Port Authority Corporate Headquarters, Camden County Correctional Facility, multiple financial institutions, two bridges crossing the Delaware River and residential communities.

As Uniform Operations Commander, commanded all aspects of Camden City uniformed police services, which included patrol, special operations-tactical forces, community policing, and support assets. Responsible for overseeing the development and execution of crime prevention plans and managing real-time emergency response. Provided leadership and guidance to subordinate commanders and first line supervisors.

Oversaw all administrative functions of the department, which included budget preparation, personnel management, procurement, technology integration, policy development, internal investigation, training, media, and community relations.

Recipient of Chief's Service Award for dedication to duty and professional performance. Earned service awards for heroism, bravery, and meritorious service. Received letters of recognition from the 43rd President of the United States, George W. Bush. and the 42nd President of the United States, William Jefferson Clinton.