# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANDREW SWAINSON,

       Plaintiff,

  v.

CITY OF PHILADELPHIA; MANUEL
SANTIAGO; JAMES ALEXANDER; JOHN
DELLA ROCCA, as personal representative of
the ESTATES OF MICHAEL COHEN,
ARTHUR DURRANT and FRANCIS
MILLER; and JOSEPH D. FISCHER,

      Defendants.

No. 2:22-cv-02163-JP

---

**Plaintiff Andrew Swainson's Response in Opposition to
Defendants' Motions for Summary Judgment**

Jonathan H. Feinberg
Grace Harris
KAIRYS, RUDOVSKY, MESSING,
 FEINBERG & LIN LLP
718 Arch Street
Suite 501 South
Philadelphia, PA 19106

Emma Freudenberger
Amelia Green
Christina Matthias
Katrina Rogachevsky
NEUFELD SCHECK BRUSTIN
 HOFFMANN & FREUDENBERGER, LLP
200 Varick Street, Suite 800
New York, NY 10014

*Counsel for Plaintiff Andrew Swainson*

# TABLE OF CONTENTS

I.   Introduction ..................................................................................................................1

II.  Facts ...........................................................................................................................5

     A.   The Murder of Stanley Opher, the Investigative Observations of Officers
          on the Scene, and the Drug House Robbery Theory .................................................5

     B.   Andrew Swainson's Truthful and Voluntary Exculpatory Statement ....................6

     C.   Santiago Drops Charges Against Paul Presley and Focuses, Without
          Evidence, on Swainson ............................................................................................7

     D.   Despite Significant Reasons to Doubt Presley's Account, Santiago Relies
          on Him as His Key Witness .....................................................................................8

     E.   Santiago Fabricates Evidence to Falsely Prosecute Swainson ..............................9

     F.   After Presley Admits Swainson Is Not the Shooter, Santiago Fabricates
          Additional Statements ............................................................................................11

     G.   Santiago Fabricates a Photo Array to Rebut a Motion to Suppress ......................12

     H.   Detectives Bury Exculpatory Leads Pointing to Other Suspects ..........................13

          1.   Paul Presley ...................................................................................................13

          2.   Jeffrey Green and Ashley Hines .....................................................................14

          3.   Latanya Furman, Darren Brown, and Brian Brown .......................................14

          4.   Allen Proctor ..................................................................................................15

          5.   "George" ........................................................................................................16

     I.   Santiago Prepares an Affidavit of Probable Cause Based on the Fabricated
          Photo Identification and Concealing Exculpatory Information .............................16

     J.   Detectives Fabricate Swainson's Flight ................................................................17

     K.   Alexander Coerces a Vulnerable Witness to Provide Additional False
          Testimony ..............................................................................................................18

     L.   Detectives Pressure Swainson's Alibi Witness to Adopt A False Statement ........18

M.    Detectives Suppress Evidence ...........................................................19

N.    Swainson Is Convicted at Trial .......................................................19

O.    Presley and Morsell Admit Their Trial Testimony Was Fabricated and
      False, and Swainson Is Exonerated .................................................20

P.    The City of Philadelphia's Policies, Practices, and Deliberately Indifferent
      Training, Supervision, and Discipline ..............................................21

III.  Standard of Review .................................................................................23

IV.   Argument ................................................................................................24

A.    The Summary Judgment Record Contains Sufficient Evidence to Support
      Swainson's § 1983 Claims Against Defendants Santiago, Alexander, and
      Fischer......................................................................................................24

      1.    Fabrication of Evidence by Defendants Santiago and Alexander ............24

            a.    Defendant Santiago ....................................................................25

                  (i.)    Fabrication of All Evidence Regarding Paul
                          Presley's Purported Identification of Andrew
                          Swainson ...............................................................25

                  (ii.)   Fabricated Flight Evidence .................................31

            b.    Defendant Alexander ...................................................................34

                  (i.)    Fabricated Flight Evidence .................................34

                  (ii.)   Jackie Morsell's False Testimony......................37

      2.    Deliberate Deception by Defendants Santiago, Alexander, and
            Fischer....................................................................................................39

      3.    Malicious Prosecution by Defendants Santiago and Fischer....................45

      4.    Civil Rights Conspiracy by Defendants Santiago, Alexander, and
            Fischer....................................................................................................48

B.    The Summary Judgment Record Contains Sufficient Evidence to Support
      Swainson's *Monell* Claim Against Defendant City of Philadelphia....................49

1. The City's Policy and Practice of Withholding Police Activity Sheets Containing Exculpatory Information ..............................................50

2. The City's Deliberately Indifferent Failure to Supervise and Discipline Detectives in the PPD Homicide Division .............................52

V. Conclusion ....................................................................................................63

## I.        Introduction

In 1988, detectives in the Philadelphia Police Department (PPD) homicide division framed Andrew Swainson for a murder he did not commit. The detectives, who were investigating the January 17, 1988, shooting death of Stanley Opher, engaged in extensive and extraordinary misconduct. They fabricated a purported photo identification of Swainson and falsely claimed that he fled the country in order to evade prosecution for Opher's murder. They secured Swainson's arrest through a sworn affidavit that was based on the fabricated photo identification and omitted facts undermining evidence purportedly pointing to him as the perpetrator. They intentionally buried exculpatory and material evidence that would have proven he was, in fact, innocent. As a result of these actions, Swainson was arrested in March 1988, convicted of first-degree murder and related charges in March 1989, and sentenced to life imprisonment without parole.

Swainson remained incarcerated for more than three decades. Beginning in 2018, an investigation conducted by the Philadelphia District Attorney's Office (DAO) uncovered significant material evidence that had never been disclosed to Swainson and his counsel at the time of his trial and throughout the litigation of multiple post-conviction petitions. Following its reinvestigation of the case, the DAO consented to relief for Swainson, and, on June 12, 2020, the Philadelphia Court of Common Pleas vacated his conviction. The murder charges were dismissed, and Swainson was released. He went into prison as a 22-year-old man. After more than 32 years of incarceration, he was released at the age of 55.

The figure at the center of the Opher murder investigation and prosecution of Swainson was PPD Homicide Detective Manuel Santiago—a detective with a lengthy history of proven misconduct in murder prosecutions that occurred in the same time period as Swainson's.

Santiago's wrongdoing led to the prosecution of innocent men on murder charges in at least four high profile cases. His actions caused decades of wrongful imprisonment. In one case, the City of Philadelphia agreed to pay close to $10 million to an innocent man who spent 25 years in prison due to Santiago's fabrication of a confession. In another, a jury sitting in this Court awarded $16 million to a man who spent 25 years on death row based on Santiago's suppression of exculpatory evidence. Santiago has been charged with perjury in connection with false testimony he provided about his involvement in one of these cases, and those charges remain pending.

Santiago's actions across these cases and the actions of his fellow detectives in the Opher murder investigation were made possible, and caused by, systemic failings on the part of the City of Philadelphia to ensure that detectives in the PPD homicide division complied with the U.S. Constitution. For decades, detectives in that unit fabricated evidence, pressured witnesses to lie, buried evidence of officers' misconduct, and intentionally concealed and suppressed exculpatory information, leading to at least two dozen wrongful prosecutions where charges were later dropped, or convictions were later vacated. As a result of this conduct, several innocent people subjected to false charges spent decades in prison. In many of the cases, proof of misconduct was found in records referred to as "activity sheets," documents that PPD homicide detectives used to record information about their investigative findings but then, as a matter of PPD policy and practice, withheld from prosecutors and defense counsel. Throughout this time, PPD leadership had ample notice of this misconduct, but they took no action to remedy officers' wrongdoing.

On June 2, 2022, Swainson initiated the instant civil rights action seeking a remedy for his extraordinary harms and losses. In his Second Amended Complaint, ECF 58, Swainson asserts claims under 42 U.S.C. § 1983 against the City of Philadelphia and Detectives Manuel

Santiago, James Alexander, and Joseph D. Fischer.[1] As to the individual defendants, his § 1983 claims are:

- Count I: fabrication of evidence in violation of the Fourteenth Amendment as to defendants Santiago and Alexander;

- Count II: intentional concealment and deliberate suppression of exculpatory evidence in violation of the Fourteenth Amendment as to defendants Santiago, Alexander, and Fischer;

- Count III: malicious prosecution in violation of the Fourth Amendment as to defendants Santiago and Fischer; and

- Count IV: conspiracy to commit the above constitutional violations as to defendants Santiago, Alexander, and Fischer.

Swainson's final claim against the individual defendants, in Count VI, is a state law malicious prosecution claim against defendants Santiago and Fischer.[2] As to the City of Philadelphia, in Count V, Swainson alleges under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), that the City's policies, practices, and procedures, and/or its deliberately indifferent failure to train,

---

[1] The Second Amended Complaint also names as defendants the estates of three other individuals: Detectives Michael Cohen and Francis Miller and Lieutenant Arthur Durrant. Swainson does not intend to proceed against these defendants, and the proposed Order filed with this response notes his agreement to dismissal of all claims against them. Unless otherwise stated, references to the actions of Cohen, Miller, and Durrant in this brief are for purposes of providing factual context only.

[2] In the Second Amended Complaint, Swainson named all individual defendants in Counts I-IV and VI. Based on the summary judgment record, he agrees to dismiss his fabrication claim (Count I) against Fischer and agrees to dismiss his malicious prosecution claims (federal and state, Counts III and VI) against Alexander. The proposed Order filed with this response reflects this agreement.

supervise, and discipline PPD detectives caused the violation of his constitutional rights and his damages.

The parties have completed extensive discovery and have exchanged expert reports. In all respects, the record has borne out Swainson's claims. Defendants, however, have filed two motions for summary judgment seeking to prevent Swainson from presenting those claims to a jury. In one motion, ECF 79, the City of Philadelphia and defendants Alexander and Fischer (collectively "City defendants") argue (1) that Alexander and Fischer did not violate Swainson's constitutional rights and (2) with respect to the City, there are no underlying constitutional violations that would support a *Monell* claim and, in any event, the record does not support any recognized theory for imposing liability on a municipality. The second motion, ECF 80, filed by defendant Santiago, is a single paragraph joinder of the motion filed by the City defendants.

Neither motion withstands scrutiny. The City defendants' motion relies on inaccurate and incomplete characterizations of the governing law. It omits critical facts developed in discovery that conflict with their version of events, including damning documents found in their own files and admissions at their depositions. And it violates the cardinal rule of summary judgment by failing to view facts and inferences drawn therefrom in the light most favorable to Swainson as the non-moving party, including, most strikingly, on his actual innocence. As for Santiago, his "joinder" is a non-entity because the City defendants' arguments on Counts I through IV only address the claims against Alexander and Fischer, not Santiago. Having made no argument seeking summary judgment as to the claims against him, Santiago has waived the opportunity to move for summary judgment, and his joinder should be denied on that basis alone. In any event, to the extent Santiago has not waived any arguments by his perfunctory filing, the arguments regarding Santiago's conduct in the City defendants' motion have no merit.

Swainson has developed more than sufficient evidence upon which a reasonable jury could rule in his favor. Both motions should be denied.

## II.     Facts

As required by this Court's Policies and Procedures, Swainson has submitted with this response Plaintiff's Statement of Additional Facts in Support of Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Statement" or "PS"). Plaintiff's Statement sets forth a detailed account of all evidence developed through discovery in this case. To provide context for the legal arguments in this response as to why the record requires the Court to deny summary judgment, a summary of the facts is as follows:

### A.     The Murder of Stanley Opher, the Investigative Observations of Officers on the Scene, and the Drug House Robbery Theory

In the early morning hours of January 17, 1988, Stanley Opher was shot in the back with a shotgun at a house from which he sold drugs at 5413 Sansom Street in West Philadelphia during an apparent attempted robbery. PS ¶ 1, 9. He was pronounced dead later that day. PS ¶ 1. Plaintiff Andrew Swainson, a friend of Opher's, is completely innocent; he had nothing to do with the shooting and was not present when it occurred. PS ¶¶ 2-3, 10,

A Philadelphia police officer, John Kay, was in the immediate vicinity of 5413 Sansom at the time of the shooting, and he saw a man, Paul Presley, run from the area. PS ¶ 11. The officer followed him and located him around the corner, hiding crouched under a bush. PS ¶ 12. Presley, unprompted, said: "I didn't shoot anybody." *Id.* He had blood on his hand and his clothing and stated his hand had been injured by a shotgun pellet. *Id.* Presley was taken into custody and charged with the shooting of Opher. PS ¶ 15. Later that evening, Presley gave a statement admitting he had been at 5413 Sansom to buy drugs at the time of the shooting, although he

claimed he had no involvement, that he merely heard a shot when he arrived, and that he was knocked down by two men running out of the house. PS ¶ 27

Detective Manuel Santiago of the PPD homicide division was assigned to lead the investigation into the Opher shooting with Lieutenant Arthur Durrant supervising him. PS ¶ 7. He was initially joined in the investigation by fellow homicide detectives Joseph Fischer and Francis Miller, and, later, James Alexander and Michael Cohen. PS ¶¶ 7, 184. Because Santiago was the lead, all information gathered during the investigation was communicated to him. PS ¶¶ 8, 185

Almost immediately after detectives started their investigation, they learned that 5413 Sansom Street, where Opher was killed, was a drug house from where Opher and others sold cocaine. PS ¶¶ 9, 27. Based on interviews with witnesses, detectives developed information that Opher was killed as part of an attempted robbery at the drug house. PS ¶ 9.

### B. Andrew Swainson's Truthful and Voluntary Exculpatory Statement

During the first days of the investigation, investigating detectives interviewed many people who knew Opher, including Swainson on January 22, 1988. PS ¶ 16. Swainson voluntarily agreed to speak with Santiago. PS ¶ 17. There is no indication anyone considered Swainson a suspect at this time. *Id.* Indeed, the information that this crime was a drug house robbery pointed away from people like Swainson who had worked with Opher at the drug house. PS ¶ 10. Swainson freely acknowledged to Santiago that he had been involved in drug sales with Opher. PS ¶ 19. He wanted to help police find the people responsible for his friend Opher's murder. *Id.* Swainson went through his recollection of where he was on the night of the shooting and provided a detailed alibi. PS ¶¶ 20-21. He explained that he had spent part of the early morning hours of January 17 with his girlfriend, Tish, at a nightclub called L&W, after which he

and Tish went to his friend Donny's house where Donny was with his girlfriend, Tamika Cole. PS ¶ 21.

Swainson agreed to provide Santiago with fingerprints and allowed Santiago to take his photograph. PS ¶ 25. He provided Santiago with two addresses where he could be reached in Philadelphia and also gave his mother's address in New York and his most recent employer's address in New York. PS ¶ 18. Nothing he said in the interview inculpated him in the shooting. PS ¶ 26.

### C. Santiago Drops Charges Against Paul Presley and Focuses, Without Evidence, on Swainson

On February 10, 1988, at Santiago's instigation, all charges brought against Presley for the Opher shooting were dismissed. PS ¶¶ 32-33. Santiago dropped the charges despite not investigating additional evidence inculpating Presley in the shooting. PS ¶¶ 27-31. Most significantly, while Presley had claimed he first arrived at 5413 Sansom Street at the time of the shooting, a friend of Opher's, Crystal Justice, had described a man meeting Presley's description showing up at the drug house an hour earlier. PS ¶¶ 27-29. This man was acting suspiciously and departed without purchasing any drugs, leaving Justice with "a real bad feeling about that guy." PS ¶ 28. In other words, his actions suggested he may have been scoping out the house for a robbery. Justice identified Presley's coat as the coat worn by the man she saw, but there is no indication Santiago or the other detectives ever asked her to identify a photo of Presley. PS ¶ 30. Nor did any detective follow up on these leads before having the charges dropped. PS ¶ 31.

At this point, Santiago was not pursuing any viable suspects and considered himself out of leads. PS ¶ 24. Santiago then received what he himself describes as a "very flimsy" second-hand report of an accusation against Swainson. PS ¶¶ 35-36. This accusation originated with a woman, Latanya Furman, who herself had been suspected of involvement in the Opher murder

because she had recently been part of discussions about setting up 5413 Sansom Street for a robbery. PS ¶ 37. Even though he had cooperated and provided a truthful alibi during Santiago's earlier interview, Swainson became the target of Santiago's investigation based solely on this flimsy accusation. PS ¶¶ 38-39.

### D. Despite Significant Reasons to Doubt Presley's Account, Santiago Relies on Him as His Key Witness

On February 12, 1988, two days after the charges against Presley had been dropped, Santiago brought Presley to the homicide division for a second interview to try to get him to identify Swainson as one of the perpetrators. PS ¶ 40. Even assuming Presley himself was not involved in the crime, his initial statement suggested he had not seen the perpetrators well enough to identify them. PS ¶ 42. Santiago was also aware of multiple indications Presley was not a credible or reliable witness, including his long criminal record and his admission that he had been using crack all night before the crime. PS ¶¶ 43-45. And there were many inconsistencies, first, *among* Presley's various accounts of what he observed, and, second, *between* Presley's accounts and credible independent evidence, including the detailed observations of Officer Kay from the night of the crime. PS ¶¶ 48-49. For example, although Presley had initially described barely seeing the perpetrators before they ran off, he now claimed he had had a prolonged struggle with them after the shooting, and that the shooter then ran off in the direction where Officer Kay was in his patrol car. PS ¶¶ 48(a), 49(a). As Santiago admitted, this account contradicted Officer Kay's credible observations, and he could not explain the inconsistency. PS ¶ 49(a). Presley's later account also provides no explanation for why he was found covered in his own blood. PS ¶ 49(b).

Santiago understood it was important for a detective to consider any motivation a witness may have to provide false information. PS ¶ 46. Given the evidence implicating Presley in the

crime—and that the charges against him had only been dropped two days earlier—Presley had substantial motivation to point the investigation away from himself. Yet despite admitting that all of these issues are the types of things that would merit follow up investigation, Santiago never investigated. PS ¶ 50. Instead, he proceeded to build a case against Swainson based solely on Presley's word. PS ¶ 55.

E.    Santiago Fabricates Evidence to Falsely Prosecute Swainson

Santiago created a typed, purportedly verbatim account of his February 12, 1988 question-and-answer interview with Presley and falsely reported that, without any suggestion, Presley viewed a series of photos and positively identified Swainson as the shooter he had seen. PS ¶ 51. Santiago understood it was critically important to follow the rules governing identification procedures to ensure any identification was reliable, and he repeatedly claimed he had done so. PS ¶ 53. He would later represent that Presley's purported identification had been made from an array of seven photos, including Swainson and six fillers. PS ¶¶ 110-12. But Presley had not seen Swainson shoot Opher, because Swainson is innocent and was not there. PS ¶ 57. Nor did Presley and Swainson know each other. *Id.* As Santiago admitted in his deposition, Presley's identification without any suggestion would not be possible if Swainson is innocent. PS ¶ 58.

There is additional and highly compelling evidence that Santiago's report of Presley's alleged identification is fabricated. PS ¶¶ 60-63, 110-22. Santiago knew in every case it was critically important to preserve a copy of the photo array in the investigation file, including which photos the witness had seen. PS ¶ 59. But, in this case, there is no such copy preserved in the police file. PS ¶ 60. Santiago could not explain the absence. *Id.* Nor is there any other contemporaneous documentation of either the photos shown or the identification Presley

allegedly made—merely Santiago's report. PS ¶ 51, 60. When Presley was first asked to identify the shooter at a preliminary hearing two months later, he did *not* identify Swainson; instead, he said he did not see the shooter in the courtroom. PS ¶ 67. Two months after that, Presley reaffirmed in a signed statement given to an investigator that Swainson was not the shooter. PS ¶¶ 72-73.

Presley later described that he had never been shown a full and fair array of seven photos, but instead had been shown seven photos of Swainson. PS ¶ 62. Santiago denies that he did what Presley alleged, but he admitted if he had—or if he had shown only a single photo of Swainson—then his report claiming an unsuggested identification would be "absolutely improper," a "lie," and a violation of Andrew Swainson's constitutional rights. PS ¶ 64. And there were multiple photos of Swainson found in the investigation file; even though Santiago was the lead detective in charge of maintaining the investigation file for the Opher murder, he denies he had anything to do with those photos and claims someone else must have added them at a later point. PS ¶ 63.

In addition to the typed Q and A, Santiago's report of the Presley interview includes a page handwritten by Presley asserting defensively that his statement was voluntary and "no one has thretened or tried to cohersed me into saying anything." PS ¶ 65. Santiago claimed Presley wrote this statement entirely independently, when Santiago was out of the room. *Id*. But on its face the statement appears to use police vernacular, and Santiago admitted the misspellings throughout are consistent with someone being dictated a statement by police and writing it out phonetically. PS ¶ 66.

**F.     After Presley Admits Swainson Is Not the Shooter, Santiago Fabricates Additional Statements**

About a month after Presley's statement to an investigator that Swainson was not the shooter, he was arrested on felony drug distribution charges and incarcerated under the alias, Kareem Miller. PS ¶¶ 76-77. In February 1989, the month before Swainson's trial, Santiago reinterviewed Presley in an attempt to explain away Presley's recantations. PS ¶¶ 79-80. Santiago knew Presley was in jail on a new case and that he was incarcerated under a false name. PS ¶¶ 81, 96. Over the course of two audio-taped interviews, Santiago fabricated two further statements, coaching Presley to claim he was intimidated and threatened into saying Swainson was not the shooter. PS ¶¶ 82-108. These statements are not only diametrically opposed to the testimony Presley gave at the preliminary hearing and the signed statement he gave to the investigator, but they are also completely false. PS ¶¶ 89, 94, 107. Swainson is not the shooter Presley saw. PS ¶ 73. Nor did the investigator threaten, coerce, or compensate Presley to change his testimony. PS ¶ 74.

During these interviews, Santiago stopped the tape recorder repeatedly to coach Presley as to what he should say to support the fabricated case against Swainson. PS ¶¶ 84-88, 98-105. This coaching is confirmed by numerous audible "clicks" on the recordings of these statements, occurring at what Santiago admits are critical moments in the interview. *Id.* Santiago understood it would be improper to stop and start the tape to have an off-record conversation with Presley and denied he stopped the tape where those clicks appeared, although he could not provide any alternate explanation. PS ¶¶ 83-84, 88. But independent forensic analysis has confirmed these "clicks" represent times when the recording was stopped. PS ¶¶ 85, 99.

### G. Santiago Fabricates a Photo Array to Rebut a Motion to Suppress

When preparing for a March 9, 1989 hearing on Swainson's motion to suppress, prosecutor Judith Rubino asked for a copy of the photo array Santiago claimed he had shown Presley, which she did not yet have in her file. PS ¶ 110. Santiago produced a series of photos that in Rubino's experience "is not what a photo spread looks like" and that she had "never seen it look like" in any other case. PS ¶ 113. Santiago had taken a photo of Swainson and the arrest photos of six purported fillers and cut out the boxes in the lower left corner with identifying information on them (including the subject's name and the date the photo was taken); those cut outs were separately preserved in an envelope labeled "Photos" in Santiago's handwriting. PS ¶¶ 111-12, 114, 116-18.

Although Rubino did not realize it at the time (as she had no reason to look at the cut-out boxes, let alone scrutinize them), one of the photos, a photo depicting Evans Daniels, was taken on February 27, 1988—fifteen days *after* Santiago claimed that Presley picked Swainson out from a full and fair array. PS ¶¶ 117-21. In other words, Santiago's representation that Presley selected Swainson's photo from this array is demonstrably false. When confronted with this discrepancy at his deposition, Santiago could offer no explanation beyond the implausible and unsupported accusation that someone must have tampered with his file. PS ¶¶ 122-23.

Rubino confirmed she was relying on Santiago's representations about how the identification procedure with Presley took place. PS ¶ 125. Santiago's representation that Presley made an identification from a full and fair array on February 12, 1988 was the entire basis for probable cause against Swainson. PS ¶ 124. If Rubino had learned that Santiago actually used suggestion—or that he misrepresented anything about the context of the photo identification— the prosecution would not have gone forward. PS ¶ 125.

**H.     Detectives Bury Exculpatory Leads Pointing to Other Suspects**

Detectives buried leads pointing away from Swainson, including evidence implicating other suspects, evidence showing that the crime was actually an attempted robbery, and evidence impeaching key witness Paul Presley. PS ¶ 126. Throughout the investigation, detectives placed all documentation of their work in a file referred to as the "homicide file." PS ¶ 128. Throughout the investigation, detectives recorded their findings, including information obtained from witnesses, on documents called activity sheets. PS ¶ 127. Detectives had discretion to decide whether to place information from witnesses in a formal question-and-answer statement adopted by the witness or, instead, to place information on activity sheets. PS ¶ 323. Consistent with longstanding PPD policy and practice, the activity sheets prepared during the Opher investigation were maintained in the Opher homicide file, but they were never provided to the Philadelphia District Attorney's Office (DAO), even after a prosecution was initiated. PS ¶¶ 130, 324, 326, 329.

**1.     Paul Presley**

Detectives developed compelling evidence pointing to Presley. PS ¶ 140. As noted, *supra* § II.D, detectives had information from an interview with Crystal Justice suggesting that Presley had been casing the house at 5413 Sansom Street an hour before the shooting. PS ¶ 28-30. The fact that it was Presley's coat she identified was not mentioned in the record of her interview, but, instead, was reported in an activity sheet. PS ¶ 252(d). Additionally, Santiago and Lieutenant Durrant interviewed Presley's girlfriend, Valerie Smith, who provided information about Presley's whereabouts that was inconsistent with what Presley told police in an earlier interview. PS ¶ 49(c).

### 2. Jeffrey Green and Ashley Hines

In addition to Presley, police developed inculpatory information about two other men stopped and arrested at the scene, Jeffrey Green and Ashley Hines. PS ¶¶ 141-45. Green told Detective Miller that although he lived on the same block as the drug house, he did not know anything about drug sales out of 5413 Sansom Street. PS ¶ 145. Jackie Morsell, however, a friend of Opher's who spent time at the drug house, told police Green had previously sold drugs from that exact location. *Id.* Hines, who was with Green at the time of the shooting, provided police with an exculpatory statement. PS ¶ 141. He was then given a polygraph examination. PS ¶ 143. An activity sheet describing that examination states that there was "deception indicated," meaning Hines failed the polygraph. *Id.* The polygraph examination was only referenced in the activity sheet, and there is no mention of it in the record of Hines's interview. PS ¶ 144.

### 3. Latanya Furman, Darren Brown, and Brian Brown

Opher's friend, Crystal Justice, provided police with additional information pointing to the involvement of Latanya Furman and two men. PS ¶¶ 146-57. Justice told Detective Fischer in the first of three interviews she gave that she learned about Opher's murder from Furman, who told Justice that she was present at the scene of the shooting. PS ¶ 146. On an activity sheet describing this interview, Fischer reported that, according to Justice, she and Furman went to the hospital to see if it was Opher who had been shot and, while there, Furman provided a fake name to police. PS ¶ 147. Furman also, according to Justice, told her not to get involved in the investigation. *Id.* Detectives Fischer and Miller each took a separate interview of Furman over two days. PS ¶¶ 150-151. In both interviews, Furman claimed she happened to be on the 5400 block of Sansom Street because she was being driven by a hack (an unlicensed taxi driver) to a

club. *Id.* Furman told police she would submit to a polygraph examination about her statements, but there is no record that any examination took place. PS ¶ 151.

Detectives also learned from Justice that Furman had facilitated a conversation between Justice and her friend, Darren Brown, about wanting to set up the drug house where Opher worked for a robbery. PS ¶ 152. Further, Justice described seeing a man name Brian Brown shortly after Opher was shot. PS ¶ 153. He was already aware of the shooting and told Justice that he and Furman had gone to 5413 Sansom Street to buy drugs when they saw Opher lying in front of the house—information that was inconsistent with what Furman reported over two separate statements. *Id.* Justice also reported that Furman mentioned to her that she was in a car with her brother, Leroy Furman, on the night of the shooting. *Id.* Police asked Justice if anyone told her who shot Opher, and she stated that Latanya Furman thought it was Andrew Swainson but acknowledged that she had not seen him at the location of the shooting. PS ¶ 35.

With this information in hand, detectives confirmed with Furman, in her third interview, that she, Brian Brown, and Leroy Furman had all been in a car together the night of Opher's shooting and that they stopped at 5413 Sansom Street. PS ¶ 156. Detectives did not ask her during this interview why she had previously said she was alone with a hack. *Id.* There is no documentation in the homicide file showing further investigation ruling out these suspects, despite detectives' acknowledgement that this would be necessary, and Santiago had no explanation for the absence of such investigation. PS ¶ 157.

### 4. Allen Proctor

Less than a week after Opher was shot, Santiago, Miller, and Durrant arrested Allen Proctor for murder and firearms charges and documented that arrest on an activity sheet in the Opher homicide file. PS ¶ 158. When they did so, they had information that Proctor had been

arrested for other murders in circumstances similar to the Opher shooting, that is, in the midst of robberies of drug dealers. PS ¶¶ 160-161. Santiago claims he did not investigate Proctor. PS ¶ 163.

### 5. "George"

Following a court date for a preliminary hearing on the charges brought against Presley, Green, and Hines in connection with the Opher shooting, Fischer documented on an activity sheet that he learned from Green's counsel that "word on the street" was that a Jamaican man named George was involved in the shooting. PS ¶¶ 165-66. Despite Swanson having also informed Santiago about interactions with someone named George, there is no further documentation of investigation into this information. PS ¶¶ 167-68.

### I. Santiago Prepares an Affidavit of Probable Cause Based on the Fabricated Photo Identification and Concealing Exculpatory Information

On February 15, 1988, Santiago prepared an affidavit of probable cause in support of a warrant for Swanson's arrest on charges that he murdered Opher. PS ¶ 169. In the affidavit, Santiago falsely claimed that Presley had identified Swanson as the perpetrator based on a full and fair photo array. PS ¶ 171. Santiago also falsely stated in the affidavit that Opher worked for Swanson selling drugs, conveying the impression that Swanson was motivated to kill Opher as part of an internal drug organization dispute. PS ¶¶ 173-76. These false assertions were the only inculpatory evidence pointing to Swanson included in the affidavit.

In addition to basing the affidavit on fabricated evidence, Santiago omitted from the affidavit extensive exculpatory information. PS ¶ 172. The omitted information included evidence from officers at the scene of the shooting and other witnesses undermining the credibility of Presley's account of the incident; evidence that was highly inculpatory as to other suspects; evidence that the shooting was the result of a botched drug house robbery, and not an

internal dispute between drug dealers; and evidence that Swainson provided police with a credible alibi about which police failed to conduct any follow up investigation. *Id.*

As a result of Santiago's false statements and omission of exculpatory information, prosecutors agreed to pursue charges against Swainson, and a judge approved the request for the warrant. PS ¶ 177.

## J. Detectives Fabricate Swainson's Flight

After obtaining an arrest warrant for Swainson, Santiago, along with Alexander and Cohen of the homicide division's fugitive unit, fabricated evidence that Swainson fled Philadelphia to avoid arrest. PS ¶¶ 178-212. In fact, after telling Santiago everything he knew about Opher's murder, Swainson left for a preplanned trip to Jamaica to visit family and propose to his girlfriend. PS ¶ 181. Alexander and Cohen, who were assigned to arrest Swainson, quickly learned from several sources that Swainson had gone to Jamaica and planned to return by early March. PS ¶¶ 178, 187, 189. Despite this knowledge, they lied to their supervisors within the PPD and initiated the process of obtaining a federal Unlawful Flight to Avoid Prosecution warrant for Swainson. PS ¶¶ 191-97. When Swainson returned to the United States as planned, he immediately contacted Santiago. PS ¶ 203. Santiago was fully aware Swainson did not know he was wanted for arrest. PS ¶ 205. Santiago chose not to inform him, then buried evidence documenting the phone call. PS ¶¶ 204-05. Swainson was arrested in New York at his parents' home, the same address he had given Santiago. PS ¶ 213. To make Swainson appear guilty, Santiago, Alexander, and Cohen told prosecutors Swainson had fled the jurisdiction, leading to the trial prosecutor, Rubino, arguing at trial that Swainson's flight demonstrated his consciousness of guilt. PS ¶¶ 208-11.

## K.  Alexander Coerces a Vulnerable Witness to Provide Additional False Testimony

Given Presley's severe credibility issues, detectives knew that in order to secure a conviction, they would need further evidence to support their theory that Swainson killed Opher as part of an internal drug organization dispute. PS ¶¶ 217-18. Thus, in March 1988, Alexander, joined by Cohen, interviewed Jackie Morsell. PS ¶ 225. Morsell, who had been friends with Opher, spoke to detectives for a first time shortly after the murder and provided background information about the people involved in drug sales at 5413 Sansom Street. PS ¶ 219. In that initial statement, Morsell did not provide any information giving rise to the suggestion that Swainson shot Opher. PS ¶ 287.

When Alexander and Cohen interviewed Morsell a second time, she resided with Opher's family. PS ¶ 226. Alexander and Cohen arranged the interview through Opher's sister. PS ¶¶ 220-23. At the time, Morsell was subjected to physical and sexual abuse by members of the family, who the police had convinced of Swainson's guilt. PS ¶ 228. The detectives interviewed Morsell in the presence of Opher's mother, Tina Dennis, and allowed Dennis to answer questions on her behalf. PS ¶ 225. Due to pressure from the police and Dennis, Morsell changed her account about Swainson and agreed to testify at trial that, among other things, Swainson was obsessed with guns and bragged about murdering people. PS ¶¶ 283, 287.

## L.  Detectives Pressure Swainson's Alibi Witness to Adopt A False Statement

Shortly before trial, Miller and other detectives interviewed Tamika Cole, who was prepared to testify as an alibi witness on Swainson's behalf. PS ¶ 233. The detectives pressured Cole into adopting a false statement that she was not certain whether the night she saw Swainson at her boyfriend's house several miles away from the crime scene was the same night as the shooting, despite her initially telling them that she was positive it was indeed the same night. PS

¶¶ 234-35, 240. Cole was only 18 at the time of the interview, and detectives continued to badger her and ask her the same question over and over until she told them what they wanted to hear so that she could leave. PS ¶¶ 236, 239-43. As a result of the fabricated statement, Swainson's attorney decided not to present Cole's exculpatory testimony at trial. PS ¶ 245.

## M.  Detectives Suppress Evidence

When Santiago prepared the binder of information to provide to the trial prosecutor, Rubino, he omitted all activity sheets. PS ¶ 250. He also omitted documents called "attempt to apprehend logs," which Alexander and Cohen prepared regarding efforts to arrest Swainson and reinterview Morsell. PS ¶ 257. Many of these documents contained exculpatory evidence obtained by Santiago, Alexander, and Fischer, including activity sheets documenting information that could have been used to impeach the witnesses who testified against Swainson at trial. PS ¶¶ 252-58. Withheld activity sheets also contained information demonstrating the existence of alternative suspects, contradicting the prosecution's trial theory that Opher was killed in an internal dispute rather than an attempted robbery, and definitively proving that Swainson had not fled to avoid arrest. *Id.* Santiago also failed to inform Rubino that Presley was facing felony drug charges under the name Kareem Miller at the time of trial. PS ¶¶ 259-66.

## N.  Swainson Is Convicted at Trial

Without these numerous pieces of suppressed evidence, Swainson was unable to present a full defense at trial and, after two days of jury deliberation, he was convicted of first-degree murder. PS ¶ 268. The conviction was based on Presley's testimony—known by the defendant detectives to be false—that he saw Swainson shoot Opher, that Santiago showed him a proper photo array from which he identified Swainson as the shooter, and that he received no promises or deals in exchange for his testimony. PS ¶¶ 270-75. Presley's drug charges under the name

¶¶ 234-35, 240. Cole was only 18 at the time of the interview, and detectives continued to badger her and ask her the same question over and over until she told them what they wanted to hear so that she could leave. PS ¶¶ 236, 239-43. As a result of the fabricated statement, Swainson's attorney decided not to present Cole's exculpatory testimony at trial. PS ¶ 245.

## M.  Detectives Suppress Evidence

When Santiago prepared the binder of information to provide to the trial prosecutor, Rubino, he omitted all activity sheets. PS ¶ 250. He also omitted documents called "attempt to apprehend logs," which Alexander and Cohen prepared regarding efforts to arrest Swainson and reinterview Morsell. PS ¶ 257. Many of these documents contained exculpatory evidence obtained by Santiago, Alexander, and Fischer, including activity sheets documenting information that could have been used to impeach the witnesses who testified against Swainson at trial. PS ¶¶ 252-58. Withheld activity sheets also contained information demonstrating the existence of alternative suspects, contradicting the prosecution's trial theory that Opher was killed in an internal dispute rather than an attempted robbery, and definitively proving that Swainson had not fled to avoid arrest. *Id.* Santiago also failed to inform Rubino that Presley was facing felony drug charges under the name Kareem Miller at the time of trial. PS ¶¶ 259-66.

## N.  Swainson Is Convicted at Trial

Without these numerous pieces of suppressed evidence, Swainson was unable to present a full defense at trial and, after two days of jury deliberation, he was convicted of first-degree murder. PS ¶ 268. The conviction was based on Presley's testimony—known by the defendant detectives to be false—that he saw Swainson shoot Opher, that Santiago showed him a proper photo array from which he identified Swainson as the shooter, and that he received no promises or deals in exchange for his testimony. PS ¶¶ 270-75. Presley's drug charges under the name

Kareem Miller were withdrawn at the next court listing following Swainson's trial. PS ¶ 267. The conviction was also based on Morsell falsely testifying that Swainson was violent and armed and that he attempted to bribe her into not testifying. PS ¶¶ 282-90.

Santiago testified that the statements he elicited from Presley were accurate and complete and that he showed Presley a full and fair photo array resulting in Presley's identification of Swainson as the shooter. PS ¶¶ 267-78. Rubino argued to the jury, based on representations from Santiago and Alexander, that Swainson fled Philadelphia because he knew he was wanted for murder and that he sought to escape prosecution by hiding in Jamaica. PS ¶¶ 279-80. Swainson could not effectively rebut this fabricated evidence without the documentation that detectives withheld from him. PS ¶ 268. Following his conviction, he was sentenced to life in prison. *Id.*

### O. Presley and Morsell Admit Their Trial Testimony Was Fabricated and False, and Swainson Is Exonerated

In 2008, after undergoing drug treatment and rehabilitation, and after contemplating whether he wanted to risk a perjury prosecution, Presley gave a statement to Swainson's post-conviction investigator and counsel. PS ¶¶ 297-99. Presley explained that he knew Swainson did not shoot Opher and that he only testified against him because he was coerced and promised leniency in his own criminal case. PS ¶¶ 298-99. He further clarified that he was never shown a photo array, but instead was shown a variety of photos of Swainson and told to identify him as the shooter. PS ¶ 300. Presley disavowed his prior statements and testimony that Swainson had offered him bribes and threatened him into recanting at the preliminary hearing and to an investigator. PS ¶ 301.

In 2014, Morsell also admitted her trial testimony was false, specifically stating to Swainson's investigator and two lawyers that Swainson never attempted to pressure her not to testify and that her depictions of him as violent and armed were false. PS ¶¶ 304-06. Morsell

explained that after detectives convinced Opher's family that Swainson was the shooter, Opher's mother forced her to provide false statements and testimony. PS ¶ 307. Morsell described the vulnerable position she was in at the time—living with Opher's mother, experiencing extreme abuse, and frightened of retribution if she did not do what Opher's mother told her to do—and how detectives interviewed her in Opher's mother's presence and allowed Opher's mother to speak for her. PS ¶¶ 225-29, 307.

After decades of fighting his conviction and maintaining his innocence, Swainson finally gained access to the suppressed evidence in the police investigation file as a result of the DAO's Conviction Integrity Unit (CIU) investigating his case. PS ¶¶ 311, 314. The CIU reviewed the case for almost two years and concluded that material, exculpatory evidence was withheld from Swainson and fabricated evidence was presented at his trial. PS ¶¶ 313, 315. As a result, the DAO agreed to post-conviction relief and Swainson's conviction was vacated in June 2020. PS ¶¶ 315, 318. Conceding that there was no remaining evidence against Swainson, the DAO withdrew the charges. PS ¶¶ 319-20. Swainson was released from prison after 32 years. PS ¶ 321.

> **P.    The City of Philadelphia's Policies, Practices, and Deliberately Indifferent Training, Supervision, and Discipline**

The detectives' misconduct causing Swainson's wrongful arrest, prosecution, and conviction was the direct result of the City of Philadelphia's policies, practices, and deliberate indifference to the need for supervision and discipline within the homicide division. PS ¶¶ 322-36. At the time of the Opher murder investigation, the PPD homicide division maintained a set policy and practice of documenting important investigatory information on activity sheets and withholding activity sheets from the DAO and therefore from defendants facing homicide charges. PS ¶¶ 322-30. The standardized PPD homicide binders that were transmitted to trial

prosecutors did not include a section for activity sheets and, as a result, detectives summarily excluded activity sheets from the binders. PS ¶ 326. This practice, known to PPD for years, incentivized detectives, who had full discretion as to where to document investigative information, to selectively omit crucial exculpatory information from documentation that would be produced in discovery, instead including it solely on activity sheets. PS ¶ 330.

Beyond the suppression of activity sheets, there is ample evidence demonstrating the City of Philadelphia's deliberate indifference to rampant misconduct among PPD homicide division detectives beginning in the late 1970s. PS ¶¶ 333-49. Due to a failure to properly supervise and discipline, PPD homicide detectives at the time of the Opher murder investigation routinely engaged in fabrication of evidence, coercion of witness testimony with reckless disregard for the falsity of the testimony, suppression of material evidence, and disregard of leads pointing to true perpetrators of criminal offenses. PS ¶ 333. Further, PPD lacked an effective disciplinary system to remedy this misconduct when it occurred and to deter future conduct. PS ¶ 335.

PPD leadership was aware of these deeply rooted problems through public reporting, federal lawsuits, and notorious police scandals, but failed to implement meaningful change. PS ¶¶ 337-43. Numerous homicide investigations that led to convictions from the time period of the Opher investigation, which have since been overturned, demonstrate how ubiquitous these practices were and how many innocent people accused of murder they harmed. PS ¶¶ 344-49, Notably, Santiago in particular has a significant history of judicial findings of misconduct. PS ¶¶ 350-54. He was the lead investigator on four separate murder prosecutions resulting in vacated convictions. PS ¶ 351. In addition to Swainson's case, Santiago has been credibly accused of fabricating and suppressing evidence to support the prosecutions of Anthony Wright, James

Dennis, and Percy St. George. PS ¶¶ 352-354. Due to his conduct in the Wright case, Santiago is currently facing perjury charges, and in April 2024, a jury awarded Dennis $16 million in damages resulting from his wrongful conviction, including $3 million in punitive damages against Santiago personally. PS ¶¶ 352(h), 353(e).

## III.    Standard of Review

Summary judgment should only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is a genuine issue of material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute bars summary judgment when it "might affect the outcome of the suit under the governing law." *Id.* In deciding a summary judgment motion, the Court must "view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Thomas v. Cumberland Cnty.,* 749 F.3d 217, 222 (3d Cir. 2014) (citation omitted).

# IV.   Argument

## A.   The Summary Judgment Record Contains Sufficient Evidence to Support Swainson's § 1983 Claims Against Defendants Santiago, Alexander, and Fischer.

The arguments offered by Alexander and Fischer and the separate "me-too" motion filed by Santiago[3] fail to provide any basis for depriving Swainson of a jury trial on his § 1983 claims against them. The record confirms that Swainson is entitled to present to a jury his claims for fabrication of evidence, deliberate deception, malicious prosecution, and civil rights conspiracy.

### 1.   Fabrication of Evidence by Defendants Santiago and Alexander

Third Circuit law makes clear that a person charged with, or convicted of, a crime based on false evidence may seek a remedy for all harms suffered based on a fabrication claim under 42 U.S.C. § 1983. *See Halsey v. Pfeiffer*, 750 F.3d 273, 294-95 (3d Cir. 2014) ("[W]e hold that if a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted."); *Black v. Montgomery Cnty.*, 835 F.3d 358, 368-69 (3d Cir. 2016)

---

[3] Defendant Santiago's single-paragraph motion makes no argument as to Swainson's claims against him in Counts I through IV of the Second Amended Complaint. Although the motion "incorporates" the motion filed by the City, Alexander, and Fischer, that motion, likewise, makes no argument regarding the claims against Santiago in Counts I through IV. As such, Santiago has waived the opportunity to seek summary judgment as to the claims against him. *See Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256 n.1 (3d Cir. 2007) ("Absent compelling circumstances not present here, failure to raise an argument in one's opening brief waives it."); *Tsitsoulis v. Twp. of Denville*, No. 07-4544, 2009 WL 5205276, at *8 (D.N.J. Dec. 23, 2009) ("Plaintiff made no concrete response to this argument in his opposition brief. That constitutes waiver because an argument left undeveloped is waived."); *Cruse v. Hook-Superx, Inc.*, 561 F. Supp. 2d 993, 1001 (N.D. Ind. 2008) ("When a party fails to address an argument in a summary judgment briefing, that is deemed a waiver."). Despite that waiver, because the City contends in its *Monell* argument that there is no underlying constitutional violation that supports a municipal liability claim, Swainson addresses in detail Santiago's unconstitutional conduct with respect to each of the individual liability claims.

(extending availability of fabrication claim to cases where plaintiff was never convicted). The fabrication need not be done knowingly or intentionally to support liability; reckless disregard for the falsity of evidence is sufficient. *Mervilus v. Union Cnty.*, 73 F.4th 185, 194-95 (3d Cir. 2023). As the record demonstrates, Swainson has developed sufficient evidence to support claims that defendants Santiago and Alexander knowingly or, at a minimum, recklessly fabricated evidence that was reasonably likely to have caused his conviction.

### a. Defendant Santiago

A reasonable jury can conclude Santiago fabricated evidence in two separate areas of the Opher murder investigation: (i) all evidence connected to Presley's purported identification of Swainson as the perpetrator and (ii) Swainson's alleged flight.

### (i.) Fabrication of All Evidence Regarding Paul Presley's Purported Identification of Andrew Swainson

The record demonstrates Santiago fabricated multiple concrete pieces of evidence relating to Presley, including (1) his February 12, 1988 purportedly verbatim report of Presley's identification of Swainson from a series of photos; (2) the February 15, 1989 taped statement from Presley; (3) the February 17, 1989 taped statement from Presley; and (4) the photo array Santiago presented to Rubino in 1989. PS ¶¶ 51-66, 79-125. For each of these documents, a reasonable jury can conclude Santiago deliberately misrepresented to the prosecutor what occurred in Santiago's interactions with Presley to falsely make it appear that Presley could provide reliable evidence implicating Swainson in the crime.

There is little question that the record is sufficient to find Santiago fabricated his February 12, 1988 report that Presley made a positive identification of Swainson from a series of photos without suggestion based on two key points. First, Santiago acknowledged in his deposition that, "[i]f Andrew Swainson is innocent, Paul Presley would not have been able to

pick out his photo from a full and fair array absent suggestion." PS ¶ 58, Second, there is abundant evidence of Andrew Swainson's innocence, including the credible testimony of an alibi witness, and Swainson's own testimony meaning that, for purposes of summary judgment, his innocence is established as a matter of fact.[4] PS ¶¶ 2, 22. In combination, this evidence alone is sufficient to deny summary judgment on Swainson's claim that Santiago fabricated his report about the Presley photo identification, and that claim must be presented to a jury.

But there is much more. There is no contemporaneous documentation of the photo array or the photos shown even though Santiago knew there should have been. PS ¶¶ 59-60. When Presley was first asked to identify Swainson in court two months later he said Swainson was *not* the shooter. PS ¶ 67. And the handwritten statement Presley allegedly prepared on his own after his interview with Santiago asserting that he had not been coerced to identify Swainson provides further support for this proposition, as the language and misspellings are consistent with a lay witness adopting statements provided by an experienced detective. PS ¶¶ 65-66.

The fact that the identification was fabricated is also supported by the additional evidence that Santiago fabricated the array he presented to the trial prosecutor. One of the photographs included in the array sent to the prosecutor, the photograph of Evans Daniels, was taken on February 27, 1988, rendering Santiago's claims factually impossible. PS ¶¶ 116, 119-21. When questioned on this fact in his deposition, Santiago could not explain why the photo of Evans Daniels included in his array postdated the date on which he claimed he showed the array to Presley. PS ¶ 122. The inference to draw from these facts is inescapable: when asked by the

---

[4] Swainson's innocence is also established for purposes of summary judgment, and trial, by virtue of the defendants' failure to respond to Swainson's requests for admission, including a request to admit that "Mr. Swainson is factually innocent of the January 17, 1988 shooting of Stanley Opher." *See* PS ¶ 2 n.1.

prosecutor before the suppression hearing to produce the full and fair photo array he had purportedly shown Presley, he did not have one, so he made one up.[5] Additionally, the evidence indicates Santiago fabricated two more interviews with Presley. PS ¶¶ 79-108. After Presley testified at the preliminary hearing that Swainson was not the shooter and provided a statement saying the same thing to Swainson's private investigator (a retired PPD detective), the next time Presley encountered Santiago was in February 1989. PS ¶¶ 67-75, 80. At that time, Presley was back in jail under a false name, Kareem Miller, and facing additional time in custody due to drug charges. PS ¶¶ 76-77. In two separate interviews, Santiago conducted unorthodox, recorded interviews where he stopped the recording before each time he was going to ask Presley about critical facts, including, as one example, before asking whether the recantation Presley gave to Swainson's investigator was true. PS ¶¶ 79-108.

Santiago acknowledged that recording an interview in this fashion was impermissible because it would misrepresent the circumstances of a supposedly verbatim statement. PS ¶ 83. He told no one about the manner in which he recorded the interviews, and, as such, falsely represented to prosecutors that the recordings were verbatim versions of those interviews. Santiago then recorded Presley providing false inculpatory evidence against Swainson, including claims that Swainson was the perpetrator and that Swainson's investigator threatened and

---

[5] The City emphasizes its disclosure of a photo of Evans Daniels taken before the February 12, 1988, Presley interview. To the extent the City is suggesting that the presence of the postdated photo (the one from February 27, 1988) is the result of an innocent mistake and that the photo predating the interview has to have been the one Santiago included in the array, ECF 79 at 19, that contention is baseless. The earlier photo the City references does not appear in the array that Santiago has repeatedly claimed for decades comprises the photos he showed Presley. While the two photos depict the same man, the photos are clearly distinct, *see* PS ¶ 121 n.4, and it is the later photo that appeared in materials Santiago presented to prosecutors as the array he showed to Presley.

coerced him and promised him compensation to induce him to give the signed statement confirming Swainson's innocence. PS ¶¶ 87-89, 101-06. With this background, there is a fully justified basis to infer that Santiago spoke to Presley in the time between recorded questions and answers, that Santiago told Presley what he needed to say, and that Presley, wanting to avoid more jail time as well as fearing that charges for the Opher shooting would be reinstituted against him, adopted whatever Santiago wanted him to say. On these facts, a reasonable jury could conclude that both February 1989 recorded statements were fabricated.

Given the weakness of the case against Swainson—and the centrality of Presley—if the prosecutor had known of any of these misrepresentations, Swainson would not have been prosecuted. PS ¶¶ 109, 124-25, 171, 270. A jury could, therefore, conclude that Santiago's fabrications caused Swainson's prosecution and conviction.

Importantly, even if the evidence did not support a finding that Santiago entirely fabricated the identification and the statements (it does), Santiago can also be held liable for using improper suggestion to induce Presley's ultimate in-court identification of Swainson at trial. *See Caldwell v. City & Cnty. of San Francisco*, 889 F.3d 1105, 1114-18 (9th Cir. 2018) (holding officer who manipulates identification procedure to procure a misidentification may be held liable for fabrication); *Bermudez v. City of New York*, 790 F.3d 368, 374-76 (2d Cir. 2015) (same); *Good v. Curtis*, 601 F.3d 393, 398-99 (5th Cir. 2010) (same); *Onuekwusi v. Graham*, No. 20-2965, 2021 WL 1085523, at *5–6 (D.N.J. Mar. 22, 2021) (same).

Of course, at this stage, Swainson has no burden to prove *how* Santiago secured a false identification. He need only prove that Santiago did secure the identification through improper suggestion and knew (or recklessly disregarded) that it was false. The same evidence recounted

above easily supports a jury finding that Santiago did so. Indeed, Santiago admits that, if Swainson is innocent, Presley could not have identified him without suggestion. PS ¶ 58.

And there is abundant other evidence that Santiago knew Presley's accounts were not credible or reliable; not only did he fail to follow up on these issues, but he also hid many of them from the prosecutor. In the first instance, Presley's two statements are entirely inconsistent. PS ¶ 48. For example, in the first statement, Presley said nothing about seeing Opher get shot or any struggle with the shooters. *Id.* In the second statement, Presley added details about the shooting of Opher and gave a vivid and terrifying account of his struggle with two armed assailants. *Id.* Further, the much more detailed statement provided on February 12, 1988, is facially implausible. PS ¶¶ 40-50. The description of the scuffle on the steps of 5413 Sansom Street is starkly inconsistent with the documented observations of Police Officer Kay, someone who, as Santiago acknowledged, was trained to make careful observations when arriving at a crime scene. PS ¶¶ 13, 49. According to Presley's statements, the purported scuffle involving three men took place on the steps *after* shots were fired at Opher. PS ¶ 48(a). Kay, however, told detectives that while driving west on Sansom Street and stopped at 54th Street, he heard a gunshot, and *at that time*, saw *one* man on the street: Presley. PS ¶¶ 11, 49(a). Additionally, whereas Presley described the two alleged perpetrators fleeing in different directions, one heading toward 55th Street and the other headed toward 54th Street, Kay did not tell police about seeing anyone running in his direction. PS ¶ 49(a).

That the account attributed to Presley is facially unbelievable undermines the credibility of any claim that Presley actually identified Swainson as the perpetrator. And the fact that Santiago ignored a fellow police officer's observations undermining information attributed to his key witness further diminishes the credibility of Santiago's entire investigation. Further,

Santiago knew given Presley's long criminal history and admitted crack use the night of the crime that there were baseline questions about his credibility and reliability. PS ¶¶ 44-45. And he knew Presley had obvious motivations to implicate someone else given the highly suspicious circumstances in which he was arrested: fleeing from the scene, bleeding heavily from a serious wound on his hand consistent with someone who mishandled a shotgun, and spontaneously volunteering that he "didn't shoot anyone." PS ¶ 46. In short, he looked very guilty. These facts collectively corroborate the claim that Santiago fabricated the identification.[6]

Finally, the last statements Presley gave relating to this case before his death, his 2008 handwritten statement and the recorded statement he gave to an investigator, confirm two critical facts: that Presley did not see Swainson shoot Opher and that Presley identified Swainson as the perpetrator only as a result of misconduct.[7] PS ¶¶ 298-300. Given all of the above regarding

---

[6] Even if the record supported the view that Presley actually identified Swainson (it does not), the implausibility of Presley's description of the incident would support a claim that Santiago "submitted false evidence…with a reckless disregard for its truth." *Mervilus*, 73 F.4th at 194-95.

[7] The City defendants contend that Presley's 2008 statements are not competent evidence to support Swainson's arguments regarding the falsity of the alleged identification. ECF 79 at 19-20. The statements are, however, admissible on several evidentiary bases. *See Alley v. Cnty. of Pima*, No. 15-0152, 2024 WL 1908965, at *11-13 (D. Ariz. May 1, 2024) (discussing grounds for admitting deceased witnesses' recantation statements). First, because Presley made the statements after expressing concern that a recantation could subject him to perjury charges, they are admissible as statements against interest under Fed. R. Evid. 804(b)(3)(A). PS ¶¶ 294-296; *Alley*, 2024 WL 1908965, at *12. Second, the statements are admissible under Fed. R. Evid. 613(b) as extrinsic evidence of a witness's prior inconsistent statements. *Alley*, 2024 WL 1908965, at *12. Third, the statements are admissible under the residual hearsay exception, Fed. R. Evid. 807(a), in that they are supported by sufficient guarantees of trustworthiness under the totality of the circumstances and are more probative than any other evidence that can be offered through reasonable efforts. The statements were made in the presence of an attorney and a trained investigator, PS ¶ 303, and are consistent with the extensive evidence discussed above regarding Santiago's misconduct (as well as evidence of Santiago's misconduct in other cases). They are, likewise, the statements of the only witness other than Santiago who can describe what happened in connection with the identification of Swainson as the perpetrator. *Alley*, 2024 WL 1908965, at *13; *see also Scott v. Pritchett*, No. 19-12718, 2021 WL 6125851, at *15-17 (E.D.

Santiago's conduct throughout the Opher murder investigation, these facts confirm that the evidence Santiago attributed to Presley to secure Swainson's arrest and conviction was fabricated.

In sum, on this record, a reasonable jury could conclude that Santiago fabricated all evidence related to Paul Presley's purported identification of Andrew Swainson as the person who shot Stanley Opher, including the statements of February 12, 1988, February 15, 1989, and February 17, 1989, the photo array, and Presley's false testimony at trial.[8] Summary judgment should be denied as to this claim against Santiago.

### (ii.) Fabricated Flight Evidence

The prosecutor who tried Swainson's murder case, Judith Rubino, acknowledged in her deposition that a key part of her presentation to the jury was evidence, presented through testimony from Santiago and Cohen, that Swainson "fled' the United States for Jamaica. PS ¶¶ 208-09. In a typical criminal case, such evidence is compelling. It can be used to argue to the jury that the fleeing suspect was seeking to avoid responsibility for criminal conduct—that is, because the suspect demonstrated consciousness of guilt, then the suspect is, in fact, guilty. And,

_____

Mich. Dec. 28, 2021) (denying summary judgment on malicious prosecution claim based on out-of-court recantation statements deemed admissible under residual hearsay exception).

Importantly, these evidentiary questions are not dispositive of Swainson's fabrication claim. The evidence of fabrication discussed above is overwhelming and a jury could find in Swainson's favor even without hearing evidence of Presley's 2008 statements. Issues regarding admissibility may therefore be addressed at trial.

[8] The City's argument that "Presley testified at Plaintiff's trial confirming his statement and identification, and why he wavered at the preliminary hearing and to Plaintiff's investigator," ECF 79 at 19, begs the question of whether Santiago knew (or recklessly disregarded) that the trial testimony was false. For all the reasons outlined above, there is more than sufficient evidence to demonstrate that he did in fact know (or recklessly disregard) the falsity of that testimony.

upon the introduction of such evidence, the prosecutor can point to a jury instruction about the import of the evidence.

The evidence of Swainson's so-called flight, however, was false and fabricated. PS ¶¶ 180-212. The defendant detectives knew from the beginning that Swainson did not "flee," but, instead, went to Jamaica for a previously planned vacation to visit family and propose to the woman he was then dating with plans to return to the United States. PS ¶ 178, 187, 189, 192. He left for this vacation at a time when he had no idea he had been identified as the perpetrator, let alone that police were considering him as a suspect. PS ¶ 189, 205. Indeed, everything about Swainson's conduct was inconsistent with flight. When he returned from Jamaica, he went to stay at his parents' home in the Bronx at the address he had previously given to Santiago. PS ¶ 213. Upon his return and learning that Santiago tried to reach him by telephone, Swainson immediately *called him back*. PS ¶ 203.

Despite this history, Santiago communicated to Rubino that Swainson had fled to avoid prosecution for the Opher murder. PS ¶ 211. Santiago started making such false representations almost immediately after he learned Swainson traveled to Jamaica. As part of efforts to obtain a federal Unlawful Flight to Avoid Prosecution Warrant, Santiago (or someone acting with Santiago's knowledge), advised PPD Chief Inspector Robert Wolfinger that Swainson "informed persons close to him that after the murder, he was going to flee to Jamaica." PS ¶ 194. This assertion was untrue and not supported by a single piece of evidence contained in the Opher homicide file. PS ¶ 195. Santiago had been maintaining contact with Alexander and Cohen through their efforts to locate and apprehend Swainson, and they learned when Swainson would be returning to the United States the day before the Wolfinger letter. PS ¶¶ 185, 189. They

documented that fact on an attempt to apprehend log, and Santiago knew the representation to Wolfinger was false. *Id*.

The falsity of the flight contention was confirmed once Santiago spoke with Swainson upon his return to his mother's home. PS ¶¶ 203-05. Based upon that telephone call, Santiago recorded in an activity sheet that Swainson "does not know that he is currently wanted for murder," and that information about the warrant issued for his arrest "was not given to" him. PS ¶ 205.

Both the attempt to apprehend log and activity sheet reporting these facts were, consistent with PPD homicide division practices, not provided to Rubino. PS ¶¶ 210, 257. Without this information, she was left to rely on the information supplied by Santiago, and, without the full facts, she thought she had a basis to argue that Swainson's flight showed his guilt. Rubino confirmed in her deposition that had she learned the information reported in these documents, she never would have argued to the jury that Swainson fled the country and that this flight was proof he murdered Opher. PS ¶¶ 210-11.

Because the flight evidence was a core piece of the prosecution, Santiago's knowing communication of false information to Rubino about alleged flight provides an independent basis to support Swainson's fabrication claim against Santiago.[9]

---

[9] The City defendants make no argument to specifically address the fabrication claim against Santiago regarding flight evidence, but, instead, argue only that there is no flight-evidence fabrication claim against Alexander. Those contentions are meritless for the reasons discussed *infra* § IV.A.1(b)(i).

### b. Defendant Alexander

Swainson's fabrication claim against Alexander covers two parts of the investigation: the production of some of the same false evidence discussed above that Swainson fled to avoid arrest and the procurement of false testimony from prosecution witness Jackie Morsell.

### (i.) Fabricated Flight Evidence

Alexander played a critical role in communicating to Rubino the false evidence regarding Swainson's purported flight. Assigned to the fugitive squad, he, along with his partner, Cohen, took on responsibility for locating Swainson after Santiago obtained an arrest warrant and learned that Swainson was not in Philadelphia. PS ¶ 184. Alexander learned, and documented, that though Swainson had left Philadelphia, he "will be returning to the United States." PS ¶ 187. He also learned the timeframe of Swainson's expected return, sometime during the first week of March. PS ¶ 189. In short, he knew Swainson was not a fugitive. Despite that knowledge, he initiated the process to seek an Unlawful Flight to Avoid Prosecution Warrant. PS ¶ 191. With these activities, Alexander was an instrumental part, along with Santiago, in communicating to Rubino the false assertion that Swainson fled to avoid prosecution, and, for the same reasons discussed above, Swainson may proceed with a fabrication claim against Alexander.

None of the City defendants' arguments to the contrary has merit. First, the contention that there was no federal fugitive warrant issued, ECF 79 at 8-9, is meaningless. Swainson's contention is not that there was an improper *warrant* issued, but, rather, that Santiago and Alexander knowingly communicated false *information* to Rubino.[10] Regardless of whether a

---

[10] The City defendants' assertion that Chief Inspector Wolfinger bears responsibility for the false statement in the letter seeking the fugitive warrant is inconsequential. In any event, it is wrong on the facts given deposition testimony that Wolfinger was not directly involved in the Opher murder investigation and would have only obtained information about Swainson from Santiago or someone working with him. PS ¶ 197.

warrant was obtained, it was this *information* that led to Rubino seeking a jury instruction on flight and arguing the flight issue to the jury.

The City defendants' additional contention that the prosecution would have been entitled to a flight charge even when the false information is disregarded, ECF 79 at 9-10, is legally and factually erroneous. On the law, the Pennsylvania decisions on flight jury instructions cited by the City require evidence that defendants know police are seeking to arrest them. In *Commonwealth v. Harvey*, 526 A.2d 330, 334 (Pa. 1987), the defendant "admitted at trial that he deliberately eluded the police when they came to his residence," leading the court to conclude that "if a person has reason to know he is wanted in connection with a crime, and proceeds to flee or conceal himself from the law enforcement authorities, such evasive conduct is evidence of guilt and may form a basis, in connection with other proof, from which guilt may be inferred." Similarly, in *Commonwealth v. Osborne*, 249 A.2d 330, 333 (Pa. 1969), the defendant was at the scene of the crime and then moved to Florida where he lived under an assumed name for seven months until he was found and arrested. In *Commonwealth v. Tinsley*, 350 A.2d 791, 793 (Pa. 1976), the defendant "abandoned his normal pattern of living…[w]ithout any explanation whatsoever for this absence." Under any of these authorities, the evidence at the time of Swainson's trial—had it been presented to Rubino truthfully—would not have supported a flight instruction. Swainson did not know he was wanted, and he did not conceal himself (*Harvey*). He did the opposite, returning to the same address he had given Santiago. PS ¶ 213. He did not leave for an unknown location and change his name (*Osborne*). And there *was* an explanation for his short-term absence from the United States: his vacation and planned proposal (*Tinsley*).[11]

---

[11] Even if Swainson's departure from the United States could reasonably be interpreted as flight (it cannot), the fact that he voluntarily called Santiago after returning home conclusively undermined that interpretation.

On the facts, the City references various inconsistencies concerning when Swainson left for Jamaica. The inconsistencies are meaningless on their face. For example, the absence of flight records for "Andrew Swinson" or "Vanier Swainson" leaving for Jamaica on February 11, 1988, could be explained by any number of facts, including that Swainson used the name Andrew Swainson to purchase a ticket. Similarly, Swainson's sister who reported the departure date could have made an innocent mistake about when Swainson left. Notably, Alexander agreed in his deposition that one "inconsistency" defendants' brief stresses, reports that Swainson went to Jamaica for a vacation and to get married, is not an inconsistency at all. PS ¶ 188. At summary judgment, when the facts must be viewed in the light most favorable to Swainson, these plausible explanations of the "inconsistent" information the defendant detectives claimed to obtain preclude acceptance of the conclusions the City defendants urge. Most importantly, none of the cited inconsistencies would have proved the critical fact that was an essential prerequisite for a flight instruction: that Swainson *knew* he was wanted for murder and purposely sought to evade the police.

The City defendants attempt to patch this hole in their argument by contending Swainson knew he was a "suspect" as of the date he was first questioned about the Opher murder. ECF 79 at 10-11. That contention, however, is grossly misleading. The assertion is based on Santiago's *testimony* at a suppression hearing about what he claimed he told Swainson. But Santiago's testimony cannot be accepted as true in the face of competing evidence that he presented false information to Rubino about the flight issue (not to mention, the critical facts about Paul Presley's statements and identification). Further, and most important for summary judgment purposes, Swainson testified in his deposition that he did not know he was a suspect. PS ¶ 17. That view is fully corroborated by Swainson's actions at the time of the investigation. He

willingly cooperated with police throughout the investigation. PS ¶¶ 17-19. He voluntarily gave a statement. *Id.* He allowed Santiago to take his photograph and fingerprints. PS ¶ 25. He provided an address to contact him at his parents' home. PS ¶ 18. He did all of these things because he wanted to help police solve Opher's murder. PS ¶ 19. This conduct is the precise opposite of behavior evincing knowledge that he was a suspect.

Because the evidence fully supports Swainson's fabrication claim against Alexander for presenting false information concerning alleged flight, that claim should be presented to a jury.

### (ii.) Jackie Morsell's False Testimony

One of the first civilian witness interviews conducted by police after Opher's murder was with Jackie Morsell. PS ¶ 16. She provided details about the drug sales that took place at 5413 Sansom Street. PS ¶ 219. None of the information she provided was inculpatory regarding Swainson's involvement in the shooting. PS ¶¶ 17, 287. Morsell's account at trial, however, changed dramatically, as she testified consistent with the prosecution's theory that Swainson was the murderer, telling the jury that, among other things, Swainson always had guns, bragged about killing people, and tried to bribe her not to testify against him. PS ¶ 283. This testimony was false. Swainson did none of the things that Morsell attributed to him. PS ¶¶ 286-90.

For purposes of summary judgment, two independent evidentiary sources establish that Morsell's false testimony at trial was procured by Alexander in an interview that occurred before trial. First is Morsell's recantation statement in 2014 in which she reports that detectives interviewed her at the home of Opher's mother, Tina Dennis. Morsell, who had been living with Dennis, feared Dennis and her family who subjected her to sexual and physical abuse and forced her into prostitution. PS ¶¶ 304-08. Dennis, based on information police provided, believed Swainson had killed Opher and wanted to ensure he was prosecuted and convicted. PS ¶ 307.

Thus, when police came to speak with Morsell before Swainson's trial, the combined impact of Dennis's conduct and the detectives' interest in securing Swainson's conviction caused Morsell to agree that she would testify at trial to inculpatory facts—which Alexander knew to be untrue.[12]

The City defendants contend that there can be no claim regarding Alexander's involvement in obtaining Morsell's false testimony because there is no documentation in the homicide file of any such interview taking place. ECF 79 at 12-13. But that is hardly conclusive evidence. The interview *had* to have taken place. As of early March 1988, the detectives involved in the investigation knew that relying on Paul Presley to support the prosecution of Swainson was problematic and knew they needed another witness. PS ¶ 217-218. The record shows that Alexander and his partner Cohen determined that Morsell would be that witness, as they documented several efforts to locate her in March 1988. PS ¶ 219. On March 1, they spoke with Opher's sister about information Morsell could provide and documented that they would pick Morsell up for an interview the next day. PS ¶ 220. On March 3, they documented that they spoke with Opher's sister and arranged an interview for the following day. PS ¶ 221. Later that day, Alexander learned that Morsell's mother did not want Morsell to speak to police without an attorney; Alexander wrote that police would attempt to get around Morsell's mother by interviewing Morsell on the street. PS ¶ 222. The next day, Cohen learned that Morsell did want

---

[12] The City defendants do not reference Morsell's 2014 statement. In view of the fact that Morsell is deceased, the statement may be considered on summary judgment for the same reasons that apply to Paul Presley's 2008 statement, that is, as a statement against interest, Fed. R. Evid. 803(4), as extrinsic evidence of an inconsistent statement, Fed. R. Evid. 613(b), or under the residual hearsay exception, Fed. R. Evid. 807(a). *See supra* note 7. In particular, with regard to admissibility under the residual hearsay exception in Rule 807(a), Morsell's 2014 statement was provided to multiple parties, including an investigator and two lawyers, and the description of the false bribery allegations is supported by the deposition testimony of Tamika Cole that Morsell's statements at trial were plainly false. PS ¶¶ 290, 308.

to speak with detectives and that she would meet with them outside of her evening school location the following week. PS ¶ 223.

The documentation of contacts regarding Morsell end at that point, but, given the detectives' interest in obtaining a second witness, their extensive documented efforts to schedule an interview, and their stated intent to conduct an interview in such a way that would avoid Morsell having the assistance of counsel obtained by her mother, it is a reasonable inference at the summary judgment stage to conclude that Alexander conducted the interview and that the interview led to Morsell's willingness to provide false information supporting the prosecution's theory of guilt. As such, there is sufficient evidence to support Swainson's fabrication clam against Alexander regarding Morsell's false trial testimony.[13]

### 2. Deliberate Deception by Defendants Santiago, Alexander, and Fischer

Swainson's cause of action for deliberate deception follows the template set forth in *Dennis v. City of Philadelphia*, 19 F.4th 279, 291 (3d Cir. 2021), that the defendants violated Swainson's due process rights through the "knowing use of false testimony or other fabricated evidence or from concealing evidence to create false testimony to secure a conviction." The

---

[13] The City defendants do not address an additional instance of fabrication concerning deceased defendant Miller and an interview with Swainson's alibi witness, Tamika Cole. That conduct establishes an additional constitutional violation underlying Swainson's *Monell* claim against the City. Specifically, Cole was prepared to testify at Swainson's murder trial that she saw him at the home of her boyfriend, Donny Ebanks, at a time that would have supported Swainson's claim that he was not present at or near the scene of the shooting. PS ¶¶ 233, 235. Shortly before trial, however, Miller interviewed Cole and pressured Cole into adopting a statement that she did not know for sure that the night she saw Swainson was the night Opher was murdered. PS ¶ 234. This was false; Cole was certain she saw Swainson on the night of the murder. PS ¶ 235. Because this statement undermined Cole's credibility as an alibi witness, however, Swainson's trial counsel did not call her to the stand during the defense case. PS ¶ 245. Miller's coercive efforts to produce a false statement for Cole therefore constitute an additional instance of actionable fabrication.

claim is also established if the defendant detectives "failed to correct testimony they knew was false and concealed from the defense the evidence that revealed that trial testimony as false." *Id.* at 291-92. The claim is similar to a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), for withholding of favorable evidence, but has an additional element requiring proof that the defendant acted knowingly. *Id.*; *see also Swainson v. City of Philadelphia*, No. 22-2163, 2023 WL 144283, at *3-4 (E.D. Pa. Jan. 10, 2023) (Pratter, J.) (distinguishing *Brady* claim from deliberate deception claim asserted by Swainson under *Dennis*).[14]

The record developed in discovery shows that each of the defendant detectives—Santiago, Alexander, and Fischer—suppressed from the prosecutor and Swainson's defense an extraordinary amount of highly material evidence that would have undermined the prosecution's case against Swainson. First, the fact that these defendants did not disclose to the prosecution that they engaged in misconduct to falsely secure Swainson's arrest and fabricate inculpatory evidence, *supra* § IV.A.1, or failed to include exculpatory information in the affidavit of probable cause, *infra* § IV.A.3, is independently actionable under a deliberate deception theory. *See Manning v. Miller*, 355 F.3d 1028, 1031-33 (7th Cir. 2004) (holding that defendant agents' inducing witnesses to falsely identify plaintiff and then failing to disclose those actions to prosecutor supported liability for withholding of favorable evidence); *Gates v. D.C.*, 66 F. Supp.

---

[14] The City defendants outline a series of four elements to a deliberate deception claim including a suggestion that Swainson must prove that "if the evidence had been provided [to prosecutors], the prosecution would not have been able to show Plaintiff murdered Opher." ECF 79 at 14. This heightened materiality standard is not referenced anywhere in *Dennis*, nor does it make sense that a plaintiff would have to prove definitively that they would not have been convicted but for the suppression of favorable evidence. *See Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 284-85 (3d Cir. 2016) (describing *Brady* materiality standard as requiring a "reasonable probability" that the disclosure of the evidence in question would have led to a different result at trial). In any event, the relevant standard is of little consequence in this case given the nature of the favorable evidence the defendants knowingly withheld from Swainson before, during, and after his trial, and Swainson's burden is met no matter the standard.

3d 1, 23 (D.D.C. 2014) (holding that police defendants' failure to disclose evidence that they fabricated plaintiff's confession would constitute *Brady* violation).

Second, the evidence shows that Santiago, Alexander, and Fischer deliberately suppressed at least ten different activity sheets and four different attempt to apprehend logs that contained exculpatory information in a range of different categories. PS ¶¶ 252, 258. Several of the activity sheets reported information about alternative suspects or alternative case theories, including:

- The January 19, 1988 activity sheet documenting that Crystal Justice told Fischer and Miller that Latanya Furman told her not to speak to police or get involved in the investigation as well as Fischer and Miller's failed attempts to locate and interview Furman, PS ¶ 252(a).;

- The January 21, 1988 activity sheet documenting Vernon Montague's statement that word on the street was that Opher was killed in a hold-up attempt as well as Fischer and Miller's further failed attempts to locate, interview, and polygraph Furman, PS ¶ 252(b);

- The January 21, 1988 activity sheet documenting Hines's failed polygraph examination, PS ¶ 252(c);

- The January 22, 1988 activity sheet documenting that the coat Justice identified during her police interview as the coat worn by the man who came to 5413 Sansom Street an hour before the murder was the coat police confiscated from Presley that night, PS ¶ 252(d);

- The January 23, 1988 activity sheet documenting Santiago and Durrant's arrest of Allen Proctor for murder, as well as Santiago and Durrant's interview with Presley's

girlfriend, Valerie Smith, in which she contradicted information he provided to police, PS ¶ 252(e);

- The January 26, 1988 activity sheet documenting Fischer receiving the tip identifying a suspect named "George" as the person who murdered Opher, PS ¶ 252(f); and

- The February 6, 1988 activity sheet documenting detectives' efforts to investigate Darren and Brian Brown, noting that Brian Brown was on parole in New Jersey and theorizing that there may be a connection between Brian Brown and Presley, who was also on parole in New Jersey, as well as detectives' further efforts to locate Furman, PS ¶ 252(g).

These activity sheets included information that would have been highly relevant to Swainson's defense to develop multiple variations of an alternative perpetrator defense, including a defense pointing to Furman, along with the Brown brothers, who had a possible connection with Presley; Hines; Proctor; and/or "George." *See Kyles v. Whitley*, 514 U.S. 419, 442 n.13 (1995) (noting that suppressed evidence concerning alternative suspect would have permitted the defense to "have attacked the investigation as shoddy"). Relatedly, these activity sheets provided extensive information showing that Opher was murdered as part of a botched drug house robbery, and not as a result of an internal conflict between men with whom Swainson sold drugs.

Another category of documents includes materials regarding the repeated efforts to obtain inculpatory testimony from Morsell:

- The March 1, 1988 attempt to apprehend log documenting Alexander and Cohen's plan to interview Morsell on March 2, 1988 because Ernestine Dennis directed them to speak to her, PS ¶ 258(c);

- The March 3, 1988 attempt to apprehend log documenting Alexander and Cohen's plans to speak with Morsell at the Dennis residence and their further conversation with Ernestine Dennis in which she explained that Morsell's mother did not want her to speak with police and the detectives' plan to speak with Morsell on the street, PS ¶ 258(d); and.

- The March 4, 1988 activity sheet documenting that Cohen spoke with Ernestine Dennis about coordinating plans to speak with Morsell without Morsell's mother finding out, PS ¶ 252(i).

The suppression of these documents deprived Swainson of the opportunity to argue that Morsell's inculpatory trial testimony was only obtained as a result of extensive police efforts to meet with her in an oppressive environment with pressure from Opher's family.

A final category of documents reported information explaining police knowledge regarding the factual circumstances of Swainson's travel to Jamaica, including:

- The February 15, 1988 activity sheet documenting Durrant and Santiago's conversation with Ebanks and Thomas in which they were told Swainson had gone to Jamaica for a vacation and would be returning soon, PS ¶ 252(h); and

- The March 8, 1988 activity sheet documenting that Swainson called Santiago after he returned to the United States from Jamaica, that Santiago was aware that Swainson did not know he was wanted for murder, and that Santiago decided not to provide Swainson with that information, PS ¶ 252(j).

Had Swainson been provided with this information, he would have been able to challenge the powerful narrative created by the prosecution that he fled the United States to avoid prosecution.

This information collectively includes information produced and suppressed from the prosecution by defendants Santiago, Alexander, and Fischer. Every piece of information would have allowed Swainson to challenge false testimony presented at trial that he murdered Opher, and, as such, each defendant "concealed from the defense…evidence that revealed that trial testimony as false." *Dennis*, 19 F.4th at 291-92. As such, Swainson has produced sufficient evidence to present to a jury his deliberate deception claims as to each defendant.

The City defendants offer little argument regarding the deception claims,[15] asserting only that there is not sufficient evidence to support a claim regarding suppression of information about Allen Proctor. ECF 79 at 27-28.[16] That argument, however, is based on an improper view of the facts, drawing inferences in the light *least* favorable to Swainson. Specifically, the City defendants parrot Santiago's deposition testimony that including information about Proctor on an activity sheet related to the Opher murder investigation must have been a mistake. This interpretation ignores several other portions of Santiago's testimony, namely, that detectives used activity sheets to record "significant investigative steps" and it was not permissible to write information about more than one case on a single activity sheet. PS ¶¶ 159, 322. Thus, while the

_____

[15] While many of the above-referenced activity sheets and attempt to apprehend logs are not referenced in Swainson's Second Amended Complaint and were not the subject of deposition testimony, that fact does not bar Swainson from using them as evidence in support of his claims. Defendants produced each of the activity sheets and attempt to apprehend logs to plaintiff in their initial production of documents. The topic of activity sheets and attempt to apprehend logs, and the fact that they were withheld from prosecutors as a matter of policy and practice, was addressed extensively during discovery. The City defendants were on notice that any and all activity sheets and attempt to apprehend logs found in the homicide file would be a part of Swainson's claims regarding the deliberate suppression of exculpatory information. Further, given that plaintiffs are free to amend their pleadings up through the time of trial, Fed. R. Civ. P. 15(b), there is no prejudice to the City defendants from the inclusion of these documents in the case now.

[16] Swainson agrees that information about Kevin Pearson does not support a suppression claim, and he does not intend to proceed on any such claim. ECF 79 at 15-16, 28.

City speculates that there was a mistake, other testimony suggests that such a mistake was unlikely. At this stage, the inferences must be drawn in Swainson's favor. When viewed in the proper light, the evidence supports a jury finding that Santiago obtained information about Proctor as someone who shot drug dealers during the course of a robbery, placed Proctor under arrest in the midst of the Opher murder investigation, determined that Proctor should be considered as a suspect in that investigation, and, for that reason, added information about Proctor to an activity sheet for the Opher investigation. PS ¶¶ 160-163.

The City defendants are free to present their "mistake" theory to a jury, but, at this stage, that theory is just that. Because the theory is in conflict with other facts that the City defendants ignore, the suppression claim regarding Proctor should, as with a claim regarding all other above-described suppressed evidence, be presented to the jury.

### 3. Malicious Prosecution by Defendants Santiago and Fischer

Swainson establishes a malicious prosecution claim under the Fourth Amendment upon a showing that (1) the defendants initiated a criminal proceeding, (2) the criminal proceeding ended in Swainson's favor, (3) the defendants initiated the proceeding without probable cause, (4) the defendants acted maliciously, and (5) the plaintiff suffered a deprivation of liberty. *Halsey*, 750 F.3d at 296-97. The City defendants concede the second and fifth elements (favorable termination and deprivation of liberty), but argue that Swainson cannot demonstrate the individual defendants' initiation of a criminal proceeding, the absence of probable cause, and malice. ECF 79 at 16-20, 29. Their arguments are meritless.

As to the initiation of a prosecution, any officer who has "influenced or participated in the decision to institute criminal proceedings…can be liable for malicious prosecution." *Halsey*, 750 F.3d at 297 (citing *Sykes v. Anderson,* 625 F.3d 294, 308–09, 317 (6th Cir. 2010)). Thus,

officers "who conceal and misrepresent material facts to the district attorney are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions." *Id.* (quoting *Pierce v. Gilchrist,* 359 F.3d 1279, 1292 (10th Cir. 2004)). Santiago and Fischer both meet this standard. As described at greater length above, *see supra* § IV.A.1-2, each of them influenced the initiation of criminal proceedings by fabricating evidence or concealing evidence from the prosecutor. Santiago fabricated the statements of Paul Presley and the purported identification of Swainson; he also withheld key exculpatory information that undermined the allegation of Swainson's flight as well as information pointing to multiple alternative suspects. Fischer, likewise, was responsible for the concealment of critical information regarding alternative suspects.

As to probable cause, the central question is whether the affidavit in support of an arrest warrant omitted facts material to the prosecutor and judge's evaluation of the case. *Pinkney v. Meadville*, 95 F.4th 743, 748-49 (3d Cir. 2024). The existence of probable cause is generally a fact issue for the jury. *Halsey*, 750 F.3d at 300; *Groman v. Twp. of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995). The sole piece of inculpatory information included in the affidavit submitted to secure a warrant for Swainson's arrest was a description of Presley's purported identification of Swainson. PS ¶ 171. Because the record shows that the identification was the result of knowing fabrication on the part of the defendant detectives, *supra* § IV.A.1.a(i), that fact establishes the absence-of-probable-cause element on its own. *See Halsey*, 750 F.3d at 303 (stating that reasonable jury could conclude that defendants "infected" prosecutor's decision to charge by fabricating a confession).

Even beyond the fact of the fabricated Presley identification, the Court may consider the extensive evidence that was *not* included in the affidavit of probable cause. *See Pinkney*, 95 F.4th at 749 (explaining that when an officer omits from an affidavit discrepant information undermining probable cause, affidavit must be evaluated as if it included omitted facts); *Thomas v. City of Philadelphia*, No. 17-4196, 2019 WL 4039575, at *10-11 (E.D. Pa. Aug. 27, 2019) (finding questions of fact as to whether defendant detectives knowingly omitted information contradicting witness identifications described in affidavit of probable cause). The quantity of material evidence omitted from the affidavit in this case is substantial: facts about the implausibility of Presley's account, facts showing that Presley's account was inconsistent with the observations of officers on the scene, facts showing that Presley was shot as part of a drug house robbery, and facts concerning multiple sets of alternative suspects. PS ¶ 172. When this information is added to the affidavit that was submitted, probable cause is conclusively undermined.[17]

As to the element of malice, it has long been the rule in the Third Circuit that malice may be inferred from the absence of probable cause. *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993). When the record establishes genuine issues of material fact as to whether a defendant officer made false statements in support of an arrest, the "issue of malice is a determination for the jury." *Andrews v. Knight*, No. 17-0962, 2022 WL 16837055, at *9 (E.D. Pa. Nov. 9, 2022). Because Swainson has established that a reasonable jury could conclude that Santiago and Fischer initiated a prosecution against Swainson without probable cause, the question of their malice is, likewise, one for the jury.

---

[17] The City defendants' sole argument on this element of the malicious prosecution claim is that Presley's statements provided the requisite probable cause. ECF 79 at 17-20. As already demonstrated, *supra* § IV.A.1.a(i), that argument fails.

Swainson has adduced sufficient evidence to establish each of the elements of a § 1983 malicious prosecution claim, and, accordingly, that claim should be presented to a jury. Additionally, because the City defendants incorporate their arguments as to Swainson's federal malicious prosecution claim with respect to Swainson's state-law malicious prosecution claim, ECF 79 at 21-22, their arguments to dismiss the state law claim, likewise, fail, and the state law claim should be presented to a jury.

### 4. Civil Rights Conspiracy by Defendants Santiago, Alexander, and Fischer

Swainson's civil rights conspiracy claim has three elements: (1) the defendants conspired to violate Swainson's constitutional rights, (2) committed an overt act, and (3) deprived Swainson's rights. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 294 n.15 (3d Cir. 2018) (quoting *Barnes Foundation v. Twp. of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001)). The City defendants rely on their arguments on Swainson's fabrication and deception claims, ECF 79 at 21, and, for the reasons described above, those arguments do not undermine Swainson's civil rights conspiracy claim. As for the City defendants' argument alleging the absence of evidence of an agreement and/or concerted action, *id.*, the record evidence is that Santiago, Alexander, and Fischer coordinated their efforts throughout the investigation. PS ¶¶ 8, 185. In view of this evidence, a jury could conclude that by advancing a prosecution based on false evidence and by withholding information that undermined the prosecution theory of the case, the defendants entered into the requisite agreement and that their investigative actions constituted an overt act in support of a conspiracy that violated Swainson's constitutional rights. This claim, like Swainson's other claims, should be presented to the jury.

**B.** **The Summary Judgment Record Contains Sufficient Evidence to Support Swainson's *Monell* Claim Against Defendant City of Philadelphia.**

Under *Monell v. Dep't. of Social Services,* 436 U.S. 658, 694 (1978), a municipal entity like the City of Philadelphia is liable when it is a moving force in the violation of a plaintiff's constitutional rights. "[A] § 1983 claim against a municipality may proceed in two ways." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citing *Estate of Roman v. City of Newark*, 914 F.3d 789, 798–99 (3d Cir. 2019)). As one method, the plaintiff may demonstrate that "an unconstitutional policy or custom of the municipality led to his or her injuries." *Id.* (citing *Roman*, 914 F.3d at 798). The other method is for the plaintiff to show that their injuries "were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice,' including failures to train, supervise, and discipline. *Id.* (citing *Roman*, 914 F.3d at 798-99).

The record in this case supports claims under both methods. First, the established policy and practice of PPD homicide detectives to withhold activity sheets from the DAO and criminal defendants resulted in the suppression of extensive exculpatory information from Swainson. Second, evidence of a lengthy history of misconduct in the PPD and especially the homicide division (particularly by defendant Santiago), including the fabrication of evidence, coercion of witness testimony, and suppression of exculpatory information demonstrates a failure to supervise and discipline which allowed the defendants in this case to engage in the misconduct that caused Swainson's wrongful conviction.[18]

---

[18] The City's contention that Swainson has proven no constitutional injury that would support a *Monell* claim, ECF 79 at 25-30, fails for the reasons outlined above. *Supra* § IV.A.1-4.

1. **The City's Policy and Practice of Withholding Police Activity Sheets Containing Exculpatory Information**

A *Monell* claim involving a policy or practice can rely on "an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject." *Forrest*, 930 F.3d at 105. But the claim need not proceed on this basis, as it may also rely on a custom, that is, a "course of conduct so well-settled and permanent as to virtually constitute law." *Id.*; *see also Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir. 1990). A custom can be shown based on "'knowledge and acquiescence' of widespread unconstitutional conduct." *Smith v. Jaskel*, No. 21-1410, 2021 WL 7707753, at *3 (E.D. Pa. Dec. 10, 2021) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)).

In this case, the record demonstrates that in the time before and during the Opher murder investigation, the City had a policy and practice of withholding activity sheets from prosecutors and defendants. PS ¶¶ 324, 326, 328. Santiago confirmed the existence of the policy when describing what documents he was required to turn over to the DAO in a "homicide binder," stating that, by policy and "set practices," the activity sheets were not placed in the binder. PS ¶ 326. Instead, they were kept in the separate and much more extensive homicide file maintained by the PPD homicide division. PS ¶ 130, 326. Prosecutors who have conducted comprehensive reviews of PPD files and DAO files from the late 1980s and early 1990s confirm that this policy resulted in activity sheets rarely, if ever, being provided to the DAO. PS ¶ 328. Under this policy, police had full control over what universe of information would be provided to prosecutors, and prosecutors would have no way to be aware of what information they were not receiving. PS ¶ 327. In short, prosecutors did not know what they did not know.[19]

---

[19] The City does not address the existence of the policy that activity sheets were not provided to the DAO other than to say that the City had appropriate policies in place regarding

Judith Rubino, the prosecutor in Swainson's case, confirmed that this policy and practice was followed in the Opher murder investigation, testifying that she only had access to what detectives gave her, or told her about, and stating that she did not receive anything in this case outside of what Santiago compiled in the homicide binder. PS ¶¶ 109, 211, 248-49, 329. When Rubino was shown in her deposition the multiple activity sheets prepared by the defendant detectives during the Opher murder investigation, she confirmed she did not receive them. PS ¶¶ 255-256, 351,

Non-disclosure of activity sheets allowed for the suppression of highly consequential information. They were used to document all significant steps taken by detectives during an investigation, and detectives routinely used them to record information that was not included in witness interviews or other documents disclosed to the prosecution and defense. PS ¶¶ 322-323. Detectives placed great importance on activity sheets to develop a running record of events in an investigation. Indeed, when Santiago was questioned in 2014 about allegations of misconduct in multiple murder investigations that took place in the 1980s and 1990s, he specifically requested the activity sheets from each of the files in those cases so he could refamiliarize himself with

---

how detectives should conduct a proper homicide investigation. ECF 79 at 33-34. To the extent the City contends that a policy is only a "policy" for *Monell* purposes if it is neatly packaged into a published policy document, that is not the law. *See Geraghty v. E. Bradford Twp.*, 584 F. Supp. 3d 10, 18 (E.D. Pa. Feb. 10, 2022) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)) ("An 'official policy' is created not only by formal rules but also when the 'government's authorized decisionmakers' make the 'decision to adopt [a] particular course of action.'"); *Quinto-Collins v. City of Antioch*, No. 21-06094, 2022 WL 18574, at *1 (N.D. Cal. Jan. 3, 2022) ("[A] plaintiff need not point to an explicit policy statement announced by the department to state a *Monell* claim."). Santiago's testimony regarding the existence of a policy and practice is more than sufficient at this stage. Of course, even if it were not sufficient, Santiago's description of his understanding of the relevant practices confirms the existence of an actionable custom. *See McKay v. City of New York*, 32 F. Supp. 3d 499, 513-14 (S.D.N.Y. July 24, 2014) ("The alleged policy does not need to be contained in an explicitly adopted rule so long as the unlawful practices of city officials are so 'persistent and widespread…as to constitute a custom or usage with the force of law.'").

what occurred in each investigation. Ex. 36, Santiago 2014 Emails and Affidavit, 4 ("these cases are so old that I need to see the activity sheets to help my recollection"). As explained by Swainson's police practices expert, the nondisclosure of such information "contravenes minimally accepted policing standards at the time and incentivizes detectives to selectively omit information that hurts their case or is otherwise inconsistent with their theory as to who committed a homicide." Ex. 81, Lynch Report, 34.

The policy and practice (or custom, *see supra* note 19) of withholding activity sheets had a significant impact in this case, leading directly to the suppression of extensive exculpatory information that, as discussed above, violated Swainson's due process rights. *See supra* § IV.A.2. Given this record, there is sufficient evidence to allow Swainson to present to a jury his claim regarding the City's policy and practice (or custom) of withholding activity sheets from prosecutors and defendants.

### 2. The City's Deliberately Indifferent Failure to Supervise and Discipline Detectives in the PPD Homicide Division

A failure to supervise and/or discipline is actionable when the "failure or inadequacy amount[s] to deliberate indifference on the part of the municipality." *Forrest v. Parry,* 930 F.3d 93, 105-106 (3d Cir. 2019). A municipality is deliberately indifferent in this context when "(1) municipal policymakers know that employees will confront a particular situation[,] (2) the situation involves a difficult choice or a history of employees mishandling[,] and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Roman,* 914 F.3d at 798 (3d Cir. 2019). The summary judgment record in this case supports a claim that the City of Philadelphia, over a lengthy period, failed to supervise and discipline detectives in the homicide division regarding proper investigative practices, and, as such, allowed detectives to

repeatedly engage in misconduct, including the fabrication of evidence, the coercion of witness testimony, and the suppression of exculpatory information.

This claim is nearly identical to the claim on which the late Honorable Gene E.K. Pratter denied summary judgment in *Thomas v. City of Philadelphia*, No. 17-4196, 2019 WL 4039575 (E.D. Pa. Aug. 27, 2019).[20] Remarkably, the City, a party in that case, fails to even mention *Thomas* in its motion. The omission is telling because *Thomas* provides a precise template for the claim Swainson has developed through discovery in this case, with one important qualifier: the evidence in this case is substantially stronger than that in *Thomas*.

In that case, the plaintiff was convicted for a 1990 murder and spent 24 years in prison before his conviction was vacated. *Id.* at *1. He brought civil rights claims against the detectives who investigated the case, alleging that they fabricated the evidence used to initiate the charges, *id.*, and he sued the City, claiming that its failure to train, supervise, and discipline detectives in the PPD homicide division caused the wrongful conviction. *Id.* at *13. In denying summary judgment, Judge Pratter provided a comprehensive recounting of the evidence of the City's failures. *Id.* at *13-24.

First, there was evidence of longstanding practices consistent with the intentional suppression of evidence at issue in Thomas's prosecution, including: a 1978 series in the Philadelphia Inquirer documenting patterns of misconduct among PPD homicide detectives, three federal court injunctions in the 1980s regarding unconstitutional investigative practices, eight cases involving unlawful conduct by homicide detectives between 1988 and 1994,[21] and a

---

[20] Judge Pratter presided over Swainson's case until her passing on May 17, 2024.

[21] The decision placed special emphasis on three cases, the wrongful prosecutions of Anthony Wright, James Dennis, and Percy St. George. *Thomas*, 2019 WL 4039575, at *15. As

series of events in the 1980s and 1990s known as the 39th District Scandal, which led to a comprehensive settlement agreement requiring the monitoring of the City's implementation of orders placing limits on police investigative powers. *Id.* at *15-16. And, second, Thomas had produced a report by a police practices expert who documented, among other things, that PPD failed to take steps to remedy longstanding misconduct; that there was a lack of training on key investigative actions at issue in the case, including the preparation of affidavits of probable cause and interrogation methods; and that there were fundamental flaws in PPD's disciplinary systems, including an assertion that the disciplinary system in the 1990s "suffered from the same if not more problematic deficiencies" that were apparent in later reports prepared in the early 2000s. *Id.* at *17-18 (internal quotations omitted).

Judge Pratter found, further, that given this background there was sufficient evidence to support a finding of the City's deliberate indifference to the failure to train, supervise, and discipline in that, at a minimum, there was constructive knowledge of such misconduct. *Id.* at *21; *see also id.* at *22 ("Although the defendants are free to argue to the jury that the alleged misconduct was not obvious to City policymakers, the evidence on record could convince a jury otherwise.") Finally, Judge Pratter ruled that there was sufficient evidence of causation because, but for the City's failure to review allegations of wrongdoing in homicide investigations, the misconduct that caused the plaintiff's wrongful conviction would have been discovered. *Id.* at *23.

In this case, Swainson has produced a record with similar evidence. Swainson's police practices expert, Michael K. Lynch, a 32-year law enforcement professional now employed as

discussed below, the main defendant in this case, Santiago, was a key figure involved in all three of those cases.

the Chief of Staff in the Camden, New Jersey Police Department, reviewed the same history of misconduct within the Philadelphia Police Department described in *Thomas* and concluded that "since the late 1970s, PPD leadership has been on notice that its officers, especially the detectives in its Homicide Division, have routinely violated the most basic legal limitations on law enforcement officer conduct." Ex. 81, Lynch Report, 27.That misconduct has included "the outright fabrication of evidence, the coercion of witness testimony while recklessly disregarding the falsity of such testimony, and the suppression and concealment of material evidence" as well as officers "routinely ignor[ing] leads pointing to the true perpetrators of criminal offenses." *Id.* Despite notice of these issues, PPD leaders have only "paid lip service to the need for reform" and "failed to implement meaningful changes in practice that remedy and prevent instances of misconduct." *Id.* Additionally, Lynch found that "longstanding failures of PPD's disciplinary system" result in "a culture of misconduct that leads to routine violations of civilians' rights under the U.S. Constitution." *Id.* at 27-28.

While these conclusions offered by Lynch are nearly identical to those deemed dispositive by the Court in *Thomas*, the record in this case is comparatively overwhelming. This is true for two reasons: first, the significantly larger raw number of homicide cases with credible allegations of misconduct and, second, the fact that at least three of those cases involve the main defendant in this case, Santiago.

With respect to the number of cases, Judge Pratter found that *eight* homicide cases described in Thomas's briefing and police practices expert report were evidence of a pattern placing City policymakers on notice of serious investigative misconduct. In this case, Lynch's

report identifies *25* cases.[22] *Id.* at 14-26. Other than the cases directly involving Santiago, six cases (involving seven men: Matthew Connor, Gerald Howell, Bruce Murray, Gregory Holden, Ah Thank Lee, Willie Stokes, and Curtis Crosland) preceded the Opher murder investigation. *Id.* at 17-20. An additional eight cases (Pedro Alicea, Donald Ray Adams, Troy Coulston, Ronald Johnson, Walter Ogrod, Chester Hollman, Willie Veasy, and Shaurn Thomas) involved investigations that occurred in and around the period of the Opher investigation, between 1989 and 1993. The remaining cases (Johnny Berry, Terrence Lewis, John Miller, Eugene Gilyard, Lance Felder, William Johnson, David Sparks, Recco Ford, and Steven Lazar) occurred in the time period when Swainson was pursuing post-conviction relief on the ground that he had been prosecuted as a result of police misconduct. Lynch, based on his review of judicial opinions, stipulated facts and other public records regarding these cases,[23] opined that the presence in these cases of "departure[s] from minimally accepted police practices seen in the Swainson case, including fabrication of evidence, coercion of witnesses, and the concealment and suppression of material evidence…demonstrates not only the existence of the patterns" of misconduct, "but also shows that PPD leadership and policymakers were aware of, and indifferent to, the unlawful conduct of PPD officers." *Id.* at 15.

---

[22] The City ignores Lynch's report and references 13 cases identified in Swainson's Second Amended Complaint. ECF 79 at 31. That pleading, of course, was filed more than two years ago, and, since that time, developments in the investigation of misconduct in the PPD homicide division have resulted in the discovery of additional cases illustrating the pattern at issue in this litigation. An expert is not precluded from referencing publicly available facts outside the allegations of the complaint nor is a plaintiff precluded from doing so on summary judgment.

[23] Swainson has provided as exhibits to Plaintiff's Statement a collection of publicly available documents related to many of the cited cases which further document the misconduct at issue in each case.

As to the second factor showing the strength of the record in this case versus the *Thomas* decision, the circumstances with respect to Santiago's involvement in wrongful prosecutions and convictions are extraordinary. Over a five-year period between 1988 and 1993, Santiago was the lead investigator in *four* murder prosecutions that resulted in judicial findings of misconduct. PS ¶¶ 350-54. One case was the prosecution of Swainson. The other three involved the prosecutions of Anthony Wright, James Dennis, and Percy St. George. PS ¶ 351. In brief, the cases involve the following misconduct by Santiago:

- *Anthony Wright*: Santiago claimed that Wright freely and voluntarily gave a 9-page confession to a violent rape and murder. Wright, however, said that Santiago fabricated the confession and coerced him into signing it. A jury found Wright guilty based in large part on Santiago's testimony about the confession. After Wright had spent 25 years in prison, DNA testing excluded Wright as the perpetrator and confirmed that he could not have provided the details in the confession. Despite that fact, Santiago testified at Wright's criminal retrial, after which Wright was acquitted, and in a later civil suit that Wright had voluntarily given the confession. The City settled Wright's civil rights suit for $9.85 million, and Santiago is currently facing perjury charges based on his testimony in both the criminal and civil cases. PS ¶ 352.

- *James Dennis*: Dennis was convicted of a murder based on eyewitness identification, but that conviction was vacated following a finding that Santiago, among other things, compiled suggestive photo arrays, suppressed information about a witness's failure to identify Dennis as the perpetrator, suppressed information about an informant who reported that other credible suspects had confessed to the crime, suppressed reports that impeached the prosecution's main identification witness, and

suppressed information that corroborated the testimony of Dennis's alibi witness who otherwise would have testified he was far from the crime scene at the time the murder occurred. As a result of this misconduct, Dennis spent 25 years on death row. In April 2024, a jury hearing Dennis's civil rights claims awarded him $16 million in damages, including a $3 million punitive damages award against Santiago. PS ¶ 353.

- *Percy St. George*: Santiago conducted an interview with David Glenn, a 16-year-old boy whom he believed was the sole witness to a murder. Glenn, however, had not witnessed the murder. Santiago threatened Glenn with arrest and coerced him into signing a statement identifying St. George as the perpetrator. When St. George's counsel moved to dismiss the case based on Santiago's misconduct, Santiago's counsel informed the court that Santiago would invoke the Fifth Amendment if asked questions about his actions in obtaining the statement from Glenn. As a result, the charges against St. George were dismissed. PS ¶ 354.

In light of these cases illustrating that "Santiago may have engaged in egregious and sometimes illegal activity for years while investigating the PPD's most serious cases," Lynch concludes that PPD must conduct a "complete investigation into him and an audit of homicide cases that led to convictions that remain undisturbed." PS ¶ 355. No such investigation has occurred. PS ¶ 357. This history, involving misconduct across all of the homicide cases addressed in Lynch's report, leads to important conclusions regarding the City's failures:

> Given the similarity, numerosity, and gravity of the allegations of misconduct in the homicide division during the time periods described the failure to fully investigate the similar allegations of investigative misconduct by detectives within that unit falls short of minimally accepted practices for supervision and discipline and raises serious concerns about PPD's commitment to preventing and

> disciplining investigative misconduct and protecting the
> constitutional rights of individuals.

Ex. 81, Lynch Report, 28.

With this background, Swainson has produced more than sufficient evidence to present his failure to supervise and discipline claim to a jury. The record shows a longstanding pattern of cases in the homicide division, in general, and involving Santiago in particular, where detectives engaged in investigative misconduct. A reasonable jury could find that the City was deliberately indifferent to that misconduct in that it knew (1) that "homicide detectives would repeatedly be in a position to interrogate…witnesses," *Thomas*, 2019 WL 4039575, at *22, (2) that these decisions would "create a difficult choice 'because the officers will be motivated to bring a suspect to justice,' and that the wrong choice by officers will frequently cause deprivation of constitutional rights," *id.* (quoting *Gilyard v. Dusak*, No. 16-2986, 2017 WL 2813225, at *20 (E.D. Pa. June 29, 2017)), and (3) "that the City's inaction 'communicated a message of approval' regarding" the defendant detectives' misconduct. *Id.* (quoting *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998)). Finally, a reasonable jury could find that the City's failures and deliberate indifference caused Swainson's constitutional injuries in that proper supervision and discipline targeted at ensuring lawful investigative conduct would have prevented an arrest, prosecution, and conviction based on fabricated evidence and the suppression of material favorable information. *Id.* at *23; *see also A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 581 (3d Cir. 2004) (quoting *Bielevicz*, 915 F.2d at 851) ("As long as the causal link between the alleged policy or custom and the constitutional injury is 'not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury.'").

None of the City's arguments supporting their request for summary judgment on Swainson's *Monell* claim has merit. First, the City contends that Swainson has not produced evidence of notice to the City about misconduct in the PPD homicide division because his Second Amended Complaint mentions only one case predating the Opher investigation and because materials shared in discovery only include cases post-dating that investigation. ECF 79 at 34-36. The City can only make this argument by willfully ignoring the cases referenced in the report of Swainson's police practices expert, in particular the six cases that preceded the Opher murder investigation.[24] It is no answer to this contention that some of the materials relied upon by Lynch are not specifically referenced in Swainson's pleadings or in discovery materials produced by Swainson, as Lynch's report makes clear that he drew conclusions about the referenced cases based on publicly available information, including court submissions, judicial opinions, and news reports, all of which is evidence properly the subject of an expert report.[25] Ex. 81, Lynch Report, 14, 40-49. The City's attempt to eliminate the import of a series of Philadelphia Inquirer articles in the late 1970s is similarly misguided. Though not in the record, it is both public and referenced in Lynch's report. And, importantly, it is specifically discussed in

---

[24] The cases discussed by Lynch that postdate the Opher investigation are likewise relevant under *Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir. 1996), where the court held that excessive force incidents postdating the incident giving rise to the plaintiff's claim "may have evidentiary value for a jury's consideration whether the City and policymakers had a pattern of tacitly approving the use of excessive force."

[25] The overwhelming majority of evidence demonstrating misconduct in the PPD homicide division comes from the PPD's own files. The natural extension of the City's argument regarding information not disclosed in discovery is that it cannot be held responsible for a custom of misconduct among homicide detectives because Swainson did not tell the City which of its *own materials* are relevant to prove that custom. No discovery rule, nor any logic, supports that position.

Judge Pratter's decision that the City conspicuously avoids citing. *Thomas*, 2019 WL 4039575, at *19.[26]

Finally, as to the failure to discipline and supervise, the City suggests that the small citizen complaint records of the defendant detectives are probative of appropriate discipline. ECF 79 at 39. This is a *non sequitur*.[27] Swainson's claim has little to do with citizen complaints; instead it focuses on two distinct sets of facts: first, the fact that the City failed to conduct its *own* investigations into misconduct within the homicide division that was readily apparent to it given the pattern discussed at length above, and, second, the fact that the lack of a fully functioning disciplinary system gave detectives the message that they were free to act with impunity. *See* Ex. 81, Lynch Report, 14. ("It is a basic principle of policing that a functioning disciplinary system and the absence of accountability will lead to a culture where officers were given the clear and

---

[26] Failure to consider the discussion of the Philadelphia Inquirer series in *Thomas* allows the City to make a remoteness argument—i.e., information about misconduct in the 1970s did not put the City on notice about Santiago's potential for misconduct in 1988 and 1989—that Judge Pratter soundly rejected. *See Thomas*, 2019 WL 4039575, at *19 ("Considered in the light most favorable to the plaintiff, a reasonable jury may conclude that the *Philadelphia Inquirer* series is the first link in a chain of evidence suggesting a publicly disclosed pattern of misconduct in the Department that allegedly continued before, during, and after the events at issue in this case.").

[27] The City also asserts, citing the Third Circuit's decision in *Watson v. Abington Twp.*, 478 F.3d 144 (3d Cir. 2007), that the Court can only consider disciplinary complaints within a five-year period preceding the incident in question. ECF 79 at 38. The City attempts to extend this proposition to other points of its argument to suggest that the Court may only consider cases of homicide investigation misconduct that are within this same time range. *Id.* at 36. The City is wrong on both counts. Yet again, had the City reviewed Judge Pratter's decision in *Thomas*, it would be aware of this point. *See Thomas*, 2019 WL 4039575, at *19 (citing *Watson*, 478 F.3d at 156) (stating that *Watson* court dismissed *Monell* claim "because, other than the plaintiff's own affidavit, the *only* evidence of unlawful behavior was from five years prior to the conduct at issue in that case").

unambiguous message that they were free to act in violation of the U.S. Constitution in their interactions with civilians and in their investigation of criminal cases.").[28]

    For these reasons, Swainson should be permitted to present his failure to supervise and discipline claim to a jury.

---

[28] The City attacks Lynch's conclusions regarding discipline because he relied on the expert findings of Dr. R. Paul McCauley, the expert whose opinions were cited in Judge Pratter's cited opinion. ECF 79 at 39-40. Lynch's reliance on McCauley's report, however, is completely appropriate under Fed. R. Evid. 703. *See In re: Processed Egg Prod. Antitrust Litig.*, 2016 WL 4582236 at *5 (E.D. Pa. Sept. 1, 2016) ("[E]xperts are permitted to rely on materials prepared by other experts in developing their own opinions."); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 286 F.R.D. 266, 271 (W.D. Pa. Aug. 24, 2012) ("[I]t is well-settled that one expert may rely upon another expert's opinion in formulating his own.").

## V.    Conclusion

For the foregoing reasons, the defendants' motions for summary judgment should be denied.

Respectfully submitted,


/s/ *Jonathan H. Feinberg*
Jonathan H. Feinberg

/s/ *Grace Harris*
Grace Harris

KAIRYS, RUDOVSKY, MESSING,
  FEINBERG & LIN LLP
718 Arch Street
Suite 501 South
Philadelphia, PA 19106


/s/ *Emma Freudenberger*
Emma Freudenberger
Amelia Green
Christina Matthias
Katrina Rogachevsky
NEUFELD SCHECK BRUSTIN
  HOFFMANN & FREUDENBERGER, LLP
200 Varick Street, Suite 800
New York, NY 10014

*Counsel for Plaintiff Andrew Swainson*