# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANDREW SWAINSON,

        Plaintiff,

  v.

CITY OF PHILADELPHIA; MANUEL SANTIAGO; JAMES ALEXANDER; JOHN DELLA ROCCA, as personal representative of the ESTATES OF MICHAEL COHEN, ARTHUR DURRANT and FRANCIS MILLER; and JOSEPH D. FISCHER,

        Defendants.

No. 2:22-cv-02163-JP

**Plaintiff Andrew Swainson's Statement of Additional Facts in Support of Opposition to Defendants' Motions for Summary Judgment**

Jonathan H. Feinberg
Grace Harris
KAIRYS, RUDOVSKY, MESSING,
 FEINBERG & LIN LLP
718 Arch Street
Suite 501 South
Philadelphia, PA 19106

Emma Freudenberger
Amelia Green
Christina Matthias
Katrina Rogachevsky
NEUFELD SCHECK BRUSTIN
 HOFFMANN & FREUDENBERGER, LLP
200 Varick Street, Suite 800
New York, NY 10014

*Counsel for Plaintiff Andrew Swainson*

# TABLE OF CONTENTS

I.      Andrew Swainson's Innocence ..................................................................1

II.     Early Police Investigation ........................................................................2

III.    Paul Presley Arrested Fleeing the Crime Scene ........................................3

IV.     Andrew Swainson's Truthful and Voluntary Exculpatory Statement
        Providing an Alibi ....................................................................................4

V.      Santiago Drops Charges Against Presley Despite Evidence Pointing to
        Him as a Suspect ......................................................................................6

VI.     Santiago Focuses on Swainson Despite No Evidence of His Guilt ............8

VII.    Presley Provides Santiago an Unreliable Account Unworthy of Belief ......9

VIII.   Santiago Fabricates an Identification of Swainson ..................................13

IX.     Presley Recants the Purported Identification of Swainson ......................17

        A.      Swainson's Preliminary Hearing ..................................................17

        B.      Presley Affirms that Swainson is Not the Shooter .........................17

X.      Presley is Returned to Jail and Santiago Fabricates Two Additional
        Inculpatory Statements ...........................................................................18

        A.      Presley is Arrested on Felony Drug Charges under an Alias ...........18

        B.      Santiago Fabricates a Statement by Presley on February 15, 1989 ....19

        C.      Santiago Fabricates Another Statement by Presley on February 17,
                1989 ............................................................................................22

XI.     Santiago Fabricates a Photograph Array to Defend Against a Motion to
        Suppress ................................................................................................24

XII.    Defendants Ignore and Hide Evidence Contradicting their Case Theory ....29

        A.      Drug House Robbery Theory ......................................................30

        B.      Alternative Suspects ..................................................................31

i. The Men Arrested at the Scene: Paul Presley, Jeffrey Green, and Ashley Hines ....................................................................... 32

ii. Latanya Furman, Darren Brown, and Brian Brown ............................. 33

iii. Allen Proctor ........................................................................................ 35

iv. "George" ............................................................................................... 36

XIII. Santiago Prepares the Affidavit of Probable Cause for Swainson's Arrest Based on Fabricated Information and Omitting Critical Exculpatory Information .............................................................................................................. 37

XIV. Santiago, Alexander, and Cohen Fabricate Swainson's Flight ......................... 40

A. Swainson's Trip to Jamaica ......................................................................... 41

B. Detectives Learn that Swainson would be Returning to the United States .......................................................................................................... 41

C. Detectives Attempt to Obtain an Unlawful Flight Warrant ....................... 43

D. Swainson Returns to the United States and Calls Santiago ...................... 44

E. Swainson is Arrested in New York ............................................................. 46

XV. Alexander and Cohen Coerce Morsell to Fabricate Testimony ......................... 46

XVI. Miller Pressures Swainson's Alibi Witness to Adopt a False Statement Undermining Swainson's Defense ..................................................................... 49

XVII. Detectives Suppress and Conceal Exculpatory Evidence ................................. 50

A. Suppressed Activity Sheets ........................................................................ 51

B. Suppressed Attempt to Apprehend Logs ................................................... 54

C. Suppressed Evidence of Presley's Pending Felony Charges ................... 55

XVIII. Swainson is Convicted at Trial .......................................................................... 56

A. Presley's Fabricated Identification and Statements Introduced ............... 56

B. Fabricated Evidence of Flight Introduced ................................................. 57

C. Morsell's Fabricated Testimony Introduced .............................................. 58

XIX.  Before their Deaths, Presley and Morsell Recant their Trial Testimony ..........................59

 A.  In 2008, Presley Admits His Trial Testimony was False and Fabricated.....................................................................................................................60

 B.  In 2014, Morsell Admits Her Trial Testimony was False and Fabricated.....................................................................................................................62

XX.  Swainson is Exonerated and Released after 32 Years of Imprisonment ..........................63

XXI.  The City of Philadelphia's Policies, Practices, and Deliberately Indifferent Training, Supervision, and Discipline.................................................................................65

 A.  Suppression of Activity Sheets and Attempt to Apprehend Logs .........................65

 B.  Failure to Train, Supervise, and Discipline............................................................66

  i.  The Pattern of Unconstitutional Investigative Conduct in the PPD Homicide Division.........................................................................66

  ii.  External Evidence of the City's Knowledge of Widespread Police Misconduct.......................................................................................68

  iii.  PPD Homicide Prosecutions Demonstrating a Pattern of Misconduct................................................................................................69

  iv.  The City's Indifference to Santiago's Significant History of Misconduct................................................................................................72

Plaintiff Andrew Swainson, through the undersigned counsel, submits this Statement of Additional Facts in support of his opposition to the defendants' two motions for summary judgment. In support of each of the below factual assertions, Swainson cites to the deposition transcripts, pleadings, documents produced in discovery and other materials marked as Exhibits 1 through 137 and filed with this Statement. Swainson respectfully submits that, when viewing the record and all reasonable inferences drawn therefrom in the light most favorable to him as the non-moving party, the material facts established in this case are as follows:

## I.    Andrew Swainson's Innocence

1.    On January 17, 1988 around 3:40 am, Stanley Opher was shot in the back with a shotgun at a drug house where he worked at 5413 Sansom Street in Philadelphia. He was found face-down in a pool of blood, with a rifle and a sawed-off shotgun nearby. Opher was pronounced dead that afternoon. Ex. 1, 1/18/88 Activity Sheet; Ex. 2, Kay Statement, 3-4.

2.    Andrew Swainson is innocent of the murder of Stanley Opher. Ex. 3, Swainson Dep., 247:22-24, 344:22-345:19, 362:15-17, 374:23-375:1.[1]

3.    Swainson was not present when Opher was killed; he was two miles away, spending the night at a friend's house with his girlfriend. Ex. 5, Swainson Statement 1/22/88 at 2-3; Ex. 6, Cole Dep., 14:14-20:8.

---

[1] Swainson's innocence is not only established through his testimony, but also the fabricated inculpatory evidence and suppressed exculpatory evidence discussed *infra* §§ VI, VIII, X-XIII. Additionally, all defendants have admitted Swainson's innocence by failing to respond to Plaintiff's November 1, 2023's Requests for Admissions, ¶ 4 ("Mr. Swainson is factually innocent of the January 17, 1988 shooting of Stanley Opher"). Ex. 4, Plaintiff's Requests for Admission. Fed. R. Civ. P .36(a)(3); *see also Kelvin Cryosystems, Inc. v. Lightnin,* 252 F. App'x 469, 472 (3d Cir. 2007) ("We have long recognized that deemed admissions 'are sufficient to support orders of summary judgment.'"); *Papa v. Chester Cty. Prison,* No. 12-03241, 2013 WL 373168, *2 (E.D. Pa. Jan. 31, 2013) (collecting cases).

4.      Swainson has consistently maintained his innocence since 1988. After being charged with Stanley Opher's murder, he turned down an unusually light plea offer for a first-degree murder case because he wanted to go to trial and profess his innocence. Ex. 7, Santiago Dep., Vol. 1, 160:22-25; Ex. 8, Wellbrock Dep., 105:11-14; Ex. 9, Rubino Dep., 51:11-18, 150:20-152:21.

5.      Swainson spent more than three decades in prison. In 2020, after a nearly two-year investigation, prosecutors in the Philadelphia District Attorney's Office (DAO) concluded that Swainson was convicted based on false evidence and police suppression of exculpatory information, and that the only evidence against Swainson was unreliable and did not provide any appropriate basis for a prosecution. Based on these findings, Swainson's conviction was vacated, and the charges were dismissed. Ex. 8, Wellbrock Dep., 23:7-24:7, 56:14-19, 58:7-17; Ex. 10, 6/16/20 PCRA Hearing Transcript; Ex. 11, Motion for Nolle Prosequi.

6.      The detective who led Swainson's prosecution was defendant Detective Manuel Santiago. Ex. 7, Santiago Dep., Vol. 1, 159:16-160:6. As demonstrated below, *infra* ¶¶ 350-357, Santiago was a central figure in multiple wrongful murder convictions in the late 1980s and early 1990s.

## II.     Early Police Investigation

7.      Within approximately 24 hours of the Opher murder, Santiago, a detective in PPD's homicide division, was assigned to investigate it, supervised by Lieutenant Arthur Durrant. Ex. 12, Santiago Assignment. He was aided in the investigation by fellow homicide detectives, defendants Francis Miller and Joseph Fischer. Ex. 13, Fischer Dep., 102:17-103:16.[2]

---

[2] Durrant, Miller, and Detective Michael Cohen, who is referenced below, are deceased. Swainson's complaint brought claims against their estates, but as indicated in Swainson's response to the defendants' summary judgment motions, he does not intend to pursue claims at

8.      Because Santiago was the assigned detective, all information that other detectives gathered during the investigation was communicated to him. Ex. 13, Fischer Dep., 51:12-53:1, 56:6-58:1.

9.      Information obtained by police shortly after the murder suggested Opher was killed in an attempted robbery of the drug house at 5413 Sansom Street. Ex. 14, 1/21/88 Activity Sheet (Furman and Montague); Ex. 15, Santiago Dep., Vol. 2, 106:4-14, 148:16-149:2.

10.      As Santiago understood, a murder committed in the course of a robbery pointed away from people close to Opher—like Swainson, who was friends with Opher and worked with him at the drug house—because a person connected with the drug house was not likely to try to rob it. Ex. 15, Santiago Dep., Vol. 2, 106:4-19, 149:17-150:18; Ex. 3, Swainson Dep., 236:24-237:5, 189:13-190:1, 101:2-7.

## III.      Paul Presley Arrested Fleeing the Crime Scene

11.      At the time of the shooting, PPD Officer John Kay was driving his patrol vehicle only a few houses east of 5413 Sansom Street when he heard a gunshot. As he continued westward, he observed a man named Paul Presley running west from the scene of the crime. Ex. 2, Kay Statement, 1–2, 5.

12.      Because Kay saw Presley repeatedly looking over his shoulder at him while he ran from 5413 Sansom Street, Kay followed Presley around the corner and discovered him crouching down under a bush in a dark front lawn on 55th Street with blood on his hand and clothes. The first thing Presley said was "I didn't shoot anybody." Presley also told Kay that his

---

trial against the estate defendants and agrees to the dismissal of those claims. This statement of facts refers to the conduct of these defendants for necessary context and, where relevant, to demonstrate unconstitutional conduct as relevant to Swainson's municipal liability claim against the City of Philadelphia.

hand had been injured by a shotgun pellet and that he knew nothing about the shooting or any robbery. Ex. 2, Kay Statement; Ex. 13, Fischer Dep., 123:13-17; Ex. 7, Santiago Dep., Vol. 1, 219:1-11; Ex. 16, Presley Criminal Complaint.

13.    Kay was trained as a patrol officer to make detailed observations, and, within a few days of the murder, he provided detectives with a specific account of what he had seen. Detectives had no reason to doubt Kay's account of the shooting and its aftermath. Ex. 13, Fischer Dep., 161:7-162:2; Ex. 17, Santiago Dep., Vol. 3, 104:15-19.

14.    Kay did not report observing Andrew Swainson at the scene of the shooting. Ex. 13, Fischer Dep., 162:2-9. For good reason: Swainson wasn't there. Ex. 5, Swainson Statement 1/22/88, 1-3.

15.    Police did observe another man, Jeffrey Green, running west on Sansom Street away from the drug house shortly after the shooting, as well as his companion, Ashley Hines, who was following behind him in a car. Police arrested them both with Presley, and all three were charged in connection with the shooting. Ex. 2, Kay Statement; Ex. 18, Investigation Report.

## IV.    Andrew Swainson's Truthful and Voluntary Exculpatory Statement Providing an Alibi

16.    In the days following the shooting, police interviewed numerous people who knew Opher, including Jacqueline Morsell, Crystal Justice, and Andrew Swainson. Ex. 19, Morsell Statement 1/18/88; Ex. 20, Justice Statement 1/19/88; Ex. 5, Swainson Statement 1/22/88.

17.    Swainson voluntarily agreed to speak to Santiago about Opher's murder on January 22, 1988. Neither Santiago nor any other officer indicated in any way to Swainson that he was considered a suspect, and there is no evidence in the PPD investigation file for the Opher

murder ("homicide file") from before that time suggesting Swainson shot Opher. Ex. 3, Swainson Dep., 305:21-306:12; Ex. 21, Harris Declaration, ¶ 3(a).

18.     Swainson provided Santiago two addresses where he could be reached in Philadelphia as well as his mother's address in New York and his most recent employer's address in New York. Ex. 5, Swainson Statement 1/22/88, 1.

19.     During the interview Swainson freely acknowledged that he had been working at the drug house. He provided Santiago as much information he could think of in an attempt help the detectives solve his friend's murder. Ex. 5, Swainson Statement 1/22/88; Swainson Dep., 205:7-9, 397:16-19.

20.     Swainson also provided Santiago with an alibi, which Santiago understood it was critically important to investigate. Ex. 7, Santiago Dep., Vol. 1, 115:25-117:6.

21.     At the time of the shooting, Swainson was at a nightclub called L&W with his girlfriend Tish. He and Tish then drove to his friend Donny's house at South 56th Street and Greenway Avenue where he met up with Donny and Donny's girlfriend, Tamika Bristow (now Cole).[3] Once Swainson arrived, he loaned Donny his coat and his car so Donny could take his girlfriend out. Swainson explained that he and Tish were in the house for the rest of the night and did not leave until Donny returned at around 6:00 am. Ex. 5, Swainson Statement 1/22/88, 2-3.

22.     At her deposition, Cole confirmed that she knows Swainson is innocent because she saw him that night. She explained that she remembered this night because she was at Donny's house past her curfew and was concerned about getting home as soon as she could, but Donny did not have a car to drive her home. Cole remembers waiting for Swainson to arrive with

---

[3] Tamika was referred to as both Tamika Bristow and Tamika Briscoe at the time of the investigation and trial. Her married name is Tamika Cole and she is referred to by that name in this filing.

his girlfriend, Tish, at which point she and Donny left in Swainson's car, leaving Swainson without a vehicle. The night was "life-changing" for Cole personally and so sticks out in her mind: because of her late arrival after curfew, Cole's mother kicked her out of the house. Ex. 6, Cole Dep., 14:14-20:8.

23.    In connection with his account of where he was at the time of Opher's murder, Swainson provided Santiago with his girlfriend Tish's phone number. Ex. 22, Investigator's Aid to Interview Form.

24.    There is no record in the homicide file indicating that detectives interviewed Tish, Donny, or Cole about Swainson's alibi before charging Swainson with murder. Cole also confirmed that no one from PPD contacted her before Swainson's arrest. Ex. 6, Cole Dep., 30:5-7; Ex. 21, Harris Declaration, ¶ 3(b).

25.    At the end of his interview with Santiago, Swainson voluntarily provided police with his fingerprints and permitted police to take his photograph. Ex. 3, Swainson Dep., 305:14-23.

26.    Nothing Swainson said to Santiago during this interview inculpated Swainson in the Opher murder. Ex. 15, Santiago Dep., Vol. 2, 201:11-20.

## V.    Santiago Drops Charges Against Presley Despite Evidence Pointing to Him as a Suspect

27.    From the beginning of the investigation, police had significant evidence pointing to Presley as the perpetrator. Presley claimed he had gone to 5413 Sansom Street to buy cocaine and, on his arrival, heard a shot and was knocked down by two men running out of the house. He did not describe seeing Opher shot and did not provide a description of the men he saw apart from the coats they were wearing, and a hat worn by one of them. Ex. 23, Presley Statement 1/17/88.

28.    Just a few days later, though, Detective Fischer interviewed Opher's friend Crystal Justice, who provided information pointing directly to Presley. She told Fischer she had gone to see Opher about an hour before he was killed and described seeing a man arrive at the drug house, who then left without purchasing any drugs. Justice said she "had a real bad feeling about that guy" and said that she would be able to recognize him again and "would never forget that face." Ex. 24, Justice Statement 1/22/88, 2-3.

29.    Justice gave Fischer a detailed description of this man, including his light-colored coat, and the fact that he was about 6'1" tall, stocky and appeared to be in his late-30s or early-40s, a description consistent with Presley's appearance. Ex. 24, Justice Statement 1/22/88, 2; Ex. 25, Presley Police Photo (describing Presley as 41 years old, 6'0" tall, and weighing 205 pounds).

30.    Lieutenant Durrant showed Justice a coat, which she identified as the same coat that the man was wearing. Ex. 24, Justice Statement 1/22/88, 3, 5. The coat Justice identified was the same coat Presley was wearing the night Opher was killed. Ex. 26, 1/22/88 Activity Sheet.

31.    At no point during this interview, or either of the two other interviews with Justice documented in the homicide file, did detectives ask her whether she could identify a photograph of Presley as the man she saw at Opher's house an hour before the murder. Ex. 24, Justice Statement 1/22/88; Ex. 27, Justice Statement 2/6/88.

32.    Despite this evidence, prosecution was withdrawn against Presley at the second preliminary hearing date on February 10, 1988. Ex. 28, Swainson Affidavit of Probable Cause, 3; Ex. 29, 1/26/88 Activity Sheet.

33.    Santiago testified that he was responsible for causing these charges to be dropped: "at the earliest opportunity I did the best I could to have the charge dropped." Ex. 30, 3/17/89 Trial Testimony, 170:10-171:23; Ex. 15, Santiago Dep., Vol. 2, 218:9-219:9.

**VI.    Santiago Focuses on Swainson Despite No Evidence of His Guilt**

34.    By early February, when Santiago dismissed the charges against Presley, he was not pursuing any suspects and considered himself out of leads. Ex. 17, Santiago Dep., Vol. 3, 57:11-24.

35.    On February 6, detectives learned second-hand about an accusation from a woman named Latonya Furman that Andrew Swainson might have been involved in the murder. Ex. 17, Santiago Dep., Vol. 3, 58:1-18; Ex. 27, Justice Statement 2/6/88.

36.    On its face, this accusation did not appear reliable; Santiago described it as "very flimsy" with "the information coming second hand from two different people." Ex. 17, Santiago Dep., Vol. 3, 62:10-63:22, 66:18-67:9.

37.    In addition, the source of the accusation, Furman, had herself been suspected of involvement in the Opher murder because she had been part of discussions about setting up the drug house at 5413 Sansom Street for a robbery—which is exactly what detectives believed led to the murder from the beginning of the investigation. Furman had mentioned these plans to Justice, who mentioned them to Swainson, both of whom reported them to the police. Ex. 27, Justice Statement 2/6/88; Ex. 5, Swainson Statement 1/22/88; Ex. X, Fischer Dep. 107:13-24; Ex. 17, Santiago Dep., Vol. 3, 68:12-21. And unlike Swainson, Furman was at the crime scene at the time of the shooting. Ex. 2, Kay Statement; Ex. 31, Furman Statement 1/20/88.

38.    Santiago had also interviewed Swainson earlier in the investigation; Swainson had cooperated, had provided an alibi, and had not incriminated himself in any way. *See supra* ¶¶ 17-26; Ex. 17, Santiago Dep., Vol. 3, 56:9-17.

39.    Nevertheless, within days of this accusation and without any additional evidence pointing to his involvement, Swainson became Santiago's suspect. Ex. 17, Santiago Dep., Vol. 3,

64:22-65:18; *id.* at 63:23-64:2, 65:19-66:9 (cannot identify any other evidence developed at this point incriminating Swainson); *id.* at 66:10–17, 67:10–13 (if there had been any other evidence incriminating Swainson, it would have been documented in the homicide file); Ex. 21, Harris Declaration, ¶ 3(c) (nothing documented in the file during this period suggesting Swainson killed Opher apart from Justice's statement repeating Furman's accusation).

**VII.    Presley Provides Santiago an Unreliable Account Unworthy of Belief**

40.    On February 12, 1988, two days after the charges against him had been dropped, Santiago brought Presley in for a second interview to try to get him to identify Swainson as one of the perpetrators. Ex. 17, Santiago Dep., Vol. 3, 64:22-65:18; Ex. 7, Santiago Dep., Vol. 1, 209:2-5, 225:2-8.

41.    It was a basic investigative principle known to PPD detectives in the 1980s to always ask eyewitnesses as soon as possible if they had a clear enough view that they thought they would be able to identify the perpetrator. Similarly, it was a basic principle to obtain as soon as possible the most complete description of the perpetrator the eyewitness could provide and to fully document the witness's account. Ex. 7, Santiago Dep., Vol. 1, 29:4-31:1, 31:21-32:8, 39:15-40:24.

42.    Presley's initial statement, taken only hours after the shooting, describes an extremely brief interaction with the shooters: "I just came up the steps and I heard a shot and I was knocked down." Presley did not describe the perpetrators, other than the coats worn by two men and the hat worn by one of them, nor did he state that he thought he would be able to identify the shooter. Ex. 23, Presley Statement 1/17/88.

43.    Santiago understood it was a fundamental part of his job to assess whether any witness account was reliable. Ex. 7, Santiago Dep., Vol. 1, 130:17-131:8. When Santiago

interviewed Presley on February 12, he was aware of many factors calling into question the reliability and credibility of any account he gave. Ex. 7, Santiago Dep., Vol. 1, 219:24-220:20, 221:6-13.

44.    Santiago understood when dealing with a witness with a long criminal record he had to be extra careful to make sure their account was reliable. Ex. 7, Santiago Dep., Vol. 1, 47:8-12, 48:4-15. Presley had an extensive criminal record in Philadelphia, and, when Santiago interviewed him on February 12, he was transported from prison because he was incarcerated on a New Jersey detainer due to a probation violation and an open drug charge. Ex. 7, Santiago Dep., Vol. 1, 210:14-18, 212:11-213:3, 218:7-14; Ex. 32, 2/12/88 Activity Sheet.

45.    If a witness had been using crack all night, that would also be a factor Santiago understood would affect the reliability of the witness's account; he would want to be more careful to corroborate anything the witness said. Ex. 7, Santiago Dep., Vol. 1, 129:17-130:4. Presley reported to Santiago he had been using crack all night before the crime. Ex. 7, Santiago Dep., Vol. 1, 213:4-17, 218:15-18; Ex. 33, Presley Statement 2/12/88.

46.    Santiago understood it was important for a detective to consider whether a witness might have a motive to provide false information. Ex. 7, Santiago Dep., Vol. 1, 49:4-17. Presley had been arrested for the Opher shooting after he was chased by police running from the crime scene and was found hiding, crouched down under a bush, wearing a coat with his own blood on it and bleeding from one of his hands. The first thing Presley said was "I didn't shoot anybody." Ex. 7, Santiago Dep., Vol. 1, 218:19-219:11. Santiago was also aware of Justice's statement providing compelling circumstantial evidence that Presley was on the scene an hour before the murder. *See supra* ¶¶ 28-30.

47.     Before interviewing a witness, Santiago would make sure to review any prior statements the witness had given to other officers. Ex. 7, Santiago Dep., Vol. 1, 41:9-15. Santiago understood that inconsistencies between witness accounts—such as significant new details added in a later interview—would raise red flags as to whether the witness account was reliable, which he would want to investigate. Ex. 7, Santiago Dep., Vol. 1, 126:12-127:13.

48.     During the February 12 interview, Santiago prepared a written statement purportedly providing a verbatim account from Presley that differed in significant ways from the original account Presley gave hours after the shooting:

   a.     Presley's first statement did not include any description of seeing Opher get shot or struggling with the shooters; it stated that he heard a shot and got knocked down. Ex. 15, Santiago Dep., Vol. 2, 226:17-227:22; Ex. 23, Presley Statement 1/17/88. However, the second statement claimed that Presley had witnessed the shooting and then had a significant interaction with the shooters, including a physical struggle with a man holding a rifle. Ex. 33, Presley Statement 2/12/88, 2-3.

   b.     In contrast to the first statement, Presley's second statement suddenly suggested he could recognize the shooter and make an identification. *Compare* Ex. 23, Presley Statement 1/17/88, 2 and Ex. 33, Presley Statement 2/12/88, 4-5.

   c.     Presley's second statement did not include anything about being shot in the finger with a shotgun pellet as he told Officer Kay on the night of the shooting. *Compare* Ex. 2, Kay Statement, 5 and Ex. 33, Presley Statement 2/12/88;

      d.      Presley's second statement claims he told Kay that people were shooting up the street, but, according to Kay, the first thing Presley said was, "I didn't shoot anybody." He also told Kay that night that he did not know anything about the shooting or robbery. Ex. 7, Santiago Dep., Vol. 1, 219:8-11; Ex. 16, Presley Criminal Complaint.

      e.      Presley told Kay that he went to 5409 Sansom Street to buy drugs, not 5413 Sansom. Ex. 2, Kay Statement, 5.

49.    The account memorialized in Presley's February 12 statement is also inconsistent in key ways with other evidence developed in the investigation:

      a.      Presley's second statement claims he had a prolonged struggle with the shooters *after* Opher was shot, and that the gunman with the shotgun then ran east toward 54th Street. But Officer Kay was only a few houses away and to the east of 5413 Sansom Street when he heard the gunshot; he did not observe any struggle on the porch or see anyone running east toward him. Santiago admits that Kay's observations memorialized shortly after the murder are inconsistent with the account depicted in Presley's February 12 statement, that he had no reason to question the reliability of Kay's observations, and that he had no explanation for the inconsistency. Ex. 17, Santiago Dep., Vol. 3, 102:13-103:9, 104:15-19; Ex. 13, Fischer Dep., 154:4-17.

      b.      Presley's second statement does not include any explanation for why he was found covered in his own blood. Ex. 33, Presley Statement 2/12/88.

     c.     Presley's statement claimed he had been doing plumbing work at his girlfriend Valerie Smith's house from 8:00 pm on Saturday, January 16, 1988 until around 2:30 am on January 17 when he left to go to 5413 Sansom Street. Ex. 33, Presley Statement 2/12/88, 1. But Smith had told Santiago that Presley had been doing work on her house on Friday, January 15, not Saturday, January 16. Ex. 34, 1/23/88 Activity Sheet.

50.     Despite the many indications that Presley was not a reliable witness and would not provide a credible account, there is no documentation in the homicide file suggesting that Santiago ever investigated these issues. For example, Santiago never followed up with Officer Kay about the discrepancies between his account and Presley's. Ex. 17, Santiago Dep., Vol. 3, 103:1-21; Ex. 21, Harris Declaration, ¶ 3(d).

**VIII.   Santiago Fabricates an Identification of Swainson**

51.     As part of what Santiago claimed to be a verbatim account of his February 12 interview with Presley, Santiago included this description of a purported unequivocal positive identification of Swainson as the shooter based on an appropriate identification procedure: "Q. I am showing you a series of photos of photos—do you recognize anyone? A. Yes, this photo is the guy that did the shooting. He had a leather Apple hat on, the big ones. (Picking out photo of Andrew Swinson)." Ex. 33, Presley Statement 2/12/88, 4; Ex. 7, Santiago Dep., Vol. 1, 43:20-44:15, 77:9-21, 272:19-273:2, 273:14-25.

52.     Santiago has claimed repeatedly since 1988, in writing and in sworn testimony, that during this interview on February 12, 1988, Presley identified Swainson as Opher's shooter by selecting Swainson's photograph from a full and fair array of seven photographs, without any suggestion whatsoever. Ex. 28, Swainson Affidavit of Probable Cause; Ex. 35, 3/8/89 Motion to

Suppress Hearing Testimony, 19:24-20:8; Ex. 30, 3/17/89 Trial Testimony; Ex. 33, Presley

Statement 2/12/88, 4; Ex. 7, Santiago Dep., Vol. 1, 193:10-15, 194:9-196:12, 251:14-19, 266:8-

11, 272:19-273:2, 307:25-308:6; Ex. 36, Santiago 2014 Emails and Affidavit, 6.

53.     Santiago understood it was critically important to follow basic rules regarding

identification procedures to make sure the witness was not identifying the wrong person and

ensure that any identification was reliable. Ex. 7, Santiago Dep., Vol. 1, 51:24-52:24, 45:3-10.

These rules required showing a single suspect along with at least five fillers—that is, people who

were not connected to the crime but were similar in appearance to the suspect's photo. Ex. 7,

Santiago Dep., Vol. 1, 59:5-61:25.

54.     The reason for showing fillers was to ensure a baseline reliability for any

selection. If a stranger participated in an identification procedure without fillers—that is, either a

single photo of the suspect or multiple photos of the suspect without any fillers—then any

identification would be unreliable, exactly the kind of thing that could lead to a wrongful

conviction. Santiago understood conducting an identification procedure that violated procedures

in this way would be "highly suggestive," "gross misconduct," and present "a massive risk of a

witness simply going along with the detective's suspect." Ex. 7, Santiago Dep., Vol. 1, 61:19-

64:18.

55.     Santiago built a case against his suspect, Andrew Swainson, based solely on

Presley's word. Presley's purported identification of Swainson was the whole case. Ex. 7,

Santiago Dep., Vol. 1, 241:5-8; Ex. 15, Santiago Dep., Vol. 2, 242:17-22.

56.     Santiago claimed he was comfortable basing a prosecution on Presley's word

because Presley made an unequivocal, confident identification of Swainson from a full, fair, and

unsuggestive photo array. Ex. 7, Santiago Dep., Vol. 1, 251:14-19, 241:5-8.

57.     Presley did not see Swainson present the night Opher was shot and did not see Swainson shoot Opher because Swainson was not there Ex. 3, Swainson Dep., 247:22-24, 344:22-345:19, 362:15-17, 374:23-375:1; *see also* Ex. 37, 4/14/88 Preliminary Hearing Transcript, 16; Ex. 38, Presley Statement 6/10/88, Ex. 39, Kolins Affidavit 12/7/08, ¶ 17; Ex. 40, Presley Taped Statement 10/13/08, 3; Ex. 41, Presley Handwritten Statement 10/13/08, 1. Presley also did not know Swainson. Ex. 3, Swainson Dep., 351:21-352:16.

58.     Santiago acknowledged that if Swainson is innocent (which he is, *see supra* ¶ 2), Presley could not have selected Swainson's photograph from a full and fair array of photographs without any suggestion. Ex. 7, Santiago Dep., Vol. 1, 318:1-10.

59.     Santiago understood it was critically important to preserve in the homicide file a copy of the photo array shown to the witness, including which photos the witness had seen; he knew to do that in every case. Ex. 7, Santiago Dep., Vol. 1, 80:6-82:9, 87:15-88:1.

60.     There is no copy of the photo spread Santiago claimed he showed Presley preserved in the homicide file; Santiago could not explain that absence. Ex. 7, Santiago Dep., Vol. 1, 314:6-9; Ex. 21, Harris Declaration, ¶ 3(e).

61.     When Presley was asked to identify the shooter at a preliminary hearing two months after his February 12 interview with Santiago, Presley said he did not see him in the courtroom. Ex. 37, 4/14/88 Preliminary Hearing Transcript, 16; Ex. 7, Santiago Dep., Vol. 1, 246:3-15. He reaffirmed the same two months later in a signed statement. Ex. 15, Santiago Dep., Vol. 2, 9:21-11:10, 12:12-13:4, 16:7-17; Ex. 38, Presley Statement 6/10/88, 2.

62.     Presley later stated that he had never been shown a full and fair array of seven photos, but instead had been shown several photos of Andrew Swainson. Ex. 40, Presley Taped Statement 10/13/08, 7-8; Ex. 39, Kolins Affidavit 12/7/08, ¶ 18.

15

63.    Santiago did not know why there were multiple copies of photographs of Swainson in the homicide file, denied that he had put them there, and claimed that someone else must have added them at a later date. Ex. 7, Santiago Dep., Vol. 1, 300:10-301:15.

64.    Santiago denied that he had shown Presley multiple photos of Swainson, as Presley alleged, but admitted if he had done so—or if he had shown only a single photo of Swainson—and then falsely represented that Presley had made an identification from an unsuggestive photo array that would be "absolutely improper," a "lie," and a violation of Andrew Swainson's constitutional rights. Ex. 7, Santiago Dep., Vol. 1, 195:11-196:12, 197:4-17, 300:10-12; *see also id.* at 305:6-12 (Presley said he made his photo selection from multiple photos of Swainson, and there are multiple photos of Swainson in the homicide file).

65.    In addition to the typed, purportedly verbatim account of his Q and A with Presley, Santiago's report of his February 12 interview of Presley includes a handwritten page asserting that Presley made the statement voluntarily, specifying "no one has thretened or tried to cohersed me into saying anything." Santiago claimed he had nothing to do with Presley writing that out, that he left Presley in the room alone and when he came back Presley had written this statement. Ex. 33, Presley Statement 2/12/88; Ex. 15, Santiago Dep., Vol. 2, 233:25-235:5; Ex. 35, 3/8/89 Motion to Suppress Hearing Testimony, 42:22-43:8.

66.    This handwritten page includes several spelling errors. Santiago acknowledged that the misspellings are consistent with someone being dictated a statement by police and writing it out phonetically. Ex. 15, Santiago Dep., Vol. 2, 240:15-241:2; Ex. 33, Presley Statement 2/12/88.

## IX.    Presley Recants the Purported Identification of Swainson

### A.    Swainson's Preliminary Hearing

67.    At Swainson's April 14, 1988 preliminary hearing, when asked to identify Swainson in court, Presley testified that Swainson was not the shooter he had seen. Ex. 37, 4/14/88 Preliminary Hearing Transcript, 16; Ex. 7, Santiago Dep., Vol. 1, 246:12-247:5; Ex. 15, Santiago Dep., Vol. 2, 11:19-25.

68.    The court held the case over for trial based on the statement Santiago prepared, but in so doing, the Judge who heard the testimony expressed clear reservations about letting the case go forward, even at the preliminary hearing stage. Ex. 7, Santiago Dep., Vol. 1, 249:1-250:10, 251:5-12.

### B.    Presley Affirms that Swainson is Not the Shooter

69.    After the preliminary hearing, Presley spoke to Swainson in Philadelphia county jail, where they were both incarcerated, and said the police were trying to make him testify falsely against Swainson, but that he did not want to do that and that he wanted to speak to Swainson's attorney. Ex. 3, Swainson Dep. 354:4-20.

70.    As a result of this conversation, Swainson's attorney retained Terrence Gibbs, a retired Philadelphia police lieutenant working as a private investigator, to speak with Presley. Ex. 3, Swainson Dep., 354:18-20; Ex. 42, Gibbs Dep., 19:6-8, 75:8-12. Gibbs was an experienced investigator who subsequently rejoined the force at the personal urging of Mayor Rendell. Ex. 42, Gibbs Dep., 25-28.

71.    After Presley was released from jail, on June 10, 1988, Gibbs went to Presley's address. Presley told him that he did not want to be interviewed at home. He asked Gibbs to

drive him out of the neighborhood, and Gibbs did so, taking Presley to the Mann Music Center

parking lot. Ex. 42, Gibbs Dep., 51:1-9.

72.     Presley provided a statement to Gibbs of his own free will and affirmed that

Swainson did not shoot Opher. Ex. 42, Gibbs Dep., 54:19-55:21; Ex. 38, Presley Statement

6/10/88.

73.     Presley told Gibbs specifically that Swainson was not involved in the shooting.

Ex. 38, Presley Statement 6/10/88, 2.

74.     Presley reviewed and signed the statement. Ex. 38, Presley Statement 6/10/88, 2;

Ex. 42, Gibbs Dep., 51:14-15.

75.     Gibbs did not offer Presley any compensation for his statement or threaten him in

any way. Ex. 42, Gibbs Dep., 56:11-57:6.

**X.    Presley is Returned to Jail and Santiago Fabricates Two Additional Inculpatory
        Statements**

      **A.    Presley is Arrested on Felony Drug Charges under an Alias**

76.     In July 1988, just over a month after he gave a statement to Gibbs, Presley was

arrested on felony drug distribution and misdemeanor possession charges under the alias

"Kareem Miller," resulting in the criminal case *Commonwealth v. Kareem Miller,* CP-51-CR-

1024751-1988. Ex. 43, *Commonwealth v. Swainson*, CP-51-CR-431311-1988 Joint Stipulations

of Fact, ¶¶ 87, 89; Ex. 8, Wellbrock Dep., 84:14-18.

77.     Presley, under the name Kareem Miller, was reincarcerated in a Philadelphia

county jail on July 19, 1988 due to these charges. Ex. 44, *Commonwealth v. Swainson*, CP-51-

CR-431311-1988, Commonwealth Answer to PCRA, ¶ 83.

78.     Presley's criminal charges under the name Kareem Miller remained pending for

more than a year, until July 10, 1989, and he remained incarcerated under that name throughout

that time. Ex. 43, *Commonwealth v. Swainson*, CP-51-CR-431311-1988 Joint Stipulations of Fact, 92-93; Ex. 9, Rubino Dep., 115:3-8.

**B.      Santiago Fabricates a Statement by Presley on February 15, 1989**

79.      Presley's statement to Gibbs that Swainson was not the shooter was significant, and it was important for Santiago to investigate it immediately. Ex. 15, Santiago Dep., Vol. 2, 14:1-23, 15:19-17:9.

80.      Santiago met with Presley on February 15, 1989. Ex. 15, Santiago Dep., Vol. 2, 25:9-27:19. The prosecutor working on the case was not present during this meeting. Ex. 15, Santiago Dep., Vol. 2, 17:13-17; 24:4-24:1, 94:2-22.

81.      Santiago was aware that Presley was incarcerated at the time of this interview, as he had to apply for a bring-down order to have Presley transported from jail. Ex. 15, Santiago Dep., Vol. 2, 27:1-10.

82.      Because of the concern that Presley would not testify consistently with what Santiago reported he said, a prosecutor working on the case asked Santiago to tape record his interview with Presley, and Santiago did so. Ex. 15, Santiago Dep., Vol. 2, 29:19-30:18, 104:10-105:10.

83.      Santiago understood that it would not be permissible for a detective to stop the tape in the middle of the audio recording of a witness statement to have an off-the-record discussion with the witness and then start the tape again, because the recording was represented as a complete and verbatim account of his interactions with Presley. Ex. 15, Santiago Dep., Vol. 2, 32:3-23.

84.      There are audible "clicks" at multiple points on the resulting recording of the February 15, 1989, statement. Ex. 15, Santiago Dep., Vol. 2, 98:7-14.

85.     Based on a technical review of the recording, plaintiff's audio and video authentication, examination, and forensic analysis expert, Bruce Koenig, concluded that the clicks correspond to instances when the tape recorder was stopped. Ex. 45, Koenig Expert Report, 3.

86.     Santiago stopped the tape recording of Presley's February 15, 1989 interview eight times. It is not possible to forensically determine how long the recording was stopped each time.  Ex. 45, Koenig Expert Report, 3.

87.     The stops in the tape correspond to critical parts of the interview, where Santiago records Presley giving statements inculpating Swainson which contradict both his testimony at the preliminary hearing and the statement he had given to Gibbs:

a.      After Santiago asked Presley to "review a statement that you gave me back on February 12, 1988, concerning the shooting death of Stanley Opher" and before he asked: "Is that statement the truth?"

b.      Just before Santiago asked Presley "In the statement you identified a photo of the male that did the shooting, is that correct?"

c.      After Santiago stated "On April 14, 1988 you testified at a preliminary hearing at City Hall. At that time you were not sure that the male who was accused was the one that did the shooting" and before Presley replied "I was sure it was him."

d.      Immediately following that answer, and just before Santiago asked Presley "Why did you testify that you were unsure?"

e.      Immediately following that question, and before Presley answered with his first mention of any alleged intimidation in prison.

  f.  After Presley described seeing someone in court "gritting on him" and before Santiago asked "Are those the reasons for your testimony in court that day?"

  g.  After Presley says he saw the shooter in the courtroom and before Santiago asks "The male that we are talking about is the defendant, not the male that was gritting on you, is that correct?"

  h.  Just before Santiago asks "Paul, ah, has anyone, myself or anyone from the District Attorney's Office made any promises or threats to you for your testimony or for the statements you given?"

Ex. 45, Koenig Expert Report, 3-4; Ex. 46, Presley Statement 2/15/89.

  88.  Santiago acknowledged these were "critically important moments" in the interview. Santiago denied that he stopped and started the tape where the clicks appeared, but he could not provide any other explanation for the presence of the clicks. Ex. 15, Santiago Dep., Vol. 2, 87:15-88:13, 98:18-99:25, 101:11-14, 102:15-103:7.

  89.  In connection with Presley's references to intimidation, Presley told Santiago that two to three days before the preliminary hearing he had been badly beaten in jail, had been sent to the hospital with a broken cheek bone and had received stitches on his head, and that the person who had attacked him in jail was present in court the day of the preliminary hearing and was "gritting on" him. Presley's statement claimed this was the reason he had testified at the preliminary hearing that Swainson was not the shooter. Ex. 46, Presley Statement 2/15/89, 4-5.

  90.  There is no documentation in the preliminary hearing record about any assault on Presley. Ex. 15, Santiago Dep., Vol. 2, 254:10-255:24, 256:24-257:6, 258:6-259:6.

21

91.    Santiago admits that, if Presley had actually reported the assault to him at the time of the preliminary hearing, as Santiago claimed at trial that he did, "it does seem weird" that neither Presley nor Santiago referred to that during the February 15, 1989 interview describing the beating. Ex. 15, Santiago Dep., Vol. 2, 241:18-242:3, 249:4-251:20, 256:24-259:6.

92.    Neither the detectives nor the prosecutors involved in the case obtained information showing that the alleged prison assault had anything to do with Swainson. Ex. 9, Rubino Dep., 102:15-19.

93.    With respect to Presley's claim that there was a man "gritting" on him at the preliminary hearing, Santiago had no information that connected any such person to Swainson. Ex. 15, Santiago Dep., Vol. 2, 88:14-90:2.

94.    The February 15, 1989 statement Santiago took from Presley also falsely claims that the investigator Gibbs told Presley that Swainson would compensate him. Ex. 46, Presley Statement 2/15/89, 3; Ex. 42, Gibbs Dep., 56:11-57:6.

**C.    Santiago Fabricates Another Statement by Presley on February 17, 1989**

95.    Two days later, Santiago brought Presley back for another interview to address the written statement Presley gave to Gibbs on June 10, 1988. Ex. 15, Santiago Dep., Vol. 2, 65:3-10, 66:10-16. Once again, the prosecutor working on the case was not present for the interview. Ex. 15, Santiago Dep., Vol. 2, 24:4-24:1.

96.    By the date of that interview, Santiago was aware that Presley was being held in a Philadelphia county jail under the alias Kareem Miller as evidenced by a Philadelphia Court of Common Pleas bring-down order stating, "I hereby order that the Sheriff release Paul Presley aka Kareem Miller...to Det. Santiago 823, Homicide Division for Interview." Ex. 47, Presley Bring Down Order; Ex. 9, Rubino Dep., 119:4-12.

97.     Santiago audio-recorded the February 17, 1989 statement. Ex. 15, Santiago Dep., Vol. 2, 40:25-41:9.

98.     The February 17, 1989 recording also included "click" sounds. Santiago again denied that the clicks corresponded to points when he turned off the tape recorder to coach Presley, but he could not offer any other explanation. Ex. 15, Santiago Dep., Vol. 2, 43:1-44:6, 44:24-45:22, 47:14-21, 50:7-12, 51:2-25, 52:9-53:21, 56:2-57:16.

99.     According to Swainson's expert, Koenig, these clicks again correspond to instances when the tape recorder was stopped. Ex. 45, Koenig Expert Report, 3.

100.     The February 17, 1989 recording was stopped four times during the interview. Ex. 45, Koenig Expert Report, 3.

101.     The first stop occurred just before Santiago asked Presley, "So when you told the investigator that you did not believe that it was him meaning Mr. Swinson, was that true?" Ex. 45, Koenig Expert Report, 3.

102.     Santiago recognized that the most important part of the interview was when Presley was asked whether his statement to Gibbs was true. Ex. 15, Santiago Dep., Vol. 2, 34:16-36:21.

103.     The second stop occurred just before Presley stated, "Yes, I did feel forced and threatened. Even the children at the house and my old lady both…all three of them felt threatened." Ex. 45, Koenig Expert Report, 3.

104.     Santiago agreed that the portion of the interview in which Presley states that he and his family felt threatened by Gibbs was also an extremely important answer. Ex. 15, Santiago Dep., Vol. 2, 36:22-38:20.

105.     While Presley initially said that he "didn't feel physically threatened" at the beginning of the interview, after Santiago stopped the recording multiple times, his account changed, and as Santiago acknowledged, Presley "directly contradicts" himself in ultimately describing feeling threatened. Ex. 15, Santiago Dep., Vol. 2, 33:4-34:1, 36:22-37:13; Ex. 48, Presley Statement 2/17/89.

106.     In the February 17, 1989 statement, Presley claimed that his statement to Gibbs on June 10, 1988 was a lie and that he made the statement because Gibbs promised him compensation; Gibbs sat on Presley's front porch for hours, frightening Presley's girlfriend; and Gibbs drove him to the park, causing Presley to feel threatened. Ex. 48, Presley Statement 2/17/89, 3, 5-7.

107.     Presley's February 17, 1989 statement is untrue; Gibbs did not offer him compensation, did not threaten him, did not stake out Presley's house, and only drove Presley to the park because Presley requested it. Ex. 42, Gibbs Dep., 53:1-11, 56:11-57:9, 57:16-58:15.

108.     Gibbs testified that, based on his knowledge of the PPD from his many years of service, if anyone from the department believed he attempted to bribe or compensate Presley for an exculpatory statement, he would have been investigated and prosecuted, which did not occur. Ex. 42, Gibbs Dep., 68:11-22, 70:15-72:5.

## XI.     Santiago Fabricates a Photograph Array to Defend Against a Motion to Suppress

109.     The Assistant District Attorney assigned to prosecute the case, Judith Rubino, was not present for any interview in which Presley was shown an array of photographs. She relied on Santiago's representations about what occurred during any photo identification procedures. Ex. 9, Rubino Dep., 42:2-11, 59:9-60:9, 131:16-18.

110.    After Swainson was charged with the Opher murder, when preparing for a March 8, 1989 hearing on his motion to suppress, Rubino did not have any copy of the photo array in her file. Rubino asked Santiago for the seven photographs he claimed to have shown Presley. Ex. 9, Rubino Dep., 129:19-130:16.

111.    The photographs Santiago provided to Rubino were labeled C-1 at the suppression hearing and were relabeled D-1 to D-7 at Swainson's trial. Ex. 9, Rubino Dep., 129:3-23; *See* Ex. 49, Photograph Array Labeled D-1—D-7.

112.    These photographs consist of one photo of Swainson and six "filler" photographs of other people. Each photograph consists of a front and side view of the subject, in the style of typical arrest photos, with the box in the lower left corner (where identifying information would appear) cut out. Ex. 49, Photograph Array Labeled D-1—D-7. *See*, *e.g.*, Ex. 49 at 11 (filler photo D-6):



113.    Rubino commented that the way Santiago presented the photos, seven separate photographs on distinct sheets of paper rather than displayed side-by-side, to her "is not the way it would have looked" and "is not what a photo spread looks like" and that she had "never seen it look like this" in any other case. Ex. 9, Rubino Dep., 134:12-135:8.

114.    Santiago claims that he made the array labeled D-1—D-7 on February 12, 1988, when he first interviewed Presley and that the photographs and corresponding boxes with

identifying information about the person depicted in each photograph were maintained in

Santiago's possession until he provided it to Rubino. Ex. 7, Santiago Dep., Vol. 1, 277:10-14.

115.    On the back side of each photograph is the unique Philadelphia police photograph

number (known as a PP number) associated with the subject of the photograph, except for D-5,

which depicts Swainson, because Swainson had never been arrested in Philadelphia and did not

have a police photograph number. Ex. 49, Photograph Array Labeled D-1—D-7; Ex. 9, Rubino

Dep., 131:22-132:4. *See*, *e.g.*, Ex. 49 at 12 (filler photo D-6 backside):



116.    Santiago maintained that the photographs labeled D-1 through D-7 were the same

photographs he showed to Presley on February 12, 1988. Ex. 7, Santiago Dep., Vol. 1, 253:10-

254:4, 262:7-15; *see also* Ex. 36, Santiago 2014 Emails and Affidavit.

117.    Santiago told Rubino that before he showed the photos to Presley, he cut out the

boxes with the identifying information pertaining to the subjects of the photographs. Ex. 9,

Rubino Dep., 131:5-22. *See* Ex. 49, Photograph Array Labeled D-1—D-7. Those cut out boxes

were preserved in an envelope labeled "Photos" in Santiago's handwriting. Rubino has no

memory of looking at those boxes; she was relying on Santiago's word about what photos he

showed and the manner in which he showed them, and her only concern was that the filler photos

were similar enough in appearance to Swainson to constitute a fair array. Ex. 7, Santiago Dep.,

Vol. 1, 275:6-15, 290:8-292:6; Ex. 9, Rubino Dep., 132:14-134:11.

118.    The envelope labeled "Photos" in Santiago's handwriting contained identification boxes cut from police photographs with biographical information and the date on which the corresponding photograph was taken; the police photo numbers on the photographs in the envelope match the numbers written on the back side of the photographs labeled D-1 through D-7. Ex. 7, Santiago Dep., Vol. 1, 292:19-25.

119.    The photograph labeled D-6 included in the array Santiago claims to have shown Presley has the PP Number 645554 written on the back. Ex. 49, Photograph Array Labeled D-1—D-7, 12. *See supra* ¶ 115.

120.    The identification box corresponding to PP Number 645554 in D-6 shows the name Evans Daniels and is dated 2/27/88, 15 days *after* Santiago purportedly showed Presley a photograph array from which Presley purportedly identified Swainson. Ex. 50, Police Photograph Identification Boxes. *See* Ex. 50, excerpt of top-left identification box (highlight added):



121.    The photograph labeled D-6 that was included in the array that Santiago claimed

he showed to Presley matches the photograph of Daniels taken on 2/27/88. *Compare* Ex. 49,

Photograph Array Labeled D-1—D-7, D-6 *with* Ex. 51, Daniels Photograph 2/27/88:[4]

 

122.    Santiago had no explanation as to why the filler photograph of Evans Daniels

marked D-6 was taken after the date on which he purportedly showed Presley an array, other

than to speculate, without supporting evidence, that someone could have tampered with the file.

Ex. 7, Santiago Dep., Vol. 1, 294:13-295:2.

123.    At his deposition, Santiago was asked if the reason there was no documentation in

his homicide file of the photos he showed Presley, and that the array he later presented included a

photo that did not exist when he interviewed Presley, was that he did not actually show a fair,

---

[4] Defendants stress that there exists another police photograph of Evans Daniels taken on
February 8, 1988. This is not the photograph marked as D-6. *Compare* Ex. 49, Photograph Array
Labeled D-1—D-7, D-6 *with* Ex. 52, Daniels Photograph 2/8/88:

 

unsuggestive array, and that he had created a fake array a year later when Rubino asked for a copy in preparation for the suppression hearing. Santiago denied that that was what had happened, but he could provide no alternate explanation. Ex. 7, Santiago Dep., Vol. 1, 315:1-316:3.

124.    Santiago's representations that Presley made an immediate, unequivocal, positive identification of Swainson's photograph was the entire basis for probable cause to arrest Swainson and for prosecuting Swainson for Opher's murder. Ex. 15, Santiago Dep., Vol. 2, 73:19-74:1, 242:17-22; Ex. 7, Santiago Dep., Vol. 1, 241:5-8; Ex. 9, Rubino Dep., 58:15-59:20, 63:16-24.

125.    If Rubino had learned that Santiago actually used suggestion to obtain the identification from Presley or misrepresented anything about the context of the photographic identification, the prosecution would not have gone forward. Ex. 9, Rubino Dep., 59:21-60:9.

## XII.    Defendants Ignore and Hide Evidence Contradicting their Case Theory

126.    Throughout their investigation, detectives developed numerous pieces of exculpatory evidence, impeaching the credibility of Presley and inculpating alternative suspects, and withheld them from prosecutors and Swainson. Ex. 43, *Commonwealth v. Swainson*, CP-51-CR-431311-1988 Joint Stipulations of Fact; *see infra* § XVII.

127.    While investigating, detectives recorded investigatory information on "activity sheets." When obtaining information from witnesses, detectives had discretion whether to record information on an activity sheet or to include the information in a question-and-answer-style written statement. Ex. 7, Santiago Dep., Vol. 1, 99:7-12; Ex. 53, Alexander Dep., 54:20-55:12.

128.    All investigatory actions taken while investigating the Opher murder were documented in the Opher homicide file. Ex. 7, Santiago Dep., Vol. 1, 14:11-13; Ex. 17, Santiago Dep., Vol. 3, 72:20-22.

129.    The complete Opher homicide file was provided to Swainson's counsel by the City of Philadelphia in this litigation and BATES stamped D000001-D001343. Ex. 7, Santiago Dep., Vol. 1, 202:18-20, 318:17-21; Ex. 17, Santiago Dep., Vol. 3, 54:4-7; Harris Declaration ¶ 2.

130.    The activity sheets that detectives created during the Opher murder investigation were kept in the homicide file, but they were not provided to the District Attorney's Office ("DAO") or to Swainson. Ex. 7, Santiago Dep., Vol. 1, 104:16-105:11, 106:4-20; Ex. 9, Rubino Dep., 56:17-22, 141:5-11, 168:24-169:2.

### A.    Drug House Robbery Theory

131.    Detectives initially theorized that Opher was killed in a drug house robbery. Santiago understood that this theory was inconsistent with Swainson's involvement. *Supra* ¶¶ 9-10; Ex. 15, Santiago Dep., Vol. 2, 106:4-19, 148:16-149:2.

132.    At trial, there were two competing theories: the prosecution argued that Opher was killed by people affiliated with the drug house because he wanted to quit, and the defense argued that Opher was killed during a robbery gone bad. Ex. 9, Rubino Dep., 51:11-52:12.

133.    The prosecution's theory was wrong and relied on misrepresentations of the nature of the group of people who operated the drug house, which in reality was disorganized and casual. People, including Swainson and Opher, often came to and left the group without issue. Ex. 3, Swainson Dep., 101:2-13, 165:2-21, 204:5-12. 420:18-20.

134.     Rubino testified that if she had learned of any additional information supporting the theory that the crime was a robbery gone bad she would have turned it over to the defense and expected the defense lawyer to use it aggressively. Ex. 9, Rubino Dep., 52:13-53:11.

135.     In fact, detectives had such information in their possession based on an interview Detective Miller conducted with Vernon Montague, a friend of Opher's, in the days following the murder. Ex. 54, Montague Statement. Miller recorded on an activity sheet, but not in the interview record, that Montague said that the word on the street was that Opher was killed in an attempted robbery of the drug house at 5413 Sansom Street. Ex. 14, 1/21/88 Activity Sheet (Furman and Montague).

136.     Additional evidence for the drug house robbery theory emerged as police developed inculpatory information pointing to numerous alternative suspects who knew drugs were sold from 5413 Sansom Street and were motivated to steal drugs and money from the house. *See infra* § XI.B.

**B.     Alternative Suspects**

137.     Police obtained and developed evidence regarding multiple suspects throughout the course of the investigation. Ex. 18, Investigation Report; Ex. 13, Fischer Dep., 75:19-76:13, 108:1-10; Ex. 15, Santiago Dep., Vol. 2, 178:25-179:12, 198:1-8; Ex. 17, Santiago Dep., Vol. 3, 72:7-12.

138.     Detectives were aware that in the event of a later prosecution, any investigative focus on different perpetrators had to be documented in the homicide file and passed along to prosecutors. Ex. 7, Santiago Dep., Vol. 1, 117:19-118:3; Ex. 15, Santiago Dep., Vol. 2, 129:18-130:4.

139.    Santiago was particularly aware that any evidence pointing to another potential suspect was critically important to fully investigate and document, and that he had an absolute obligation to do that. Ex. 15, Santiago Dep., Vol. 2, 108-3:13.

> **i.    The Men Arrested at the Scene: Paul Presley, Jeffrey Green, and Ashley Hines**

140.    Based on officers' on-scene observations and Crystal Justice's January 22, 1988 interview with Detective Fischer, detectives had significant evidence pointing to Paul Presley as the perpetrator. *Supra* ¶¶ 11-12, 28-30.

141.    Santiago also had evidence pointing to Ashley Hines, one of the men arrested with Presley at the scene of the shooting, based on a January 21, 1988 interview Santiago conducted with Hines, with Hines's lawyer present. Hines stated that he was on Sansom Street that night to drop off Jeffrey Green, who lived at 5431 Sansom Street. Santiago did not ask Hines about the fact that a responding officer, Police Officer Elga Peay, specifically observed Hines running from 5413 Sansom—the house where the murder took place—shortly after the shooting. Ex. 55, Peay Statement 1/18/88; Ex. 56, Peay Statement 1/21/88. Ex. 57, Hines Statement.

142.    Hines told Santiago that he had been driving and pulled over voluntarily when he saw his friend Green, the other man arrested with Presley at the scene, had been stopped by police. Santiago did not ask Hines about Peay's contradictory account that police ordered Hines to stop his car. Ex. 56, Peay Statement 1/21/88; Ex. 57, Hines Statement.

143.    An activity sheet dated the same day of Hines's police interview reports that Hines was given a polygraph examination, with the results "Deception Indicated." Ex. 58, 1/21/88 Activity Sheet (Hines).

144.    The written record of Hines's interview does not mention that Hines was even administered a polygraph examination, much less that he failed it. Ex. 57, Hines Statement.

145.    Green was interviewed by Detective Miller and claimed he had nothing to do with the shooting, and that, despite living down the street for years, did not know drugs were sold from 5413 Sansom Street. Ex. 59, Green Statement, 3-4. In contrast, another witness had identified Green as someone who previously sold drugs from 5413 Sansom Street. Ex. 19, Morsell Statement 1/18/88.

### ii.    Latanya Furman, Darren Brown, and Brian Brown

146.    On January 19, 1988, Crystal Justice reported to detectives during an interview that she heard about Opher's murder shortly after it occurred from her friend Latanya Furman, who told Justice she had been present at the scene of the shooting. Ex. 20, Justice Statement 1/19/88.

147.    On an activity sheet describing this interview, detectives documented additional information not recorded in the written interview, including that on the night of the murder, Furman provided to a detective a fake name and that Furman had directed Justice not to get involved in the investigation. Ex. 60, 1/19/88 Activity Sheet,

148.    Furman providing police with a fake name on the night of the murder gave detectives cause for concern. Ex. 13, Fischer Dep., 107:13-24.

149.    At this point in the investigation, Furman was somebody police were looking at in connection with the crime. Ex. 13, Fischer Dep., 108:1-10.

150.    Fischer interviewed Furman on January 20, 1988 and she confirmed that she had been present at the scene of the shooting, claiming that she was alone in a car with a "hack" (an unlicensed taxi driver) on the way to a nightclub. Ex. 61, Furman Statemen 1/20/88.

151.    An activity sheet dated January 21, 1988 documents that the day after she was interviewed, Fischer and Miller sought to bring Furman in for a polygraph examination. They

33

went to her home twice that morning and could not locate her. Ex. 14, 1/21/88 Activity Sheet (Furman and Montague). Later that day, Miller interviewed Furman again, at which point she again stated that she was being driven by a "hack" the night of the murder. Miller asked Furman if she would take a polygraph test and she said yes, Ex. 62, Furman Statement 1/21/88, but there is no record in the homicide file of Furman undergoing a polygraph examination. Ex. 21, Harris Declaration, ¶ 3(f).

152.    Santiago soon learned that a few weeks before the murder, Furman had been part of discussions with a man named Darren Brown about setting up the drug house where Opher worked for a robbery. Ex. 5, Swainson Statement 1/22/88; Ex. 27, Justice Statement 2/6/88.

153.    Police also learned that Brian Brown, Darren Brown's brother, had reported that he had gone with Furman to 5413 Sansom Street at the time of the murder to buy drugs and had seen Opher's body and Furman told Justice she had been in a car with her brother on the night of the shooting. Ex. 27, Justice Statement 2/6/88, 1-2.

154.    An activity sheet documents that detectives performed criminal record checks on individuals connected to Furman, including Leroy Furman (Latanya Furman's brother), Brian Brown, and Darren Brown. The activity sheet notes that Durrant found that Brian Brown was on parole in New Jersey and that he then called the New Jersey State Police for further information on Brian Brown "to see if there is a connection between Brown and Paul Presley who is also on parole from New Jersey State Prison." Ex. 63, 2/6/88 Activity Sheet.

155.    The activity sheet also documents detectives' efforts to locate Latanya Furman again at multiple locations. Ex. 63, 2/6/88 Activity Sheet.

156.    Santiago and Fischer recognized that Furman's third statement, on February 7, 1988, in which she finally acknowledged that in fact she was at the crime scene with her brother

and Brian Brown at the time of the murder contradicted her earlier statements and that it was important for detectives to further investigate Furman and Darren Brown as potential suspects before ruling them out. Ex. 17, Santiago Dep., Vol. 3, 70:11-15, 72:7-12; Ex. 13, Fischer Dep., 75:19-76:13.

157.    Despite recognizing that additional investigation was required before the Furmans and the Browns could be eliminated as suspects, detectives conducted no such investigation; Santiago had no explanation for its absence. Ex. 17, Santiago Dep., Vol. 3, 72:7-73:15.; Ex. 13, Fischer Dep., 75:19-76:13.

### iii.    Allen Proctor

158.    A January 23, 1988 activity sheet for the Opher murder investigation details how that day Santiago, Miller, and Durrant arrested a man named Allen Proctor for murder and firearms charges. Ex. 34, 1/23/88 Activity Sheet. The top of this activity sheet lists Opher's name, the unique case number for the Opher murder investigation, and Santiago's name as the assigned detective, as well as the names of his supervisors. This activity sheet also includes documentation of investigative activities specific to the Opher murder. Ex. 15, Santiago Dep., Vol. 2, 168:10-169:22, 182:19-183, 185:11-186:7.

159.    Detectives were required to put information about only one case on each activity sheet, and the presence of information about Proctor on an activity sheet regarding the Opher murder indicates that Santiago considered Proctor in connection with the Opher murder. Ex. 15, Santiago Dep., Vol. 2, 178:25-179:12, 198:1-8; Ex. 7, Santiago Dep., Vol. 1, 99:23-100:21, 103:7-14; Ex. 8, Wellbrock Dep., 30:23-31:7.

160.    Police documentation shows that Proctor had a history of violence with a substantial record for shooting and robbing drug dealers at gunpoint in the late 1980s. Ex. 15, Santiago Dep., Vol. 2, 153:8-155:5, 158:16-159:14, 181:4:7.

161.    Proctor had been arrested for other murders with similar circumstances to the Opher murder, including another 3:00 am gunpoint robbery of a drug dealer and a drug house, and another murder inside a drug house. Proctor was also described as a "holdup guy" who "always had a gun on his person" and was reported to be sticking up drug dealers repeatedly. Ex. 8, Wellbrock Dep., 28:11-30:15, 31:8-25.

162.    The DAO's investigation in 2020 concluded that Proctor was an alternate suspect PPD had considered for the Opher homicide. Ex. 8, Wellbrock Dep., 27:11-28:10, 30:23-31:7.

163.    Santiago admitted that Allen Proctor had "a long criminal history for robbing drug dealers at gunpoint" and that he was investigating "whether Stanley Opher had been murdered in the course of a gun point robbery gone bad." He admitted "one objective interpretation" of the activity sheet was that Proctor was considered a suspect in the Opher case, and that if Proctor had been a suspect, he should have been fully investigated with the investigation documented and disclosed to the district attorney. In his deposition, Santiago initially denied any memory of Allen Proctor, but, when confronted with this evidence, he suddenly claimed he "didn't investigate Allen Proctor" and Proctor had nothing to do with the Opher homicide. Ex. 15, Santiago Dep., Vol. 2, 136:20-137:11, 152:20-153:1, 176:2-12, 181:4-14, 182:2-13, 198:1-8.

### iv.    "George"

164.    On January 26, 1988, Fischer attended the first preliminary hearing court date for Presley, Green, and Hines. The hearing did not go forward and was continued until February 10, 1988. Ex. 29, 1/26/88 Activity Sheet.

165.    An activity sheet from that date documents that Fischer spoke with Green's attorney about information indicating that a "George" was involved in the shooting. The attorney relayed to Fischer that his law partner said that the name George came from "word on the street." Ex. 29, 1/26/88 Activity Sheet.

166.    According to the same activity sheet, Fischer then called the law partner who explained that some people came to his office to tell him that a Jamaican man named George was involved in the shooting. Ex. 29, 1/26/88 Activity Sheet.

167.    When Santiago interviewed Swainson on January 22, 1988, Swainson had told him that he had bought his car from a man named George whom he had met at a drug house. Ex. 5, Swainson Statement 1/22/88, 5.

168.    There is no documentation in the homicide file of detectives asking any witnesses about a man named George or otherwise investigating this information. Ex. 21, Harris Declaration, ¶ 3(g)

### XIII.    Santiago Prepares the Affidavit of Probable Cause for Swainson's Arrest Based on Fabricated Information and Omitting Critical Exculpatory Information

169.    Three days after Presley's February 12, 1988 statement and purported photo identification, Santiago prepared and signed an affidavit of probable cause for an arrest warrant charging Swainson with Opher's murder. Ex. 15, Santiago Dep., Vol. 2, 199:22-200:1, 204:25-205:3.

170.    In the affidavit, Santiago included all the information he felt a prosecutor needed to know in order to proceed with the case. Ex. 15, Santiago Dep., Vol. 2, 200:11-20.

171.    Presley's purported identification was the basis for probable cause to arrest Swainson. Without representations that Presley made an immediate, unequivocal identification,

there would not have been probable cause to arrest Swainson. Ex. 9, Rubino Dep. 58:15-59:8, 63:16-24.

172.    Santiago did not include in his affidavit of probable cause the following facts that detectives learned during their investigation, Ex. 28, Swainson Affidavit of Probable Cause:

  a.  Presley did not actually identify Swainson's photograph from a full and fair array of photographs, *see supra* ¶¶ 51-64;

  b.  Presley provided a statement on January 17, 1988 that was inconsistent with the statement he provided on February 12, 1988, *see supra* ¶ 42, 48(a-b);

  c.  Presley's February 12, 1988 statement was inconsistent with Officer Kay's on-scene observations, *see supra* ¶¶ 48(c-e), 49(a-b);

  d.  Presley matched the description of a man who had been seen at the scene of the shooting an hour before the murder took place, *see supra* ¶¶ 28-30;

  e.  Presley's statements were inconsistent with information detectives received from his girlfriend, Valerie Smith, *see supra* ¶ 49(c);

  f.  Officer Peay's on-scene observations were inconsistent with Hines's statement, in particular her observation that he ran down the steps of 5413 Sansom Street shortly after the shooting, *see supra* ¶¶ 141-42;

  g.  Hines failed a polygraph examination following his interview, *see supra* ¶ 143;

  h.  A witness identified Green as someone who had previously sold drugs from 5413 Sansom Street, contradicting Green's statement, *see supra* ¶ 145;

i.      Police learned that Latanya Furman, whom the affidavit described as an "unknown female," was at the scene of the shooting and, in the weeks prior to Opher's death, had been part of discussions regarding a plan to rob the drug house where the murder took place, *see supra* ¶¶ 37, 152;

j.      Furman discussed robbing the drug house with Darren Brown, and Furman was with Brown's brother the night of the shooting, *see supra* ¶¶ 152-53, 156;

k.      Furman lied to police multiple times about who she was with at the scene of the shooting, *see supra* ¶¶ 150-51, 156;

l.      Furman gave police a fake name the night of the murder, told Justice not to speak to police, and, given these facts, Furman was someone police were investigating as a potential suspect, *see supra* ¶¶ 147-49;

m.      Information received from Vernon Montague that word on the street was that Opher was killed in a hold-up attempt, *see supra* ¶¶ 135;

n.      Detectives arrested Proctor, who was known for robbing and murdering drug dealers, for another murder during the course of the Opher investigation and considered him in connection with the Opher murder, *see supra* ¶¶ 158-63;

o.      Detectives heard that a man named George was involved in the Opher murder, *see supra* ¶¶ 165-66; and

p.      Swainson provided police with an alibi for the night of the murder, the names of three alibi witnesses, and contact information for at least one alibi witness, none of whom the police interviewed; *see supra* ¶¶ 20-24.

173.     In an effort to convey the impression Swainson carried out the shooting of Opher to ensure discipline within a drug organization, Santiago included in the affidavit of probable cause the assertion that Swainson, in his January 22, 1988 statement, said that Opher and another man known by the name "Dred," worked for him, meaning that Swainson was running the drug house. Ex. 15, Santiago Dep., Vol. 2, 204:3-14, 205:23-206:18; Ex. 28, Swainson Affidavit of Probable Cause, 4.

174.     Swainson did not say that Dred and Opher worked for him or that he ran the drug house in his January 22, 1988 statement. Ex. 15, Santiago Dep., Vol. 2, 206:24-208:23; Ex. 5, Swainson Statement 1/22/88.

175.     Swainson, in fact, did not run the drug house and no drug dealers worked for him. Ex. 3, Swainson Dep., 164:18-165:21.

176.     During the period he sold drugs in Philadelphia, Swainson worked for someone named Uncle, and Santiago had no basis to contest that Swainson was one of the lower-level people who was only responsible for bringing drugs and money to and from the drug houses. Ex. 17, Santiago Dep., Vol. 3, 115:7-119:3.

**XIV.    Santiago, Alexander, and Cohen Fabricate Swainson's Flight**

177.     On February 15, 1988, a warrant for Swainson's arrest was issued based on Santiago's affidavit of probable cause, and Santiago, Durrant, and two other detectives went to one of the addresses Swainson provided to arrest him. Ex. 64, 2/15/88 Activity Sheet.

178.     Once there, they encountered two individuals, Donny Ebanks and Isaiah Thomas, who told them that Swainson was in Jamaica for a vacation and would be back soon. Ex. 64, 2/15/88 Activity Sheet.

179.    There is no record in the homicide file indicating that Santiago explored whether Donny Ebanks was the same Donny whose name Swainson provided as an alibi witness, nor is there any indication that Santiago interviewed him about the night of the murder. Ex. 21, Harris Declaration, ¶ 3(h).

**A.    Swainson's Trip to Jamaica**

180.    After Opher was killed, Swainson decided that his time in Philadelphia had to end and that he did not like the reality of selling drugs, so he returned to New York City as he had originally planned to do. He returned to his mother's home in the Bronx, to the same address he had provided to Santiago on January 22, 1988. Ex. 3, Swainson Dep., 307:3-20. Ex. 5, Swainson Statement 1/22/88.

181.    Sometime in February 1988, Swainson went to Jamaica for an approximately two-week trip to visit his family and to propose to his girlfriend Alicia. Ex. 3, Swainson Dep., 307:21-312:23.

182.    Swainson had gone to Jamaica for brief visits to see his family and Alicia on multiple occasions since immigrating to the United States. Ex. 3, Swainson Dep., 313:2-15.

**B.    Detectives Learn that Swainson would be Returning to the United States**

183.    Santiago testified that once he learned Swainson was not in Philadelphia, the investigation was transferred to the homicide division's fugitive squad. Ex. 15, Santiago Dep., Vol. 2, 134:6-135:7.

184.    Defendant Detective James Alexander, assigned to the fugitive squad, testified that it would be inaccurate to say that the case was transferred to the fugitive squad. Instead, he

and his partner, Detective Michael Cohen,[5] were responsible for attempting to locate Swainson while the investigation remained Santiago's responsibility. Ex. 53, Alexander Dep., 15:9-16:16.

185.    Alexander, Cohen, and Santiago shared with one another all information about efforts to apprehend Swainson and information regarding his location. Ex. 53, Alexander Dep., 36:21-37:19.

186.    Detectives sometimes recorded information about these activities on attempt to apprehend logs, which were treated the same as activity sheets. Ex. 53, Alexander Dep., 57:4-12; 98:21-24.

187.    As of February 18, 1988, Alexander and Cohen had received information that Swainson had gone to Jamaica to get married and would be returning to the United States, and they recorded that information on an attempt to apprehend log. Ex. 65, 2/18/88 Attempt to Apprehend Log; Ex. 53, Alexander Dep., 57:4012.

188.    Going to Jamaica for a vacation and going to Jamaica to get married are not inconsistent with one another. Ex. 53, Alexander Dep., 45:18-22.

189.    On an attempt to apprehend log dated February 19, 1988, Alexander and Cohen recorded that Swainson was expected to return to Philadelphia in the first week of March and that according to Swainson's sister, he left for Jamaica on February 11, 1988, before Presley purportedly identified him as Opher's killer. Ex. 66, 2/19/88 Attempt to Apprehend Log; Ex. 17, Santiago Dep., Vol. 3, 73:22-74:15.

190.    Cohen testified at Swainson's trial that Santiago was in contact with Swainson's family members in the Bronx. Ex. 30, 3/17/89 Trial Testimony, 205:14-18.

---

[5] Cohen is deceased, and Swainson does not pursue claims against his estate. *See supra* note 2.

### C.    Detectives Attempt to Obtain an Unlawful Flight Warrant

191.    On February 19, 1988, Alexander and Cohen prepared an application for issuance of an Unlawful Flight to Avoid Prosecution Warrant. Ex. 66, 2/19/88 Attempt to Apprehend Log.

192.    Despite knowing that Swainson had left for Jamaica before Presley's alleged identification of him as the perpetrator, Alexander believed there was sufficient evidence for an unlawful flight warrant. He testified he "was aware [Swainson] was Jamaican and that he was involved in the—one of the—probably one of the Jamaican cartels that were in Philadelphia at the time, and the fact that people told [detectives] that he was going there to get married or had a planned trip or anything like that—again, drug dealer, doesn't necessarily mean he is going to tell the truth." Ex. 53, Alexander Dep., 120:9-17.

193.    Alexander testified that it was "understood at the time" that "Jamaicans lied to police." Ex. 53, Alexander Dep., 175:25-176:3.

194.    On February 20, 1988, Robert Wolfinger, Chief Inspector of the Philadelphia Police Detective Bureau, sent a letter to Deputy District Attorney Raymond Harley asking Harley to request that the United States Attorney issue an Unlawful Flight to Avoid Prosecution warrant with the basis that, "Investigation by the Homicide Division revealed that Andrew Swinson informed persons close to him that after the murder, he was going to flee to Jamaica." Ex. 67, Wolfinger Letter.

195.    There is no record in the homicide file of detectives receiving information that Swainson informed anyone he would flee to Jamaica after Opher's murder. Ex. 17, Santiago Dep., Vol. 3, 90:19-91:15; Ex. 21, Harris Declaration, ¶ 3(i).

196.    The quoted statement was inconsistent with the information Alexander and Cohen received from witnesses. Ex. 53, Alexander Dep., 156:23-157:17.

197.    According to Alexander, because Wolfinger was not involved in the investigation, the information Wolfinger included in his letter to Harley had to have come from Santiago, Cohen, or one of the other detectives in Santiago's squad who was working on the case. Ex. 53, Alexander Dep., 154:5-24.

198.    On an attempt to apprehend log dated February 29, 1988, Alexander wrote that detectives checked with the airlines Air Jamaica and American Airlines whether a passenger named "Andrew Swinson" or "Vanier Swainson" had travelled to Jamaica on February 11, 1988. Ex. 68, 2/29/88 Attempt to Apprehend Log.

199.    There is no record in the homicide file of detectives contacting airlines for information regarding a passenger named "Andrew Swainson." Ex. 21, Harris Declaration, ¶ 3(j).

200.    There is no record in the homicide file to indicate that detectives obtained a federal unlawful flight to avoid prosecution warrant. Ex. 21, Harris Declaration, ¶ 3(k)

201.    Based on her communications with Cohen and Santiago, ADA Rubino believed at the time of trial that the detectives had applied for and obtained a federal Unlawful Flight to Avoid Prosecution warrant. Ex. 9, Rubino Dep., 66:14-24.

D.    **Swainson Returns to the United States and Calls Santiago**

202.    Swainson returned to the United States from Jamaica during the first week of March, just as his sister told detectives he would. Ex. 17, Santiago Dep., Vol. 3, 75:1-5.

203.    Upon his return to New York City, Swainson called Santiago in response to a message Santiago had left with Swainson's family. Ex. 17, Santiago Dep., Vol. 3, 75:6-19; Ex. 69, 3/8/88 Activity Sheet.

204.    Santiago memorialized this call on an activity sheet, but not a formal interview document. Ex. 69, 3/8/88 Activity Sheet.

205.    Santiago wrote on the activity sheet that Swainson was not aware that he was wanted for murder and that Santiago did not provide Swainson with this information. Ex. 17, Santiago Dep., Vol. 3, 75:20-76:1, 77:11-14, 79:19-23; Ex. 69, 3/8/88 Activity Sheet.

206.    Alexander and Cohen had an obligation to relay information contained in activity sheets to Rubino. Ex. 17, Santiago Dep., Vol. 3, 86:1-87:6.

207.    The information contained in Santiago's March 8, 1988 activity sheet should have been provided to the DAO. Ex. 17, Santiago Dep., Vol. 3, 84:16-85:8; Ex. 9, Rubino Dep., 71:23-72:5.

208.    Rubino argued at Swainson's trial that Swainson fled to Jamaica after the Opher murder and that his flight was evidence of his consciousness of guilt. Ex. 9, Rubino Dep., 65:4-17.

209.    Rubino also argued for and obtained a jury instruction regarding flight. Ex. 9, Rubino Dep., 68:25-69:3.

210.    Rubino did not see Santiago's March 8, 1988 activity sheet and would not have argued at Swainson's trial that he fled from prosecution and therefore had consciousness of guilt if she had. Ex. 9, Rubino Dep., 71:15-72:16.

211.    Rubino relied on representations from Santiago and Cohen that Philadelphia police had in fact obtained a federal unlawful flight to avoid prosecution warrant. Ex. 9, Rubino Dep., 65:25-67:7

212.    The information Santiago reported on the March 8, 1988 activity sheet, specifically that Swainson did not know he was wanted for murder, severely undercut the theory later argued at trial that Swainson fled to avoid prosecution. Ex. 8, Wellbrock Dep., 42:18-43:3.

**E.    Swainson is Arrested in New York**

213.    Swainson was arrested in his family's home in the Bronx on March 9, 1988 at the location where he told Santiago he would be. Ex. 17, Santiago Dep., Vol. 3, 80:23-81:12.

214.    Swainson's family's address was the only residence Swainson had ever had in New York City and he provided it to Santiago on January 22, 1988. Ex. 3, Swainson Dep., 42:12-18.

215.    Swainson spent approximately eight days in jail in New York City before being transferred into the custody of Alexander and Cohen. Ex. 70, 3/17/88 Activity Sheet.

216.    Upon his arrest, Swainson provided another exculpatory statement. Ex. 17, Santiago Dep., Vol. 3, 81:13-15.

**XV.    Alexander and Cohen Coerce Morsell to Fabricate Testimony**

217.    Given Presley's extensive credibility problems, the circumstances under which he purportedly observed the crime, and the lack of any other direct incriminating evidence, the prosecution's case against Swainson was weak. Trial prosecutor Rubino thought she could "very easily lose" and that any one piece of evidence could have tipped the case with the jury. Ex. 9, Rubino Dep., 93:3-94:8, Ex. 8, Wellbrock Dep., 91:14-92:5.

218.    When asked at her deposition if Presley was a "witness with many problems," Rubino laughed and agreed that was an understatement. Ex. 9, Rubino Dep., 60:10-17.

219.    In March 1988, Detectives Alexander and Cohen documented on activity sheets and attempt to apprehend logs multiple efforts to locate and interview Jackie Morsell, a friend of

Opher's who had given police a lengthy statement the day after the murder describing drug sales out of the house at 5413 Sansom Street. Ex. 19, Morsell Statement 1/18/88. Ex. 71, 3/1/88 Attempt to Apprehend Log; Ex. 72, 3/3/88 Attempt to Apprehend Log; Ex. 73, 3/4/88 Activity Sheet.

220.    On March 1, 1988, Alexander and Cohen spoke with Ernestine Dennis, Opher's sister, who told the detectives that Morsell had a lot of information to provide them about "the Jamaicans involved in this case." Alexander and Cohen planned to pick Morsell up the following day to interview her. Ex. 71, 3/1/88 Attempt to Apprehend Log.

221.    On March 3, 1988, Alexander and Cohen again contacted Dennis to inform her that they would interview Morsell the following day at Dennis's residence. Ex. 72, 3/3/88 Attempt to Apprehend Log.

222.    Later that day, Dennis called Alexander to tell him that Morsell's mother did not want her to speak to the police and would call an attorney if police attempted the interview. Alexander and Cohen planned to make further attempts to speak to Morsell on the street. Ex. 72, 3/3/88 Attempt to Apprehend Log.

223.    The following day, Cohen spoke with Dennis again who told him that Morsell did want to speak with detectives but that her mother did not want her to be involved. Dennis relayed to Cohen that Morsell would meet with detectives on Tuesday or Thursday the following week outside of her evening school, as long as her mother did not find out. Detectives planned to coordinate a meeting with Dennis. Ex. 73, 3/4/88 Activity Sheet.

224.    Detectives did not record a further interview with Morsell in the homicide file. Ex. 21, Harris Declaration, ¶ 3(l).

225.     Detectives, however, did interview Morsell before trial at the Dennis residence in the presence of Opher's mother Tina Dennis. During this interview, Tina frequently interrupted Morsell and answered questions herself. When Tina did so, the detectives asked Morsell if Tina's response was correct, and Morsell agreed out of fear of Tina's reprisal if she disagreed. Ex. 74, Morsell Affidavit 7/22/14, ¶ 10(f). In the interview, Morsell agreed to an account of the circumstances surrounding Opher's drug selling that was untrue and fabricated to support the police theory that Swainson murdered Opher as part of an internal drug organization dispute. *See supra* ¶ 132.

226.     At the time, Morsell was living with Opher's family, including Tina Dennis, and the family was intimidating her. Ex. 9, Rubino Dep., 94:13:95:1; Ex. 17, Santiago Dep., Vol. 3, 94:1-95:1; Ex. 74, Morsell Affidavit 7/22/14, ¶ 10.

227.     Morsell was afraid of Ernestine, who was known as a bully in the neighborhood. Whatever Ernestine told her to do, Morsell would do. Ex. 6, Cole Dep., 49:3-14, 50:14-21, 57:18-58:10.

228.     Morsell was experiencing physical and sexual abuse as well as forced prostitution at the hands of Tina Dennis and other family members. Ex. 74, Morsell Affidavit 7/22/14, ¶ 10(b).

229.     Morsell gave statements to the police at Tina's urging. Ex. 74, Morsell Affidavit 7/22/14, ¶ 10(e).

230.     After police convinced Tina that Swainson had killed Opher, the Dennises pressured Morsell to testify against him to help secure a conviction. Ex. 74, Morsell Affidavit 7/22/14, ¶ 10(d).

48

231.     Morsell had a poor reputation for telling the truth and was known in the
community as a habitual liar. Ex. 6, Cole Dep., 34:22-35:4.

232.     ADA Rubino relied on reports from the detectives who interviewed Morsell that
Morsell's information was credible, otherwise she would not have called Morsell to testify
against Swainson. Ex. 9, Rubino Dep., 96:3-16.

**XVI.   Miller Pressures Swainson's Alibi Witness to Adopt a False Statement Undermining
Swainson's Defense**

233.     Shortly before trial, on March 7, 1989, Detective Miller interviewed Tamika Cole,
who was prepared to testify as an alibi witness for Swainson at trial. Ex. 6, Cole Dep., 19:13-
20:12; 22:16-19; Ex. 75, Cole Statement.

234.     During this interview, Miller and other detectives pressured Cole into making a
false statement: that she could not say with certainty what night she saw Swainson at her
boyfriend Donny's house at 56th and Greenway Streets. Ex. 6, Cole Dep., 26:21-28:6.

235.     This statement was not true; Cole was certain at the time that the night she saw
Swainson at her boyfriend's house was the same night Opher was killed. Ex. 6, Cole Dep.,
22:20-22; 28:7-8.

236.     Cole was 18 years old at the time of the interview. Ex. 6, Cole Dep., 26:8-9.

237.     Cole was subpoenaed to speak with the detectives without any warning. Ex. 6,
Cole Dep., 23:3-9.

238.     She was interviewed by herself without a parent or lawyer present. Ex. 6, Cole
Dep., 26:11-15.

239.     During the interview, Miller and the other detectives badgered her, asking her the
same question over and over: how did she know it was the same night Opher was killed? Ex. 6,
Cole Dep., 27:1-22, 43:2-8.

240.    Cole initially told them she was sure she was describing the same night that Opher was killed. Ex. 6, Cole Dep., 42:23-43:1.

241.    They continued to badger her, standing in front of her and aggressively asking her the same question until she agreed to change her answer to what they wanted her to say. Ex. 6, Cole Dep., 43:2-44:12.

242.    During the interview, Cole did not feel free to leave. The behavior of Miller and the other detectives was "very aggressive" and "not professional." She was only permitted to leave after she changed her statement. Ex. 6, Cole Dep., 43:5-45:22.

243.    Cole only signed the false statement because she felt that the detectives would not allow her to leave until she agreed with them and told them what they wanted to hear. Ex. 6, Cole Dep., 28:9-17.

244.    Miller did not include all of the questions that the detectives asked Cole in the written record documenting the interview. Ex. 6, Cole Dep., 43:5-14, 45:23-47:1.

245.    Cole was not called to testify in Swainson's defense as a result of the fabricated statement and understood that Swainson's counsel decided not to present her testimony due to the statement Miller compelled her to sign. Ex. 6, Cole Dep., 22:10-14, 29:8-20.

## XVII.  Detectives Suppress and Conceal Exculpatory Evidence

246.    As the trial prosecutor, ADA Rubino had a duty to turn over any exculpatory evidence to the defense and she took that obligation seriously. She made a record of discovery disclosures through written discovery letters or if the disclosure occurred at trial, by putting it on the trial record. Ex. 9, Rubino Dep., 45:20-50:2.

247.    Santiago was aware at the time of the Opher investigation of his obligation to provide to prosecutors, and not to conceal or suppress, all exculpatory evidence, including any

information that could be used to impeach a prosecution witness. Ex. 7, Santiago Dep., Vol. 1, 91:6-93:5.

248.    On July 19, 1988, Santiago compiled a "homicide binder," a selection of investigative materials PPD policies required homicide detectives to provide with documentation of the investigation, and he forwarded the binder to the DAO. Ex. 7, Santiago Dep., Vol. 1, 106:4-7; Ex. 15, Santiago Dep., Vol. 2, 80:15-82:3.

249.    As the assigned detective, it was Santiago's responsibility to ensure that the binder was complete. Ex. 15, Santiago Dep., Vol. 2, 84:9-14, Ex. 53, Alexander Dep., 99:10-16.

## A.    Suppressed Activity Sheets

250.    Santiago did not include a single activity sheet in the binder he gave to ADA Rubino. Ex. 7, Santiago Dep., Vol. 1, 106:4-20.

251.    Rubino never received any activity sheets documenting the Opher homicide investigation. Ex. 9, Rubino Dep., 56:17-22, 141:5-11, 168:24-169:2.

252.    The homicide file produced to Swainson's counsel in this litigation contained the following activity sheets, which Santiago did not provide to the DAO, thereby resulting in the suppression of those activity sheets from Swainson:

      a.    The January 19, 1988 activity sheet documenting Justice's account to Fischer and Miller that Furman told her not to speak to police or get involved in the investigation as well as Fischer and Miller's initial failed attempts to locate and interview Furman, Ex. 60, 1/19/88 Activity Sheet;

      b.    The January 21, 1988 activity sheet documenting Montague's statement that the word on the street was that Opher was killed in a hold-up attempt as well as Fischer and Miller's further failed attempts to locate, interview,

and polygraph Furman, Ex. 14, 1/21/88 Activity Sheet (Furman and

Montague);

c.     The January 21, 1988 activity sheet documenting Hines's failed polygraph

examination, Ex. 58, 1/21/88 Activity Sheet (Hines);

d.     The January 22, 1988 activity sheet documenting that the coat Justice

identified during her police interview as the coat worn by the man who

came to 5413 Sansom Street an hour before the murder was the same coat

police confiscated from Presley that night, Ex. 26, 1/22/88 Activity Sheet;

e.     The January 23, 1988 activity sheet documenting Santiago and Durrant's

arrest of Allen Proctor for murder, as well as Santiago and Durrant's

interview with Presley's girlfriend, Valerie Smith, in which she

contradicted information Presley provided to police, Ex. 34, 1/23/88

Activity Sheet;

f.     The January 26, 1988 activity sheet documenting Fischer receiving a tip

regarding the involvement of "George" in Opher's murder, Ex. 29, 1/26/88

Activity Sheet;

g.     The February 6, 1988 activity sheet documenting detectives' efforts to

investigate Darren and Brian Brown, specifically noting that Brian Brown

was on parole in New Jersey and theorizing that there may be a connection

between Brian Brown and Presley, who was also on parole in New Jersey,

as well as detectives' further efforts to locate Furman, Ex. 63, 2/6/88

Activity Sheet;

52

h.  The February 15, 1988 activity sheet documenting Durrant and Santiago's conversation with Ebanks and Thomas in which detectives learned Swainson had gone to Jamaica for a vacation and would be returning soon, Ex. 64, 2/15/88 Activity Sheet;

i.  The March 4, 1988 activity sheet documenting that Cohen spoke with Ernestine Dennis about coordinating plans to speak with Morsell without Morsell's mother finding out, Ex. 73, 3/4/88 Activity Sheet; and

j.  The March 8, 1988 activity sheet documenting that Swainson called Santiago after he returned to the United States from Jamaica, that Santiago was aware that Swainson did not know he was wanted for murder, and that Santiago decided not to provide Swainson with that information, Ex. 69, 3/8/88 Activity Sheet.

253.  Activity sheets supporting the theory that Opher was killed in a holdup attempt constituted favorable evidence and had to be turned over to the defense. Ex. 9, Rubino Dep., 141:17-142:13.

254.  It was critically important for police to disclose any evidence of alternative suspects to the prosecutor, even if detectives believed they had ruled out the persons in question as suspects. Ex. 7, Santiago Dep., Vol. 1, 113:10-14.

255.  If Rubino received information that detectives had investigated an individual with a history of drug-related robberies in connection with the Opher investigation, she would have disclosed that information to the defense. Ex. 9, Rubino Dep., 53:17-54:2.

256.    If Rubino had received the activity sheet documenting Swainson's phone call with Santiago on March 8, 1988, she would have disclosed that information to the defense. Ex. 9, Rubino Dep., 71:23-72:5.

**B.    Suppressed Attempt to Apprehend Logs**

257.    Santiago did not provide Rubino with attempt to apprehend logs. Ex. 9, Rubino Dep., 77:22-78:12, 164:20-169:2.

258.    The homicide file produced to Swainson's counsel in this litigation contained the following attempt to apprehend logs, which Santiago did not provide to the DAO, thereby resulting in the suppression of those activity sheets from Swainson:

   a.    The February 18, 1988 attempt to apprehend log documenting Alexander and Cohen receiving information that Swainson went to Jamaica to get married and would be returning to the United States, Ex. 65, 2/18/88 Attempt to Apprehend Log;

   b.    The February 19, 1988 attempt to apprehend log documenting that Alexander and Cohen received information that Swainson left for Jamaica on February 11, 1988 and would be returning in the first week of March, Ex. 66, 2/19/88 Attempt to Apprehend Log;

   c.    The March 1, 1988 attempt to apprehend log documenting Alexander and Cohen's plan to interview Morsell on March 2, 1988 because Ernestine Dennis directed them to speak to her, Ex. 71, 3/1/88 Attempt to Apprehend Log; and

   d.    The March 3, 1988 attempt to apprehend log documenting Alexander and Cohen's plans to speak with Morsell at the Dennis residence and their

further conversation with Ernestine Dennis in which she explained that
Morsell's mother did not want her to speak with police and the detectives'
plan to speak with Morsell on the street, Ex. 72, 3/3/88 Attempt to
Apprehend Log.

## C.    Suppressed Evidence of Presley's Pending Felony Charges

259.    At the time of Presley's February 1989 statements and through Swainson's trial,
Presley was incarcerated due to pending felony drug charges under the alias Kareem Miller,
*Commonwealth v. Kareem Miller,* CP-51-CR-1024751-1988. *See supra* ¶ 76-78.

260.    Santiago was aware of Presley's felony drug case and the fact that he was being
prosecuted and incarcerated under the name Kareem Miller. *See supra* ¶ 81, 96.

261.    Information regarding Presley's arrest in the case *Commonwealth v. Kareem
Miller*, CP-51-CR-1024751-1988 was not provided to Swainson or his counsel before or during
trial. Ex. 43, *Commonwealth v. Swainson*, CP-51-CR-431311-1988 Joint Stipulations of Fact, ¶
96.

262.    The evidence regarding Presley's alias and pending felony charges was
exculpatory to Swainson as that information demonstrated potential bias in Presley's testimony.
Ex. 8, Wellbrock Dep., 90:11-91:13.

263.    It was extremely important for the trial prosecutor to know that the case's key
witness, Presley, had pending felony charges. Ex. 9, Rubino Dep., 119:20-15.

264.    Rubino had an absolute obligation to disclose to the defense any benefits received
by a witness in exchange for testimony or any request by a witness for a deal in exchange for
testimony. Ex. 9, Rubino Dep., 45:7-19.

265.    Rubino did not know that Presley had pending drug charges under the name Kareem Miller at the time of trial. Ex. 9, Rubino Dep., 118:2-17.

266.    If Rubino had received documentation regarding Presley's case under the name Kareem Miller, she would have provided it to the defense. Ex. 43, *Commonwealth v. Swainson*, CP-51-CR-431311-1988 Joint Stipulations of Fact, ¶ 98.

267.    Presley's drug case, *Commonwealth v. Kareem Miller*, CP-51-CR-1024751-1988, was withdrawn at the first court date following Swainson's trial. Ex. 43, *Commonwealth v. Swainson*, CP-51-CR-431311-1988 Joint Stipulations of Fact, ¶ 93; Ex. 9, Rubino Dep., 115:3-25.

## XVIII. Swainson is Convicted at Trial

268.    Swainson's trial took place in March 1989. After the presentation of the below false evidence and, with a defense case hampered by the suppression of extensive favorable evidence, Swainson was convicted of first-degree murder on March 21, 1989 and sentenced to life in prison. Ex. 43, *Commonwealth v. Swainson*, CP-51-CR-431311-1988 Joint Stipulations of Fact, ¶¶ 59-60.

### A.    Presley's Fabricated Identification and Statements Introduced

269.    Presley testified at trial against Swainson on March 17, 1989. Ex. 30, 3/17/89 Trial Testimony, 3-140.

270.    The entire case against Swainson rested on Presley's testimony. Ex. 9, Rubino Dep., 62:16-63:7.

271.    Presley testified that he did not receive any kind of deal or receive any promises in exchange for his testimony. Ex. 30, 3/17/89 Trial Testimony, 20:9-12.

272.    Presley testified regarding the fabricated photograph array that Santiago purportedly showed him and testified that he selected Swainson's photograph from an array. Ex. 30, 3/17/89 Trial Testimony, 19:17-20:1.

273.    Presley also testified that the charges against him for the Opher shooting had been dropped "long before the photo identification." Ex. 30, 3/17/89 Trial Testimony, 20:6-8.

274.    Presley further testified to the accuracy of the fabricated audio-recorded statements that he made to Santiago in February 1989. Ex. 30, 3/17/89 Trial Testimony, 32:20-33:2.

275.    Presley's trial testimony inculpating Swainson was false. Ex. 39, Kolins Affidavit 12/7/08, ¶ 17; Ex. 40, Presley Taped Statement 10/13/08, 3; Ex. 41, Presley Handwritten Statement 10/13/08, 1; *see also supra* §§ I, IV, VIII, IX-XI.

276.    Santiago testified that he showed Presley a photograph array on February 12, 1988 from which Presley selected Swainson's photograph. Ex. 30, 3/17/89 Trial Testimony, 173:4-15.

277.    Santiago also testified regarding the accuracy of the February 1989 statements he took from Presley. Ex. 30, 3/17/89 Trial Testimony, 174:9-175:1, 186:7-187:18.

278.    Santiago's testimony regarding the purported identification on February 12, 1988, and the statements taken in February 1989 was false. *See supra* §§ VIII, X-XI.

**B.    Fabricated Evidence of Flight Introduced**

279.    At trial, Rubino argued that Swainson had fled from Philadelphia after the Opher murder and that his flight was evidence of his consciousness of guilt. *See supra,* ¶¶ 208.

280.    That argument was based on Santiago's representations to Rubino and Cohen's trial testimony that they applied for a federal Unlawful Flight to Avoid Prosecution warrant and

57

that they received such a warrant. Ex. 30, 3/17/89 Trial Testimony, 205:10-13, 19-21, *supra* ¶ 211.

281.    In fact, Swainson had not fled to Jamaica, and Rubino's argument to that effect was based on the false representations of Santiago, Alexander, and Cohen. *See supra* § XIV.

### C.    Morsell's Fabricated Testimony Introduced

282.    Morsell testified at trial against Swainson on March 16, 1989. Ex. 76, 3/16/89 Trial Testimony, 85-166.

283.    Her testimony deviated from her January 18, 1988 statement in several ways. *Compare* Ex. 19, Morsell Statement 1/18/88 with Ex. 76, 3/16/89 Trial Testimony, 85-166. Specifically, Morsell testified to the following facts that were not included in her police statement:

> a.    She saw Swainson cleaning the shotgun that was used to kill Opher on several occasions. Ex. 76, 3/16/89 Trial Testimony, 121:3-22;
>
> b.    Opher told Morsell that Swainson was "pistol happy." Ex. 76, 3/16/89 Trial Testimony, 121:23-122:14, 156:17-19;
>
> c.    Swainson received the nickname "Blood" because he used to tell Opher and others stories about how many people he killed. Ex. 76, 3/16/89 Trial Testimony, 123:20-22.

284.    Morsell also testified that Swainson called her from jail and told her that Opher's murder "wasn't supposed to happen like that" and that she would be taken care of if she did not testify against him. Ex. 76, 3/16/89 Trial Testimony, 119:4-120:10.

285.    Morsell further testified that Swainson used Tamika Cole to try to bribe her and that Morsell left home without telling her parents where she had gone to prevent Swainson's

attorney from contacting her after feeling threatened by repeated calls. Ex. 76, 3/16/89 Trial Testimony, 120:13-15, 154:18-24.

286.    Morsell's trial testimony on the above points was false. Ex. 74, Morsell Affidavit 7/22/14, ¶ 8; Ex. 3, Swainson Dep., 162:6-163:8, 349:17-23; Ex. 6, Cole Dep., 39:2-40:11.

287.    In her original January 18, 1988 statement, Morsell attributed these characteristics—owning guns, cleaning the gun used to shoot Opher, and bragging about prior murders—to other drug dealers who worked with Opher, not Swainson. Ex. 19, Morsell Statement 1/18/88, 3, 6, 9.

288.    Swainson never used any weapons in the course of his drug dealing, nor did he see any other drug dealers using weapons. Firearms were not permitted inside the drug houses where he worked. Ex. 3, Swainson Dep., 219:22-220:7, 222:24-223:2, 224:7-225:10.

289.    Swainson received the nickname "Blood" from a person he encountered in the West Philadelphia community where he was living who did not know Swainson's name. The name means "brother," and is a common way for Black men to refer to each other if they do not know one another's names. Ex. 3, Swainson Dep., 123:18-22, 125:15-126:13, 129:8-130:9.

290.    Cole confirmed that she never attempted to bribe Morsell on Swainson's behalf. Ex. 6, Cole Dep., 39:2-40:11.

## XIX.  Before their Deaths, Presley and Morsell Recant their Trial Testimony

291.    In 2005, Certified Criminal Defense Investigator Russell Kolins began to work with Swainson to investigate the circumstances of his prosecution and conviction. Kolins agreed to work on the case on a pro bono basis because he believed Swainson to be innocent. Ex. 39, Kolins Affidavit 12/7/08, ¶¶ 1-3.

A.    **In 2008, Presley Admits His Trial Testimony was False and Fabricated**

292.    Throughout 2007 and 2008, Kolins engaged in conversations with Presley, which he summarized in an affidavit prepared on December 7, 2008. Ex. 39, Kolins Affidavit 12/7/08.

293.    On October 11, 2007, after Presley agreed to speak with him, Kolins interviewed Presley at Bayside State Prison in New Jersey, where Presley was incarcerated at the time. Ex. 39, Kolins Affidavit 12/7/08, ¶¶ 8-10.

294.    During that interview Presley intimated to Kolins that his trial testimony was false but explained that he had concerns about being prosecuted for perjury if he told the truth. Ex. 39, Kolins Affidavit 12/7/08, ¶ 10.

295.    On December 12, 2007, Presley sent Kolins a holiday card reaffirming his concerns about potential perjury charges. Ex. 39, Kolins Affidavit 12/7/08, ¶ 11; Ex. 77, Presley Holiday Card.

296.    On October 3, 2008, Kolins, along with Swainson's post-conviction attorney, Craig Cooley, met with Presley at the Albert "Bo" Robinson Assessment and Treatment Center, a residential re-entry center in New Jersey. During this meeting, Presley again expressed concerns about being prosecuted for perjury were he to discuss the truth regarding his trial testimony. Ex. 39, Kolins Affidavit 12/7/08, ¶¶ 14-15.

297.    During this meeting, Presley also expressed that he wanted to openly discuss his trial testimony and his role in Swainson's conviction because of the drug treatment and counseling he received at the "Bo" Robinson Treatment Center and his newfound religious convictions. He agreed to meet again the following week. Ex. 39, Kolins Affidavit 12/7/08, ¶ 15.

298.    On October 13, 2008, Kolins and Cooley met with Presley again at which point Presley explained that Swainson did not shoot Opher and Presley knew at the time of trial that

Swainson was not the perpetrator. Ex. 39, Kolins Affidavit 12/7/08, ¶ 17; Ex. 40, Presley Taped Statement 10/13/08, 3; Ex. 41, Presley Handwritten Statement 10/13/08, 1.

299.    During this meeting, Presley wrote a four-page statement documenting that he testified against Swainson falsely due to coercion and promises of leniency in his own criminal case. Ex. 39, Kolins Affidavit 12/7/08, ¶ 22; Ex. 40, Presley Taped Statement 10/13/08, 5-6; Ex. 41, Presley Handwritten Statement 10/13/08.

300.    Presley explained that he was never shown a photograph array with photographs of multiple people. He only recalled being shown numerous photographs of Swainson. Ex. 40, Presley Taped Statement 10/13/08, 8-9.

301.    Presley further explained that the statement he provided to Gibbs that Swainson was innocent in June 1988 was accurate and that Gibbs never threatened him or offered him compensation. Ex. 39, Kolins Affidavit 12/7/08, ¶ 19; Ex. 40, Presley Taped Statement 10/13/08, 2-3; Ex. 41, Presley Handwritten Statement 10/13/08.

302.    With Presley's permission, Kolins tape-recorded a statement in which Presley read his handwritten statement and provided additional background information, which Kolins then transcribed. Ex. 39, Kolins Affidavit 12/7/08, ¶ 23; Ex. 40, Presley Taped Statement 10/13/08.

303.    Kolins wrote an affidavit in 2008 documenting his interactions with Presley during the course of his investigation. In July 2024, Kolins and Cooley affirmed the truth and accuracy of that affidavit. Ex, 78, Kolins Declaration, 7/17/24; Ex, 79, Cooley Declaration, 7/16/24; Ex. 39, Kolins Affidavit 12/7/08.

**B.    In 2014, Morsell Admits Her Trial Testimony was False and Fabricated**

304.    On June 19, 2014, Kolins and Cooley interviewed Morsell and she admitted that she testified falsely against Swainson at trial. Ex. 74, Morsell Affidavit 7/22/14, 4, 8.

305.    On July 22, 2014, Morsell signed and initialed each page of a declaration memorializing the information she provided to Kolins and Cooley. Ex. 74, Morsell Affidavit 7/22/14.

306.    In this declaration Morsell stated that her trial testimony was false in the following respects:

      a.    Swainson did not call her after Opher's murder and tell her that it did not go down as planned, Ex. 74, Morsell Affidavit 7/22/14, 8(a);

      b.    Swainson did not call her from jail to harass her prior to trial to offer her compensation, Ex. 74, Morsell Affidavit 7/22/14, 8(b);

      c.    Neither Swainson nor any member of his legal team bribed or attempted to bribe her, Ex. 74, Morsell Affidavit 7/22/14, 8(c);

      d.    Cole never attempted to bribe her on Swainson's behalf, Ex. 74, Morsell Affidavit 7/22/14, 8(d);

      e.    Swainson never bragged to her about killing anyone, Ex. 74, Morsell Affidavit 7/22/14, 8(f)(ii); and

      f.    Opher never told her that Swainson was "pistol happy," Ex. 74, Morsell Affidavit 7/22/14, 8(g).

307.    Morsell further explained that she provided false testimony at Swainson's trial because she faced extreme pressure from Opher's family after police convinced them that

Swainson had murdered Opher. Ex. 74, Morsell Affidavit 7/22/14, 10(d); *see also supra* ¶¶ 225-230.

308.    In July 2024, Kolins and Cooley affirmed that the description in Morsell's 2014 declaration of the communications that led to that declaration were accurate, and, further, that the information presented in that declaration is consistent with what Morsell told them in their encounters. Ex, 78, Kolins Declaration, 7/17/24; Ex, 79, Cooley Declaration, 7/16/24.

## XX.    Swainson is Exonerated and Released after 32 Years of Imprisonment

309.    Swainson filed numerous petitions for post-conviction relief in Pennsylvania and federal courts from 1989 to 2012, which were all denied. Ex. 43, *Commonwealth v. Swainson*, CP-51-CR-431311-1988 Joint Stipulations of Fact, ¶¶ 61-68.

310.    In 2018, with state and federal court filings pending, Swainson submitted a formal request to the DAO's Conviction Integrity Unit ("CIU") for investigation into his claim of innocence. Ex. 43, *Commonwealth v. Swainson*, CP-51-CR-431311-1988 Joint Stipulations of Fact, ¶¶ 68-71; Ex. 8, Wellbrock Dep., 11:14-12:6.

311.    The CIU agreed to investigate the case and obtained the original homicide file from the police department. Ex. 43, *Commonwealth v. Swainson*, CP-51-CR-431311-1988 Joint Stipulations of Fact, ¶¶ 72-75; Ex. 8, Wellbrock Dep., 12:7-12, 24:8-11.

312.    ADA Andrew Wellbrock conducted the investigation on behalf of the CIU, which he took very seriously, knowing that his findings would be scrutinized by the courts as well as other criminal justice stakeholders. Ex. 8, Wellbrock Dep., 12:7-13:5.

313.    The CIU investigation spanned almost two years. Ex. 8, Wellbrock Dep., 23:11-13.

314.    In the course of their review, Wellbrock and other attorneys with the CIU discovered numerous pieces of previously undisclosed evidence in the homicide file. Ex. 43, *Commonwealth v. Swainson*, CP-51-CR-431311-1988 Joint Stipulations of Fact, ¶ 77; Ex. 8, Wellbrock Dep., 24:24-25:2.

315.    Based on a thorough review of the homicide file, the DAO file, the trial transcripts, and other relevant evidence, the CIU investigation concluded that exculpatory evidence was suppressed at Swainson's trial and false information was presented to the jury without correction. Ex. 8, Wellbrock Dep., 16:21-17:4, 23:19-24, 24:12-17, 55:9-12.

316.    As a result of the CIU investigation findings, the DAO agreed that Swainson was entitled to relief on the grounds that exculpatory evidence was withheld from him at trial and that false evidence was introduced against him at trial. Ex. 44, *Commonwealth v. Swainson*, CP-51-CR-431311-1988, Commonwealth Answer to PCRA, ¶¶ 80-81, 141.

317.    The DAO also determined that the evidence discovered during the CIU investigation indicated that Swainson may have been innocent and that it was more likely than not that no reasonable juror could have found him guilty. Ex. 44, *Commonwealth v. Swainson*, CP-51-CR-431311-1988, Commonwealth Answer to PCRA, ¶ 68.

318.    On June 16, 2020, Court of Common Pleas Judge Shelley Robins New granted Swainson a new trial based on violations of his due process rights concerning the suppression of exculpatory evidence and the presentation of fabricated evidence at trial. Ex. 10, 6/16/20 PCRA Hearing Transcript, 26:18-24.

319.    The DAO made the decision not to retry Swainson for the Opher murder because there was no evidence to support a conviction. Ex. 8, Wellbrock Dep., 56:17-19.

320. On June 18, 2020, Court of Common Pleas Judge Leon Tucker granted the Commonwealth's motion to nolle pros all charges against Swainson. Ex. 80, Swainson Docket.

321. Swainson was released from prison in June 2020 after 32 years of incarceration. Ex. 3, Swainson Dep., 12:19-22, 14:10-12.

## XXI. The City of Philadelphia's Policies, Practices, and Deliberately Indifferent Training, Supervision, and Discipline

### A. Suppression of Activity Sheets and Attempt to Apprehend Logs

322. During the time of the Opher murder investigation, Philadelphia Police Department ("PPD") homicide detectives used activity sheets to create "an internal record of...the significant investigative steps" detectives were taking. Ex. 7, Santiago Dep., Vol. 1, 99:7-12.

323. PPD practice was to give detectives full discretion as to whether they recorded information gathered from a witness in a formal statement or on an activity sheet. Ex. 53, Alexander Dep., 54:8-55:12, 57:1-3.

324. Per PPD policy, homicide detectives did not include activity sheets in the binder of documentation that they provided to the DAO in support of a homicide prosecution. Ex. 7, Santiago Dep., Vol. 1, 104:16-105:11.

325. PPD detectives treated attempt to apprehend logs the same as activity sheets. Ex. 53, Alexander Dep., 98:9-24.

326. Under "set practices of the police department," the binder that was provided to the DAO did not include a section for activity sheets, so the activity sheets were not placed in the binder, but, instead, kept in the homicide file that remained in the possession of the assigned homicide detective. Ex. 7, Santiago Dep., Vol. 1, 105:20-106:3, 106:16-20.

327.    PPD determined which documents would be sent to the DAO. Prosecutors did not know to request activity sheets because they did not know what information they did not have. Ex. 8, Wellbrock Dep., 88:8-89:11.

328.    This policy and practice of excluding activity sheets and attempt to apprehend logs from the homicide binder sent to the DAO was in effect at the time that Swainson was prosecuted for the Opher murder. Activity sheets rarely appeared in DAO files for any case from the late 1980s to early 1990s. Ex. 8, Wellbrock Dep., 37:23-38:7.

329.    This policy and practice was followed in the Swainson prosecution as Santiago did not include activity sheets in the DAO binder that was provided to Rubino and Rubino did not receive any activity sheets or attempt to apprehend logs. Ex. 7, Santiago Dep., Vol. 1. 106:16-20; Ex. 9, Rubino Dep., 56:17-22, 77:22-78:12

330.    The policy and practice to withhold activity sheets documenting investigative activity from the DAO binder contravened minimally accepted policing standards of the time and incentivized detectives to selectively omit from documentation produced to the DAO and the defense information that hurt their case or was otherwise inconsistent with their case theory. Ex. 81, Lynch Expert Report, 34.

   **B.    Failure to Train, Supervise, and Discipline**

        **i.    The Pattern of Unconstitutional Investigative Conduct in the PPD
             Homicide Division**

331.    Police practices expert Michael K. Lynch derives his expertise from a 32-year career as a law enforcement professional with extensive experience, knowledge, and practice in law enforcement procedures. He has served as a police officer, detective, sergeant, lieutenant, captain, police inspector, deputy chief of police, assistant chief of police, interim chief of police,

and is currently the Chief of Staff to the Camden County Police Department. Ex. 81, Lynch Expert Report, 1-5.

332.    In forming his opinions regarding the PPD homicide division's policies and practices in place at the time of the Opher murder investigation and Swainson prosecution, Lynch reviewed numerous PPD and DAO personnel deposition transcripts, PPD homicide case files, newspaper articles, federal case filings, judicial opinions, and reports documenting PPD practices and disciplinary systems. Ex. 81, Lynch Expert Report, 39-49.

333.    Based on his expertise and extensive review of evidence, Lynch concluded that PPD leadership has been on notice since the late-1970s that PPD homicide division detectives routinely violated the most basic legal limitations on law enforcement officer conduct, Ex. 81, Lynch Expert Report, 27, including:

      a.    Engaging in the outright fabrication of evidence;

      b.    Coercing witness testimony while recklessly disregarding the falsity of such testimony;

      c.    Suppressing and concealing material evidence; and

      d.    Ignoring leads pointing to the true perpetrators of criminal offenses.

334.    Lynch also concluded that PPD leadership learned of this widespread unconstitutional conduct and in response failed to implement meaningful changes to remedy and prevent instances of misconduct, instead merely paying lip service to the need for reform. Ex. 81, Lynch Expert Report, 27.

335.    Lynch further determined that PPD lacked an effective disciplinary system, with inadequate investigations and minimal, if any, disciplinary sanctions even in cases of gross

misconduct, resulting in a lack of accountability for actions in violation of PPD rules. Ex. 81,

Lynch Expert Report, 27.

336.    This lack of effective discipline gave police officers a clear message that they

could violate established legal and departmental rules with impunity, fostering a culture of

misconduct that led to routine violations of civilians' constitutional rights. Ex. 81, Lynch Expert

Report, 27-28.

        **ii.**      **External Evidence of the City's Knowledge of Widespread Police**
                    **Misconduct**

337.    The City of Philadelphia had notice of policies, practices, and customs within the

PPD that deviated from minimally accepted police practices since at least 1978 when the

Philadelphia Inquirer published a series of articles detailing how PPD homicide detectives

repeatedly engaged in misconduct including fabricating evidence, coercing statements, and

concealing material evidence. Ex. 81, Lynch Expert Report, 11.

338.    Providing further notice to the City of widespread PPD misconduct, federal courts

intervened to enjoin PPD practices that violated the constitution on three separate occasions in

the 1980s. Ex. 81, Lynch Expert Report, 12.

339.    In the late 1980s into the early 1990s, police detectives operating in PPD's 39th

District routinely made unlawful arrests of innocent people and initiated prosecutions based on

fabricated evidence, perjured police testimony, and concealed exculpatory evidence. Ex. 81,

Lynch Expert Report, 12.

340.    When evidence of the 39th District misconduct reached news outlets in the 1990s,

the DAO vacated hundreds of wrongful convictions, the City agreed to pay millions of dollars to

those wrongfully accused, and numerous officers were prosecuted and convicted by federal

authorities. Ex. 81, Lynch Expert Report, 12.

341.    The City also entered into a Settlement Agreement in a lawsuit initiated by the NAACP to address the 39th District practices through which it agreed to implement policy and training initiatives to ensure PPD officers complied with constitutional restrictions on their investigative powers. Ex. 81, Lynch Expert Report, 12.

342.    The Settlement Agreement also included the appointment of an Integrity and Accountability Officer to monitor compliance with the Agreement and in particular to evaluate how the PPD investigated and disposed of misconduct complaints against officers to address the lawsuit's allegations that PPD lacked a functioning disciplinary system. Ex. 81, Lynch Expert Report, 12-13.

343.    Instances of misconduct and ineffective disciplinary systems continued throughout the early 2000s, as documented in a 2015 report issued by the U.S. Department of Justice that was critical of PPD policies and practices. Ex. 81, Lynch Expert Report, 14; *see also* Ex. 82, DOJ Report.

### iii.    PPD Homicide Prosecutions Demonstrating a Pattern of Misconduct

344.    Lynch's report identifies 25 PPD homicide investigations that led to the prosecution of innocent people based on credible allegations of misconduct including fabrication of evidence, coercion of witnesses, and concealment and suppression of material evidence. Ex. 81, Lynch Expert Report, 14-26.

345.    Of these cases, six predate the Opher murder, occurring between 1978 and 1987, demonstrating the practices in place at the time of the Opher murder investigation and indicating that PPD leadership was or should have been aware of the existence of these practices. Ex. 81, Lynch Expert Report, 17-20. These cases include the wrongful prosecutions of:

a.    Matthew Connor, Ex. 83, Connor Commonwealth Motion for New Trial;

b.    Gerald Howell, Ex. 84, Howell Commonwealth Answer to Habeas Petition; Ex. 85, Howell 1/13/22 Evidentiary Hearing Transcript; Ex. 86, Howell 4/28/22 Evidentiary Hearing Transcript;

c.    Co-defendants Bruce Murray and Gregory Holden, Ex. 87, Murray Joint Stipulations of Fact, Ex. 88, Holden Joint Stipulations of Fact; Ex. 89, Murray and Holden 7/25/91 Evidentiary Hearing Transcript;

d.    Ah Thank Lee, Ex. 90, Lee National Registry of Exonerations;

e.    Willie Stokes, Ex. 91, Stokes Report and Recommendation; Ex. 92, Stokes 8/23/89 Evidentiary Hearing Transcript; and

f.    Curtis Crosland, Ex. 93, Crosland Commonwealth Answer to Habeas Petition; Ex. 94, Tilghman Dep.; Ex. 95, Everett Dep.

346.    Lynch identifies eight homicide investigations that occurred within the time period of Opher murder investigation or in the few years following, Ex. 81, Lynch Expert Report, 20-23, resulting in the wrongful prosecutions of:

a.    Pedro Alicea (aka Antonio Martinez), Ex. 96, Alicea (Martinez) Joint Stipulations of Fact; Ex. 97, Alicea Dep.; Ex. 98, Brown Dep.;

b.    Donald Ray Adams, Ex. 99, Adams *Philadelphia Inquirer* Article;

c.    Troy Coulston, Ex. 100, Coulston Commonwealth Answer to PCRA Petition;

d.    Ronald Johnson, Ex. 101, R. Johnson Commonwealth Answer to PCRA Petition;

e.    Walter Ogrod, Ex. 102, Ogrod Joint Stipulations of Fact; Ex. 103, Ogrod Trial Testimony;

        f.        Chester Hollman, Ex. 104, Hollman Joint Stipulations of Fact; Ex. 105, Dawkins Affidavit;

        g.        Willie Veasy, Ex. 106, Veasy Order Granting PCRA Petition; Ex. 107, Veasy DAO Interview Transcript; and

        h.        Shaurn Thomas, Ex. 108, Young Trial Testimony; *see also Thomas v. City of Philadelphia*, No. 17-4196, 2019 WL 4039575 (E.D. Pa. Aug. 27, 2019).

347.    Another nine homicide investigations that Lynch cited to support his conclusions occurred from the mid-1990s to the mid-2000s, Ex. 81, Lynch Expert Report, 23-26, during the time period in which Swainson was pursuing post-conviction relief on the basis of police misconduct, and resulted in the wrongful prosecutions of:

        a.        Johnny Berry, Ex. 109, Berry Vacatur Hearing Transcript, 6/24/2019; Ex. 110, Brooks Trial Testimony; Ex. 111, Rocks Dep.;

        b.        Terrence Lewis, Ex. 112, Lewis Vacatur Hearing Transcript; Ex. 113, Lewis Misconduct Allegations *Philadelphia Inquirer* Article; Ex. 114, Lewis Settlement *Philadelphia Inquirer* Article;

        c.        John Miller, Ex. 115, Miller Report and Recommendation;

        d.        Co-defendants Eugene Gilyard and Lance Felder, Ex. 116, Gilyard & Felder PCRA Petition; Ex. 117, Williams Affidavit; Ex. 118, Det. Dusak Trial Testimony;

        e.        William Johnson, Ex. 119, W. Johnson Motion for Nolle Prosequi; Ex. 120, Bowens Statement;

        f.        David Sparks, Ex. 121, Sparks Commonwealth Answer to PCRA Petition;

g.      Recco Ford, Ex. 122, Ford Complaint; and

h.      Steven Lazar. Ex 123, Lazar DAO Answer to Habeas Corpus Petition; Ex. 124, Kedra Trial Testimony.

348.    Each of these cited investigations resulted in overturned convictions or dismissed charges, and several led to civil rights lawsuits resolved in many cases by seven-figure payouts. Ex. 81, Lynch Expert Report, 14-26.

349.    Lynch opined that because each of these cases involved allegations of the same departures from minimally accepted police practices, including fabrication of evidence, coercion of witnesses, and concealment and suppression of material evidence, they collectively evidence the existence of a pattern and practice of PPD leadership's indifference to unlawful PPD officer conduct in general and, in particular, within the PPD homicide division. Ex. 81, Lynch Expert Report, 15.

### iv.      The City's Indifference to Santiago's Significant History of Misconduct

350.    Santiago was the lead investigator in four of the homicide investigations leading to overturned convictions and dismissed charges that Lynch reviewed, including Swainson's. Each of the four investigations resulted in allegations and sometimes judicial findings of severe police misconduct. Ex. 81, Lynch Expert Report, 15-17.

351.    In addition to Swainson, Santiago's misconduct was responsible for the wrongful prosecutions of Anthony Wright, James Dennis, and Percy St. George. Ex. 81, Lynch Expert Report, 15-17.

352.    Anthony Wright was wrongfully convicted of the 1991 rape and murder of an elderly woman, and he spent nearly 25 years in prison before his conviction was overturned by DNA evidence. Ex. 81, Lynch Expert Report, 15-16.

a.  During the 1991 homicide investigation, Santiago and another PPD detective fabricated a written confession from Wright after interrogating him for hours, failing to inform him of his rights, and denying his requests for a phone call. Ex. 125, Wright 1993 Trial Testimony, 151-52, 156-57, 163; Ex. 126, Wright 2016 Trial Testimony, 9, 20-21, 16-17; Ex. 127, Wright Fabricated Confession.

b.  The detectives wrote out a false confession, which they attributed to Wright. Ex. 127, Wright Fabricated Confession.  The detectives then coerced Wright to sign the fabricated document without allowing him to read it, by handcuffing him to a chair, pressing on his neck, threatening him with extreme violence, and promising him he could go home after hours of interrogation. Ex. 125, Wright 1993 Trial Testimony, 156-63; Ex. 126, Wright 2016 Trial Testimony, 22, 61, 80-81.

c.  At the 1993 criminal trial, although Wright maintained his innocence and that the "confession" had been fabricated, Santiago falsely claimed that the fabricated statement was a verbatim, contemporaneous record of Wright's interrogation. Ex. 125, Wright 1993 Trial Testimony, 145-46, 150-51, 156; Ex. 128, Santiago 1993 Wright Trial Testimony, 22-23, 29-40

d.  After DNA testing excluded Wright as the source of male DNA in the victim's rape kit and identified a different man as the true perpetrator, Santiago continued to falsely maintain that Wright freely and willingly confessed. Ex. 129, Smith 2016 Wright Trial Testimony, 29-42; Ex. 128, Santiago 1993 Wright Trial Testimony 39-5l.

73

    e.     At a retrial in 2016, Santiago again testified falsely that Wright had confessed to him and that the fabricated statement was valid. Ex. 128, Santiago 1993 Wright Trial Testimony, 39-5l; Ex. 125, Wright 1993 Trial Testimony, 150.

    f.     The jury acquitted Wright of all charges after less than an hour of deliberation. Ex. 130, City of Philadelphia Press Release 6/6/18.

    g.     The City settled Wright's wrongful conviction civil rights lawsuit for $9.85 million. Ex. 130, City of Philadelphia Press Release 6/6/18..

    h.     In 2021, Santiago was indicted for perjury for his false testimony in Wright's 2016 retrial and in Wright's civil rights lawsuit; the perjury charges remain pending. Ex. 131, Santiago Grand Jury Presentment.

353.    James Dennis was wrongfully convicted of the 1991 murder of a teenage girl and spent more than 25 years on death row before his conviction was vacated in 2017 based on findings that exculpatory evidence was suppressed. Ex. 81, Lynch Expert Report, 17.

    a.     Early in the investigation, Dennis told detectives he had nothing to do with the crime and provided them with a detailed alibi and asserted his innocence. Ex. 132, Dennis Trial Testimony, 96-107, 127-28, 130-33.

    b.     Santiago, however, suppressed information about, among other things, a witness's failure to identify Dennis in a photo array and a witness's failure to identify Dennis in a lineup. Ex. 133, Santiago Dennis Trial Testimony, 9-11, 13-17.

    c.     Santiago and his partner also falsely claimed at the time of the investigation that clothing police had allegedly confiscated from Dennis's

home—evidence that may have had led to critical testing that exculpated
Dennis—had been "lost." Ex. 133, Santiago Dennis Trial Testimony, 31-
26.

d.    Most critically, Santiago had obtained documentation from Dennis's alibi
witness that would have convincingly corroborated the witness's
testimony that she observed Dennis at the time the murder was committed,
but Santiago buried that documentation and never disclosed it to Dennis.
Ex. 133, Santiago Dennis Trial Testimony, 37-46.

e.    In 2024, a civil jury that heard this evidence found Santiago and his
partner liable for deliberately concealing evidence and awarded Dennis
$16 million, including $3 million in punitive damages against Santiago.
Ex. 134, Dennis Verdict Sheet.

354.    In the early-1990s, Percy St. George was incarcerated for more than thirteen
months on murder charges based on Santiago's representations that an eyewitness had identified
him as the perpetrator. The charges were then dismissed because the supposed witness testified
that he had not actually witnessed the murder at all and that Santiago coerced him into a making
a false identification. Ex. 81, Lynch Expert Report, 16-17.

a.    In 1993, Santiago interrogated a 16-year-old boy named David Glenn,
whose name had been falsely given to police by an eyewitness as the
eyewitness's own. Ex. 135, St. George Preliminary Hearing Testimony,
18-25, 30-32.

b.    At the time Santiago interviewed Glenn, Percy St. George was Santiago's
suspect. Ex. 17, Santiago Dep., Vol. 3, 29:4-7.

c.      But it is undisputed that Glenn did not actually see the murder; a different teenager did and later posed as Glenn. Ex. 135, St. George Preliminary Hearing Testimony, 12-13, 33, 40.

d.      Santiago separated Glenn from his mother and used suggestion to induce Glenn to falsely identify a photograph of St. George as the perpetrator, even though Glenn had not actually witnessed the murder. Ex. 135, St. George Preliminary Hearing Testimony, 32, 37, 44-47 (A: [Santiago] pointed, I didn't point, he pointed. Q: And, so, he basically pointed to the guy that he wanted you to identify? A: Yes.).

e.      Glenn did not know Percy St. George and had never seen him before. Ex. 135, St. George Preliminary Hearing Testimony, 13, 37.

f.      Glenn stated that Santiago threatened him with incarceration in order to coerce him into acquiescing to the false identification of St. George: "he told me I could get locked up, so I was scared, because I had never been locked up before." Ex. 135, St. George Preliminary Hearing Testimony, 32.

g.      Santiago documented in a report that he forwarded to the prosecution that David Glenn had identified Percy St. George from a full and fair photo array immediately and without suggestion. Ex. 17, Santiago Dep., Vol. 3, 24:16-25:6.

h.      Santiago was sequestered, and when he took the stand he did not know that Glenn had truthfully testified that he had made a false identification of

St. George because Santiago had threatened him and suggested who to pick. Ex. 17, Santiago Dep., Vol. 3, 30:11-31:14.

i.      Santiago then testified that Glenn had made an immediate positive identification from a photo array without any suggestion whatsoever. Ex. 135, St. George Preliminary Hearing Testimony, 99-100, 103.

j.      Thereafter, when St. George's counsel moved to dismiss the prosecution based on Santiago's misconduct, Santiago declined to answer questions on the grounds that his answers could incriminate him in violation of his Fifth Amendment rights. Ex. 136, St. George Motion to Bar Prosecution; Ex. 137, Santiago Response to Motion to Bar Prosecution.

k.      At his deposition, Santiago admitted that the allegation made against him in the Percy St. George case was exactly the allegation Swainson is making against him in this lawsuit: that he used suggestion to compel a witness who worried about his own criminal consequences to identify Santiago's suspect. Ex. 17, Santiago Dep., Vol. 3, 43:4-24.

l.      At his deposition Santiago denied threatening Glenn or suggesting to Glenn who to pick out and stated that Glenn was lying when he testified in court that those things happened. Ex. 17, Santiago Dep., Vol. 3, 44:21-45:7.

m.      Santiago had no explanation for why Glenn, a teenager with no record who had been warned by the court about the consequences of perjury, would lie about Santiago's actions in court. Ex. 17, Santiago Dep., Vol. 3, 45:8-16.

355. Lynch concluded that given the allegations and evidence that Santiago engaged in egregious and sometimes illegal conduct spanning several cases, PPD must conduct a complete investigation into Santiago's conduct, including an audit of homicide cases he worked on that led to currently undisturbed convictions. Ex. 81, Lynch Expert Report, 28.

356. Lynch specified that such an investigation should address whether Santiago committed perjury in any other case. Ex. 81, Lynch Expert Report, 28.

357. No such investigation has occurred into overturned investigations that Santiago or other detectives conducted, demonstrating the City's ongoing indifference. Ex. 81, Lynch Expert Report, 26.

Respectfully submitted,

/s/ *Jonathan H. Feinberg*
Jonathan H. Feinberg

/s/ *Grace Harris*
Grace Harris

KAIRYS, RUDOVSKY, MESSING,
 FEINBERG & LIN LLP
718 Arch Street
Suite 501 South
Philadelphia, PA 19106

/s/ *Emma Freudenberger*
Emma Freudenberger
Amelia Green
Christina Matthias
Katrina Rogachevsky
NEUFELD SCHECK BRUSTIN
 HOFFMANN & FREUDENBERGER, LLP
200 Varick Street, Suite 800
New York, NY 10014

*Counsel for Plaintiff Andrew Swainson*
