IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANDREW SWAINSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, ET AL. | : | NO.  22-2163 |

**MEMORANDUM**

**Padova, J.**                                                              **July  2, 2025**

Plaintiff Andrew Swainson brought this action pursuant to 42 U.S.C. § 1983 and state common law against the City of Philadelphia and certain police officers arising from his wrongful conviction for the 1988 murder of Stanley Opher.  Plaintiff was convicted in 1989 and imprisoned for more than 30 years.[1]    The City, Defendant Detective Joseph D. Fischer, and Defendant Detective James Alexander have brought a Motion for Summary Judgment with respect to all of Plaintiff's claims against them.  Defendant Manuel Santiago has filed a Motion for Summary Judgment adopting the Motion for Summary Judgment brought by the other Defendants.[2]  For the following reasons, we deny the Motions in part and grant them in part as follows.

---

[1] Plaintiff maintains that he is innocent of the murder of Mr. Opher and that Defendants admitted his innocence by failing to respond his November 1, 2023 Request for Admission, which states:  "[Plaintiff] is factually innocent of the January 17, 1988 shooting of Stanley Opher.'" (Reply at 2-3 (citing Resp. at 26 n.4).)  Defendants have nonetheless taken the position that Plaintiff is guilty and they "reserve the right to prove his guilt by a preponderance of the evidence at trial of this matter."  (Id. at 3 (quotation omitted).)  We have not been asked to decide this issue in the context of the instant Motions for Summary Judgment and do not address it further.

[2] The Motion for Summary Judgment brought by the City and Detectives Fischer and Alexander asks us to enter summary judgment on behalf of the City and Detectives Fischer and Alexander.  The Motion for Summary Judgment brought by Detective Santiago merely adopts the Motion for Summary Judgment brought by the City and Detectives Fischer and Alexander.  (See Docket No. 80 at 2 of 3.)  We conclude, accordingly, that no party has asked us to enter summary judgment with respect to the claims against Detective Santiago.

I.    **FACTUAL BACKGROUND**

A.    <u>The Murder of Stanley Opher</u>

Mr. Swainson, who was originally from Jamaica, moved from New York City to Philadelphia, where he met Mr. Opher, in September 1987. (Defs. Ex. 3 at D000133; Swainson Dep. (Defs. Ex. 2) at 41, 64-66.) Mr. Opher and Mr. Swainson sold drugs out of a house located at 5413 Sansom Street that was run by a man known as "Uncle." (3/16/89 N.T. (Defs. Ex. 4) at 87-89.)

At 3:40 a.m. on January 17, 1988, Mr. Opher was shot in the back by a shotgun at the 5413 Sansom Street house and he died later that day. (Pl. Ex. 1.) Plaintiff maintains that he was not at that location at the time of the Opher murder, rather, he was at a friend's house with his girlfriend. (Swainson Dep. (Pl. Ex. 3) at 267-75; Defs. Ex. 3 at D000134-35.) Philadelphia Police Officer John Kay was in the area at the time of the shooting and saw a man named Paul Presley run from the scene. (Pl. Ex. 2 at D000204, D000208.) Officer Kay followed Mr. Presley and found him around the corner, crouched under a bush. (<u>Id.</u> at D000204-05; Santiago Dep. Vol. 1 (Pl. Ex. 7) at 219.) Mr. Presley's hand was bleeding and he had blood on his coat. (Pl. Ex. 2 at D000206.) Mr. Presley told Officer Kay that his hand injury was caused by a shotgun pellet. (<u>Id.</u> at D000208.) Officer Kay also saw another man, Jeffrey Green, running from the area of the shooting. (<u>Id.</u> at D000205, D000208.) Officer Kay stopped Mr. Presley and Mr. Green at 55th and Sansom Streets. (<u>Id.</u> at D000205-06.) Another man, Ashley Hines, who was driving a blue Toyota, pulled up at 55th and Sansom Streets, got out of his car, pointed towards Mr. Green and said: "he's with me he has nothing to do with this." (<u>Id.</u> at D000206, D000208 (emphasis omitted).) Presley, Green and Hines were all arrested in connection with the shooting of Mr. Opher. (Pl. Ex. 18.) Mr. Presley gave a statement to the police on January 17, 1988, in which he stated that he had gone to 5413

Sansom Street to purchase "A Bag" when Opher was shot, but that he had no knowledge of the shooter. (Pl. Ex. 23 at D000262-63.)

      B.    The Early Police Investigation

On January 18, 1988, Detective Santiago was assigned to lead the investigation into the shooting, supervised by Lieutenant Arthur Durrant. (Pl. Ex. 12.) On January 21, 1988, Vernon Montague, a friend of Mr. Opher, told Detective Francis Miller that "the word being passed around the streets is that the deceased was shot during a hold-up attempt." (Pl. Ex. 14.) When the police initially investigated the murder, one of the theories they considered was that the murder was the result of a robbery of the drug house. (Santiago Dep. Vol. 2 (Pl. Ex. 15) at 106, 148-49.)

The police interviewed Jacqueline Morsell on January 18, 1988. (Pl. Ex. 19.) She told the police that Mr. Opher was her godbrother and that they grew up together. (Id. at D000274.) Ms. Morsell also told the police about "Dred," one of the men that worked in the drug house with Mr. Opher. (Id. at D000277.) Ms. Morsell said that Dred told her that he had killed plenty of people. (Id.) Ms. Morsell also told the police that Dred had shotguns, rifles, a .45 automatic, an UZI, and a "snub nose" in the house at 5413 Sansom Street. (Id. at D000280.) The police tried to interview Ms. Morsell again in March 1988, but there is no record that a second interview ever took place. (Harris Decl. (Pl. Ex. 21) ¶ 3.l., Pl. Exs. 71-73.)

Mr. Swainson was first interviewed by Detective Santiago in connection with the Opher murder on January 22, 1988. (See Pl. Ex. 5 at D000133.) He maintains that he was not told by the police officers who took his statement that he was a suspect in Mr. Opher's murder. (Id. at 305-06.) In his statement, Mr. Swainson discussed the drug house where he worked with Mr. Opher. (Pl. Ex. 5 at D000137-38.) He also provided Detective Santiago with a detailed alibi for the time of the Opher murder. (Id. at D000134-35.) Mr. Swainson gave Detective Santiago two

addresses where he could be reached in Philadelphia, his mother's address in New York, and his employer's address in New York. (Id. at D000133.) Detective Santiago has admitted that Mr. Swainson did not say anything in this interview that would implicate him in Mr. Opher's murder. (Santiago Dep. Vol. 2 at 200-01.) Mr. Swainson was fingerprinted, photographed, and released after he gave his statement. (Swainson Dep. at 299, 305.)

On the same day that Mr. Swainson gave his statement to Detective Santiago, Crystal Justice gave a statement to Detective Fischer. (Pl. Ex. 24.) Ms. Justice told Detective Fischer that she was a friend of Mr. Opher, and that Mr. Opher had recently moved to 5413 Sansom Street, where he sold drugs. (Id. at D000325.) Ms. Justice drove to 5413 Sansom Street around 2:30 or 2:45 on January 17, 1988. (Id. at D000326.) Mr. Opher let Ms. Justice into the house while he sold drugs to people who rang the doorbell. (Id.) Ms. Justice also told Detective Fischer that the last person she saw come to the door didn't buy anything. (Id.) This man was about 6' 1" inch tall and wore a tan-colored, knee-length puffy coat. (Id.) Ms. Justice "had a real bad feeling about that guy" and left the house after he did. (Id.) Lieutenant Durrant showed Ms. Justice a coat that had been confiscated from Mr. Presley on January 17, 1988. (Pl. Ex. 26.) Ms. Justice reported that it "looked like the coat the guy had on, it had the same design and the same size the same leng[th]. It looked tan to me . . . I know the design and it was just like that coat." (Id. at D000327.) Ms. Justice also told Detective Fischer that she would recognize the man who came to the door if she saw him again. (Id.) There is a notation on Mr. Presley's police photo that he was six feet tall. (Pl. Ex. 25.) Nonetheless, the District Attorney withdrew the charges against Mr. Presley, Mr. Hines, and Mr. Green at their Preliminary Hearing. (Pl. Ex. 28 at D000171.)

By early February 1988, Detective Santiago was out of leads in connection with the Opher murder. (Santiago Dep. Vol. 3 (Pl. Ex. 17) at 57.) On February 6, 1988, Ms. Justice had a second

4

interview with the police.  (See Pl. Ex. 27.)  Ms. Justice told Detective Blackburn that she learned about Opher's shooting from Latanya Furman, her cousin.  (Id. at D000333.)  She and Ms. Furman drove to the hospital to check on Mr. Opher, who was in surgery, and briefly spoke to a police officer who had been in the emergency room.  (Id. at D000334-35.)  Ms. Justice told the police officer that Ms. Furman had been at the scene of the shooting and had seen Mr. Opher lying on the ground.  (Id. at D000335.)  The police officer asked Ms. Furman her name and she responded that her name was Sandra White.  (Id.)  Detective Blackburn told Ms. Justice during her February 6, 1988 interview that the police had learned during their investigation of Mr. Opher's murder that Ms. Furman had said "something about setting up the drug dealers on 54th St[.] and Samson St." (Id. at D000336.)  Ms. Justice told Detective Blackburn that, a week or two before Mr. Opher was shot, she spoke on the phone with Ms. Furman's friend, Darren Brown, who asked her to set up the Jamaicans on 54th Street, but she refused.  (Id. at D000336-37.)  Two days after this conversation, Ms. Justice told Blood (Mr. Swainson) about what Mr. Brown said.  (Id. at D000337.)  Ms. Justice also told Detective Blackburn that Ms. Furman believed that Blood murdered Mr. Opher.  (Id. at D000339.)

    C.    Mr. Presley's Identification of Mr. Swainson as the Shooter

    On February 12, 1988, six days after Ms. Justice's second interview with police, Detective Santiago brought Mr. Presley in for a second interview.  (Santiago Dep. Vol. 3 at 64065.)  Detective Santiago was aware, at the time of this interview, of Mr. Presley's criminal history, that Mr. Presley was incarcerated at the time of the interview, that Mr. Presley had a drug problem, and that Mr. Presley had been high throughout the night of Mr. Opher's shooting.  (Santiago Dep. Vol. 1 at 211-13, 219-20.)  Detective Santiago was also aware that Police Officer Kay had reported that, when he found Mr. Presley crouching under a bush after Mr. Opher's shooting, Mr. Presley told

him "'I didn't shoot anybody.'"  (<u>Id.</u> at 219.)   The written statement that Detective Santiago prepared after his February 12, 1988 interview with Mr. Presley differed significantly from Mr. Presley's original statement.  In Mr. Presley's first statement, he told police officers that, when he was going up the steps at 5413 Sansom Street, he heard a shot and was knocked down by two men, one wearing an orange-brown coat and a big hat and the other wearing a dark hooded coat.  (Pl. Ex. 23 at D000262.)   Mr. Presley also denied shooting Mr. Opher and denied knowing who had shot Mr. Opher.  (<u>Id.</u> at D000262-63.)   Detective Santiago recorded Mr. Presley's description of the Opher shooting in Mr. Presley's second statement as follows:

> When I walk up to the house there is no one on the porch.  I had my money out, about 30.00 dollars.  [B]efore I rang the bell the door just openned [sic] up.  I saw the guy that was shot run out the door.  I side stepped and he went by me.  He got to the steps of the porch, and this brown skin dude came out the door behind him.  [H]e stepped out the door.  I don't think he saw me, because I was to the side about two feet.  He just steps on the porch from inside the house, and he had the sawed-off shotgun . . . in his hand and he shot it.  I actually saw the guy get hit in the back and either fall off the steps or run off.  I was looking at the guy that was shot and then I look at the guy that did the shooting and he hollered at me – Yo.  I put up my hands and said something like hold up brother.  I then see another guy come to the door from inside the house.  This guy has a rifle in his hands.  He turns the rifle on me and I grabbed the rifle and pushed it up, and then I grabbed him.  When he pointed the rifle at me he said – get the fuck out of here.  But I [sic] afraid of getting shot and that's when I grabbed the rifle.  I tussled with him and turned him around and I was pushing him into the guy with the sawed-off.  I had [them] pushed up against the wall on the porch, and the guy with the sawed-off was pulling at me.  I [sic] surprised he didn't shot [sic] me in the back, but I wasn't about to let go of the rifle.  The other guy pulled me and I'm near the top of the steps and I lose my balance and I fall down the steps.  I'm down on the street and I see the guy with the sawed-off runs toward 54th street . . . .  The other guy, the one with the rifle ran towards 55th st. . . .

(Pl. Ex. 33 at D000267-68.)

Mr. Presley's second statement also differed from Police Officer Kay's description of what he saw and heard on January 17, 1988.  As detailed above, Police Officer Kay stated that he heard a shotgun blast and then saw Mr. Presley and Jeffrey Green running from the area of the drug

house.  (Id. at D000204-05.)   Officer Kay did not include anything in his statement about witnessing Mr. Presley struggle over a rifle with two other men on the porch of 5413 Sansom Street.  Detective Santiago never asked Officer Kay about the inconsistences between his statement and Mr. Presley's second statement.  (Santiago Dep. Vol. 3 at 102-04.),

Detective Santiago's written record of Mr. Presley's second statement also includes Mr. Presley's identification of Mr. Swainson as the person who shot Mr. Opher:

Q.  I am showing you a series of photos . . .  do you recognize anyone?

A.  Yes, this photo—is the guy that did the shooting, he had a leather apple hat on the big ones (Picking out photo of Andrew Swinson [sic]).

(Pl. Ex. 33 at D000269.)  In the Affidavit of Probable Cause that Detective Santiago prepared to obtain an arrest warrant for Mr. Swainson, he described Mr. Presley's February 12, 1988 identification of Mr. Swainson as follows:  "Presley states that he would be able to recognize both of the males that were involved in shooting the decedent.  Presley was then shown an array of photos, and he picks out the photo of Andrew Swinson [sic] (Blood), as the male with the sawed-off shotgun that shot and killed Stanley Opher."  (Pl. Ex. 28 at D000173.)  Prior to his trial, Mr. Swainson filed a Motion to Suppress Identification, which was heard on March 8, 1989.  (See Pl. Ex. 35.)  During the Hearing, Detective Santiago testified that he showed Mr. Presley seven photographs of black males in their mid-twenties, one of which was a photograph of Mr. Swainson. (Id. at 20-21.)  Detective Santiago understood that it was important to keep a record of the photo array shown to the witness, whether the original or a photocopy of the photographs the witness had seen, in the homicide file.  (Santiago Dep. Vol. 1 at 80-81.)  Nonetheless, the 1,343 page Stanley Opher murder investigation file produced by the Defendants did not contain a copy of the photo array that Detective Santiago reported having shown to Mr. Presley.  (Harris Decl. ¶ 3.e.)

The file did, however, contain copies of seven photographs of Mr. Swainson. (Santiago Dep. Vol. 1 at 297-98.)

Judith Rubino, the Assistant District Attorney ("ADA") who prosecuted Mr. Swainson, asked Detective Santiago for a copy of the photo array. (Rubino Dep. (Pl. Ex. 9) at 130.) He gave her photos on seven different sheets, which, in her opinion, was "not what a photo spread looks like." (Id. at 134.) A photo spread should have been all seven photos displayed side-by-side simultaneously. (Id. at 134-35.) The District Attorney's Office ("DAO") file contains an envelope with the identifying information for six individuals whose Philadelphia Police Department ("PPD") numbers correspond to the filler photographs in the photo array that Detective Santiago claims he showed to Mr. Presley. (Santiago Dep. Vol. 1 at 292.) One of those photographs has the number 645554 written on the back. (Pl. Ex. 49 at NSB Swainson 057372.) The identification box corresponding to number 645554 contains the name Evans Daniels and is dated 2/27/88, two weeks after Detective Santiago showed Mr. Presley the photo array. (Pl. Ex. 33 at D000269; Pl. Ex. 50.) During his deposition in this case, Detective Santiago was asked why the information box for Mr. Daniels' photo is dated after the date on which Detective Santiago showed the photo array to Mr. Presley. (Santiago Dep. Vol. 1 at 293.) Detective Santiago suggested that it was likely that someone had tampered with the envelope that contained the information box. (Id. at 293-94.)

Ms. Rubino relied on Mr. Presley's photographic identification of Mr. Swainson as her basis for probable cause in this case. (Rubino Dep. at 58-59.) She also relied on Detective Santiago's representation "that he had obtained an immediate, unequivocal, positive photographic identification from Paul Presley out of a fair array with no suggestion." (Id. at 59.) She would not have proceeded with the case against Mr. Swainson if she had "learned that Detective Santiago

had misrepresented . . . anything about the circumstances of that photographic identification." (Id. at 60.)

Mr. Presley appeared as a witness during Mr. Swainson's April 14, 1988 Preliminary Hearing, and was asked to identify the individual who shot Mr. Opher. (See 4/14/88 N.T. (Pl. Ex. 37) at 16.) Mr. Presley initially responded that he did not see that person in court. (Id.) However, he also testified that he saw a man who "looks closely familiar to the guy that shot him" but with shorter hair. (Id. at 15-16, 35.) Mr. Presley also looked in the direction of Mr. Swainson at some point during his testimony on this subject, but did not specifically identify Mr. Swainson as the person who shot Mr. Opher. (See id. at 16-17.) On June 10, 1988, Mr. Presley signed a statement in which he said that the man he saw in the courtroom, Mr. Swainson, was not present at the shooting of Mr. Opher. (Pl. Ex. 38 at D015704.) Mr. Presley said in his June 10, 1988 statement that he could say that Mr. Swainson was not there "because I've seen him, even though I picked his photo out. At the time I thought it was him, but since I seen him at court . . . I realized that [Mr. Swainson's] not the guy. The guy was much darker than [Mr. Swainson] is." (Id.)

D.    Mr. Swainson's Arrest for Mr. Opher's Murder

A warrant for Mr. Swainson's arrest for the murder of Mr. Opher was approved on February 15, 1988. (Pl. Ex. 64.) On that date, police officers, including Detective Santiago and Lieutenant Durrant, went to a Philadelphia address provided by Mr. Swainson to arrest him for the murder of Stanley Opher. (Id.; Pl. Ex. 5.) When they arrived, two individuals, Donny Eubanks and Isiah Thomas, told them that Mr. Swainson had gone to Jamaica for vacation and would be back soon. (Pl. Ex. 64.) Since Mr. Swainson was not there, Detective James Alexander and his partner Detective Michael Cohen of the PPD fugitive squad were assigned to find and arrest Mr. Swainson. (Santiago Dep. Vol. 2 at 134; Alexander Dep. (Pl. Ex. 53) at 12-14, 18, 21.) Detectives

Santiago, Alexander, and Cohen frequently communicated about their efforts to arrest Mr. Swainson. (Id. at 36-37.) On February 18, 1988, Detectives Alexander and Cohen learned that Mr. Swainson had gone to Jamaica to get married and would be returning to the United States. (Id. at 57, Pl. Ex. 65.) The next day, they learned from Mr. Swainson's sister that he left for Jamaica on February 11, 1988 and was expected to return to Philadelphia during the first week of March. (Pl. Ex. 66.)

On February 19, 1988, Detectives Alexander and Cohen "prepared [an] application for issuance of [an] Unlawful Flight to Avoid Prosecution Warrant." (Id.) On February 20, 1988, Robert Wolfinger, the Chief Inspector of the PPD's Detective Bureau, sent a letter to Philadelphia Deputy District Attorney Raymond Harley, asking Mr. Harley to "request[] the United States Attorney to issue a warrant charging Andrew Francis Swinson [sic] with Unlawful Flight to Avoid Prosecution on the charge of Murder." (Pl. Ex. 67.) Mr. Wolfinger stated in this letter that "[i]nvestigation by the Homicide Division revealed that Andrew Swinson [sic] informed persons close to him that after the murder, he was going to flee to Jamaica." (Id.) The homicide file for Mr. Opher does not contain any information that would indicate that a federal Unlawful Flight to Avoid Prosecution Warrant was issued for Mr. Swainson. (Harris Decl. ¶ 3.k.) Nonetheless, Ms. Rubino believed at the time of Mr. Swainson's trial, based on conversations with Detectives Cohen and Santiago, that the detectives had such a warrant. (Rubino Dep. at 66.)

Mr. Swainson returned to the United States during the first week of March, 1988 and received a message that Detective Santiago had left for him, asking him to call when he returned from Jamaica. (Santiago Dep. Vol. 3 at 75.) On March 8, 1988, Mr. Swainson called as instructed and told Detective Santiago that he had returned from Jamaica and was in New York at his parents' house. (Pl. Ex. 69.) Detective Santiago wrote, in an Activity Sheet documenting this telephone

conversation, that Mr. Swainson "does not know that he []is currently wanted for murder, and the information was not given to [him]." (Id.) Mr. Swainson was subsequently arrested by New York Police Department officers at his parents' home, which was one of the addresses that Mr. Swainson had given to Detective Santiago during his January 22, 1988 interview. (Santiago Dep. Vol. 3 at 80-81; Pl. Ex. 5 at D000133.)

Ms. Rubino argued, during Mr. Swainson's trial and in closing, that the jury "should consider Mr. Swainson's fleeing to Jamaica after he was interviewed by police in connection with this case as evidence of consciousness of guilt." (Rubino Dep. at 65.) Ms. Rubino believed that this was true based on the representations made to her by Detectives Santiago and Cohen. (Id. at 66, 68.) Ms. Rubino also obtained a jury instruction regarding flight. (Id. at 68-69.) However, Ms. Rubino was not aware during Mr. Swainson's trial of the Activity Sheet indicating that Mr. Swainson had called Detective Santiago when he returned to New York and told Detective Santiago that he was in New York at his parents' house. (Id. at 71.) If she had been aware of this information, she would have provided it to the defense and would not have argued flight as consciousness of guilt at Mr. Swainson's trial. (Id. at 71-72.)

E.    Activity Sheets

Activity sheets, like the one on which Detective Santiago recorded his telephone conversation with Mr. Swainson, were "informal document[s] [Philadelphia police officers] used in the homicide division that [were] meant to apprise [their] supervisors and fellow detectives of important things going on in an investigation." (Santiago Dep. Vol. 1 at 95.) "Activity sheets were generally done at the end of each tour." (Id. at 98.) They were also completed at the end of an interview, or after a crime scene was processed. (Id.) "[T]he purpose of the activity sheets was to have a record of . . . the significant investigative steps" being taken by detectives. (Id. at 99.)

"[A]ctivity sheets were done on a case by case basis," meaning that they were associated with cases and would only contain information from that case. (Id. at 99-100.) Detectives did not give Activity Sheets to ADAs at the time of Mr. Opher's homicide. (Id. at 102-05.) That changed later, possibly in the mid-1990s. (Id. at 102.) When Detective Santiago prepared binders to be sent to the DAO, he followed the PPD's policy to omit Activity Sheets unless the district attorney asked to see a particular activity sheet. (Id. at 104-05.) The PPD's policy was to separate the binder given to the DAO into different categories, none of which included a section for Activity Sheets. (Id. at 105-06.) Detectives maintained Activity Sheets in the PPD's file. (Id. at 106.)

Detective Santiago prepared the binder for Ms. Rubino to use in her prosecution of Mr. Swainson. (Id.) He did not include any Activity Sheets in the binder. (Id.; Rubino Dep. at 168-69.) Detective Santiago also omitted Attempt to Apprehend Logs prepared by Detectives Alexander and Cohen from the binder that he gave to Ms. Rubino. (Rubino Dep. at 77-78.)

### F.    Mr. Swainson's Conviction and Post-Conviction Relief

On March 21, 1989, a jury convicted Mr. Swainson of first-degree murder, criminal conspiracy, and possession of an instrument of crime in the death of Mr. Opher. (Concise Statement of Material Facts ("SMF") ¶ 113.) He was sentenced to life imprisonment without the possibility of parole. (Id. ¶ 114.) On October 13, 2008, a private detective that worked for Mr. Swainson's post-conviction attorneys took a statement from Mr. Presley in which Mr. Presley stated that Mr. Swainson was not the man that shot Mr. Opher.[3] (Id. ¶ 115; Defs. Ex. 50 at D002116.) Mr. Presley also admitted in this statement that he committed perjury when he

---

[3] Defendants argue that we cannot rely on this Declaration in connection with the instant Motion because it is inadmissible hearsay. We need not address Defendants' argument in the context of these Motions because we mention this statement solely as part of the background of the instant litigation and do not consider this statement for the truth of the information included therein.

identified Mr. Swainson as the shooter during Mr. Swainson's 1989 trial. (Defs. Ex. 50 at D002116.) Mr. Presley died on November 13, 2009. (SMF ¶ 116.)

Between 1993 and 2012, Mr. Swainson filed numerous petitions for post-conviction relief in the state and federal courts. (Pl. Ex. 43 ¶¶ 62-67.) On August 18, 2014, Mr. Swainson filed his third Post-Conviction Relief Act petition in state court, based, in part, on a July 22, 2014 statement given by Ms. Morsell recanting her trial testimony, which implicated Mr. Swainson in Mr. Opher's murder. (Id. ¶ 68; 3/16/89 N.T. (Pl. Ex. 76) at 119-23, 156; Morsell Decl. (Pl. Ex. 74).) He amended that petition on July 13, 2017 to include claims pursuant to Brady v. Maryland, 373 U.S. 83 (1963), after learning that evidence from the Opher homicide file had been suppressed. (Pl. Ex. 43 ¶ 68.) On November 18, 2019, he again amended his third petition, to raise claims regarding Mr. Presley's testimony and evidence admitted at trial regarding his alleged flight. (Id. ¶ 70.)

While the state court was considering Mr. Swainson's third PCRA petition, his attorneys submitted a request that the DAO's Conviction Integrity Unit ("CIU") review and investigate his case and his claim of innocence. (Id. ¶ 71.) The CIU reviewed the prosecution file, all of the transcripts in the case, and a partial copy of the homicide file that had been provided to Mr. Swainson by the City in 2017. (Id. ¶ 73 & n.4.) In March 2019, the CIU also obtained a copy of the PPD's complete Opher homicide file and, on March 21, 2019, provided it to Mr. Swainson's attorneys. (Id. ¶¶ 74-76.) There were several pieces of evidence in the partial copy of the Opher homicide file that was provided to Mr. Swainson's attorneys in 2017 and in the complete copy of the homicide file that was provided to Mr. Swainson's attorneys in 2019 that had not previously been disclosed to Mr. Swainson or his trial counsel. (Id. ¶ 77.)

Andrew Wellbrock, an ADA with the CIU, investigated Mr. Swainson's case. (Wellbrock Dep. (Pl. Ex. 8) at 9-11.) At the conclusion of his investigation, Mr. Wellbrock did not believe

that he "could prove beyond a reasonable doubt that Mr. Swainson was guilty." (Id. at 55.)  On

February 12, 2020, Mr. Wellbrock filed the Commonwealth's Answer to Mr. Swainson's third

Post-Conviction Relief Act petition.  (See Pl. Ex. 44.)  The Commonwealth's Answer concluded

as follows:

> After careful consideration of the individual facts of this case, the relevant law, and
> the role of the prosecutor as a "minister of justice," see Pa. R. Prof. Resp. 3.8
> comment 1 (Special Responsibilities of a Prosecutor), the Commonwealth agrees
> that Swainson's conviction resulted from a violation of his right to due process as
> described by Brady and its progeny, i.e., the suppression of evidence that would
> have changed the outcome of his trial, as well as the Commonwealth's reliance on
> false testimony in violation of Napue [v. Illinois, 360 U.S. 264 (1959)].  Swainson
> is entitled to post-conviction relief in the form of a new trial under 42 Pa. C.S. §
> 9543.

 (Id. ¶ 141.)  The Commonwealth asked the state court to vacate Mr. Swainson's sentence and

order a new trial.  (Id. at 30.)  On June 12, 2020, Judge Shelley Robins New granted Mr. Swainson

a new trial and he was released from prison.  (SMF ¶¶ 120-21.)  On June 18, 2020, the DAO nolle

prossed its case against Mr. Swainson.  (Id. ¶ 122.)

Mr. Swainson filed the instant lawsuit against the City of Philadelphia, Detective Santiago,

Detective Cohen, Detective Alexander, Lieutenant Durrant, Detective Miller, Detective Fischer,

Detective Raymond Barlow, and John Doe on June 2, 2022.  On August 26, 2022, Mr. Swainson

filed an Amended Complaint that did not name Detective Barlow as a defendant.  Mr. Swainson

filed a Second Amended Complaint on May 24, 2023.  (See Docket No. 58.)  The Second Amended

Complaint asserted claims against John Della Rocca as personal representative of the estates of

Lieutenant Durrant, Detective Miller, and Detective Cohen, all of whom are deceased.  (Id.)  Mr.

Swainson has informed the Court that he has agreed to dismiss those claims.  (See Resp. at 3 n.1.)

We dismissed Mr. Swainson's claim against John Doe by agreement of the parties on June 4, 2024.

(See Docket No. 76.)

The Second Amended Complaint asserts six claims for relief against the City of Philadelphia and Detectives Manuel Santiago, James Alexander, and Joseph D. Fischer:[4]

> Count I:     a claim brought pursuant to 42 U.S.C. § 1983 for deprivation of liberty without due process of law and denial of a fair trial by fabricating evidence against Detectives Santiago and Alexander.

> Count II:     a claim brought pursuant to 42 U.S.C. § 1983 for deprivation of liberty without due process of law and denial of a fair trial by intentionally concealing and deliberately suppressing material exculpatory and impeachment evidence against Detectives Santiago, Fischer and Alexander.

> Count III:     a claim brought pursuant to 42 U.S.C. § 1983 for malicious prosecution in violation of the Fourth and Fourteenth Amendments against Detectives Santiago and Fischer.

> Count IV:     a claim brought pursuant to 42 U.S.C. § 1983 for civil rights conspiracy against Detectives Santiago, Fischer and Alexander.

> Count V:     a municipal liability claim brought pursuant to 42 U.S.C. § 1983 against the City of Philadelphia.

> Count VI:     a claim of malicious prosecution brought under Pennsylvania law against Detectives Santiago and Fischer.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. In ruling on a summary judgment motion, the Court "must construe the evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion." Jacobs v.

---

[4] Mr. Swainson initially brought Counts I through IV and VI against all of the individual Defendants. However, in his Response to the instant Motions, he has agreed to dismiss Count I as against Detective Fischer and Counts III and VI as against Detective Alexander. (Resp. at 3 n.2.)

Cumberland Cnty., 8 F.4th 187, 192 (3d Cir. 2021) (citing Bland v. City of Newark, 900 F.3d 77, 83 (3d Cir. 2018)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court[] that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). The court will grant summary judgment if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'" Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler Cnty. Fam. YMCA, 418 F.3d 265, 267 (3d Cir. 2005)). However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010) (citing Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989)).

**III.    DISCUSSION**

A.  Claims Against Detectives Alexander and Fischer

Defendants ask us to grant summary judgment on behalf of Detectives Fischer and Alexander as to the remaining claims against them (Counts II, III, IV, and VI against Detective Fischer and Counts I, II, and IV against Detective Alexander) on the ground that Mr. Swainson can point to no evidence that Detectives Fischer and Alexander were personally involved in fabricating or concealing evidence against him or maliciously prosecuting him.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted).  In addition, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted).  Thus, "in the face of [a] motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial."  Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 291 (3d Cir. 2018).

1.    Count I – Fabrication of Evidence

Count I of the Second Amended Complaint asserts a claim against Detectives Santiago and Alexander pursuant to 42 U.S.C. § 1983 for the violation of Mr. Swainson's 14th Amendment due process rights through the fabrication of evidence.  (See 2d Am. Compl. ¶ 168.) Mr. Swainson asserts that Detective Alexander was involved in the fabrication of evidence that Mr. Swainson fled to Jamaica to avoid prosecution and in the procurement of false testimony from Commonwealth witness Jacqueline Morsell.  It is "axiomatic that 'those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes

they did not commit.'" <u>Dennis v. City of Philadelphia</u>, 19 F.4th 279, 289 (3d Cir. 2021) (quoting <u>Halsey v. Pfeiffer</u>, 750 F.3d 273, 296 (3d Cir. 2014)).  Thus, "if a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted."  <u>Halsey</u>, 750 F.3d at 294.

In order to survive a motion for summary judgment, a plaintiff "must bring 'persuasive evidence supporting a conclusion that [the police officer was] aware that evidence [was] incorrect or that [it was] offered in bad faith.'"  <u>Mervilus v. Union Cnty.</u>, 73 F.4th 185, 194 (3d Cir. 2023) (third alteration in original) (quoting <u>Black v. Montgomery Cnty.</u>, 835 F.3d 358, 372 (3d Cir. 2016)).  In addition, the evidence must "support[] a conclusion that the allegedly fabricated evidence was so significant that it could have affected the outcome of the criminal case."  <u>Halsey</u>, 750 F.3d at 295.  "[T]estimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong."  <u>Id.</u>  In order to establish that a police officer acted in bad faith, a plaintiff must point to "persuasive evidence [that the police officer] formulated or submitted false evidence willfully, knowingly, or with a reckless disregard for its truth."  <u>Mervilus</u>, 73 F.4th at 194-95.  Defendants argue that Detective Alexander is entitled to summary judgment as to Count I because Mr. Swainson cannot point to evidence that Detective Alexander fabricated evidence of flight to avoid prosecution or that he procured false testimony from Ms. Morsell.

a)    <u>Fabrication of Evidence of Flight</u>

Mr. Swainson argues that fabricated evidence introduced during his trial that he fled Philadelphia for Jamaica to avoid prosecution for Mr. Opher's murder was critical to his

conviction. He relies on the deposition testimony of ADA Judith Rubino that she both obtained a jury instruction regarding flight and argued in closing that the jury "should consider Mr. Swainson's fleeing to Jamaica after he was interviewed by police in connection with this case as evidence of consciousness of guilt." (Rubino Dep. at 65, 68-69.) She testified that she did so in reliance on the representations of Detectives Santiago and Cohen that detectives "had applied for and obtained . . . a Federal Flight to Avoid Prosecution Warrant." (Id. at 66.) Moreover, Ms. Rubino also testified that she was not aware of the Activity Sheet documenting Mr. Swainson's call to Detective Santiago upon his return from Jamaica, and would not have argued "flight as consciousness of guilty at trial" or requested a jury instruction regarding flight if she had been. (Id. at 71-72.) We conclude that the record contains evidence that could establish that "the allegedly fabricated evidence was so significant that it could have affected the outcome of the criminal case." Halsey, 750 F.3d at 295.

Detectives Alexander and Cohen, who were assigned to the PPD's fugitive squad, were responsible for locating Mr. Swainson after the police obtained a warrant for his arrest. (Alexander Dep. at 12, 14.) Their role was limited to locating Mr. Swainson so that he could be arrested for Mr. Opher's homicide. (Id. at 13.) Detectives Alexander and Cohen freely shared information about their attempts to apprehend Mr. Swainson with Detective Santiago. (Id. at 36-37.)

On February 18, 1988, Detective Alexander prepared an Attempt to Apprehend Log regarding Mr. Swainson. (Id. at 38-40.) Detective Alexander wrote that "[i]nformation shows that [Mr. Swainson] went [to Jamaica] to get married and will be returning to the United States." (Pl. Ex. 65; see also Alexander Dep. at 57.) Detective Alexanders and Cohen recorded on another Attempt to Apprehend Log dated February 19, 1988, that they had received information that Mr. Swainson "went to Jamaica to get married and is supposed to return to Phila[delphia] in the 1st

week of March." (Pl. Ex. 66.)  Detective Alexander remembers that several individuals told police officers that Mr. Swainson "was going to Jamaica to get married or he already had a planned vacation." (Alexander Dep. at 47)

Detective Cohen testified at Plaintiff's trial that on February 19, 1988, Detective Santiago applied for an Unlawful Flight to Avoid Prosecution Warrant.  (3/17/89 N.T. (Pl. Ex. 30) at 205; Pl. Ex. 66.)  Detective Alexander testified at his deposition that they applied for this warrant even though they knew that Plaintiff had a planned trip to Jamaica and was going to Jamacia to get married.  (Alexander Dep. at 120; Pl. Ex. 66.)  On February 20, 1988, Robert A. Wolfinger, Chief Inspector for the PPD's Detective Bureau, wrote to Deputy District Attorney Raymond Harley, asking Mr. Harley to ask the United States Attorney "to issue a warrant charging Andrew Francis Swinson [sic] with Unlawful Flight to Avoid Prosecution on the charge of Murder." (Pl. Ex. 67.) The letter states that Mr. Swainson had been charged with the murder of Mr. Opher and that "[i]nvestigation by the Homicide Division revealed that Andrew Swinson [sic] informed persons close to him that after the murder, he was going to flee to Jamaica."  (Id.)

This statement, however, is inconsistent with the information that Detectives Alexander and Cohen had received from witnesses and is not information that Detective Santiago had received from any interview.  (Alexander Dep.. at 156-57; Santiago Dep. Vol 3 at 91.)  In fact, there is no documentation of any kind in the Opher homicide file that "detectives received information from any source suggesting that Swainson informed anyone that he planned to flee to Jamaica after Opher's murder." (Harris Decl. ¶ 3.i.)  There is also no documentation in the Opher homicide file "that detectives obtained a federal unlawful flight to avoid prosecution warrant for Swainson."  (Id. ¶ 3.k.)  We conclude that Plaintiff has pointed to record evidence showing that the representations about evidence of flight made in the letter requesting the federal warrant, as

well as the representations made to ADA Rubino that detectives "had applied for and obtained . . . a Federal Flight to Avoid Prosecution Warrant" (Rubino Dep. at 66), were false.

Mr. Swainson maintains that, even though Detective Alexander did not directly make these false representations, we should deny the Motions for Summary Judgment as to this claim because Detective Alexander had an instrumental part in communicating to ADA Rubino that Mr. Swainson had fled to Jamaica to avoid prosecution. We find that there is record evidence that Detective Alexander instigated the process of obtaining an Unlawful Flight to Avoid Prosecution Warrant, even though he was aware that Mr. Swainson had gone to Jamaica for a short pre-planned trip rather than to avoid prosecution for the murder of Mr. Opher. (See Alexander Dep. at 47, 57, 120.) We thus conclude that Mr. Swainson has pointed to record evidence that Detective Alexander was aware that evidence used to instigate the process of obtaining an Unlawful Flight to Avoid Prosecution Warrant was false. See Mervilus, 73 F.4th at 194 (quoting Black, 835 F.3d at 372). As we have concluded that this evidence could have affected the outcome of Mr. Swainson's trial, we deny the Motions for Summary Judgment with respect Mr. Swainson's claim against Detective Alexander based on the fabrication of evidence that Mr. Swainson fled to Jamaica to avoid prosecution for the murder of Mr. Opher.

b)    Fabrication of Ms. Morsell's trial testimony

As we described above, on January 18, 1988, Jacqueline Morsell told police about hearing Mr. Opher argue with "Dred," one of the men that worked in the drug house, and also stated that Dred told her that he had killed plenty of people and kept multiple guns, including shotguns, in the house located at 5413 Sansom Street. (Pl. Ex. 19 at D000274, D000277, D000280.) Ms. Morsell testified differently at trial. Ms. Morsell testified at trial, stating that she had often seen Blood with a sawed-off shotgun. (3/16/89 N.T. at 121.) She also testified that Mr. Opher called Mr.

Swainson "pistol happy" and that Mr. Swainson was called Blood because of stories he told "about other bodies and stuff he is supposed to have." (Id. at 122,-23, 156.) Ms. Morsell further testified that Mr. Swainson called her from jail during the summer of 1988, said that Mr. Opher's shooting "wasn't supposed to happen like that," and told her not testify and that she would be taken care of if she didn't testify. (Id. at 119-120.)

Mr. Swainson contends that Morsell's trial testimony was fabricated and that Detective Alexander procured this false testimony in an interview with Ms. Morsell that took place in March 1988. Defendants argue that we should grant summary judgment in favor of Detective Alexander with respect to this aspect of Plaintiff's fabrication of evidence claim because there is no admissible evidence in the record that Detective Alexander interviewed Ms. Morsell in March 1988. The record before us contains an Activity Sheet and Attempt to Apprehend Logs that document repeated efforts by Detective Alexander in March 1988 to locate Ms. Morsell for a second interview. (See Pl. Exs. 71-73.) However, Mr. Opher's homicide file does not contain any records indicating that police officers actually conducted a second interview with Ms. Morsell. (Harris Decl. ¶ 3.l.).

The only evidence before us regarding Ms. Morsell's second interview is Ms. Morsell's July 22, 2014 Declaration. (Pl. Ex. 74.) In fact, Mr. Swainson relies entirely on this Declaration to "establish that Morsell's false testimony at trial was procured by Detective Alexander in an interview that occurred before trial."[5] (Resp. at 37.) Defendants argue that this Declaration is

---

[5] Mr. Swainson argues in his response to the Motions for Summary Judgment that there are "two independent evidentiary sources" that "establish that Morsell's false testimony at trial was procured by Detective Alexander in an interview that occurred before trial." (Resp. at 37.) Mr. Swainson identifies the first of these sources as Ms. Morsell's 2014 Declaration. (Id.) Mr. Swainson does not identify or discuss the second independent evidentiary source. If this second source refers to the Attempt to Apprehend Logs and Activity Sheets showing Detective

inadmissible hearsay, and the parties disagree about whether it can be considered in the context of a motion for summary judgment.  See Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment.").  For purposes of the instant Motions, we assume *arguendo* that we may consider the Declaration.

Ms. Morsell stated in her 2014 Declaration that she testified falsely at Mr. Swainson's trial regarding Mr. Swainson's calls to her from prison, his use of guns, and his violent reputation. (Morsell Decl. ¶¶ 7-8.)  Additionally, she states that she gave a second statement to police after Mr. Swainson's arrest and before his trial, however, her Declaration does not identify the officers present or make any mention of Detective Alexander.  (Id. ¶ 10.f.)  Ms. Morsell further states that she made this second statement at the home of Tina Dennis, Mr. Opher's mother, where she was living after having a falling out with her own mother.  (Id. ¶¶ 10.a., f.)  Ms. Morsel specifically states that she "knowingly testified falsely at [Mr. Swainson's] trial" because she "feared for [her] life from Stanley's family, particularly his mother, Tina Dennis" due to physical and sexual abuse that she suffered in Ms. Dennis's home and because "Tina prostituted [Ms. Morsell] out when [she] was 19 years old."  (Id. ¶ 10.)  Ms. Morsell also states that "[a]fter Stanley's murder, but before [Ms. Swainson's] trial, Tina and Stanley's family members repeatedly told [her] how [she] needed to testify if [Mr. Swainson] was to be convicted of Stanley's murder."  (Id. ¶ 10.d.)  Ms. Morsell expressly states in her Declaration that she testified falsely at trial  because of the pressure placed on her by Ms. Dennis:

> Simply put, I testified falsely against [Mr. Swainson] because:  (1) Tina placed tremendous pressure on me to implicate him in Stanley's murder; (2) I feared physical retribution from Tina if I didn't implicate him; (3) I feared Tina would

---

Alexander's attempts to locate and interview Ms. Morsell, we note that there are no Attempt to Apprehend Logs or Activity Sheets indicating that such an interview ever took place.

kick me and my son out if I didn't falsely implicate Andrew and my son and I didn't have a place to live; and (4) I felt a moral obligation to implicate him because I was so close to Stanley and his mother was putting a roof over my son's head.

(Id. ¶ 10.m.)

Mr. Swainson argues that we can infer from the evidence of attempts made by Detectives Alexander and Cohen to interview Ms. Morsell in March 1988, and the evidence that a second interview with Ms. Morsell took place sometime between Mr. Swainson's arrest and trial, that Detective Alexander procured false trial testimony from Ms. Morsell. We conclude, however, based on the absence of evidence that Detective Alexander participated in this second interview of Ms. Morsell, and based on Ms. Morsell's statements in her Declaration that she testified falsely against Mr. Swainson as a result of the pressure put on her by Ms. Dennis and her fear of Ms. Dennis, that this is not a reasonable inference. We further conclude, accordingly, that Mr. Swainson has failed to point to "persuasive evidence [that Detective Alexander] formulated or submitted false evidence [with respect to Ms. Morsell's trial testimony] willfully, knowingly, or with a reckless disregard for its truth." Mervilus, 73 F.4th at 194-95. We therefore grant the Motions for Summary Judgment with respect to Mr. Swainson's claim in Count I that Detective Alexander procured Ms. Morsell's false trial testimony.

### 2.    Count II - Deliberate Deception

Count II of the Second Amended Complaint asserts a claim against Detectives Santiago, Alexander, and Fischer pursuant to 42 U.S.C. § 1983 for the violation of Mr. Swainson's Fourteenth Amendment due process rights through the intentional concealment and deliberate suppression of exculpatory evidence and/or by violating their duties under Brady v. Maryland, 373 U.S. 83 (1963). (See 2d Am. Compl. ¶ 169.) The Third Circuit has explained that a § 1983 deliberate deception claim "must go beyond the failure to disclose evidence and arises when

24

imprisonment results from the *knowing* use of false testimony or other fabricated evidence or from concealing evidence to create false testimony to secure a conviction." Dennis, 19 F.4th at 291 (citation omitted). Thus, police officers engaged in deliberate deception where they "withheld exculpatory and impeachment evidence that would have supported [the defendant's] alibi and defense [and] also failed to correct testimony they knew was false and concealed from the defense the evidence that revealed that trial testimony as false." Id. at 291-92. In order to succeed on his deliberate deception claim, Mr. Swainson must "show he would not have been convicted of [Mr. Opher's murder] in the absence of the deliberate deception." Gladden v. City of Philadelphia, Civ. A. No. 21-4986, 2022 WL 605445, at *6 (E.D. Pa. Feb. 28, 2022) (quotation omitted); see also Dennis v. City of Philadelphia, Civ. A. No. 18-2689, 2024 WL 3904046, at *3 (E.D. Pa. Aug. 22, 2024) (stating that to succeed on a claim of deliberate deception, the plaintiff "was required to prove by a preponderance of the evidence that he would not have been convicted [of the crime] in the absence of the deliberate deception" (quotation omitted)).

Defendants argue that Detectives Alexander and Fischer are entitled to summary judgment with respect to this claim because Mr. Swainson can point to no evidence that they knowingly concealed evidence from him or from ADA Rubino. Mr. Swainson points, in response, to evidence that he claims shows that Detective Alexander knowingly concealed that he fabricated evidence of flight to avoid prosecution and that Detective Fischer knowingly concealed exculpatory information from the prosecutor and from his attorneys. Specifically, Mr. Swainson contends that Detectives Alexander and Fischer intentionally concealed the following Activity Sheets and Attempt to Apprehend logs from ADA Rubino and from his trial counsel:

     1.     A 1/19/88 Activity Sheet that describes an interview that Detective Fischer conducted with Crystal Justice. (Pl. Ex. 60 at D000033.) The Activity Sheet documents statements made by Ms. Furman to Ms. Justice about what she saw the night of Mr. Opher's murder, as well as Ms. Furman's attempts to elude police and avoid getting involved in the

subsequent investigation. (Id.) At the time of the interview, Detective Fischer was aware that Ms. Furman was present at the scene of Mr. Opher's murder and had been "named by witnesses as having discussed trying to set up the drug house for a robbery." (Fischer Dep. (Pl. Ex. 13) at 73-74.) In addition, the information that Ms. Justice gave Detective Fischer about why Ms. Furman was at the drug house at the time of Mr. Opher's murder is different from the information that Ms. Furman herself told police. (Id. at 74.) Mr. Swainson argues that the information in the January 19, 1988 Activity Sheet regarding Detective Fischer's conversation with Ms. Justice could have been used to impeach the trial testimony of Ms. Furman, who appeared as a witness for the Commonwealth, because it shows that she was a suspect and had a motive to hide information regarding Mr. Opher's murder.

2.      A 1/21/88 Activity Sheet that describes Detectives Miller's and Fischer's attempts to pick up Ms. Furman for a polygraph examination and an interview that Detective Miller held with Vernon Montague, a friend of Mr. Opher. (Pl. Ex. 14 at D000037.) The Activity Sheet reports that Mr. Montague told Detective Miller "that since the shooting the word being passed around the streets is that the deceased was shot during a hold-up attempt." (Id.) Mr. Swainson argues that the information in this Activity Sheet tends to impeach the police investigation into Mr. Opher's murder because it shows that the police had information that the murder could have been part of an attempted robbery. He relies on ADA Rubino's deposition testimony that, if she had been aware of Mr. Montague's statement, she would have turned it over to the defense as Brady information, particularly because Mr. Swainson's counsel was pursuing an alternate perpetrator defense at trial. (Rubino Dep. at 141-42.) Mr. Swainson also contends that this Activity Sheet is material because it shows that Detectives Fischer and Miller made additional attempts to locate, interview, and polygraph Ms. Furman.

3.      A 1/22/88 Activity Sheet that describes an interview that Detective Fischer held with Ms. Justice on January 22, 1988. (Pl. Ex. 26.) The Activity Sheet states that Detective Fischer showed Ms. Justice the coat confiscated from Mr. Presley on January 17, 1988 and Ms. Justice stated that she recognized the coat as looking like the one worn by the man she saw at 5413 Sansom Street prior to Mr. Opher's murder. (Id. at D000040.) Mr. Swainson argues that this Activity Sheet could have been used to impeach Mr. Presley's credibility at trial, as well as the credibility of the Opher murder investigation as a whole, because the charges against Mr. Presley were dropped despite this evidence of his guilt.

4.      A 1/26/88 Activity Sheet stating that Detective Fischer spoke with the attorney representing Jeffrey Green at the preliminary hearing for Mr. Green, Mr. Hines, and Mr. Presley. (Pl. Ex. 29 at D000044.) Mr. Green's attorney told Detective Fischer that his law partner had information "that the word on the street was a George was involved [in the Opher shooting] and [that George] was from the area of 53rd and Spruce [Streets]." (Id.) Detective Fischer also spoke with the law partner, who "told him that a [J]amaican with the name of George was involved." (Id.) Mr. Swainson argues that the January 26, 1988 Activity Sheet impeaches the credibility of the investigation and could have led his trial counsel to investigate George as part of an alternative perpetrator defense.

26

5 and 6.  A 2/18/88 Attempt to Apprehend Log stating that Detectives Alexander and Cohen learned that Mr. Swainson went to Jamaica to get married and would return to the United States (Pl. Ex. 65) and a 2/19/88 Attempt to Apprehend Log stating that Detectives Alexander and Cohen learned that Mr. Swainson left for Jamaica on February 11, 1988 to get married and would be returning to the United States the first week of March 1988 (Pl. Ex. 66).  Mr. Swainson argues that these Attempt to Apprehend Logs could have been used to impeach trial testimony that Mr. Swainson fled to Jamaica to avoid prosecution  and to oppose ADA Rubino's request for a jury instruction on flight as well as any argument at trial that Mr. Swainson's travel was evidence of his consciousness of guilt.

7, 8, and 9.  Attempt to Apprehend Logs dated 3/1/88 and 3/3/88 and a 3/4/88 Activity Sheet documenting plans made by Detectives Alexander and Cohen to interview Ms. Morsell at the suggestion of members of Mr. Opher's family.  (Pl. Exs. 71-73.)  Mr. Swainson argues that these documents impeach Ms. Morsell's trial testimony and also impeach the credibility of the police investigation because they could have led his trial counsel to investigate whether Mr. Opher's family pressured Ms. Morsell to testify.

We find that Mr. Swainson has submitted evidence that Activity Sheets and Attempt to Apprehend Logs prepared by Detectives Alexander and Fischer contain information that could have been used by Mr. Swainson's trial counsel to impeach prosecution witnesses, attack the police investigation, or identify alternate perpetrators.   Mr. Swainson has also pointed to evidence that these documents were intentionally concealed and that it was the policy of the PPD that such documents were not given to prosecutors and, therefore, not turned over to defense attorneys.  (See Santiago Dep. Vol. 1 at 102, 104-05; Rubino Dep. at 56, 168-69.)  We conclude, accordingly, that Mr. Swainson has pointed to record evidence that creates a genuine issue of material fact regarding whether Detectives Fischer and Alexander engaged in deliberate deception by withholding exculpatory and impeachment evidence from Defendant and whether this deception affected the outcome of his trial.   See Dennis, 19 F.4th at 291-92; Gladden, 2022 WL 605445, at *6. Accordingly, we deny the Motions for Summary Judgment with respect to Mr. Swainson's claim of deliberate deception in Count II of the Second Amended Complaint.

3.    <u>Counts III and VI –Malicious Prosecution</u>

Count III of the Second Amended Complaint alleges a claim of malicious prosecution in violation of the Fourth Amendment pursuant to 42 USC § 1983 against Detective Santiago and Detective Fischer.  To prove a § 1983 malicious prosecution claim, a Plaintiff must show the following:

> "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding."

<u>Rodgers v. Pennsylvania State Police</u>, No. 24-1759, 2025 WL 729497, at *2 (3d Cir. Mar. 7, 2025) (quoting <u>Johnson v. Knorr</u>, 477 F.3d 75, 82 (3d Cir. 2007)).  While malicious prosecution claims are most commonly associated with prosecutors, police officers who influence or participate in a decision to institute criminal proceedings by concealing or misrepresenting material facts to prosecutors may also be liable for malicious prosecution.  <u>Halsey</u>, 750 F.3d at 297 (citation omitted); <u>Brooks v. Dooley</u>, Civ. A. No. 16-6136, 2017 WL 2480734, at *3 (E.D. Pa. June 7, 2017) (recognizing that police officers may be liable for malicious prosecution where they "knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion" (citations omitted)).

Count VI asserts a claim of malicious prosecution pursuant to state law.  The elements of a malicious prosecution claim under Pennsylvania law are:  "(1) institution of proceedings against the plaintiff without probable cause and with malice, and (2) the proceedings were terminated in favor of the plaintiff."  <u>Alleyne v. Pirrone</u>, 180 A.3d 524, 528 n.3 (Pa. Commw. Ct. 2018) (citing <u>Turano v. Hunt</u>, 631 A.2d 822, 825 (Pa. Commw. Ct. 1993)).

Defendants concede that Plaintiff's criminal proceeding ended in his favor. (Defs. Mem. at 16.) They also concede that Plaintiff suffered a deprivation of liberty, since he was incarcerated for years. (Id.) However, Defendants argue that Detective Fischer is entitled to summary judgment as to Counts III and VI because Mr. Swainson cannot point to record evidence that would establish that he acted maliciously or participated in the prosecutorial decision to institute criminal proceedings against Mr. Swainson by concealing or misrepresenting material facts.

We have concluded that Mr. Swainson has pointed to sufficient record evidence to establish a genuine issue of material fact regarding whether Detective Fischer engaged in deliberate deception by concealing exculpatory and impeachment evidence from the prosecution. (See supra at 26-28.) We further conclude, accordingly, that Mr. Swainson has pointed to sufficient record evidence to establish a genuine issue of material fact regarding whether, by concealing this evidence, Detective Fischer maliciously participated in the initiation of criminal proceedings against him. See Halsey, 750 F.3d at 297.

Defendants also argue that Detective Fischer is entitled to summary judgment as to Counts III and VI because the police had probable cause to initiate criminal proceedings against Mr. Swainson. (Id.) "'[A] finding of probable cause is . . . a complete defense' to a claim of malicious prosecution." Rodgers, 2025 WL 729497, at *2 (second alteration in original) (quoting Goodwin v. Conway, 836 F.3d 321, 327 (3d Cir. 2016)). "An arrest was made with probable cause if 'at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense.'" Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005) (alterations in original) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). Defendants argue that the record evidence shows that the police had probable

cause to bring charges against Mr. Swainson based on Mr. Presley's identification of Mr. Swainson as the shooter.

The Affidavit of Probable Cause that Detective Santiago prepared to obtain the arrest warrant for Mr. Swainson includes Detective Santiago's description of Mr. Presley's February 12, 1988 identification of Mr. Swainson as the individual who shot Mr. Opher. (Pl. Ex. 28 at D000172-73.) The Affidavit of Probable Cause states as follows:

> Presley states that he would be able to recognize both of the males that were involved in shooting the decedent. Presley was then shown an array of photos, and he picks out the photo of Andrew Swinson [sic] (Blood), as the male with the sawed-off shotgun that shot and killed Stanley Opher.

(Id. at D000173.)  ADA Rubino testified at her deposition that she relied on Mr. Presley's photographic identification of Mr. Swainson as her basis for probable cause. (Rubino Dep. at 58-59.)  "We give an eyewitness identification significant weight. It satisfies probable cause unless it is unreliable or undermined by exculpatory evidence." Pinkney v. Meadville, Pennsylvania, 95 F.4th 743, 749 (3d Cir. 2024) (citing Wilson v. Russo, 212 F.3d 781, 790 (3d Cir. 2000)). However, when the "witness is the sole source of information, we 'cast a brighter light' on his account to ensure that it is reliable enough." Id. (quoting Andrews v. Scuilli, 853 F.3d 690, 704 (3d Cir. 2017)).  Mr. Swainson has pointed to evidence that Mr. Presley did not identify Mr. Swainson from an array of photos, as stated in the Affidavit of Probable Cause. (See Harris Decl. ¶ 3.e., Santiago Dep. Vol. 1 at 297-98, Rubino Dep. at 58-60, 130, 134-35; Pl. Ex. 50.)  We conclude, accordingly, that Plaintiff has come forward with record evidence showing that there is a genuine issue of material fact regarding whether there was probable cause for Mr. Swainson's arrest for the murder of Mr. Opher.  Consequently, we deny the Motions for Summary Judgment with respect to Mr. Swainson's § 1983 claim of malicious prosecution in violation of the Fourth Amendment in Count III and his state law claim of malicious prosecution in Count VI.

4.    <u>Count IV – Civil Rights Conspiracy</u>

Count IV of the Second Amended Complaint asserts a claim pursuant to 42 U.S.C. § 1983 that Detectives Alexander, Fischer, and Santiago conspired to deprive Mr. Swainson of his civil rights. "To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." <u>Jutrowski</u>, 904 F.3d at 293-94 (quoting <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 150-52 (1970)). The Third Circuit has explained the elements of a claim of conspiracy to deprive a person of their civil rights as follows:

> "(1) two or more persons conspire to deprive any person of [constitutional rights]; (2) one or more of the conspirators performs . . . any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States," with the added gloss under § 1983 that "the conspirators act 'under the color of state law.'"

<u>Id.</u> at 294 n.15 (alterations in original) (quoting <u>Barnes Foundation v. Twp. of Lower Merion</u>, 242 F.3d 151, 162 (3d Cir. 2001)). "After a plaintiff establishes that the object of the conspiracy was the deprivation of a federally protected right, 'the rule is clear that' the plaintiff 'must provide some factual basis to support the existence of the elements of a conspiracy:  agreement and concerted action.'" <u>Id.</u> at 295 (quoting <u>Capogrosso v. Supreme Court of N.J.</u>, 588 F.3d 180, 184-85 (3d Cir. 2009)). "To show agreement, he must demonstrate that 'the state actors named as defendants in the[] complaint somehow reached an understanding to deny [the plaintiff] his rights[.]'" <u>Id.</u> (first and second alterations in original) (quoting <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 185 (3d Cir. 1993)). "[I]n the absence of direct proof, that 'meeting of the minds' or 'understanding or agreement to conspire' can be 'infer[red]' from circumstantial evidence[.]" <u>Id.</u> (second alteration in original) (quoting <u>Startzell v. City of Philadelphia</u>, 533 F.3d 183, 205 (3d Cir. 2008)). "Such circumstantial evidence may include that the alleged conspirators 'did or said

31

something . . . to create an understanding,' 'the approximate time when the agreement was made, the specific parties to the agreement[,] the period of the conspiracy, or the object of the conspiracy.'" Id. (alterations in original) (quoting Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 178-79 (3d Cir. 2010)). "[I]n the context of an alleged conspiracy among police officers, [the agreement] may manifest as 'conversations' between officers about the incident, 'allegedly distorted' stories that 'emerged,' an 'awareness of conflicting stories' and 'irregularities in the series of official investigations' into the incident." Id. (quoting Hampton v. Hanrahan, 600 F.2d 600, 627-28 (7th Cir. 1979), rev'd in part on other grounds by Hanrahan v. Hampton, 446 U.S. 754 (1980)).

Defendants argue that we should grant summary judgment in favor of Defendants Alexander and Fischer with respect to Count IV because Mr. Swainson can point to no record evidence that they entered into an agreement to violate his civil rights or that they took concerted action in furtherance of such agreement. Mr. Swainson argues that the jury could infer, from evidence that Detectives Alexander, Cohen, and Santiago coordinated their efforts to falsely show that Mr. Swainson fled to Jamaica to avoid prosecution, that they entered into the requisite agreement to violate his civil rights and took concerted action in furtherance of that agreement. Plaintiff points to record evidence that Detectives Alexander, Cohen, Fischer and Santiago shared information about their investigative activities in connection with the Opher homicide. (See Alexander Dep. at 36-37; Fischer Dep. at 51-52.) Specifically, Detective Alexander testified at his deposition regarding the manner in which he, Detective Cohen, and Detective Santiago shared information regarding their attempts to apprehend Mr. Swainson:

> Q. [T]he way things worked once the fugitive squad got involved is that you and Detective Cohen and Detective Santiago would be sharing information freely back and forth about your efforts to apprehend Mr. Swainson and what you learned.

A.  Yes.

Q.  And likewise, Detective Santiago would be keeping you apprised of any information he learned relevant to your efforts to locate Andrew Swainson; correct?

A.  Yes.  It was – probably got information from Manny [Santiago] about anything that came up as to where Swainson might be.

Q.  Right.  You were relying on him to freely convey that information to you so that you could do your job, right?

A.  Correct.

Q.  All three of you were frequently and freely and openly exchanging information with one another, correct?

A.  Yes, I guess.

Q.  That is the way it worked; right?

A.  Yes.

(Alexander Dep. at 36-37.)   Detective Fischer testified at his deposition that he shared the information he learned about the Opher murder investigation with Detective Santiago and that Detective Santiago directed whether Detective Fischer documented his investigative efforts formally, or in Activity Sheets and Attempt to Apprehend Logs:

Q. . . . when it came to the investigative activities you conducted in this case, you relayed what you had done and what you had learned to Detective Santiago.

A.  That is correct.

Q.  Okay.  And . . . it was up to Santiago or Santiago and the supervisor, if he chose to consult with the supervisor, to determine whether you conducted any further follow-up investigation; correct?

A.  That's correct.

Q.  And whether you created official documentation of what you had done; correct?

A.  Correct.

(Fischer Dep. at 57-58.)

We find that Mr. Swainson has pointed to record evidence that Detective Alexander took concerted action with Detective Santiago to violate Mr. Swainson's civil rights by fabricating evidence that Mr. Swainson fled to Jamaica to avoid prosecution for Mr. Opher's murder.  We further find that Mr. Swainson has pointed to record evidence that Detective Fischer took concerted action with Detective Santiago to violate Mr. Swainson's civil rights by recording his efforts in the Opher murder investigation on Activity Sheets, rather than as official documentation that would be provided to ADA Rubino.  We conclude that Mr. Swainson has thus pointed to record evidence that establishes a genuine issue of material fact regarding whether Detectives Santiago, Fischer and Alexander entered into an agreement to violate Mr. Swainson's civil rights and we deny the Motions for Summary Judgment as to Count IV of the Complaint.

B.      The Monell Claim Against the City

Count V of the Second Amended Complaint asserts a § 1983 municipal liability claim against the City.  A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  Rather, to prove a § 1983 claim against a municipality, a plaintiff must demonstrate that his constitutional deprivations were caused by (1) an official policy or custom of the municipality or (2) a failure by the municipality that reflects a deliberate or conscious choice.  Id.; see also City of Canton v. Harris, 489 U.S. 378, 388 (1989); Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403 (1997),  Forrest v. Parry, 930 F.3d 93, 105 (3d Cir. 2019) (citing Estate of Roman v. City of Newark, 914 F.3d 789, 798 (3d Cir. 2019)).  "The latter avenue arose in the failure-to-train context, but applies to other failures and inadequacies by municipalities, including those related to supervision and discipline of its police officers." Forrest, 914 F.3d at 798 (citing Estate of Roman,

914 F.3d at 798-99).  Mr. Swainson seeks to proceed on his municipal liability claim against the City under both theories.

The Third Circuit has explained that "[p]laintiffs that proceed under a municipal policy or custom theory must make showings that are not required of those who proceed under a failure or inadequacy theory, and vice versa." Id.  "Notably, an unconstitutional municipal policy or custom is necessary for the former theory, but not for the latter, failure or inadequacy theory." Id. (citing Estate of Roman, 914 F.3d at 798.  Consequently, a plaintiff asserting that his constitutional deprivation arose from "an unconstitutional policy must point to an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject." Id.  A plaintiff challenging a municipal custom "must evince a given course of conduct so well-settled and permanent as to virtually constitute law." Id. at 106 (citing Estate of Roman, 914 F.3d at 798).  "On the other hand, one whose claim is predicated on a failure or inadequacy has the separate, but equally demanding requirement of demonstrating a failure or inadequacy amounting to deliberate indifference on the part of the municipality." Id. (citing Estate of Roman, 914 F.3d at 798.   A plaintiff may show deliberate indifference through evidence that "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." Id. (citing Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999)).

1.     Municipal Policies and Customs

Mr. Swainson contends that the PPD had an established policy and practice of withholding Activity Sheets and Attempt to Apprehend Logs from prosecutors and defendants, which resulted in the unconstitutional suppression of exculpatory information in his case and in turn led to his

arrest, prosecution, and conviction for the Opher murder. As we mentioned above, a plaintiff relying on a policy or custom to establish municipal liability must identify a policy issued by a decisionmaker with final authority or a custom or practice that is "so well-settled and permanent as to virtually constitute law." Id. at 105-06 (citation omitted). "Once the policy or custom has been identified, a plaintiff must show a 'plausible nexus' or 'affirmative link' between the policy or custom and plaintiff's specific injury." Moses-Farrare v. City of Philadelphia, Civ. A. No. 24-540, 2024 WL 3522192, at *4 (E.D. Pa. July 24, 2024) (quoting Bielevicz v. Dubinon, 915 F.2d 845, 850-51 (3d Cir. 1990)).

Defendants argue that the City is entitled to summary judgment as to this claim because Mr. Swainson has no evidence that the City had a policy or custom of withholding Activity Sheets or Attempt to Apprehend Logs from prosecutors and defendants. In response, Mr. Swainson points to Detective Santiago's deposition, in which he testified that Activity Sheets were not given to prosecutors or provided to defendants at the time of Mr. Swainson's prosecution. (See Santiago Dep. Vol. 1 at 102-05.) As we discussed above, Detective Santiago further testified that when he prepared homicide binders to be sent to prosecutors, he did not include Activity Sheets unless the district attorney made a specific request because the PPD's policy was to separate the binder given to the DAO into different categories, none of which included a section for Activity Sheets. (Id. at 104-06.)

ADA Rubino testified during her deposition that Detective Santiago did not include any Activity Sheets or Attempt to Apprehend Logs in the binder he prepared for the Opher murder trial. (Rubino Dep. at 56, 77-78, 168-69.) In fact, Ms. Rubino does not believe that she ever saw any Activity Sheets connected to the Opher murder investigation. (Id. at 141, 169.) Ms. Rubino also testified during her deposition that she was not aware during Mr. Swainson's trial of the

Activity Sheet stating that Mr. Swainson had called Detective Santiago upon returning from Jamaica and stating that Mr. Santiago was not aware that he was wanted for the Opher murder. (Id. at 71.)  She further testified that, if she had been aware of this information, she would have provided it to the defense and would not have argued flight as consciousness of guilt at Mr. Swainson's trial.  (Id. at 71-72.)

We conclude, based on this evidence, that Mr. Swainson has not identified an official PPD policy issued by a decisionmaker with final authority instructing that Activity Sheets and Attempt to Apprehend Logs should not be provided to prosecutors and defendants.  However, he has pointed to record evidence that it was the PPD's custom during the relevant time period that Activity Sheets and Attempt to Apprehend Logs would not be given to ADAs except upon request and that this custom was followed during the Opher murder investigation.

Defendants also argue that the City is entitled to summary judgment with respect to this claim because there is no evidence that the withheld documents contained exculpatory information or that there was an affirmative link between the City's custom of withholding such documents and Mr. Swainson's injuries.  We have previously discussed the materiality of nine Activity Sheets and Attempt to Apprehend Logs that were not provided to Ms. Rubino, which discuss steps that Detectives Fischer and Alexander took in their investigation of the Opher murder and their attempt to arrest Mr. Swainson.  (See supra Section III.A.2.)  We concluded that each of these documents contains information that Mr. Swainson's trial counsel could have used for impeachment of the Commonwealth's witnesses at trial and/or to further Mr. Swainson's alternate perpetrator defense, and that, if ADA Rubino had been aware of some of these documents, she would not have argued at trial that Mr. Swainson fled to Jamaica to avoid prosecution for Mr. Opher's murder and would not have sought a flight to avoid prosecution jury instruction.

Mr. Swainson has also identified additional Activity Sheets prepared in connection with the Opher murder investigation that were not provided to Ms. Rubino and that he claims contain exculpatory or impeaching material.  Mr. Swainson points to the following:

1.    A January 21, 1988 Activity Sheet that describes an interview that Detective Santiago conducted with Ashley Hines, one of the men arrested on the night of the murder. (Pl. Ex. 58) The Activity Sheet states that Mr. Hines was given a polygraph examination on January 21, 1988 and asked whether he knew who shot Mr. Opher, whether he saw who shot Mr. Opher, and whether he was involved in the shooting of Mr. Opher.  (Id.)  Detective Santiago recorded on the Activity Sheet that Mr. Hines responded no to all three questions and that the polygraph indicated deception in connection with those responses.  (Id.)  Mr. Swainson asserts that this Activity Sheet could have been used for impeachment of the police detectives who conducted the investigation because the charges against Mr. Hines were dropped even though there was evidence that he had lied to the police.

2.    A January 23, 1988 Activity Sheet designated "Dec. Opher, Stanley" that describes the arrest of Allen Proctor for murder. (Pl. Ex. 34)  This Activity Sheet also includes information regarding Detective Santiago's interview with Valerie Smith regarding the Opher murder.  (Id.)  Mr. Swainson argues that this description of Mr. Proctor's arrest on an Activity Sheet that was identified as being part of the Opher investigation, and which also describes Detective Santiago's interview of another individual in connection with that investigation, indicates that Detective Santiago was considering Mr. Proctor in connection with the murder of Mr. Opher.  Mr. Swainson further argues that this Activity Sheet could have been used to impeach the credibility of Detective Santiago and his investigation of the Opher murder and could also have been used by Mr. Swainson's trial counsel in an investigation of Mr. Proctor in connection with an alternative perpetrator defense.

3.    A February 6, 1988 Activity Sheet stating that Lieutenant Durrant contacted New Jersey State Police to learn whether there was a connection between Brian Brown and Mr. Presley, who were both on parole from New Jersey State Prison. (Pl. Ex. 63.)  Crystal Justice had previously informed police that she had seen Mr. Brown the night Mr. Opher was shot, near the location of the shooting, and that Mr. Brown had told her that one of her friends had been shot or stabbed on 54th and Sansom Streets.  (Pl. Ex. 27 at D000333-34.)  Mr. Swainson argues that this Activity Sheet could have been used to impeach the investigation of the Opher murder because Mr. Brown was cleared as a suspect and also contends that this Activity Sheet could have led his trial counsel to investigate Mr. Brown in support of an alternative perpetrator defense.

4.    A February 15, 1988 Activity Sheet that describes Detective Santiago's attempt to serve Mr. Swainson with an arrest warrant in the murder of Stanley Opher. (Pl. Ex. 64.) This Activity Sheet states that Mr. Swainson was not present at the address where Detective Santiago attempted to serve the warrant and that two men at the location told Detective Santiago that Mr. Swainson was in Jamaica for a holiday and would return soon.  (Id.)  Mr. Swainson argues that this Activity Sheet could have been used to impeach Detective

Santiago's trial testimony and ADA Rubino's argument and request for a jury instruction on flight to avoid prosecution.

5.      A March 8, 1988 Activity Sheet that describes the phone call that Detective Santiago received from Mr. Swainson after Mr. Swainson returned from Jamaica. (Pl. Ex. 69)  The Activity Sheet states that Mr. Swainson "does not know that he []is currently wanted for murder, and the information was not given to [him]."  (Id.)  Mr. Swainson argues that this Activity Sheet could have been used by his trial counsel to impeach Detective Santiago's trial testimony, to oppose ADA Rubino's request for a jury instruction on flight to avoid prosecution, and to oppose any trial argument that Mr. Swainson fled to Jamaica to avoid prosecution.

We conclude that these Activity Sheets and Attempt to Apprehend Logs contain information that could have been exculpatory to Mr. Swainson or could have been used by his trial counsel to impeach the Commonwealth's witnesses at trial.  We further conclude, accordingly, that Mr. Swainson has pointed to record evidence that creates a genuine issue of material fact regarding whether there was an affirmative link between the City's custom of failing to provide prosecutors with Activity Sheets and Attempt to Apprehend Logs and the falsified and suppressed evidence that led to his conviction.  Accordingly, we deny the Motions for Summary Judgment with respect to this argument.

### 2.      Failure to Supervise or Discipline

Mr. Swainson also claims that the violations of his constitutional rights occurred because the City failed to supervise and discipline detectives in the PPD's homicide division regarding proper investigative practices and allowed detectives to engage in misconduct, including the fabrication of evidence, the coercion of witness testimony, and the suppression of exculpatory evidence.[6]  Defendants argue that the City is entitled to summary judgment as to this aspect of Mr.

---

[6] Defendants move for summary judgment with respect to any failure to train claim because Mr. Swainson has not pointed to evidence of any necessary training that the City failed to provide for its police officers.  We agree that Mr. Swainson has not pointed to such evidence, but note that it does not appear that his Monell claim relies on a failure to train.  Nonetheless, we grant the

Swainson's <u>Monell</u> claim because Plaintiff has no evidence that would establish that the City failed to supervise or discipline its detectives with deliberate indifference to Mr. Swainson's constitutional rights.

Mr. Swainson relies on the report prepared by his police practices expert, Michael K. Lynch.[7]  (Pl. Ex. 81.)  Mr. Lynch, who has 32 years of experience in law enforcement, currently serves as the Chief of Staff of the Camden County Police Department.  (<u>See</u> Lynch Rpt. Ex. B. at 1.)  In his previous position, as Senior Policy Advisor at the Camden County Police Department, he advised the Chief of Police on investigative practices and operational protocols.  (<u>Id.</u>)  Mr. Lynch reviewed the following documents, among others, in the preparation of his report in this case:  deposition transcripts of Detective Santiago, Detective Fischer, and Judith Rubino; the PPD's homicide file for Stanley Opher; newspaper articles about police misconduct and corruption in Philadelphia published by the Philadelphia <u>Inquirer</u>, the New York <u>Times</u>, and the Washington <u>Post</u>; pleadings, opinions, and consent decrees in lawsuits brought against the City of Philadelphia for police misconduct; as well as documents related to 25 other cases involving claims of wrongful conviction caused by PPD misconduct, including newspaper articles, pleadings, interviews, court opinions, and homicide files.  (<u>Id.</u> Ex. A.)  Mr. Lynch opined, based on the documents he reviewed, as follows:

> since the late 1970s, PPD leadership has been on notice that its officers, especially the detectives in its Homicide Division, have routinely violated the most basic legal limitations on law enforcement officer conduct.  They have engaged in the outright fabrication of evidence, the coercion of witness testimony while recklessly

Motions for Summary Judgment with respect to Count V to the extent this claim relies on the City's failure to train its police officers.

[7] Defendants' argument that we should grant summary judgment in their favor with respect to this claim largely repeats their Motion to Preclude Mr. Lynch's testimony and report.  (Docket No. 82.)  We denied that Motion in a Memorandum and Order filed simultaneously with this Memorandum and do not repeat our analysis of Defendants' arguments herein.

disregarding the falsity of such testimony, and the suppression and concealment of material evidence. They have also routinely ignored leads pointing to the true perpetrators of criminal offenses. Through repeated publicity about notorious scandals, PPD leadership have learned of this conduct and, in response, have paid lip service to the need for reform. In each instance, however, PPD leadership has failed to implement meaningful changes in practice that remedy and prevent instances of misconduct.

This is most apparent in the longstanding failures of PPD's disciplinary system. Law enforcement agencies cannot secure their employee officers' compliance with legal obligations without the promise of accountability for misconduct. Investigations that give officers the benefit of the doubt and mete out minimal, if any, discipline even in cases of gross misconduct, provide officers with the clear message that they can violate established legal and departmental rules with impunity. As such, the lack of effective discipline fosters a culture of misconduct that leads to the routine violations of civilians' rights under the U.S. Constitution.

(Id. at 27-28.)

Mr. Lynch also specifically addressed evidence that he reviewed with respect to wrongful conviction lawsuits brought against Detective Santiago and the City of Philadelphia by the following: (1) Anthony Wright, who was convicted of the 1991 rape and murder of an elderly woman based on a coerced confession obtained by Detective Santiago and spent nearly 25 years in prison before his conviction was overturned based on DNA evidence that excluded him as the perpetrator (id. at 15-16); (2) Percy St. George, who was charged with murder and spent 13 months in jail based on a photo identification that Detective Santiago pressured a teenager to make, even though the teenager had not been a witness to the murder (id. at 16-17); and (3) James Dennis, who was convicted of the 1991 murder of a teenage girl in Philadelphia based on eyewitness identifications and was released from prison after 25 years based on evidence that the identifications were based on improper conduct by Detective Santiago, including the compilation of suggestive photo arrays and the suppression of information regarding other suspects who confessed to the crime (id. at 17). Mr. Lynch opined, based on this evidence, that Detective Santiago:

41

may have engaged in egregious and sometimes illegal activity for years while investigating the PPD's most serious cases, [and] there should be a complete investigation into him and an audit of homicide cases that led to convictions that remain undisturbed.  Such an investigation should address whether Santiago has committed perjury in other cases.  Given the similarity, numerosity, and gravity of the allegations of misconduct in the homicide division during the time periods described[,] the failure to fully investigate the similar allegations of investigative misconduct by detectives within that unit falls short of minimally accepted practices for supervision and discipline and raises serious concerns about PPD's commitment to preventing and disciplining investigative misconduct and protecting the constitutional rights of individuals.

(Id. at 28.)  Mr. Lynch also specifically opined regarding the evidence that he has reviewed of 25 other wrongful convictions:

[t]he multiple wrongful convictions outlined above illustrate the clear and foreseeable results of such lack of discipline and, further, confirm[] the absence of effective training and supervision.  In the years before the 1988 Opher murder investigation, PPD leadership had notice of multiple homicide arrests and prosecutions that were the result of improper investigative practices, yet they failed to address those practices. The absence of action set the stage for the conduct that caused Andrew Swainson's arrest and prosecution for a crime he did not commit. The persistent failure to address misconduct . . . continued through the time and after the Opher murder investigation and into the 1990s and 2000s . . . .

(Id. at 28-29.)

We find that Mr. Swainson has pointed to evidence, specifically Mr. Lynch's Report, upon which a jury could determine that the City's policymakers were aware, prior to Mr. Opher's murder, that detectives in the PPD's homicide division needed supervision and discipline because the detectives had "engaged in the outright fabrication of evidence, the coercion of witness testimony while recklessly disregarding the falsity of such testimony, and the suppression and concealment of material evidence."  (Id. at 27.)  Mr. Lynch's Report also constitutes evidence upon which a jury could determine that the City was or should have been aware of a history of officer supervision and discipline being mishandled, specifically Mr. Lynch's opinion that "[i]n the years before the 1988 Opher murder investigation, PPD leadership had notice of multiple

42

homicide arrests and prosecutions that were the result of improper investigative practices, yet they failed to address those practices." (Id. at 28-29.)  Mr. Lynch's Report also constitutes evidence that constitutional violations were likely to occur in the absence of sufficient supervision and discipline, specifically his opinion that "the longstanding failures of PPD's disciplinary system . . . foster[ed] a culture of misconduct that [led] to the routine violations of civilians' rights under the U.S. Constitution." (Id. at 27-28.)  We conclude that Mr. Swainson has pointed to record evidence that creates a genuine issue of material fact regarding whether the City's failure to supervise and discipline the detectives in the homicide division of the PPD "amounted to deliberate indifference to the rights of individuals with whom those officers would come into contact." Forrest, 930 F.3d at 108.  Accordingly, we deny Defendants' Motion for Summary Judgment as to Mr. Swainson's Monell claim that the City failed to discipline and supervise its police officers in deliberate indifference to his constitutional rights.

## IV.    CONCLUSION

For the reasons stated above, we deny the Motions for Summary Judgment with respect to Counts I-VI of the Second Amended Complaint except as follows:  (1) the Motions for Summary Judgment are granted as unopposed with respect to Mr. Swainson's fabrication of evidence claim against Detective Fischer in Count I; (2) the Motions are granted with respect to Mr. Swainson's claim in Count I that Detective Alexander procured Ms. Morsell's false trial testimony; (3) the Motions are granted as unopposed as to Mr. Swainson's malicious prosecution claims against Detective Alexander in Counts III and VI; (4) the Motions are granted as to Mr. Swainson's municipal liability claim against the City in Count V to the extent that the claim is based on a failure to train the City's police officers.  In addition, all claims asserted against John Della Rocca

as the personal representative of Detectives Cohen and Miller and Lieutenant Durrant are dismissed by agreement of the parties. An order follows.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.